IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,           }
     Plaintiff,                    }
                              }
vs.                                 }      Case No. 13-10112-JTM
                              }
GERALD BEASLEY, et al.              }
     Defendants.                   }
_____}

### DEFENDANTS' MOTION TO SUPPRESS EVIDENCE OF WIRETAP OF TARGET TELEPHONE #1, AND REQUEST FOR A *FRANKS* HEARING AND BRIEF

COMES NOW, the defendants, Gerald Beasley, Antoine Beasley, Helen Beasley, Terry Beasley, Herbert Jones, William Parker, Stephan Smallwood, Brandon Smith, and Gerald Wilson by and through their attorneys, Michael D. Hepperly, James R. Pratt, Carl Fredrick A. Maughan, Kari S. Schmidt, Kurt Kerns, Edward L. Robison, Roger L. Falk, Sylvia B. Penner and John V. Wachtel respectively, and respectfully move this Court for an order suppressing all interceptions from the wiretaps authorized against "Target Telephone # 1" pursuant to 18 U.S.C. § 2518(10) (a), and any evidence derived from information obtained from the interceptions which were dependent upon the fruits of the illegal wiretap evidence. In support of this motion, defense counsel states as follows:

1. The defendants are all charged in the Third Superseding Indictment (Doc 50), with crimes including drug conspiracies, conspiracy to commit program fraud, conspiracy to commit bank fraud and money laundering, among other more individual charges. The defendants were all either Target Subjects of the wiretap on Target Telephone #1 or were intercepted during the

1

time period the wiretap was "up" on Target Telephone #1.[1] As such the above defendants are "aggrieved persons" as set forth below and are entitled to challenge the validity of the wiretap.

2. During the course of the investigation the government, on March 26, 2013, submitted a sealed Application for Interception of Wire and Electronic Communications and an Affidavit in Support of the Application pursuant to 18 U.S.C. § 2510 et seq. (Prepared by ATF agent Jason Fuller). This application was for the interception of communications on telephone number 316-409-4289 (Target Telephone #1).

3. The Honorable Eric F. Melgren granted the application on the same day it was submitted and issued a sealed Order Authorizing the Interception of Wire and Electronic Communication authorizing the interception of telephone calls, and text messages made to and from Target Telephone #1, allegedly used by, Gerald Beasley. The electronic interceptions of the target telephone began on March 26, 2013and ended on April 24, 2013.

<u>ARGUMENTS AND AUTHORITIES</u>

**Authorities:**

Under Title III wiretaps:

Any aggrieved person in any trial, hearing, or proceeding in or before any court . . . may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived there from, on the grounds that–

---

1  Defendant Steven Smallwood was the only defendant not named as a Target Subject, but was intercepted on the wiretap. Defendant Carlos Beasley was neither named in the wiretap application nor intercepted on the wiretap of Target Telephone #1.

> (i) the communication was unlawfully intercepted;
> (ii) the order of authorization or approval under which it was intercepted was insufficient on its face; or
> (iii) the interception was not made in conformity with the order of authorization or approval.

18 U.S.C. § 2518(10)(a). An "aggrieved person "is defined as a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11). The defendants' oral and electronic communications were not only intercepted during the time of the wiretap, but they were also listed as a "Target Interceptee" in the application for the wiretap.

    This challenge to the wiretap authorization centers on subsections (i) and (ii) of 18 U.S.C. § 2518(10)(a), *i.e.*, that the wiretap was unlawfully obtained, and that the order of authorization was insufficient on its face. If evidence arises to suggest the interception was not made in conformity with the order of authorization, the defendants reserve the right to challenge the wiretap under subsection (iii).

> Federal investigatory wiretaps are governed by Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2210-22. Section 2518 sets forth the requirements for issuance of a wiretap warrant. In particular, the government must submit a written application to the issuing magistrate laying out, among other things, "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried. 18 U.S.C. § 2518(1)(c). This provision is called the necessity requirement. *See, e.g., United States v. Green*, 175 F.3d 822, 828 (10th Cir. 1999). The purpose of this requirement is to ensure that the relatively intrusive device of wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime. *Id.* (quoting *United States v. Edwards*, 69 F.3d 419, 429 (10th Cir. 1995)) (internal quotation marks and further citation omitted). Traditional investigative techniques include surveillance, infiltration or undercover work, questioning of participants, execution of search warrants, and the use of pen registers and trap-and-trace devices. *See, e.g., United States v. Ramirez*, 479 F.3d 1229, 1240 (10th Cir. 2007); *United States v. Ramirez-Encarnacion*, 291 F.3d 1219, 1222 n. 2 (10th Cir. 2002). Section 2518 does not, however, mandate exhaustion of all possibilities; the requirement is "met if the government demonstrates either [that] normal

investigatory techniques have been tried and failed or that they reasonably appear to be unlikely to succeed if tried, or to be too dangerous to try. *Ramirez*, 479 F.3d at 1240 (quoting *United States v. Castillo-Garcia*, 117 F.3d 1179, 1187 (10th Cir. 1997)). . . .

Once a wiretap has been authorized by a judge, it is presumed proper and the burden is on the defendant to prove its invalidity. *United States v. Radcliff*, 331 F.3d 1153, 1160 (10th Cir. 2003).

*United States v. Verdin-Garcia*, 516 F.3d 884, 889-890 (10th Cir.), *cert. denied*, 129 S. Ct. 161 (2008).

The Supreme Court has emphasized that the government should strictly adhere to the requirements of the wiretap statute. *United States v. Mondragon*, 52 F.3d 291, 293 (10th Cir. 1995), citing *United States v. Donovan*, 429 U.S. 413, 440 (1977).

[G]eneralities, or statements in the conclusory language of the statute, are insufficient to support a wiretap application. The statements must be factual in nature and they must specifically relate to the individuals targeted by the wiretap. The district court here rejected boilerplate allegations contained in some of the applications and as we discuss in Part III, *infra*, we agree with its concerns in certain regards.

*United States v. Castillo-Garcia*, 117 F.3d 1179, 1188 (10th Cir. 1997), *reversed* on other grounds by *Ramirez-Encarnacion*, *supra*.

Whenever any wire or oral communication has been intercepted, no part of the contents of such communication **and no evidence derived therefrom** may be received in evidence in any trial, hearing, or other proceeding . . . if the disclosure of that information would be in violation of this chapter.

18 U.S.C. § 2515 (emphasis supplied). Thus, the fruit of the poisonous tree doctrine applies statutorily to violations committed in obtaining a wiretap authorization.

"[W]e consider all the facts and circumstances . . . and read the necessity requirement in a common sense fashion." *Ramirez-Encarnacion*, 291 F.3d at 1222 (internal quotations and citations omitted). *Cline*, 349 F.3d at 1281. "However, we have also made it clear that a 'common sense approach' will not rehabilitate the government's failure to include statutorily

4

required information in a wiretap application." *Castillo-Garcia*, 117 F.3d at 1194-95, quoting *Mondragon*, 52 F.3d at 293.

The Ninth Circuit has held that omitting the successes of traditional investigative methods can constitute *Franks* error, because it impairs the authorizing court's ability to evaluate necessity. *See United States v. Simpson*, 813 F.2d 1462 (9th Cir.), *cert. denied*, 484 U.S. 898 (1987). In *Simpson*, the federal affiant alleged the conspirators and high-echelon accomplices had insulated themselves from law enforcement's ability to penetrate the highest levels of the conspiracy. *Id.* at 1471. In upholding the district court's suppression of the wiretap evidence, the Ninth Circuit found that the government had not fully revealed the extent to which they actually had infiltrated the drug conspiracy. *Id.* at 1471-72. "Here, the specific facts withheld from the issuing judge about this particular investigation reveal that traditional techniques could have led to the successful infiltration of the entire enterprise." *Id.* at 1472-73.

**The application and affidavit for the warrant to tap Target Telephone #2 failed to established sufficient probable to issue the warrant**

As with any warrant, a wiretap warrant must be predicated on probable cause. *US Const. Amend. IV*. As applied to wiretaps the probable cause must establish: 1) that an individual is committing, has committed or is about to commit a crime; 2) that communications regarding the offense will be intercepted; and 3) that the phone line that the government is seeking to tap is being used to communicate about the offense. *See* 18 USC § 2518(3)(a)(b) & (d). If probable cause is lacking the warrant cannot stand and any evidence derived from the wiretap must be suppressed as "fruit of the poisonous tree." *See* 18 U.S.C. § 2515; *See also United States v. Milton,* 153 F.3d 891, 894 (8th Cir. 1998) (The probable cause required for allowing electronic interception of wire communications is the same as that required by the Fourth Amendment for a

5

search warrant). If the allegations and information used by the government to establish probable cause is stale or otherwise outdated that it "no longer suggests that the items sought will be found in the place to be searched", it should be stricken from the affidavit. *United States v. Roach*, 582 F.3d 1192, 1201 (10th cir 2009), *quoting United States v. Mathis,* 357 F.3d 1200 (10th Cir. 2004). If the affidavit is unable to show probable cause for the wiretap without this information then the evidence must be suppressed.

The probable cause section of the affidavit submitted to obtain the warrant for Target Telephone #1 contains 45 separate factual allegations related to Gerald Beasley. These allegations range from a sentence or two to several paragraphs in length. Taken together they make up 41 pages, not including background information, of the application for the wiretap. However, thirty-seven of those allegations occurred over a year before the application was submitted on March 26, 2013, while the majority (thirty-three) occurred before November 11, 2011, the earliest being from May, November and December 2003.

Of those 45 factual allegations only ten of them indicate even a remote association with phone numbers attributed to Gerald Beasley, much less the Target Telephone. One from October 6, 2009 lists Gerald Beasley's phone number as 479-4284 (not Target Telephone #1 409-4289). On November 29, 2010 there were allegedly text messages between Terry Ross and Gerald Beasley. However, two phone numbers were listed for Gerald Beasley (316-925-1108 and the Target Telephone) and the affidavit makes it clear that law enforcement was not able to tell which of the two numbers was associated with the text messages.

The Target Telephone is listed four times as merely being in someone else's contacts: August 12, 20011; August 17, 2011; August 19, 2011 and November 10, 2011. There is also an allegation from November 8, 2012 that an Anonymous Source gave information that Gerald

Beasley was cashing fake checks and that the source "had" Gerald Beasley's phone number and that number was the Target Telephone number. There are no allegations that this number was associated with alleged criminal activity. Simply being in another person's contact list is not enough to establish probable cause.

On October 20, 2012, the affidavit alleges that there was a series of text messages that "*appear*" to be related to creating a fraudulent check. (The text messages themselves were not quoted in the affidavit). The text messages are alleged to be between William Park and Gerald Beasley using the Target Telephone. That same day there is an allegation that William Parker made a call from the Sedgwick County Jail to Gerald Beasley at the Target Telephone. During that conversation Mr. Parker allegedly told Gerald Beasley to "clean up", because "this mother fucker done told everything." This a full five months before the application for the wiretap was granted.

Finally, on January 30, 2013, while the government was monitoring Gerald Beasley's phone usage through a pen register, he allegedly made a phone call to Herbert Jones and then met several *unidentified* black males "near" where Mr. Jones lives. Apparently this is an attempt to connect Gerald Beasley and his phone to two undercover purchases of crack cocaine from Herbert Jones at 2659 E. 8th Street in August 2011, over a year and a half earlier.

The affidavit may, *arguendo,* establish probable cause that Gerald Beasley was committing some sort of criminal offense. However, if it does, it relates only to past conduct, not conduct that could be assumed to be continuing at the time of the wiretap application. Even being generous to the government, the last event that could be associated with criminal conduct on the part of Gerald Beasley was the October 20, 2012 phone conference with William Parker in which Mr. Parker is quoted as telling Gerald Beasley that "this mother fucker done told

everything," and that Gerald needed to "clean up." The inference being that someone told the police something about Gerald Beasley's alleged criminal activity and he needed to get rid of any associated evidence.

After being told that the police had someone cooperating with them and filling them in all aspects of his operation, it is only reasonable that Gerald Beasley would heed the advice of William Parker and "clean up."

In this case the wiretap application and affidavit had to establish, at the time it was submitted, probable cause that: 1) that Gerald Beasley is committing, has committed or will commit a crime; 2) that communications regarding that offense *will* be intercepted; and 3) that the phone line that the government is seeking to tap *is being used* to communicate about the offense. It is not enough to have probable cause for one and not the others, or even two and not the third. All must be satisfied. This was not done here.

**The application and affidavit fails to satisfy the Necessity requirement of § 2518(1)(c):**

Title III establishes and requires the government to set forth sufficient facts to warrant the intrusion of electronic surveillance – the "necessity requirement" which must be satisfied before a wiretap order may be lawfully issued. *See* 18 U.S.C. § 2518 (1)(c). In the instant case, the government cannot demonstrate sufficient necessity for the wiretap it obtained on Gerald Beasley's phone.

18 U.S.C. § 2518 (3)(c) requires that the court make a finding that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."

The goal of the necessity requirement is to ensure that the government first attempts to use normal investigative techniques to uncover the alleged crime. *U.S. v. Foy*, 641 F.3d 455 (10th

8

Cir. 2011). "The purpose of the necessity requirement is to ensure that the relatively intrusive device of wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *Untied States v. Castillo-Garcia*, 117 F.3d 1179, 1185 (10th cir. 1997). The burden rests on the defendant to prove the lack of necessity. *United States v. Ramirez-Encarnacion*, 291 F.3d 1219 (10th cir. 2002).

In order to satisfy the necessity requirement, the government's affidavit must include specifics as to why ordinary investigative techniques will not work. *See generally, U.S. v. Ramirez*, 479 F.3d. 1220, 1241-43 (10th Cir. 2007).

In *Castillo-Garcia,* the Tenth Circuit held:

> To obtain an electronic surveillance order, the government must explain fully in its application what investigative techniques gave been tried against the target of the wiretap. If any of the four categories of normal investigative techniques referred to in the legislative history of Title III have not been tried, the government must explain with particularity why each of such untried techniques would either be unsuccessful or too dangerous. Those investigative procedures are: (1) standard visual and aural surveillance; (2) questioning and interrogation of witnesses or participants (including the use of grand juries and the grant of immunity if necessary); (3) use of search warrants; and (4) infiltration of conspiratorial groups by undercover agents or informants. In addition, if other normal investigative techniques such as pen registers or trap and trace devices have not been tried, a similar explanation must be offered as to why they also would be unsuccessful or too dangerous…
>
> ….in any event, generalities, or statements in the conclusory language of the statute, are insufficient to support a wiretap application. The statements must be factual in nature and they must specifically relate to the individuals targeted by the wiretap.

117 F. 3d at 1187-1188 (citations omitted). This court owes no deference to the issuing judge who found sufficient necessity to issue the wiretap order. *Castillo-Garcia* at 1186 n. 3.

**Interviews and Grand Jury Subpoenas**

The inclusion of the use of grand juries or grants of immunity is so that law enforcement won't rely simply on a suspect's *potential* invocation of his or her Fifth Amendment right against self-incrimination, without attempting this traditional investigative technique. Thus, even if a suspect invoked their Fifth Amendment right, immunity can be used to obtain information that would otherwise be protected. Yet, this traditional investigative technique was not tried, nor did the affiant explain with particularity why this technique would not be successful. Here, the affiant, ATF Agent Fuller relied solely on generalities that are not permitted to supplant the particularity requirement.

In the section entitled "Interviews, Grand Jury Subpoenas, and Grants of Immunity" the affidavits for Target Telephone #1 and Target Telephone #2 use the exact same language, despite being written by different law enforcement officers (DEA TFO Gourley, for Target #2) and being written approximately two months apart. As set forth in paragraphs 43, 44 and 45 in the affidavit for Target Telephone #1 (paragraphs 68, 69 and 70 of the affidavit for Target Telephone #2):

> Based on Affiant's training and experience, Affiant believes interviews of additional TARGET SUBJECTS or their know associates would produce insufficient information regarding the identities of all persons involved in the conspiracy, including, but not limited to, sources, transporters, financiers, distributors, and customers for controlled substances as well as co-conspirators involved in fraud. In addition, Affiant believes that any responses to any interviews of the TARGET SUBJECTS at this stage of the investigation would contain a significant number of untruths, diverting the investigation with false leads or otherwise frustrating the investigation. Furthermore, Affiant believes such interviews would also have the effect of altering other members of the conspiracy, thereby compromising the investigation and possibly resulting in destruction or concealment of relevant evidence and the possibility of harm to cooperating sources whose identity may become known.

> Grand Jury subpoenas suffer from the same limitations as
> interviews discussed above. Based on Affiant's training and
> experience, Affiant believes that the TARGET SUBJECTS and/or
> their co-conspirators would likely be uncooperative and invoke
> their Fifth Amendment privilege not to testify if called to testify
> before a grand jury.
>
> Grants of immunity would not be appropriate at this state of the
> investigation because immunity would foreclose the prosecution of
> principle members of this conspiracy and would not ensure the
> receipt of truthful testimony before a grand jury. In addition, it
> would be unwise to seek grand jury immunity for the TARGET
> SUBJECTS or their co-conspirators as that would likely foreclose
> prosecutor of some of the most culpable persons involved in the
> conspiracy.

Wiretap Affidavit (Target Telephone #1, pp. 86-87). By way of comparison, here is how

"Interviews of Subjects and Associates" and "Use of Grand Jury Subpoena" *(sic)* were

written in an affidavit for a wire tap submitted in an unrelated case[2], and submitted over

a year *after* the applications in this case:

> 111.    **<u>Interviews of Subjects and Associates</u>** – Based on
> training and experience, your Affiant believes that interviews of
> the Targets or their know associates would produce insufficient
> information concerning the identities of individuals involved in the
> conspiracy, the source of the drugs, financing, the location of
> records, drugs, drug proceeds, or other pertinent information
> regarding the subject crimes under investigation. Your affiant also
> believes that any responses to interviews would contain a
> significant number of half-truths and untruths diverting the
> investigation with false leads or otherwise frustrating the
> investigation or be of limited value. Additionally, such interviews
> would like result in interviewees alerting members of the
> conspiracy, thereby compromising the investigation and resulting
> in possible concealment, movement or destruction of relevant
> documents, narcotics, drug proceeds and/or other evidence.[3]

---

2 14-CM-60038-MLB **SEALED** Case sealed as of August 10, 2015.
3 After this boilerplate language the unrelated affidavit contains several pages of information regarding the
interviews, with named individuals, which had already taken place during the investigation.

136.    **Use of Grand Jury Subpoena** – Numerous Grand
Jury Subpoenas have been served on local business'*(sic)* and banks
as a part of the financial investigation in this case due to the
limited chance of reputable buiness' *(sic)* providing that
information to their customers. While grand jury subpoenas on
criminal associates of this case may ultimately be issued in this
investigation, there is no reason to believe that such a technique
will provide details not already know. Actual targets of the
ongoing investigation who may be subpoenaed to testify before the
grand jury would likely invoke their Fifth Amendment privilege
against self-incrimination. Granting immunity to those targets
would result in a lack of prosecution for some of the most culpable
individuals. Also, the issuance of grand jury subpoenas to
peripheral or lower-level members of the organization (many of
whom have not yet even been identified) may alert the other
conspirators as to the scope and progress of this investigation.

While the statements in the unrelated affidavit use slightly different language, the

justifications for not using grand jury subpoenas in each affidavit are identical, and each

fail to explain with particularity why grand jury subpoenas are not a viable means of

investigation.

Generalities alone are insufficient to support a wiretap application. But
generalities can be made so long as they are accompanied by specific information
about how these generalities apply to the particular suspects and/or particular
investigation. (internal citations omitted)

*U.S. v. Martinez*, 230 Fed.Appx. 808, 814 (10th Cir.), *cert. denied*, 522 U.S. 1069 (2007). Such

statements are boilerplate used in an attempt to ignore and avoid the use of one of the clearly

enumerated investigative techniques.

The boilerplate language in the affidavit for Target Telephone #1 is not accompanied by

any specific information explaining how the generalities apply to this particular case or these

particular suspects.

Congress specifically enumerated this traditional investigative tool in its legislative

history, and the Tenth Circuit stated, "[i]f any of the four categories of normal investigative

techniques referred to in the legislative history of Title III have not been tried, the government

must explain *with particularity* why each of such untried techniques would be either

unsuccessful or too dangerous." *United States v. Killingsworth*, 117 F.3d 1159, 1163 (10th Cir.

1997) (emphasis supplied), quoting *Castillo-Garcia*, 117 F.3d at 1187-88; *see also Ramirez-*

*Encarnacion*, 291 F.3d at 1222, (If any of these traditional investigative techniques has not been

tried, the government must explain why with particularity.), citing *United States v. Mitchell*, 274

F.3d 1307, 1310 (10th Cir. 2001). The affiant's explanation on failing to use grand juries or

grants of immunity in this case is done with anything but particularity.

Further, simply saying that the use of grand jury subpoenas and use of immunity will

cause some suspects to avoid prosecution, or may lead to leaks in the investigation, does not

mean this investigative technique would not be successful if tried. Any collateral consequences

may be distasteful to the prosecution and law enforcement, but that does not allow them to

ignore that which is required by statute and case law. As the Ninth Circuit stated in *Gonzalez,*

*Inc.*,

> [T]he affidavit's terse rejection of the possible productive use of grand jury
> subpoenas or search warrants [discussed *infra*] does not establish that these
> investigative techniques were reasonably unlikely to work. The affidavit rejects
> these tools by claiming they would likely reveal the investigation to its targets.
> Such statements do not reasonably explain why traditional investigative tools are
> unlikely to succeed in a particular investigation, but are boilerplate conclusions
> that merely describe inherent limitations of normal investigative procedures,
> which we have found insufficient to establish necessity.

*Gonzalez, Inc.*, 412 F.3d at 1114 (citation omitted). Such conclusory statements of generalized

fears that could apply to any drug conspiracy are the very type of boilerplate that courts of appeal

have refused to give effect to.

13

The Tenth Circuit has confronted such boilerplate explanations based upon mere conclusions by an affiant. *See United States v. Castillo-Garcia*, 117 F.3d at 1194 (re: wiretap application on why visual surveillance would not work). "The Third Wiretap application, by contrast, relies on wholly conclusory language which would apply to every member of every suspected drug conspiracy to explain why visual surveillance of Jaime Olivas-Sanchez, which was never attempted, would not have worked." *Id.*

As the Ninth Circuit explained, the government cannot simply rest on generalizations, but instead, "must allege *specific circumstances* that render normal investigative techniques particularly ineffective or the application must be denied . . . . The reason for requiring specificity is to prevent the government from making general allegations about classes of cases and thereby sidestepping the requirement that there be necessity in the particular investigation in which the wiretap is sought." *United States v. Ippolito*, 774 F.2d 1482, 1486 (9th Cir. 1985) (emphasis supplied) (internal citations omitted).

While the Government need not exhaust all alternative means of investigation, it cannot avoid the enumerated traditional techniques of investigation by merely resorting to generalities as the affiant here has done.

> [N]either should [the government] be able to ignore avenues of investigation that appear both fruitful and cost-effective. It is not unreasonable to expect the government to utilize those methods that appear to be potentially productive. We would flout the statutory intent that wiretaps be used only if necessary, were we to sanction a wiretap simply because the government pursued some normal investigative strategies that were unproductive, when more fruitful investigative methods were available. In effect, the government would be able to secure a wiretap in every case, even where a normal strategy would be likely to achieve the same result without resort to the serious intrusion that a wiretap necessarily entails.

*Id.*

14

**Undercover Investigations**

A second investigative technique not used, nor explained away with any particularity, is the use of undercover investigations. To justify not employing this technique prior to applying for a wiretap, the affiant provided the following response:

38. Introducing an undercover ("UC") law enforcement officer to this organization is unlikely to succeed in bring criminal charges against all of the culpable members of the organization and is too dangerous to attempt. As described above, WPD Det. Fort, acting in an undercover capacity, has met with Gerald Beasley at this restaurant, Tiara's Place, while other investigators were conducting surveillance of Gerald Beasley. While Det. Fort was able to meet with Gerald Beasley, it was only for the purpose of conducting a legitimate purchase of food from the restaurant. As described above, WPD Det. Heimerman, acting in an undercover capacity, has made several purchases of suspected crack cocaine from Herbert Jones Jr. Det. Heimerman is no longer in contact with Jones. It is unknown if Det. Heimerman, acting in an undercover capacity, would be able to reinitiate contact with Jones. If Det. Heimerman was able to reinitiate contact with Jones, affiant believes it unlikely that she would be able to gather the evidence sufficient to fulfill the objectives of this investigation. Affiant believes the sole use of an undercover investigator will not achieve the objectives of the investigation. A UC might be able to gain the trust of one of the lower-level members of Gerald Beasley's organization and become privy to their illegal activities. However, this would only allow the UC to gain direct evidence against these lower-level members. While it is unknown if it would even be possible, it would most likely take a long time for the UC to gain the trust of Gerald Beasley and to be able to deal directly with him regarding criminal activity. The longer a UC operates in an undercover capacity, the greater the probability that his or her fictitious identity may be compromised, thereby jeopardizing his or her safety as well as the investigation. Even if a UC was able to eventually gain the trust of Gerald Beasley and deal directly with him, the UC would most likely only be privy to parts of Gerald Beasley's criminal activities. In order for the UC to move up within the organization, he or she would need to be available to the organization 24 hours a day, every day, in order to be convincing. Placing a UC in the company of the members of this organization on a constant, or even limited, basis would be extremely dangerous. Finally, based upon affiant's experience, it would not be possible for a UC to obtain the evidence necessary to charge all of the participants included in this conspiracy because the UC would not be privy to the full scope of all co-conspirator conversations and activities, nor exposed to all of the subjects of this investigation, it's participants, their roles, locations of stash houses, routes of transportation for drugs and money, or plans for illegal transactions. Accordingly, a UC would most likely not be able to effectively and

sufficiently obtain evidence needed to prosecute all of the offenses under investigation.

The affiant attempts to convince the reader that law enforcement had tried using undercover officers and the technique simply did not work. However, the undercover operations described consisted of sending a police officer in street clothes in to Tiara's Place to buy food and a description of undercover drug purchases from Herbert Jones in 2011 without presenting any evidence that the drug purchases from Jones are in any way tied to Gerald Beasley. The rest of the paragraph lays out why an undercover operation will not be successful; mainly because it will not give the investigators everything thing they want: "it is unlikely that she would be able to gather the evidence sufficient to fulfill the objectives of this investigation"; "Affiant believes the sole use of an undercover investigator will not achieve the objectives of the investigation"; and "it would not be possible for a UC to obtain the evidence necessary to charge all of the participants included in this conspiracy."

The affiant seems to be under the impression that if the technique does not accomplish everything the government wants it need not be tried. This is not the standard. The technique must "have been tried and failed" or the affidavit must state with particularity why it reasonably appears unlikely to succeed or would be too dangerous to attempt. Sending a police detective into a soul food restaurant to buy a plate of food does not count as an undercover operation, no matter how many other cops are watching. And generic, boilerplate, language is not sufficient to claim that this technique will not be successful or too dangerous if tried.

**Physical Surveillance**

Paragraph 37 of the affidavit discusses the use and lack of use of physical surveillance. The affidavit lists nine dates in which law enforcement conducted surveillance on Gerald

16

Beasley. This is nine dates between November 8, 2012 and February 12, 2013, a four month period.

The affiant indicates that Gerald Beasley "associating with other individuals believe to be involved in his drug trafficking organization such as Gerald Wilson." For reasons unknown, the affiant fails to mention that Gerald Wilson is not only Gerald Beasley's son, but he also works at Tiara's Place restaurant with his father. It would have been suspicious if Gerald Beasley *had not* been seen with Gerald Wilson during the surveillance.

The affiant also attempts to tie Gerald Beasley to Herbert Jones and the undercover drug purchases from Jones in 2011. In paragraph 37 the affiant states that pen registers show there was telephone contact between Gerald Beasley and what was *believed* to be a telephone belonging to Herbert Jones. And that Gerald Beasley then drove "near" the residence of Herbert Jones and made contact with four unidentified males. Positive identification were not able to be made, nor were agents able to tell if anything was exchanged.

The affiant concludes that physical surveillance is likely to fail because alone it "will not accomplish the *full objectives* of the investigation." *Affidavit* at 81 (emphasis added). That an investigative technique will not accomplish everything law enforcement wants does not mean it has failed or is reasonably unlikely to succeed. If fact, the affiant concedes that physical surveillance works, albeit not as well as the invasion of privacy that accompanies a wiretap: "[it]provides only a portion of the necessary information needed in gathering evidence to be used in prosecut[ion]." The standard to obtain a wiretap must be higher than a mere desire on the part of law enforcement not to exert itself.

**Confidential Sources**

17

The same problem arises with the affiant's assertions regarding Confidential Sources and Sources of Information: the inability to "effectively and sufficiently obtain admissible evidence needed to prosecute *all* of the offenses under investigation." *Id.* at 83. Moreover, the affiant discounts the very thought of having to develop confidential sources by stating that a "CI would most likely not be able to obtain the evidence necessary to charge *all* of the participants included in this conspiracy." *Id.* It would seem that the government is under the impression that if an investigative technique will not present them the case on a silver platter, it need not be pursued, and automatically entitles them to a wiretap. The hurdles set out in the wiretap statute require more.

**Search Warrants**

The use of search warrants is discussed in Paragraph 42 of the affidavit. The affiant discusses three times search warrants were executed. The first was on May 25, 2009 (660 N. Estelle), the second on March 25, 2010 (3623 E. Funston). Other than the fact that Gerald Beasley had an ownership interest in the properties and acted as the landlord, there is no evidence linking any of the contraband found in these searches to him. The affiant attempts to make a substantial, if not misleading leap by inferring these searches occurred during *this* investigation. In fact, they occurred more than two years *before* the instant investigation even began. (Approximately three years and four months for the N. Estelle search and approximately two years and six months for the search at E. Funston).

The third search discussed in the affidavit occurred in February of 2013 of a package to be delivered to 655 N. Estelle. This was due to a United States Postal Service parcel interception, not the actions of the agents in this case. Again, the affiant presents no evidence to connect the

18

contents of this package, or the package itself, with Gerald Beasley, other than that Gerald

having an ownership interest in the residence located at 655 N. Estelle.

 No search warrants were executed as part of this investigation, nor were any considered

by the investigating agents. Rather, to justify not utilizing this standard investigative technique,

the affiant simply made general conclusive statements, the type that can be said of all drug cases:

> Based on affiant's training and experience, affiant believes that the use of search warrants *will not provided sufficient evidence necessary to determine the full scope of criminal activity and the various methods being utilized by the Target Subjects* in furtherance of their criminal activities. Furthermore, it is affiant's experience that, while drug traffickers often keep records listing their sources and customers for controlled substances, these records are seldom of such a detailed nature so as to ensure successful prosecution of those identified in the records based solely on the records themselves. Such records that have been seized in past drug trafficking investigations have generally been insufficient in and of themselves to establish all of the elements of a federal offense because such records are often difficult to interpret and of little or no value without further knowledge of the drug traffickers' activities. At this stage of the investigation, the service of search warrant *would only serve to alert others*, but would not, for the above reasons, be adequate to sustain a successful prosecution of all members of the organization. Affiant knows from information provided by sources of information, as described above, that *Gerald Beasley periodically changes the location where he stores controlled substances and conducts his criminal activities in order to avoid detection by law enforcement.* From affiant's training and experience, as well as consultation with other experienced investigators, affiant knows that the use of information received by way of wire and electronic interception has been very successful in disclosing locations used by drug trafficking organizations to store controlled substances. In addition, information received by way of wire and electronic interception often provides substantial assistance in determining when to serve a search warrant so as to increase the probability of locating evidence of a crime at a specific location since members of a conspiracy often talk to each other about the contraband they have at a particular location.

*Affidavit* at 85-86. (Emphasis added)

 Again, the affiant seems more concerned that this technique will not "be adequate to

sustain a successful prosecution of *all* members of the organization," than whether or not it will

work as an investigative technique. This is not the standard to be applied when considering

whether to issue a warrant for a wiretap. The standard is has the technique been tried and failed; is the technique reasonably like to fail if tried; or is it simply too dangerous to try in the first place. This standard is not met by the generic boiler plate set forth by the affiant.

It is interesting to note the affiant states that he knows form sources of information that Gerald Beasley "periodically charges the location where he stores controlled substances and conducts his criminal activities in order to avoid detection by law enforcement," and that he believes a wiretap will help disclose these locations. However on page 29 of the affidavit, the affiant lists all of the properties in which Gerald Beasley has an interest and later on page 83 the affiant discusses placing pole cameras at some of those locations. Pole cameras would have allowed law enforcement to keep these locations under surveillance without the need for wiretaps.

Finally, the investigating agents failed to employ another investigative technique that has become more common over the years: the use of the delayed-notification ("sneak and peek") warrant pursuant to 18 U.S.C. § 3103a. According to the *Report of the Director of the Administrative Office of the United States Courts on Applications for Delayed-Notice Search warrants and Extensions* in fiscal year 2013 alone there were 135 "sneak and peek" warrants and 420 extensions requested in Kansas. Not one of the requests were denied. In the entire United States there were a total of 6,480 such warrants granted, 80% of which were in drug cases. *Id.* at 7. While counsel is certainly not advocating the use of these secretive warrants, the fact is that they are available to law enforcement and provide a potentially valuable investigative tool.

In this case law enforcement had information about, at least one, potential "stash house" allegedly being operated by Gerald Beasley, i.e. 1120 N. Piatt. A "sneak and peek" warrant would have allowed agents to confirm whether or not this was in fact a stash house and if so to

marshal their resources accordingly to conduct a more productive investigation without the invasion of privacy inherent in the interception of personal communications through a wiretap.

**Fixed Position Cameras**

Fixed Position Cameras, or pole cameras, were used in this investigation and the government concedes that they have worked as they are intended in that they "assist[ed] investigators in monitoring the activity at [the locations they are installed]." The government frets, however, that pole cameras "[have] not provided information that would lead to the prosecution of any of the Target Subjects," and that they provide "only a portion of the necessary information needed in gathering evidence to be used in prosecuting members of a criminal organization." This, again, is not the standard, and the investigative device was being used successfully at the time the affidavit was submitted.

**Pen Registers**

In this case the government made use of pen registers and admits that they have worked as intended: "confirm[ing] that calls are being made between identified telephone numbers in this organization, as well as telephone numbers not previously identified. According to the government, the problem with pen registers is they "alone will not allow the government to achieve the goals of the investigation." Again this is not the standard, and again the investigative device was being used successfully at the time the affidavit was submitted.

**The *Leon* "Good-Faith Exception" does not apply to wiretap warrants issued in violation of Title III.**

In 1984 the United States Supreme Court handed down *United States v. Leon*, 468 U.S. 897. In its opinion the Court created an exception to its own judicially created Fourth Amendment exclusionary rule. This exception would allow otherwise suppressible evidence to

remain admissible when the evidence is "seized in reasonable, good-faith reliance on a search

warrant that is subsequently held to be defective." *Id.* at 897. "The Court reasoned that the

exclusionary ruled seeks to deter police misconduct rather than judicial mistakes. . ." *United

States v. Banks 2015 WL 2401046 (D. Kan. May 15, 2015), citing Leon* at 918-21.

> Title III contains its own, statutorily created, exclusionary rule:

> Whenever any wire or oral communication has been intercepted, no part of the
> contents of such communication and no evidence derived therefrom may be
> received into evidence in any trial, hearing, or other proceeding in or before any
> court . . . if the disclosure of that information would be in violation of this chapter.

18 U.S.C. § 2515. Title III, however, does not have a *Leon* type "good-faith "exception to that

rule.

> Although the Tenth Circuit has yet to decide the issue, the Honorable Judge Crabtree,

wrote in *Banks*, based primarily on *United States v. Rice*, 478 F.3d 704 (6th Cir. 2007), that the

rule created in *Leon* does not apply in the context of Title III.

> Judge Crabtree found that the defendants in *Banks*, like the defendants here, did not rely

on the Fourth Amendment as the basis for suppression, but rather they sought suppression under

section 2515 of Title III. *Banks* at 4. Looking to *Rice*, Judge Crabtree found that the "law

governing [wiretaps] is codified in a comprehensive statutory scheme providing explicit

requirements, procedures, and protections." *Id.,* citing *Rice* 478 F. 3d at 712. Judge Crabtree

went on to state that "[n]either statutory [the Kansas or Federal wiretap law] suppression remedy

explicitly contains a good-faith exception . . . and the Court must construe Title III's provisions

strictly." *Banks* at *4 (internal citations omitted). Moreover, Judge Crabtree agreed with the *Rice*

Court when it found that in providing for suppression of unlawfully obtained evidence to be the

sole remedy for violations of Title III, "Congress has already balanced the social costs and

benefits" in the same manner the Supreme Court did when it created the good-faith exception in Leon. *Rice* at 713.

The second issue Judge Crabtree raises in *Banks* is that Congress "knew how to incorporate a good-faith exception and it even did so as a defense to civil or criminal cases alleging violations of Title III." *Banks* at 4. Judge Crabtree was referring to 18 U.S.C. § 2520 (d (1)): "[a] good faith reliance on . . . a court warrant or order, a grand jury subpoena, a legislative authorization, or a statutory authorization . . . a complete defense against any civil or criminal action" *Banks* at *4.

Finally, Judge Crabtree acknowledged that while Title III was passed in 1968 *Leon* was not decided until 1984 the legislative history "counsels against incorporating a good-faith exception" into the wiretap statute. *Id.* Again looking to *Rice*, Judge Crabtree found that

> Congress obviously could not know that Fourth Amendment search and seizure law would embrace a good-faith exception sixteen years after the passage of Title III, and the language from the Senate Report indicates a desire to incorporate only the search and seizure law that was in place at the time of the passage of Title III. (citing S. Rep. No. 90-1097 (1968) (indicating intent not to 'press the scope of the suppression role beyond present search and seizure law")).

*Banks* at *4, citing *Rice* 478 F.3d at 713 (internal citations omitted).

Based on these factors (and a factor that was applied to the Kansas wiretap statute only) Judge Crabtree concluded that the good-faith exception should not apply to wiretaps.

In an Order issued on June 18, 2015, this Court reached a different conclusion. *See United States v. Arevalo*, 13-10140-JTM at 19 (D. Kan. June 18, 2015). In *Arevalo*, the issue was whether the state court judge had the power to authorize a wiretap warrant, knowing that "after the fact" minimization was occurring outside of the court's jurisdiction. This Court found that the circumstances giving rise to the "after the fact" minimization were due to factors outside the

23

control of the agents (i.e. sequestration), and was approved after consultation with the court. *Arevalo* at 19.

The facts in *Arevalo* are easily distinguishable from the facts of this case and those of *Banks,* where the issues involve lack of probable cause and the failure to satisfy the necessity requirements of Title III. For these reasons the defendants ask this Court to adopt the reasoning of Judge Crabtree and find that the good-faith exception of *United States v. Leon* does not apply to the wiretaps in this matter.

**Conclusion**

Congress did not pass title III to make it easier for police to catch alleged criminals. Congress' overriding concern was the protection of privacy. *Gelbard v. United States*, 408 U.S. 41, 48 (1972). Nor do the courts construe Title III's provisions in a way that ignores the means and focuses on the ends. Quite the opposite. As the Tenth Circuit put it: "Our mandate to strictly construe judicial wiretap authorizations is bottomed on the fact that few threats to liberty exist which are greater than that posed by the use of eavesdropping devices." *United States v. McNulty*, 729 F.2d 1243, 1264 (10th Cir. 1985).

The affiant's actions in this case do a disservice to the intent of Congress and the jurisprudence developed over Title III wiretaps. "The purpose of this [necessity] requirement is to ensure that the relatively intrusive devise of wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *Verdin-Garcia*, 516 F.3d at 889-890, quoting *United States v. Edwards*, 69 F.3d 419, 429 (10th Cir. 1995). As the Tenth Circuit has said:

> The necessity requirement directly and substantially implements the congressional intention to limit the use of intercept procedures to those situations clearly calling for their employment. As a result, failure to satisfy this requirement requires that

the contents of the intercepted communications and the evidence derived
therefrom be suppressed.

[*Mondragon*, *supra*] at 294 (citing *United States v. Donovan*, 429 U.S. 413, 433-34, 97 S.Ct.

658, 671, 50 L.Ed. 2d 652 (1977) (internal punctuation and citations omitted).

This approach to the necessity requirement of Title III is consistent with the opinion of

the Supreme Court in *United States v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341

(1974). In *Giordano*, the Court described the congressional intent underlying Title III as follows:

Congress legislated in considerable detail in providing for applications and orders
authorizing wiretapping and evidenced the clear intent to make doubly sure that
the statutory authority be used with restraint and only where the circumstances
warrant the surreptitious interception of wire and oral communications. These
procedures were not to be routinely employed as the initial step in criminal
investigation. Rather, the applicant must state and the court must find that normal
investigative procedures have been tried and failed or reasonably appear to be
unlikely to succeed if tried or to be too dangerous.

*Id.* at 515, 94 S.Ct. at 1826-27.

As the Supreme Court stated, "the applicant must state and the court must find that

normal investigative procedures [1] have been tried and failed or [2] reasonably appear to be

unlikely to succeed if tried or [3] to be too dangerous." *Id.* On the four corners of the affidavit

fails to prove the Government's case for the necessity of a wiretap.

The Government should not, through the use of conclusory opinion, be able to

generically argue that an investigation is failing simply to permit it to resort to the very intrusive

use of a wiretap. *See Giordano*, 416 U.S. at 515 ("These procedures were not to be routinely

employed as the initial step in criminal investigation. Rather, the applicant must state and the

court must find that normal investigative procedures have been tried and failed or reasonably

appear to be unlikely to succeed if tried or to be too dangerous").

> Few threats to liberty exist which are greater than that posed by the use of eavesdropping devices. Some may claim that without the use of such devices crime detection in certain areas may suffer some delays since eavesdropping is quicker, easier, and more certain. However, techniques and practices may well be developed that will operate just as speedily and certainly and what is more important without attending illegality.

*Berger v. New York*, 388 U.S. 41, 63 (1967). As Justice Brandeis said in his dissent in *Olmstead*

over 80 years ago,

> The evil incident to invasion of the privacy of the telephone is far greater than that involved in tampering with the mails. Whenever a telephone line is tapped, the privacy of the persons at both ends of the line is invaded, and all conversations between them upon any subject, and although proper, confidential, and privileged, may be overheard. Moreover, the tapping of one man's telephone line involves the tapping of the telephone of every other person whom he may call, or who may call him. As a means of espionage, writs of assistance and general warrants are but puny instruments of tyranny and oppression when compared with wire tapping.

*Olmstead v. United States*, 277 U.S. 438, 475-76 (1928) (Brandeis, J., dissenting).

WHEREFORE, for the above and foregoing reasons, the defendants pray this Court suppress the evidence seized in this case obtained from the alleged illegalities underlying the wiretap, and that the Court hold a *Franks* hearing to determine whether any of the alleged omissions or misrepresentations of the affiant in the respective warrant applications were made knowingly, intentionally, or recklessly, and that this information was material to the Court's findings, thereby warranting suppression as this Motion requests**.**

Respectfully Submitted

/s/ Michael D. Hepperly
Michael D. Hepperly
Michael D. Hepperly Law Office, Chtd
310 W. Central, Suite 119
Wichita, KS 67202
316-267-5330

26

316-267-6589 (fax)
mhepperly@aol.com
Attorney for Gerald Beasley


/s/ James R. Pratt
James R. Pratt
Pratt Law L.L.C.
445 N. Waco
Wichita, KS 67202
316-262-2600
316-262-2606 (fax)
jim@jamesrprattlaw.com
Attorney for Antoine Beasley

/s/ Carl Fredrick A. Maughan
Carl Fredrick A. Maughan
Maughan Law Group, LC
200 W Douglas, Suite 350
Wichita, KS 67202
316-264-2023
316-264-1919 (fax)
carl@mlglc.com
Attorney for Helen Beasley

/s/ Kari S. Schmidt
Kari S. Schmidt
Conlee Schmidt & Emerson, LLP - Wichita
200 W. Douglas, Suite 300
Wichita, KS 67202
316-264-3300
316-264-3423 (fax)
karis@fcse.net
Attorney for Terry Beasley

/s/ Kurt P. Kerns
Kurt P. Kerns
Ariagno, Kerns, Mank & White
328 North Main
Wichita, KS 67202
316-265-5511
316-265-4433 (fax)
kurtpkerns@aol.com
Attorney for Herbert Jones

27

/s/ Edward L. Robinson
Edward L. Robinson
Robinson Law, LLC
2313 N. Zoo Park Circle
Wichita, KS 67205
316-260-9771
316-260-9773 (fax)
erobinson@robinsonlawks.com
Attorney for William Parker

/s/ Roger L. Falk
Roger L. Falk
Law Office of Roger L. Falk, P.A.
301 West Central Avenue
Wichita, KS 67202
316-265-5115
316-265-5183 (fax)
roger_falk@sbcglobal.net
Attorney for Steven Smallwood

/s/ Sylvia B. Penner
Sylvia B. Penner
Fleeson, Gooing, Coulson & Kitch, LLC - Wichita
1900 Epic Center, 301 N. Main
Wichita, KS 67202
316-267-7361
316-267-1754 (fax)
spenner@fleeson.com
Attorney for Brandon Smith


/s/ Mark A. Sevart
Mark A. Sevart
PO Box 781602
Wichita, KS 67278
316-686-1519
316-788-7437 (fax)
markchrissevart@yahoo.com
Attorney for Carlos Beasley

/s/ John V. Wachtel
John V. Wachtel
Klenda Austerman LLC - Wichita
1600 Epic Center
301 N. Main Street

28

Wichita, KS 67202-4816
316-267-0331
316-267-0333 (fax)
jvwachtel@klendalaw.com
Attorney for Gerald Wilson

## CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2015, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to each counsel of record in this case.

I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants: none

s/James R. Pratt
JAMES R. PRATT #17716
Attorney for Defendant
445 N. Waco
Wichita, Kansas 67202
Ph: (316) 262-2600
Fax: (316) 262-2602
Jim@JamesRPrattLaw.com