IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | } | |
|     Plaintiff, | } | |
| | } | |
| vs. | } | Case No. 13-10112-JTM |
| | } | |
| GERALD BEASLEY, et al. | } | |
|     Defendant. | } | |

**DEFENDANTS' MOTION TO SUPPRESS EVIDENCE OF WIRETAP FROM TARGET TELEPHONE #2, AND REQUEST FOR A *FRANKS* HEARING AND BRIEF**

COMES NOW, the defendants, Gerald Beasley, Antoine Beasley, Helen Beasley, Terry Beasley, Carlos Bealsey and Gerald Wilson by and through their attorneys, Michael D. Hepperly, James R. Pratt, Carl Fredrick A. Maughan, Kari S. Schmidt, Mark Severt, and John V. Wachtel respectively, and respectfully move this Court for an order suppressing all interceptions from the wiretaps authorized against "Target Telephone # 2" pursuant to 18 U.S.C. § 2518(10)(a), and any evidence derived from information obtained from those electronic interceptions. Further, defendant requests a evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), be held regarding the wiretap application due to omissions and/or misrepresentations made in the affidavit supporting the wiretap authorization by the affiant and DEA TFO Kari Gourley (Target Telephone #2). In support of this motion, defense counsel states as follows:

1. The defendants are all charged in the Third Superseding Indictment (Doc 50) with crimes including drug conspiracies, conspiracy to commit program fraud, conspiracy to commit bank fraud and money laundering, among other more individual charges. The defendants were all either Target Subjects of the wiretap on Target Telephone #2 or were intercepted during the time

1

period the wiretap was "up" on Target Telephone #2. As such the above defendants are "aggrieved persons" as set forth below and are entitled to challenge the validity of the wiretap.

2. During the course of the investigation the United States, on March 26, 2013, submitted a sealed Application for Interception of Wire and Electronic Communications and an Affidavit in Support of the Application pursuant to 18 U.S.C. § 2510 et seq. (Prepared by ATF agent Jason Fuller). This application was to intercept the communications on telephone number 316-409-4289 (Target Telephone #1). The Honorable Eric F. Melgren granted the application on the same day it was submitted and issued a sealed Order Authorizing the Interception of Wire and Electronic Communication authorizing the interception of telephone calls, and text messages made to and from the target telephone identified in the Application, allegedly used by Gerald Beasley. The electronic interceptions of the target telephone commenced on March 26, 2013and ended on April 24, 2013.

3. On May 7, 2013, the United States submitted a second sealed Application for Interception of Wire and Electronic Communications and an Affidavit in Support of the Application pursuant to 18 U.S.C. § 2510 et. seq. (Prepared by DEA TFO Kari Gourley). This application was to intercept the communications on telephone number 316-992-9165 (Target Telephone #2).

4. The Honorable Eric F. Melgren granted the application on the same day it was submitted and issued a sealed Order Authorizing the Interception of W ire and Electronic Communication authorizing the interception of telephone calls, and text messages made to and from the target telephone identified in the Application, allegedly used by the accused, Antoine Beasley. The electronic interceptions of the target telephone commenced on May 8, 2013and ended on June 5, 2013.

2

ARGUMENTS AND AUTHORITIES

**Authorities:**

Under Title III wiretaps:

Any aggrieved person in any trial, hearing, or proceeding in or before any court . . . may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that–
> (I) the communication was unlawfully intercepted;
> (ii) the order of authorization or approval under which it was intercepted was insufficient on its face; or
> (iii) the interception was not made in conformity with the order of authorization or approval.

18 U.S.C. § 2518(10)(a). An "aggrieved person "is defined as a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11). This present challenge to the wiretap authorization centers on subsections (i) and (ii) of 18 U.S.C. § 2518(10)(a), *i.e.*, that the wiretap was unlawfully obtained, and that the order of authorization was insufficient on its face. If evidence arises to suggest the interception was not made in conformity with the order of authorization, the defendant reserves the right to challenge the wiretap under subsection (iii).

Federal investigatory wiretaps are governed by Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2210-22. Section 2518 sets forth the requirements for issuance of a wiretap warrant. In particular, the government must submit a written application to the issuing magistrate laying out, among other things, "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried. 18 U.S.C. § 2518(1)(c). This provision is called the necessity requirement. *See, e.g., United States v. Green*, 175 F.3d 822, 828 (10th Cir. 1999). The purpose of this requirement is to ensure that the relatively intrusive device of wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime. *Id.* (quoting *United States v. Edwards*, 69 F.3d 419, 429 (10th Cir. 1995)) (internal quotation marks and further citation omitted). Traditional investigative techniques include surveillance, infiltration or undercover work, questioning of participants, execution of search warrants, and the use of pen registers and trap-and-trace

3

devices. *See, e.g., United States v. Ramirez*, 479 F.3d 1229, 1240 (10th Cir. 2007); *United States v. Ramirez-Encarnacion*, 291 F.3d 1219, 1222 n. 2 (10th Cir. 2002). Section 2518 does not, however, mandate exhaustion of all possibilities; the requirement is "met if the government demonstrates either [that] normal investigatory techniques have been tried and failed or that they reasonably appear to be unlikely to succeed if tried, or to be too dangerous to try. *Ramirez*, 479 F.3d at 1240 (quoting *United States v. Castillo-Garcia*, 117 F.3d 1179, 1187 (10th Cir. 1997)). . . .

Once a wiretap has been authorized by a judge, it is presumed proper and the burden is on the defendant to prove its invalidity. *United States v. Radcliff*, 331 F.3d 1153, 1160 (10th Cir. 2003).

*United States v. Verdin-Garcia*, 516 F.3d 884, 889-890 (10th Cir.), *cert. denied*, 129 S. Ct. 161 (2008).

The Supreme Court has emphasized that the government should strictly adhere to the requirements of the wiretap statute. *United States v. Mondragon*, 52 F.3d 291, 293 (10th Cir. 1995), citing *United States v. Donovan*, 429 U.S. 413, 440 (1977).

[G]eneralities, or statements in the conclusory language of the statute, are insufficient to support a wiretap application. The statements must be factual in nature and they must specifically relate to the individuals targeted by the wiretap. The district court here rejected boilerplate allegations contained in some of the applications and as we discuss in Part III, *infra*, we agree with its concerns in certain regards.

*United States v. Castillo-Garcia*, 117 F.3d 1179, 1188 (10th Cir. 1997), *reversed* on other grounds by *Ramirez-Encarnacion*, *supra*.

Whenever any wire or oral communication has been intercepted, no part of the contents of such communication **and no evidence derived therefrom** may be received in evidence in any trial, hearing, or other proceeding . . . if the disclosure of that information would be in violation of this chapter.

18 U.S.C. § 2515 (emphasis supplied). Thus, the fruit of the poisonous tree doctrine applies statutorily to violations committed in obtaining a wiretap authorization.

Likewise, errors in earlier wiretaps applications (whether having probable cause or necessity shortcomings) can taint later wiretaps that rely upon them. *See, e.g., United States v.*

4

*Giordano*, 416 U.S. 505, 529-530 (1974) (re: cannot use fruits of an illegal wiretap to obtain authorization for later wiretap interceptions); *see also United States v. Vento*, 533 F.2d 838, 847 (3rd Cir. 1976) (If the government's application did not present probable cause for the authorization of the interception, then the authorization and any surveillance pursuant to it were improper. And, if the surveillance was improper, the government could not use the fruits of that surveillance at trial or to further its investigation.); *see also United States v. Zapata*, 546 F.3d 1179, 1186 (10th Cir. 2008), *cert. denied*, 129 S. Ct. 772 (2008) (Evidence obtained through a wiretap order that does not meet the necessity requirement must be suppressed. 18 U.S.C. § 2518(10)(a).); *see also United States v. Cline*, 349 F.3d 1276, 1280 (10th Cir. 2003), and *United States v. Castillo-Garcia*, 117 F.3d at 1185.

"[W]e consider all the facts and circumstances . . . and read the necessity requirement in a common sense fashion." *Ramirez-Encarnacion*, 291 F.3d at 1222 (internal quotations and citations omitted). *Cline*, 349 F.3d at 1281. "However, we have also made it clear that a 'common sense approach' will not rehabilitate the government's failure to include statutorily required information in a wiretap application." *Castillo-Garcia*, 117 F.3d at 1194-95, quoting *Mondragon*, 52 F.3d at 293.

The Ninth Circuit has held that omitting the successes of traditional investigative methods can constitute *Franks* error, because it impairs the authorizing court's ability to evaluate necessity. *See United States v. Simpson*, 813 F.2d 1462 (9th Cir.), *cert. denied*, 484 U.S. 898 (1987). In *Simpson*, the federal affiant alleged the conspirators and high-echelon accomplices had insulated themselves from law enforcement's ability to penetrate the highest levels of the conspiracy. *Id.* at 1471. In upholding the district court's suppression of the wiretap evidence, the Ninth Circuit found that the government had not fully revealed the extent to which they actually

5

had infiltrated the drug conspiracy. *Id.* at 1471-72. "Here, the specific facts withheld from the

issuing judge about this particular investigation reveal that traditional techniques could have led

to the successful infiltration of the entire enterprise."   *Id.* at 1472-73.

**The allegations derived from Target Telephone #1 and used in the probable cause section of the affidavit for Target Telephone #2 are based on unlawfully obtained evidence and as such cannot be used to support probable cause for the wiretap on Target Telephone #2**

The defendants have filed a Motion to Suppress the intercepts of the wiretap on Target

Telephone #1 involving a phone number allegedly associated with Gerald Beasley. That motion

seeks suppression of all of the evidence derived from that wiretap due to lack of probable cause

and for violations of the necessity requirements of 18 U.S.C. § 2518(1)(c). The probable cause

section of the affidavit for Target Telephone #2 relies heavily, if not exclusively, on evidence

illegally derived from the intercepts of Target Telephone #1. The government, however, cannot

base a second wiretap on the illegal fruits of a previous wiretap. *See United States v. Giordano*,

416 U.S. 505. 529-30 (1974):

> Even though suppression of the wire communications intercepted under
> the October 16, 1970, order is required, the government nevertheless contends
> that communications intercepted under the November 6 extension order are
> admissible, because they are not "evidence derived" from the contents of
> communications intercepted under the October 16 order within the meaning of §§
> 2515 and 2518(10)(a). This position is untenable.

In other words, when deciding whether or not an application and affidavit for a wiretap

establishes probable cause, the court cannot rely on evidence from a prior order that has

previously been suppressed.

**The application and affidavit for the warrant to tap Target Telephone #2 failed to established sufficient probable cause to issue the warrant**

As with any warrant, a wiretap warrant must be predicated on probable cause. *US Const.*

*Amend. IV. See also United States v. Milton,* 153 F.3d 891, 894 (8th Cir. 1998) (The probable

cause required for allowing electronic interception of wire communications is the same as that required by the Fourth Amendment for a search warrant). As applied to wiretaps the probable cause must establish: 1) that an individual is committing, has committed, or is about to commit a crime; 2) that communications regarding that offense will be intercepted; and 3) that the phone line that the government is seeking to tap is being used to communicate about the offense. *See* 18 USC § 2518(3)(a)(b) & (d). If probable cause is lacking the warrant cannot stand and any evidence derived from the wiretap must be suppressed as "fruit of the poisonous tree." *See* 18 U.S.C. § 2515. If the allegations and information used by the government to establish probable cause is stale or otherwise outdated that it "no longer suggests that the items sought will be found in the place to be searched", it should be stricken from the affidavit. *United States v. Roach*, 582 F.3d 1192, 1201 (10th cir 2009), *quoting United States v. Mathis,* 357 F.3d 1200 (10th Cir. 2004). If the affidavit is unable to establish probable cause without this information then the evidence must be suppressed.

The probable cause section of the affidavit submitted to obtain the warrant for Target Telephone #2 contains 19 separate factual allegations related to Antoine Beasley and his use of the Target Telephone #2. These allegations range from a sentence or two to several paragraphs in length. Taken together they make up a mere 10 pages of the application for the wiretap. Eleven of these allegations are directly based on evidence obtained from the intercepts on Target Telephone #1. As the defendants contends above, these allegations should be stricken as the information was obtained in violation of 18 U.S.C. § 2518. Whether or not probable cause exists should be determined only on the remaining eight factual allegations in the application. With regard to the remaining eight factual allegations there is insufficient cause for the Court to find probable cause to issue the interception order.

7

Four of the paragraphs contain nothing but background information on the case and the conclusions of the affiant: 1) #21 provides information on when and how the investigation began; 2) # 24 outlines the issuance of the wiretap order on Target Telephone #1; 3) #38 sets forth the affiant's conclusion that affidavit establishes probable to believe Target Telephone #2 is being used to commit the offenses discussed in the application; and 4) #39 is the purely conclusionary statement that the affiant believes that Antoine Beasley is the "source of supply for Gerald Beasley and Jerry Beasley Jr." and acts as a middleman between them and the Ibarra brothers.

Paragraph 22 makes an allegation regarding a telephone number that was allegedly intercepted on a wiretap in the Western District of Tennessee:

> On October 7, 2012, at approximately 7:21 pm, FNU LNU was intercepted by Tennessee Title III, FNU LNU using 206-313-8054, asked the main target, Larry Bailey, when he was going to start selling the "H" so he can get some more clients. Bailey said he is going to get some of that shit, FNU LNU said ok. On October 22, 2012, at approximately 1:19 pm, FNU LNU using 206-313-8054 called Bailey and FNU LNU called Bailey and FNU LNU said, "tell your brother I'm fixing to need them 200 today." Bailey said, "I thought you said in 4 days." Your Affiant talked to TFO Garrison Taylor of the Memphis Resident Office in reference to the T-III and phone calls. TFO Taylor advised that the conversation about "H" was in reference to Heroin and the phone conversation about the "200" were in reference to a Dilaudid Drug Traffic Organization in the Memphis area. TFO Taylor stated that Bailey's main supplier for cocaine in (*sic*) Houston, TX and Los Angeles, CA. *Antoine Beasley, using Target Talephone (sic) #2 is in frequent contact with FNU LNU, utilizing 206-313-8054.*

Affidavit paragraph 22 (emphasis added).

The telephone number 206-313-8054, is mentioned two other times in the affidavit. The first being in paragraph 37; where the affiant discusses an alleged conversation between Antoine Beasley and his father Gerald Beasley on April 22, 2013. According to the affiant, Antoine Beasley states that "big brother sent me a text . . ." The affiant then states that she checked the

pen register attached to Antoine Beasley's phone and claims that 206-313-8054 was on the register as an electronic communication. The affiant then assumes that this communication was not only a text message but the text message referred to in the intercepted call. The affiant further assumes that this must be a telephone number being used by Juan Ibarra, and that the text must have been in reference to drugs.

Finally, 206-313-8054 is discussed in subparagraph f. of paragraph 48 addressing the pen register on Antoine Beasley's telephone. According to this subparagraph: "Between April 15, 2013 and April 22, 2013, Target Telephone #2 has been in contact with FNU LNU, utilizing 206-313-8054 on 58 separate occasions, with the last contact being on April 22, 2013, of those contacts none were voice communication, while 58 of those contacts were text messages FNU LNU has been intercepted over 206-313-8054 on a current Title III wire intercept occurring in Tennessee."[1]

Counsel for Antoine Beasley had spoken with the government several times about telephone number 206-313-8054, seeking any additional information it might have regarding the number or its subscriber. Counsel was told no additional information was available. Counsel also asked if the government would request subscriber information from T-Mobile (the carrier to which the number is assigned) and was told that the government would not be requesting that information. Counsel than sought and received an ex-parte Rule 17 subpoena issued to T-Mobile requesting:

> a.    Records pertaining to T-Mobile Wireless telephone number 206-313-8054- specifically, subscriber information, call detail records, text message detail, bill copies, payment history and cell site/sector information from October 1, 2012 through June 12, 2013.

---

1 The issues related to the Pen Register will be discussed below in the necessity section of the motion.

b.      If T-Mobile Wireless telephone number 206-313-8054 was not issued to a T-Mobile subscriber at any time during the period from October 1 2012, through June 12, 2013 then any information regarding its use by T-Mobile, including but not limited to its use as a "Network switch", a "Short message service center", a "multi-media message service center", or whether it was issued to a "Family Mobile" subscriber.

On April 9, 2015, in response to the Rule 17 subpoena, T-Mobile provided the following information:

TARGET NUMBER 2063138054 is not associated with any T-Mobile subscribers. Target number is an MSRN number. The MSRN number is the Mobile Station Roaming Number. The Mobile Station Roaming number is defined telephone number used to route telephone calls in a mobile network. It can also be defined as a directory number temporarily assigned to a mobile for a mobile terminated call.

(See attached). In other words, 206-313-8054 is an internal number used by T-Mobile to help it move cell calls through its own network. It appears to be nothing more than an unfortunate coincident that the number appeared in the Tennessee wiretap and the pen registers of Antoine Beasley. And despite the affiant's desire to link the number to Antoine Beasley and alleged criminal conduct, no such connection can be made.

It took barely three weeks for T-Mobile to respond to Antoine Beasley's subpoena for information regarding phone number 206-313-8054. Yet the government was unable, or unwilling to discover this information prior to including its baseless assumptions in the affidavit to place a tap on Antoine Beasley's phone.

The affidavit continues with paragraph 23 which discusses March 19, 2013, "electronic surveillance on *known stash houses* owned by Gerald and Antoine Beasley." *Affidavit* at p. 10 (Presumably this is a reference to pole cameras that were set up at various locations during the investigation). The affiant goes on to state:

10

   . . . Special Agent Brian Alwes observed a Ford F-150, normally utilized by
Antoine Beasley, arrive at 655 North Estelle and one of the occupants was
observed carrying some sort of bag into the residence. The truck was than
observed traveling to 1122 North Piatt, another known stash house. At 1122 North
Piatt a passenger in the F-150 exited the vehicle and got into a white Grand Am
parked at the residence. The white Grand Am then returned to 655 North Estelle
and was observed meeting with a bald Hispanic male driving a silver Honda
Ridgeline registered to a Juan J. Ibarra. Juan Ibarra was observed carrying some
sort of bag out of the residence on Estelle.

*Id.*

This section of paragraph 23 is filled with assumptions and conclusions that are

unsupported by facts. The affiant claims that both 655 North Estelle and 1122 North Piatt are

"known stash houses," but presents no evidence to support this charge. The affiant goes on to

state that "one of the occupants" of the F-150 "carried *some sort of bag*" into the North Estelle

address before traveling to North Piatt where the passenger of the truck got in a Grand Am. The

questions are endless: Who was the occupant that got out of the truck?; Was it the passenger or

the driver?; Was it Antoine Beasley or someone else?; Was Antoine Beasley even present? (The

affiant states that the F-150 is "normally utilized" by Antoine Beasley, implying that it may also

be used by other unnamed individuals); Did the person who carried the "bag" into Estelle get

back into the truck and travel to the Piatt address?; Was the person who carried the "bag" into

Estelle the same person who drove back to Estelle in the white Grand Am?; Was it actually Juan

Ibarra at North Estelle or was it just someone driving a vehicle register to him?; Did this person,

the affiant assumes is Juan Ibarra, carry the same bag out of the residence as was carried in

earlier (in both instances it is described as "some sort of bag")?

The affiant continues paragraph 23 with an outline of her activities related to Juan Ibarra;

Your Affiant ran a criminal history and NADDIS check on Juan Ibarra and found
a current case on Juan Ibarra out of El Paso, Texas. DEA TFO Shauna Sherwood
contacted Special Agent Yvette Lomeli from the El Paso Divisional Office and

was informed that SA Lomeli has been involved in a seizure of over ten kilograms of cocaine in October 2012 and a cooperator from that seizure provided information about his bother that led investigators to a US currency seizure of $80,000.00 of drug proceeds. A confidential source (CS) was developed from that seizure. The CS informed SA Lomeli that he/she had been dealing with Juan Ibarra, Inocente Ibarra and Myra Ibarra for the past two to three years. The CS informed investigators that he/she dealt with the Ibarra's directly in the Wichita area. The CS stated that the Ibarra's (*sic*), were involved in transporting multiple kilograms loads of cocaine to Wichita, Kansas on a weekly basis and then transporting US currency back to El Paso. The CS is a defendant CS and the motivation for cooperating was reduction of sentence and or charges. SA Lomeli informed TFO Sherwood that she has corroborated some of the CS's information and believes the CS to be reliable.

*Id.* at 10-11. Without having identified the individual seen at North Estelle on March 19, 2013 as Juan Ibarra, or even one of his brothers, this information about Juan Ibarra is completely irrelevant to a probable cause determination. It should also be noted that the affiant does not include any indication that the CS from El Paso ever refer to any of the Ibarras as "big brother" and/or "little brother". However, throughout the affidavit, the affiant concludes that "big brother" and "little brother" are the Ibarras; a conclusion without any supporting evidence.

The final factual allegations not related to the intercepts from the Gerald Beasley wiretap are contained in paragraphs 30 and 31. Here, the affiant describes surveillance that was conducted on Antoine Beasley on April 12, 2013 by the Sedgwick County Sheriff's Department and the DEA Wichita Resident Office. During that surveillance Antoine Beasley was followed from 655 North Estelle to 6223 East Eilerts.[2]  Antoine Beasley was at the Eilerts address for approximately two minutes. He was then followed to a dumpster on North Woodlawn, where he was seen removing two bags from the rear of his truck and putting the bags into the dumpster. Officers remove what they assume to be the same bags from the dumpster and search them. The affiant alleges that found inside the trash bags was a plastic bag with marijuana residue and

---

2  This is the address of Antoine Beasley's aunt Loretta Beasley and his cousin Carlos Beasley.

"O.G. Kush" written on it; and "numerous plastic baggies with the corners missing and baggies with a white powder residue." *Affidavit* at 14.

While this can arguably be considered suspicious behavior on the part of Antoine Beasley, it does nothing to establish probable cause to obtain a wiretap on his telephone. First, there is no indication where the bags came from. There is no allegation that they came from either of the "known stash houses" discussed in the affidavit. Prior to allegedly stopping at the dumpster Antoine Beasley stopped at 6223 East Eilerts for a few minutes. Based on the sparse information in the affidavit it is just as likely that the bag came from that address as any other place. If that is the case, it *may* impute a degree of knowledge on Antoine Beasley that the residents of that address, his aunt and cousin, were engaged in some sort of illicit activities, but, without more, it is not enough to impute on to Antoine Beasley actual knowledge of criminal activity, his participation in that criminal activity, or that his phone was being used in connection with that criminal activity.

In this case the wiretap application and affidavit had to establish, at the time it was submitted, probable cause that: 1) that Antoine Beasley is committing, has committed or is about to commit a crime; 2) that communications regarding that offense *will* be intercepted; and 3) that the phone line that the government is seeking to tap *is being used* to communicate about the offense. It is not enough to have probable cause for one and not the others, or even two and not the third. All must be satisfied. This was not done here. The sections of the affidavit detailing calls between Antoine Beasley and Gerald Beasley are based on the unlawful wiretap of Gerald Beasley's telephone and must be stricken from affidavit and from the Court's review for probable cause. The remaining sections of the affidavit do not provide sufficient evidence to establish an independent basis for a probable cause finding.

13

**Financial Investigation**

In a section of the affidavit entitled "FINANCIAL INVESTIATION," the affiant devotes paragraphs 43-45 to a discussion of Reltsuh Inc., a corporation owned by Gerald Beasley and Antoine Beasley for the purpose of renting out low-income housing; the property the corporation owns and the property that Gerald Beasley owns himself or with his wife, Helen Beasley. Finally the section discusses Tiara's Pace Restaurant, owned and operated by Gerald Beasley. There is nothing in these paragraphs that assist the court in making a probable cause determination in regard to issuing a warrant to intercept telephone calls or text messages.

**Anonymous Information**

Paragraph 47 is perhaps the closest the affiant comes to establishing probable cause. However, any potential probable cause does not extend to demonstrating that communications regarding a crime will be intercepted on Target Telephone #2, or that Target Telephone #2 is being used to communicate about the alleged crimes. For these reasons the information contained in this paragraph should be disregarded by the Court.

**Call detail and pen register analysis**

Paragraph 48 sets out in great deal alleged contacts between Target Telephone #2 and various individuals for a period of time beginning on April 15, 2013 and April 22, 2015. The problem with this information is that it is wrong.[3]

- Paragraph 48 a. claims that there were 1201 contacts between Target Telephone #2 and Gerald Beasley (using Target Telephone #1). The actual number of contacts was 52. The

---

3  The correct numbers come from a December 2, 2014 letter from AUSA Michelle Jacobs in response to an inquiry from Antoine Beasley's counsel.

difference in the actual number of contacts and the number of contacts listed in the affidavit is so large that it cannot reasonably be considered simple scriveners errors.

- Paragraph 48 b. states there were 2 contacts between Target Telephone #2 and Helen Beasley. This number is correct.

- Paragraph 48 c. claims that there were 92 contacts between Target Telephone #2 and Jerry Beasley. The actual number was 69.

- Paragraph 48 d. claims there were 66 contacts between Target Telephone #2 and Isaac Woods. The actual number was 44.

- Paragraph 48 e. claims there were 6 contacts between Target Telephone #2 and Jonas Veazey. The actual number was 5.

- Paragraph 48 f. claims there were 58 contacts between Target Telephone #2 and 206-313-8054 (the T-Mobile Mobile Station Roaming Number). The actual number was 47. This paragraph also reiterates that 206-313-8054 was "intercepted" on a wiretap in Tennessee.

- Paragraph 48 g. does not provide any information from the pen register, but rather makes a bald conclusion that the "affiant believes Antoine Beasley is also in contact with Juan Ibarra and Incente Ibarra who are utilizing unknown phone number." This is apparently based on the "big brother", "little brother" comments overheard on the unlawful wiretap on Gerald Beasley's phone (Target Telephone #1).

**The application and affidavit fails to satisfy the Necessity requirement of § 2518(1)(c):**

Title III establishes and requires the government to set forth sufficient facts to warrant the intrusion of electronic surveillance – the "necessity requirement" which must be satisfied before

a wiretap order may be lawfully issued. *See* 18 U.S.C. § 2518 (1)(c). In the instant case, the government cannot demonstrate sufficient necessity for the wiretap it obtained on Antoine Beasley's phone.

18 U.S.C. § 2518 (3)(c) requires that the court make a finding that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."

The goal of the necessity requirement is to ensure that the government first attempts to use normal investigative techniques to uncover the alleged crime. *U.S. v. Foy*, 641 F.3d 455, 469 (10th Cir. 2011). "The purpose of the necessity requirement is to ensure that the relatively intrusive device of wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *Untied States v. Castillo-Garcia*, 117 F.3d 1179, 1185 (10th cir. 1997). The burden rests on the defendant to prove the lack of necessity. *United States v. Ramirez-Encarnacion*, 291 F.3d 1219 (10th cir. 2002).

In order to satisfy the necessity requirement, the government's affidavit must include specifics as to why ordinary investigative techniques will not work. *See generally, U.S. v. Ramirez*, 470 F.3d. 1229, 1241-43 (10th Cir. 2007).

In *Castillo-Garcia,* the Tenth Circuit held:

> To obtain an electronic surveillance order, the government must explain fully in its application what investigative techniques gave been tried against the target of the wiretap. If any of the four categories of normal investigative techniques referred to in the legislative history of Title III have not been tried, the government must explain with particularity why each of such untried techniques would either be unsuccessful or too dangerous. Those investigative procedures are: (1) standard visual and aural surveillance; (2) questioning and interrogation of witnesses or participants (including the use of grand juries and the grant of immunity if necessary); (3) use of search warrants; and (4) infiltration of conspiratorial groups by undercover agents or informants. In addition, if other normal investigative techniques such as pen registers or trap and trace devices have not been tried, a similar explanation must be offered as to why they also would be unsuccessful or too dangerous…

16

….in any event, generalities, or statements in the conclusory language of the statute, are insufficient to support a wiretap application.   The statements must be factual in nature and they must specifically relate to the individuals targeted by the wiretap.

117 F. 3d at 1187-1188 (citations omitted).   This court owes no deference to the issuing judge who found sufficient necessity to issue the wiretap order.   *Castillo-Garcia* at 1186 n. 3

**Interviews and Grand Jury subpoenas**

The inclusion of the use of grand juries or grants of immunity is so that law enforcement won't rely simply on a suspect's *potential* invocation of his or her Fifth Amendment right against self-incrimination, without attempting this traditional investigative technique. Thus, even if a suspect invoked their Fifth Amendment right, immunity can be used to obtain information that would otherwise be protected. This traditional investigative technique was not tried, nor did the affiant explain with particularity why this technique would not be successful. Rather, the affiant, relied solely on generalities that are not permitted to supplant the particularity requirement. In sections entitled "Interviews, Grand Jury Subpoenas, and Grants of Immunity" the affidavits for Target Telephone #2 and Target Telephone #1 use the exact same language, despite being written by different law enforcement officers (DEA TFO Gourley, for Target #2 and ATF Agent Jason Fuller for Target Telephone #1) and being written approximately two months apart. As set forth in paragraphs 68, 69 and 70 of the affidavit for Target Telephone #2 (43, 44 and 45 in the affidavit for Target Telephone #1):

> Based on Affiant's training and experience, Affiant believes interviews of additional TARGET SUBJECTS or their know associates would produce insufficient information regarding the identities of all persons involved in the conspiracy, including, but not limited to, sources, transporters, financiers, distributors, and customers for controlled substances as well as co-conspirators involved in fraud. In addition, Affiant believes that any responses to any interviews of the TARGET SUBJECTS at this stage of the

17

investigation would contain a significant number of untruths, diverting the investigation with false leads or otherwise frustrating the investigation. Furthermore, Affiant believes such interviews would also have the effect of altering other members of the conspiracy, thereby compromising the investigation and possibly resulting in destruction or concealment of relevant evidence and the possibility of harm to cooperating sources whose identity may become known.

Grand Jury subpoenas suffer from the same limitations as interviews discussed above. Based on Affiant's training and experience, Affiant believes that the TARGET SUBJECTS and/or their co-conspirators would likely be uncooperative and invoke their Fifth Amendment privilege not to testify if called to testify before a grand jury.

Grants of immunity would not be appropriate at this state of the investigation because immunity would foreclose the prosecution of principle members of this conspiracy and would not ensure the receipt of truthful testimony before a grand jury. In addition, it would be unwise to seek grand jury immunity for the TARGET SUBJECTS or their co-conspirators as that would likely foreclose prosecutor of some of the most culpable persons involved in the conspiracy.

Wiretap Affidavit (Target Telephone #2, pp. 36-37). By way of comparison, here is how "Interviews of Subjects and Associates" and "Use of Grand Jury Subpoena" *(sic)* were written in an affidavit for a wiretap submitted in an unrelated case4, and submitted over a year *after* the applications in this case:

111.    **Interviews of Subjects and Associates** – Based on training and experience, your Affiant believes that interviews of the Targets or their know associates would produce insufficient information concerning the identities of individuals involved in the conspiracy, the source of the drugs, financing, the location of records, drugs, drug proceeds, or other pertinent information regarding the subject crimes under investigation. Your affiant also believes that any responses to interviews would contain a significant number of half-truths and untruths diverting the investigation with false leads or otherwise frustrating the

---

4  14-CM-60038-MLB **SEALED** Case sealed as of August 10, 2015.

investigation or be of limited value. Additionally, such interviews would like result in interviewees alerting members of the conspiracy, thereby compromising the investigation and resulting in possible concealment, movement or destruction of relevant documents, narcotics, drug proceeds and/or other evidence.[5]

136.    **Use of Grand Jury Subpoena** – Numerous Grand Jury Subpoenas have been served on local business'*(sic)* and banks as a part of the financial investigation in this case due to the limited chance of reputable buiness' *(sic)* providing that information to their customers. While grand jury subpoenas on criminal associates of this case may ultimately be issued in this investigation, there is no reason to believe that such a technique will provide details not already know. Actual targets of the ongoing investigation who may be subpoenaed to testify before the grand jury would likely invoke their Fifth Amendment privilege against self-incrimination. Granting immunity to those targets would result in a lack of prosecution for some of the most culpable individuals. Also, the issuance of grand jury subpoenas to peripheral or lower-level members of the organization (many of whom have not yet even been identified) may alert the other conspirators as to the scope and progress of this investigation.

While the statements in the unrelated affidavit use slightly different language, the justifications for not using grand jury subpoenas in each affidavit are identical, and fail to explain with particularity why grand jury subpoenas are not a viable means of investigation.

Generalities alone are insufficient to support a wiretap application. But generalities can be made so long as they are accompanied by specific information about how these generalities apply to the particular suspects and/or particular investigation. (internal citations omitted)

*U.S. v. Martinez*, 230 Fed.Appx. 808, 814 (10th Cir.), *cert. denied*, 522 U.S. 1069 (2007). Such statements are nothing more than standard boilerplate used in an attempt to ignore one of the clearly enumerated investigative techniques.

---

5  After this boilerplate language the unrelated affidavit contains several pages of information regarding the interviews, with named individuals, which had already taken place during the investigation.

The boilerplate language in the affidavit for Target Telephone #2 is not accompanied by other specific information explaining how the generalities apply to the particular suspects for whom the wiretap was sought.

Congress specifically enumerated this traditional investigative tool in its legislative history, and the Tenth Circuit stated, "[i]f any of the four categories of normal investigative techniques referred to in the legislative history of Title III have not been tried, the government must explain *with particularity* why each of such untried techniques would be either unsuccessful or too dangerous." *United States v. Killingsworth*, 117 F.3d 1159, 1163 (10th cir 1997) (emphasis supplied), quoting *Castillo-Garcia*, 117 F.3d at 1187-88; *see also Ramirez-Encarnacion*, 291 F.3d at 1222, (If any of these traditional investigative techniques has not been tried, the government must explain why with particularity.), citing *United States v. Mitchell*, 274 F.3d 1307, 1310 (10th Cir. 2001). The affiant's explanation on failing to use grand juries or grants of immunity in this case is done with anything but particularity.

Further, simply saying that the use of grand jury subpoenas and use of immunity will cause some suspects to avoid prosecution, or may lead to leaks in the investigation, does not mean this investigative technique would not be successful if tried. Any collateral consequences may be distasteful to the prosecution and law enforcement, but that does not allow them ignore that which is required by statute and case law. As the Ninth Circuit stated in *Gonzalez, Inc.*,

> [T]he affidavit's terse rejection of the possible productive use of grand jury subpoenas or search warrants [discussed *infra*] does not establish that these investigative techniques were reasonably unlikely to work. The affidavit rejects these tools by claiming they would likely reveal the investigation to its targets. Such statements do not reasonably explain why traditional investigative tools are unlikely to succeed in a particular investigation, but are boilerplate conclusions that merely describe inherent limitations of normal investigative procedures, which we have found insufficient to establish necessity.

20

*Gonzalez, Inc.*, 412 F.3d at 1114 (citation omitted). Conclusory statements of generalized fears that could apply to any drug conspiracy are the very boilerplate that courts of appeal have refused to give effect to.

The Tenth Circuit confronted such boilerplate explanations in *United States v. Castillo-Garcia*, 117 F.3d at 1194 (re: wiretap application on why visual surveillance wouldn't work). "The Third Wiretap application, by contrast, relies on wholly conclusory language which would apply to every member of every suspected drug conspiracy to explain why visual surveillance of Jaime Olivas-Sanchez, which was never attempted, would not have worked." *Id.*

As the Ninth Circuit explained, the government cannot simply rest on generalizations, but instead, "must allege *specific circumstances* that render normal investigative techniques particularly ineffective or the application must be denied . . . . The reason for requiring specificity is to prevent the government from making general allegations about classes of cases and thereby sidestepping the requirement that there be necessity in the particular investigation in which the wiretap is sought." *United States v. Ippolito*, 774 F.2d 1482, 1486 (9th Cir. 1985) (emphasis supplied) (internal citations omitted).

While the Government need not exhaust all alternative means of investigation, it cannot avoid the enumerated traditional techniques of investigation by merely resorting to generalities as the affiant here has done.

> [N]either should [the government] be able to ignore avenues of investigation that appear both fruitful and cost-effective. It is not unreasonable to expect the government to utilize those methods that appear to be potentially productive. We would flout the statutory intent that wiretaps be used only if necessary, were we to sanction a wiretap simply because the government pursued some normal investigative strategies that were unproductive, when more fruitful investigative methods were available. In effect, the government would be able to secure a wiretap in every case, even where a normal strategy would be likely to achieve

the same result without resort to the serious intrusion that a wiretap necessarily entails.

*Id.*

## Undercover Investigations

A second investigative technique not used, nor explained with any particularity, is the use of undercover investigations. To justify not employing this technique prior to applying for a wiretap, the affiant provided the following response:

> 63. Introducing an undercover ("UC") law enforcement officer to this organization is unlikely to succeed in bring criminal charges against all of the culpable members of the organization and is too dangerous to attempt. As described above, WPD Det. Fort, acting in an undercover capacity, has met with Gerald Beasley at this restaurant, Tiara's Place, while other investigators were conducting surveillance of Gerald Beasley. While Det. Fort was able to meet with Gerald Beasley, it was only for the purpose of ducting a legitimate purchase of food from the restaurant. SCSO Detective Matt Lynch has contacted Antoine Beasley to inquire about a vehicle Antoine had for sale in the hopes of furthering future conversations with Antoine and was told the car was no longer for sale and the conversation was ended. Affiant believes the sole use of an undercover investigator will not achieve the objectives of the investigation. A UC might be able to gain the trust of one of the lower-level members of Gerald Beasley's organization and become privy to their illegal activities. However, this would only allow the UC to gain direct evidence against lower-level members. While it is unknown if it would even be possible, it would most likely take a long time for the UC to gain the trust of Gerald Beasley and to be able to deal directly with him regarding criminal activity. The longer a UC operates in an undercover capacity, the greater the probability that his or her fictitious identity may be compromised, there by jeopardizing his or her safety as well as the investigation. Even if a UC was able to eventually gain the trust of Gerald Beasley and deal directly with him, the UC would most likely be privy to parts of Gerald Beasley's criminal activities. In order for the UC to move up within the organization, he or she would need to be available to the organization 24 hours a day, every day, in order to be convincing. Placing a UC in the company of the members of this organization on a constant, or even limited, basis would be extremely dangerous. Finally, based upon Affiant's experience, it would not be possible for a UC to obtain the evidence necessary to charge all of the participants included in this conspiracy because the UC would not be privy to the full scope of all co-conspirator conversations and activities, nor exposed to all of the subjects of this investigation, it's participants, their roles, locations of stash houses, routs of transportation for drugs and money, or plans for illegal transactions. Accordingly,

22

a UC would most likely not be able to effectively and sufficiently obtain
admissible evidence needed to prosecutor all of the offenses under investigation.

The affiant attempts to convince the reader that law enforcement had tried using undercover officers and the technique failed. However, the undercover operations described in the affidavit consisted of sending a police officer in street clothes in to Tiara's Place to buy food and a telephone call to Antoine Beasley about a vehicle for sale, including no dates for either contact. The rest of the paragraph, a nearly verbatim repeat of the language used by SA Fuller in his affidavit for Target Telephone #1, lays out why an undercover operation will not work; mainly because it will not give the investigators everything thing they want: "it unlikely that she would be able to gather the evidence sufficient to fulfill the objectives of this investigation"; "Affiant believes the sole use of an undercover investigator will not achieve the objectives of the investigation"; and "it would not be possible for a UC to obtain the evidence necessary to charge all of the participants included in this conspiracy"

The affiant seems to be under the impression that if the technique does not accomplish everything he or she wants out of an investigation it need not be tried. This is not the standard. The technique must "have been tried and failed" or the affiant must explain "why [the techniques] reasonably appear to be unlikely to succeed if tried or to be too dangerous." Sending a police detective into a soul food restaurant to buy a plate of food makes a customer not an undercover operation nor does placing a telephone call to a subject of the investigation in an attempt to engage them in conversation. And generic, boilerplate, language is not sufficient to claim that this technique will not be successful or too dangerous.

**Physical Surveillance**

The affiant sets forth the government's efforts at physical surveillance in paragraphs 54 through 62 in the necessity section of the affidavit.

Paragraphs 54 and 55 describe a series of incidents that allegedly occurred on March 19, 2013. According to the affiant:

> 54. Surveillance related to this investigation has been conducted on multiple occasions, including but not necessarily limited to, on March 19, 2013, at approximately 9:00 am, SA Phil Pritchett saw a maroon truck bearing Kansas license plate 144-FCB in the driveway of Antoine Beasley's residence located at 618 Hedgewood Court in Andover, KS. SA Pritchett noticed what he determined to be surveillance cameras covering most of the angles of the residence to include the garage doors, front door, back doors and the west side of the residence. At approximately 10:46 am, SA Pritchett and SA Brian Alwes watched video of a truck similar to the one seen at 618 Hedgewood in Andover, KS arrive at 655 Estelle in Wichita. *Two individuals get into the back hatch area of the Navigator before going into the restaurant.* At approximately 10:47 am, Antoine Beasley *walks into the residence carrying a large blue or purple laundry style bag*. At 10:49 am, Antoine left the residence and at approximately 10:59 am, Antoine's truck is seen arriving at 1122 North Piatt Street, Wichita, KS.
>
> 55 At approximately 12:23 pm, a white Grand Prix arrives at 655 Estelle along with a silver Honda Ridgeline truck. The truck backs in the drive very close to the car. The driver of the car, a black male, opens the trunk of the car. The driver of the trucks meets the driver of the car and they both walk into the house. The same person is seen *carrying a large white laundry style bag into the residence*. SA Alwes determined that the license plate on the Honda Ridgeline was 031-DDY. That plate comes back to Juan Jose Ibarra DOB XX-XX-1975 SSN: XXX-XX-7587.[6]  The vehicle comes back to 1624 North Emporia St. Wichita, KS.
>
> (Emphasis added).

There are several issues with these paragraphs that call into question the accuracy of the affidavit itself. The first is the fact that paragraph 54 confuses where Antoine Beasley was allegedly seen on March 19, 2013. While discussing what seems to be something occurring at the Estelle residence, the affiant states: "Two individuals get into the back hatch area of the

---

[6] Counsel has redacted the birthdate and Social Security Number listed in the affidavit.

Navigator before going into the restaurant." Clearly this is a reference to Gerald Beasley's vehicle, the Navigator, and Tiara's Place, Gerald Beasley's restaurant. While this may be a simple mistake on the part of the affiant, it does demonstrate the same disregard for accuracy as seem elsewhere in the affidavit.

The second issue is that the alleged facts set forth in these two paragraphs directly contradict statements made earlier in the affidavit in paragraph 23. Both paragraphs are based on information provided by and observations of SA Brian Alwes.

- Paragraph 23 states that a Ford F-150 "normally utilized by Antoine Beasley" was seen arriving at 655 N. Estelle, while paragraph 54 describes the vehicle as "a truck similar to the one seen at 618 Hedgewood . . . at 655 N. Estelle."

- Paragraph 23 states that "one of the occupants was observed carrying some sort of bag into the residence." Paragraph 54, on the other hand, definitively states that "Antoine Beasley walk[ed] into the residence carrying a large blue or purple laundry style bag." Paragraph 54 makes no mention of any other occupants of the Ford truck.

- Paragraph 23 states that "the truck was than observed traveling to 1122 North Piratt, another know stash house." Again paragraph 54 was more definitive: "Antoine left the residence and at approximately 10:59 am, Antoine's truck is seen arriving at 1122 North Piatt . . ."

- Paragraph 23 then claims that while North Piatt "a passenger in the F-150 exited the vehicle and got into a white Grand Am parked at the residence." There is no mention of this in paragraphs 54 or 55.

25

- Paragraph 23 goes on to states that the "white Grand Am then returned to 655 North Estelle and was observed meeting with a bald Hispanic male driving a silver Honda Ridgeline registered to a Juan J. Ibarra. Paragraph 55 treats this event with slightly more detail: "At approximately 12:23 pm, a white Grand Prix arrives at 655 Estelle along with a silver Honda Ridgeline truck. (Later in the paragraph the affiant provides that the Honda is registered to Juan Ibarra). The truck backs into the drive very close to the car. The driver of the car, a black male, opens the trunk of the car. The driver of the truck meets the driver of the car and they both walk into the house."

- Finally, paragraph 23 states that "Juan Ibarra was observed carrying some sort of bag *out* of the residence on Estelle." Paragraph 55 states: "The same person is seen carrying a large white laundry style bag *into* the residence."

The unexplained inconsistencies between these two versions of this one event demonstrates, yet again, the sloppiness of this affidavit. This sloppiness calls into question, not only, the accuracy of the entire affidavit, but also the diligence with which it was prepared.

The remainder of the physical surveillance section contains information derived from the unlawful wiretap of Gerald Beasley's telephone (Target Telephone #1) and reiterations of information contained in the probable cause section of the affidavit. The section ends with a discussion of the limitations of surveillance and "alone [it] will not accomplish the full objectives of the investigation." And that without being guided by a wiretap on Target Telephone #2, physical surveillance "could jeopardize the investigation."

The affiant states that physical surveillance is likely to fail because alone it "will not accomplish the *full objectives* of the investigation." *Affidavit* at 31 (emphasis added). That an

26

investigative technique will not accomplish everything law enforcement wants does not mean it has failed or is reasonably unlikely to succeed. To find otherwise would allow the government to "shoot for the moon" in their investigation and then obtain a wiretap order by claiming that traditional investigative techniques will not "accomplish the full objectives of the investigation."

**Confidential Sources**

The same problem arises with the affiant's assertions regarding Confidential Sources and Sources of Information: the inability to "effectively and sufficiently obtain admissible evidence needed to prosecute *all* of the offenses under investigation." *Affidavit* at 33. Moreover, the affiant discounts the very thought of having to develop confidential sources by stating that a "CI would most likely not be able to obtain the evidence necessary to charge *all* of the participants included in this conspiracy." *Id.* It would seem that the government is under the impression that if an investigative technique will not present them the case on a silver platter, it need not be pursued, and automatically entitles them to a wiretap. The hurdles set out in the wiretap statute require more.

**Search Warrants**

The use of search warrants is discussed in Paragraph 67 of the affidavit. The affiant discusses three times search warrants were executed. The first was on May 25, 2009 (660 N. Estelle), the second on March 25, 2010 (3623 E. Funston). Antoine Beasley has no ownership interest in these properties and there is no evidence linking any of the contraband found in these searches to him. The affiant attempts to make a substantial, if not misleading leap by inferring these searches occurred during *this* investigation. In fact, they occurred more than two years *before* the instant investigation even began. (Approximately three years and four months for the N. Estelle search and approximately two years and six months for the search at E. Funston).

27

The third search discussed in the affidavit occurred in February of 2013 of a package to be delivered to 655 N. Estelle. This was due to a United States Postal Service parcel interception, not the actions of the agents in this case. Again, the affiant presents no evidence to connect the contents of this package, or the package itself, with Antoine Beasley, other than that Antoine having an ownership interest in the residence located at 655 N. Estelle.

No search warrants were executed as part of this investigation, nor were any considered by the investigating agents. Rather, to justify not utilizing this standard investigative technique, the affiant simply made general conclusive statements, the type that can be said of all drug cases:

> Based on affiant's training and experience, affiant believes that the use of search warrants will not provided sufficient evidence necessary to determine the full scope of criminal activity and the various methods being utilized by the Target Subjects in furtherance of their criminal activities. Furthermore, it is affiant's experience that, while drug traffickers often keep records listing their sources and customers for controlled substances, these records are seldom of such a detailed nature so as to ensure successful prosecution of those identified in the records based solely on the records themselves. Such records that have been seized in past drug trafficking investigations have generally been insufficient in and of themselves to establish all of the elements of a federal offense because such records are often difficult to interpret and of little or no value without further knowledge of the drug traffickers' activities. At this stage of the investigation, the service of search warrant would only serve to alert others, but would not, for the above reasons, be adequate to sustain a successful prosecution of all members of the organization. Affiant knows from information provided by sources of information, as described above, that Antoine Beasley periodically changes the location where he stores controlled substances and conducts his criminal activities in order to avoid detection by law enforcement. From affiant's training and experience, as well as consultation with other experienced investigators, affiant knows that the use of information received by way of wire and electronic interception has been very successful in disclosing locations used by drug trafficking organizations to store controlled substances. In addition, information received by way of wire and electronic interception often provides substantial assistance in determining when to serve a search warrant so as to increase the probability of locating evidence of a crime at a specific location since members of a conspiracy often talk to each other about the contraband they have at a particular location.

*Affidavit* at 35-36. This is the exact same language used by the affiant in the affidavit for the wiretap on Gerald Beasley's phone, with the exception that Antoine Beasley's name is substituted for Gerald Beasley's. Simply cutting and pasting paragraphs from one affidavit to another is the definition of boilerplate especially when no facts are provided to support the allegations.

Moreover, the affiant seems more concerned that this technique will not "be adequate to sustain a successful prosecution of *all* members of the organization." This is not the standard to be applied when considering whether or not a wiretap warrant should issue. The standard is has the technique been tried and failed; is the technique reasonably like to fail if tried; or is it simply too dangerous to try in the first place.

It is interesting to note the affiant states that he knows form sources of information that Antoine Beasley "periodically charges the location where he stores controlled substances and conducts his criminal activities in order to avoid detection by law enforcement," and that he believes a wiretap will help disclose these locations. However in paragraph 44 of the affidavit, the affiant lists all of the properties in which Gerald Beasley alone and together with Antoine Beasley through Reltsuh Inc. have an interest and later the affiant discusses placing pole cameras at some of those locations. Pole cameras would have allowed law enforcement to keep these locations under surveillance without the need for wiretaps.

Law enforcement also failed to employ another investigative technique that has become more common over the years: the use of the delayed-notification ("sneak and peek") warrant pursuant to 18 U.S.C. § 3103a. According to the *Report of the Director of the Administrative Office of the United States Courts on Applications for Delayed-Notice Search warrants and Extensions* in fiscal year 2013 alone there were 135 "sneak and peek" warrants and 420

extensions requested in Kansas. Not one of the requests were denied. In the entire United States

there were a total of 6,480 such warrants granted, 80% of which were in drug cases. *Id.* at 7.

While counsel is certainly not advocating the use of these secretive warrants, the fact is that they

are becoming common place and provide a potentially valuable tool to law enforcement.

In this case law enforcement had information about two alleged "stash houses" being

operated by Gerald Beasley and Antoine Beasley, i.e. 1120 N. Piatt and 655 N. Estelle. A "sneak

and peek" warrant would have allowed agents to confirm whether or not these were in fact stash

houses and if so to marshal their resources accordingly to conduct a more productive

investigation without the invasion of privacy inherent in the interception of personal

communications through a wiretap.

**Fixed Position Cameras**

Fixed Position Cameras, or pole cameras, were used in this investigation and the

government concedes that they have worked as they are intended in that they "assist[ed]

investigators in monitoring the activity at [the locations they are installed]." The government

frets, however, that pole cameras "[have] not provided information that would lead to the

prosecution of any of the Target Subjects," and that they provide "only a portion of the necessary

information needed in gathering evidence to be used in prosecuting members of a criminal

organization." This is not the standard, and the investigative device was being used successfully

at the time the affidavit was submitted.

**Pen Registers**

In this case the government made use of pen registers and admits that they have worked

as they are intended, although its interpretation of the data has been severely flawed:

"confirm[ing] that calls are being made between identified telephone numbers in this

30

organization, as well as telephone numbers not previously identified. According to the government, the problem with pen registers is they "alone will not allow the government to achieve the goals of the investigation." Again this is not the standard, and again the investigative device was being used successfully at the time the affidavit was submitted.

**Administrative Subpoenas**

Administrative subpoenas were used in this investigation and were successful, and worked as intended.

**Trash Searches**

The affiant takes a page and a half informing the Court why attempting trash searches as part of the investigation would be difficult or would risk "compromising the investigation." The standard for a wiretap is not the degree of difficulty faced by law enforcement but whether the technique has failed, is likely to fail, or is too dangerous to try.

**Financial Investigation**

Part of the investigation in this matter centered on the finances of Gerald and Antoine Beasley. The affiant admits that the financial investigation was successful and states that it "will aid the ongoing investigation of the Target Subject's drug trafficking, check fraud, and money laundering activities, but alone, will not meet the objectives of this investigation." In other words, it is working, and it will help, but won't help enough.

**The *Leon* "Good-Faith Exception" does not apply to wiretap warrants issued in violation of Title III.**

In 1984 the United States Supreme Court handed down *United States v. Leon*, 468 U.S. 897. In its opinion the Court created an exception to its own judicially created Fourth Amendment exclusionary rule. This exception would allow otherwise suppressible evidence to remain

admissible when the evidence is "seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." *Id.* at 897. "The Court reasoned that the exclusionary ruled seeks to deter police misconduct rather than judicial mistakes. . ." *United States v. Banks 2015 WL 2401046 (D. Kan. May 15, 2015), citing Leon* at 918-21.

Title III contains its own, statutorily created, exclusionary rule:

Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received into evidence in any trial, hearing, or other proceeding in or before any court . . . if the disclosure of that information would be in violation of this chapter.

18 U.S.C. § 2515. Title III, however, does not have a *Leon* type "good-faith "exception to that rule.

Although the Tenth Circuit has yet to decide the issue, the Honorable Judge Crabtree, wrote in *Banks*, based primarily on *United States v. Rice*, 478 F.3d 704 (6th Cir. 2007), that the rule created in *Leon* does not apply in the context of Title III.

Judge Crabtree found that the defendants in *Banks*, like the defendants here, did not rely on the Fourth Amendment as the basis for suppression, but rather they sought suppression under section 2515 of Title III. *Banks* at 4. Looking to *Rice*, Judge Crabtree found that the "law governing [wiretaps] is codified in a comprehensive statutory scheme providing explicit requirements, procedures, and protections." *Id.,* citing *Rice* 478 F. 3d at 712. Judge Crabtree went on to state that "[n]either statutory [the Kansas or Federal wiretap law] suppression remedy explicitly contains a good-faith exception . . . and the Court must construe Title III's provisions strictly." *Banks* at *4 (internal citations omitted). Moreover, Judge Crabtree agreed with the *Rice* Court when it found that in providing for suppression of unlawfully obtained evidence to be the sole remedy for violations of Title III, "Congress has already balanced the social costs and benefits" in the same manner the Supreme Court did when it created the good-faith exception in

Leon. *Rice* at 713.

The second issue Judge Crabtree raises in *Banks* is that Congress "knew how to incorporate a good-faith exception and it even did so as a defense to civil or criminal cases alleging violations of Title III." *Banks* at 4. Judge Crabtree was referring to 18 U.S.C. § 25020 (d): "[a] good faith reliance on . . . a court warrant or order, a grand jury subpoena, a legislative authorization, or a statutory authorization . . . a complete defense against any civil or criminal action" *Banks* at *4.

Finally, Judge Crabtree acknowledged that while Title III was passed in 1968 *Leon* was not decided until 1984 the legislative history "counsels against incorporating a good-faith exception" into the wiretap statute. *Id.* Again looking to *Rice*, Judge Crabtree found that

> Congress obviously could not know that Fourth Amendment search and seizure law would embrace a good-faith exception sixteen years after the passage of Title III, and the language from the Senate Report indicates a desire to incorporate only the search and seizure law that was in place at the time of the passage of Title III. (citing S. Rep. No. 90-1097 (1968) (indicating intent not to 'press the scope of the suppression role beyond present search and seizure law")).

*Banks* at *4, citing *Rice* 478 F.3d at 713 (internal citations omitted).

Based on these factors (and a factor that was applied to the Kansas wiretap statute only) Judge Crabtree concluded that the good-faith exception should not apply to wiretaps.

In an Order issued on June 18, 2015, this Court reached a different conclusion. *See United States v. Arevalo*, 13-10140-JTM at 19 (D. Kan. June 18, 2015). In *Arevalo*, the issue was whether the state court judge had the power to authorize a wiretap warrant, knowing that "after the fact" minimization was occurring outside of the court's jurisdiction. This Court found that the circumstances giving rise to the "after the fact" minimization were due to factors outside the control of the agents (i.e. sequestration), and was approved after consultation with the court. *Arevalo* at 19.

The facts in *Arevalo* are easily distinguishable from the facts of this case and those of *Banks,* where the issues involve lack of probable cause and the failure to satisfy the necessity requirements of Title III. For these reasons the defendants ask this Court to adopt the reasoning of Judge Crabtree and find that the good-faith exception of *United States v. Leon* does not apply to the wiretaps in this matter.

**CONCLUSION**

Congress did not pass title III to make it easier for police to catch alleged criminals. Congress' overriding concern was the protection of privacy. *Gelbard v. United States*, 408 U.S. 41, 48 (1972). Nor do the courts construe Title III's provisions in a way that ignores the means and focuses on the ends. Quite the opposite. As the Tenth Circuit put it: "Our mandate to strictly construe judicial wiretap authorizations is bottomed on the fact that few threats to liberty exist which are greater than that posed by the use of eavesdropping devices." *United States v. McNulty*, 729 F.2d 1243, 1264 (10th Cir. 1985).

The affiant's actions in this case do a disservice to the intent of Congress and the jurisprudence developed over Title III wiretaps. "The purpose of this [necessity] requirement is to ensure that the relatively intrusive devise of wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *Verdin-Garcia*, 516 F.3d at 889-890, quoting *United States v. Edwards*, 69 F.3d 419, 429 (10th Cir. 1995). As the Tenth Circuit has said:

> The necessity requirement directly and substantially implements the congressional intention to limit the use of intercept procedures to those situations clearly calling for their employment. As a result, failure to satisfy this requirement requires that the contents of the intercepted communications and the evidence derived therefrom be suppressed.

[*Mondragon*, *supra*] at 294 (citing *United States v. Donovan*, 429 U.S. 413, 433-34, 97 S.Ct. 658, 671, 50 L.Ed. 2d 652 (1977) (internal punctuation and citations omitted).

This approach to the necessity requirement of Title III is consistent with the opinion of the Supreme Court in *United States v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). In *Giordano*, the Court described the congressional intent underlying Title III as follows:

> Congress legislated in considerable detail in providing for applications and orders authorizing wiretapping and evidenced the clear intent to make doubly sure that the statutory authority be used with restraint and only where the circumstances warrant the surreptitious interception of wire and oral communications. These procedures were not to be routinely employed as the initial step in criminal investigation. Rather, the applicant must state and the court must find that normal investigative procedures have been tried and failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous.

*Id.* at 515, 94 S.Ct. at 1826-27.

As the Supreme Court stated, "the applicant must state and the court must find that normal investigative procedures [1] have been tried and failed or [2] reasonably appear to be unlikely to succeed if tried or [3] to be too dangerous." *Id.* On the four corners of the affidavit fails to prove the Government's case for the necessity of a wiretap.

The Government should not, through the use of conclusory opinion, be able to generically argue that an investigation is failing simply to permit it to resort to the very intrusive use of a wiretap. *See Giordano*, 416 U.S. at 515 ("These procedures were not to be routinely employed as the initial step in criminal investigation. Rather, the applicant must state and the court must find that normal investigative procedures have been tried and failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous").

> Few threats to liberty exist which are greater than that posed by the use of eavesdropping devices. Some may claim that without the use of such devices crime detection in certain areas may suffer some delays since eavesdropping is quicker, easier, and more certain. However, techniques and practices may well be

> developed that will operate just as speedily and certainly and what is more
> important without attending illegality.

*Berger v. New York*, 388 U.S. 41, 63 (1967). As Justice Brandeis said in his dissent in *Olmstead*

over 80 years ago,

> The evil incident to invasion of the privacy of the telephone is far greater than that
> involved in tampering with the mails. Whenever a telephone line is tapped, the
> privacy of the persons at both ends of the line is invaded, and all conversations
> between them upon any subject, and although proper, confidential, and privileged,
> may be overheard. Moreover, the tapping of one man's telephone line involves
> the tapping of the telephone of every other person whom he may call, or who may
> call him. As a means of espionage, writs of assistance and general warrants are
> but puny instruments of tyranny and oppression when compared with wire
> tapping.

*Olmstead v. United States*, 277 U.S. 438, 475-76 (1928) (Brandeis, J., dissenting).

WHEREFORE, for the above and foregoing reasons, defendant prays this Court suppress

the evidence seized in this case obtained from the alleged illegalities underlying the wiretap, and

that the Court hold a *Franks* hearing to determine whether any of the alleged omissions or

misrepresentations of the affiant in the respective warrant applications were made knowingly,

intentionally, or recklessly, and that this information was material to the Court's findings,

thereby warranting suppression as this Motion requests.

Respectfully Submitted


/s/ Michael D. Hepperly
Michael D. Hepperly
Michael D. Hepperly Law Office, Chtd
310 W. Central, Suite 119
Wichita, KS 67202
316-267-5330
316-267-6589 (fax)
mhepperly@aol.com
Attorney for Gerald Beasley


/s/ James R. Pratt

36

James R. Pratt
Pratt Law L.L.C.
445 N. Waco
Wichita, KS 67202
316-262-2600
316-262-2606 (fax)
jim@jamesrprattlaw.com
Attorney for Antoine Beasley

/s/ Carl Fredrick A. Maughan
Carl Fredrick A. Maughan
Maughan Law Group, LC
200 W Douglas, Suite 350
Wichita, KS 67202
316-264-2023
316-264-1919 (fax)
carl@mlglc.com
Attorney for Helen Beasley

/s/ Kari S. Schmidt
Kari S. Schmidt
Conlee Schmidt & Emerson, LLP - Wichita
200 W. Douglas, Suite 300
Wichita, KS 67202
316-264-3300
316-264-3423 (fax)
karis@fcse.net
Attorney for Terry Beasley

/s/ Mark A. Sevart
Mark A. Sevart
PO Box 781602
Wichita, KS 67278
316-686-1519
316-788-7437 (fax)
markchrissevart@yahoo.com
Attorney for Carlos Beasley

/s/ John V. Wachtel
John V. Wachtel
Klenda Austerman LLC - Wichita
1600 Epic Center
301 N. Main Street
Wichita, KS 67202-4816
316-267-0331

37

316-267-0333 (fax)
jvwachtel@klendalaw.com
Attorney for Gerald Wilson

## CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2015, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to each counsel of record in this case.

I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants: none

s/James R. Pratt
JAMES R. PRATT #17716
Attorney for Defendant
445 N. Waco
Wichita, Kansas 67202
Ph: (316) 262-2600
Fax: (316) 262-2602
Jim@JamesRPrattLaw.com