1

```
 1              IN THE UNITED STATES DISTRICT COURT
                      DISTRICT OF KANSAS
 2

 3  THE UNITED STATES OF AMERICA,

 4            Plaintiff,

 5        vs.                        District Court
                                     Case Number
 6  GERALD BEASLEY,                  13-10112-01
    ANTOINE BEASLEY,                 13-10112-03
 7  CARLOS BEASLEY,                  13-10112-04
    HELEN BEASLEY,                   13-10112-05
 8  TERRY BEASLEY,                   13-10112-06
    HERBERT JONES,                   13-10112-07
 9  WILLIAM PARKER, III,             13-10112-08
    STEPHEN SMALLWOOD,               13-10112-10
10  BRANDON SMITH,                   13-10112-11
    GERALD WILSON,                   13-10112-12
11                                   Volume 1
              Defendants.
12

13            TRANSCRIPT OF PROCEEDINGS

14        On the 11th day of April, 2016 at 9:00 a.m.
    came on to be heard in the JAMES hearing  in the
15  above-entitled and numbered cause before the
    HONORABLE J. THOMAS MARTEN, Judge of the United States
16  District Court for the District of Kansas, Sitting in
    Wichita.
17        Proceedings recorded by mechanical
    stenography.
18        Transcript produced by computer.

19

    APPEARANCES
20
          The United States Government appeared by and
21  through:
                Ms. Michelle Jacobs, Special AUSA
22              Mr. Aaron Smith, AUSA
                301 N. Main, Suite 1200
23              Wichita, Kansas 67202

24

25
```

2

```
 1          The Defendant, Gerald Beasley, appeared in
    person, by and through:
 2               Mr. Michael D. Hepperly
                 Michael D. Hepperly Law Office, Chtd.
 3               310 W. Central, Suite 119
                 Wichita, KS 67202
 4
            The Defendant, Antoine Beasley, appeared in
 5  person, by and through:
                 Mr. James Pratt
 6               Pratt Law Office, LLC
                 445 N. Waco
 7               Wichita, KS 67202

 8          The Defendant, Carlos Beasley, appeared in
    person, by and through:
 9               Mr. Mark A. Sevart
                 PO Box 781602
10               Wichita, KS 67278

11          The Defendant, Helen Beasley, appeared in
    person, by and through:
12               Mr. Kevin Loeffler
                 Law Office of Kevin Loeffler
13               111 E. 7th
                 Newton, KS 67114
14
            The Defendant, Terry Beasley, appeared in
15  person, by and through:
                 Ms. Kari Schmidt
16               Conlee, Schmidt & Emerson, LLP
                 200 W. Douglas, Suite 300
17               Wichita, KS 67202

18          The Defendant, Herbert Jones, appeared in
    person, by and through:
19               Mr. Kurt P. Kerns
                 Ariagno, Kerns, Mank & White
20               328 N. Main
                 Wichita, KS 67202
21
            The Defendant, William Parker, III, appeared
22  by and through:
                 Mr. Edward C. Robinson
23               Robinson Law, LLC
                 105 S. Broadway, Suite 1170
24               Wichita, KS 67202

25
```

1           The Defendant, Stephen Smallwood, appeared by
and through:
2               Mr. Roger Falk
                Roger Falk Law Office, PA
3               301 W. Central
                Wichita, KS 67202
4
            The Defendant, Brandon Smith, appeared in
5 person, by and through:
                Ms. Sylvia B. Penner
6               Fleeson, Gooing, Coulson & Kitch, LLC
                1900 Epic Center
7               301 N. Main
                Wichita, KS 67202
8
            The Defendant, Gerald Wilson, appeared in
9 person, by and through:
                Mr. John V. Wachtel
10              Klenda Austerman, LLC
                1600 Epic Center
11              301 N. Main
                Wichita, KS 67202
12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1                        INDEX

 2  Reporter's Certificate                        401

 3  WITNESS FOR THE PLAINTIFF:
        JASON FULLER
 4          Direct Examination by Ms. Jacobs        8
            Cross Examination by Mr. Hepperly     201
 5          Cross Examination by Mr. Pratt        223
            Cross Examination by Mr. Kerns        267
 6          Cross Examination by Mr. Wachtel      277
            Cross Examination by Mr. Falk         279
 7          Cross Examination by Ms. Schmidt      302
            Cross Examination by Mr. Loeffler     328
 8          Cross Examination by Mr. Robinson     338
            Cross Examination by Ms. Penner       345
 9          Cross Examination by Mr. Sevart       367
            Redirect                              385
10

11

12  EXHIBITS                      OFFERED    ADMITTED
    Government 1 Notebook           199        200
13  Government 2 Affidavit          199        200

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Proceedings commenced at 9:00 a.m.)
 2              THE COURT:  Good morning.  This is the United
 3  States District Court for the District of Kansas, Case
 4  Number 13-10112-01, United States of America versus
 5  Gerald Beasley, et al.
 6              You can keep your seats, but if you would note
 7  your appearances for me, please.
 8              MS. JACOBS:  Thank you, Your Honor.  Special
 9  Assistant United States Attorney Michelle Jacobs
10  appears on behalf of the United States.
11              With me at counsel table is Assistant United
12  States Attorney Aaron Smith, and to my right is Shauna
13  Sherwood, one of the case agents on this case.  She
14  will not be testifying today, but she is here to
15  assist -- assist me.
16              And then seated behind me is Jason Fuller with
17  the ATF and he will be our testifying witness today.
18              THE COURT:  Thank you very much.
19              MR. HEPPERLY:  If it may please the Court.
20  Mike Hepperly appears on behalf of Gerald Beasley, who
21  is present in the courtroom.  He is in the gallery.
22              THE COURT:  Thank you, Mr. Hepperly.
23              MR. PRATT:  Your Honor, Jim Pratt appears for
24  Antoine Beasley, who is also present.
25              THE COURT:  Thank you.
```

1             MS. PENNER:  Good morning, Your Honor.  Sylvia

2   Penner appears on behalf of Brandon Smith, who is also

3   present.

4             THE COURT:  Thank you.

5             MR. FALK:  Good morning, Your Honor.  Roger

6   Falk appearing for the defendant, Stephen Smallwood.

7             I do not see Mr. Smallwood here yet, but I

8   know he was planning on attending.

9             THE COURT:  Thank you, Mr. Falk.

10            MR. SEVART:  May it please the Court, Your

11  Honor.  Mark Sevart appearing on behalf of Carlos

12  Beasley, and Carlos Beasley is present, Your Honor.

13            THE COURT:  Thank you, Mr. Sevart.

14            MS. SCHMIDT:  Kari Schmidt appearing on behalf

15  of Terry Beasley who is also present in the gallery,

16  Your Honor.

17            THE COURT:  Thank you, Ms. Schmidt.

18            MR. ROBINSON:  Good morning, Your Honor.  Ed

19  Robinson for William Parker who is not present, he is

20  actually still in the hospital.

21            THE COURT:  Thank you, Mr. Robinson.

22            MR. WACHTEL:  Your Honor, Val Wachtel on

23  behalf of Gerald Wilson who also appears in person.

24            THE COURT:  Thank you.

25            MR. KERNS:  Kurt Kerns on behalf of Herbert

1  Jones.  He is present as well, Your Honor.

2          THE COURT:  Thank you so much.

3          MR. LOEFFLER:  Kevin Loeffler on behalf of

4  Calvin Beasley.  He is present.

5          THE COURT:  Thank you, Mr. Loeffler.

6          This matter comes on today for a <u>James</u>

7  hearing.  Are there any preliminary matters from any

8  party?

9          MS. JACOBS:  Not from the Government, Your

10  Honor.

11          MR. HEPPERLY:  If it may please the court.  On

12  the direction of cross examination, would it be a

13  possibility that the first lawyer up could be the

14  person who is the declarant in the telephone

15  conversation, rather than always Mr. Beasley's lawyer?

16          THE COURT:  Absolutely.  That's fine.  Thank

17  you.

18          MR. PRATT:  Your Honor, I have two points.

19  Ms. Penner brought this up.

20          Instead of -- if there is an objection,

21  instead of all nine defense counsel objecting, would

22  the Court allow each objection to apply to everyone so

23  we can also preserve that particular objection?

24          THE COURT:  That's fine with me, unless you

25  object to the objection, and then let me know.

1          MR. PRATT:  And another thing, Your Honor, I

2  would ask the Court if following the hearing you would

3  allow -- consider a briefing schedule.

4          THE COURT:  We haven't put one together but

5  I'll give you time to brief it, of course.

6          MR. PRATT:  Thank you.

7          THE COURT:  Certainly.

8          Any other preliminaries from any of the

9  defendants?

10          All right.  Well, Ms. Jacobs, you may proceed.

11          MS. JACOBS:  Thank you, Your Honor.

12          The United States would call Special Agent

13  Jason Fuller with the ATF.

14          THE COURT:

15          (Witness is sworn.)

16                          **JASON FULLER,**

17  called as a witness on behalf of the Plaintiff, having

18  been first duly sworn, testified as follows:

19                      **DIRECT EXAMINATION**

20  BY MS. JACOBS:

21  Q.    Good morning.

22  A.    Good morning.

23  Q.    Would you please go ahead and state your name

24  for the record.

25  A.    Jason Fuller, F-u-l-l-e-r.

9

1  Q.    Mr. Fuller, how are you employed?

2  A.    I'm a special agent with the Bureau of Alcohol

3  Tobacco, Firearms, and Explosives, otherwise known as

4  ATF.

5  Q.    And as agent for ATF, what are your duties?

6  A.    I investigate all areas under ATF's

7  jurisdiction, primarily violations concerning firearms,

8  explosives, arson, and a few other areas.

9  Q.    Is that also --

10          THE COURT:  Excuse me.

11          Special Agent Fuller, could you -- is your

12  microphone turned on?  I guess that's the first thing.

13          THE WITNESS:  It is now, sir.

14          THE COURT:  Thank you.

15  BY MS. JACOBS:

16  Q.    In your investigations, do you also frequently

17  investigate narcotic offenses, as well?

18  A.    Yes.

19  Q.    Will you explain to the Court how those narcotic

20  offenses are related or intertwined with explosive and

21  firearm cases.

22  A.    When it comes to our jurisdiction, one of the

23  offenses that we investigate is carrying a firearm

24  during or in furtherance of a crime of violence or drug

25  trafficking crime and that gives us some jurisdiction

1   in investigating narcotics offenses.

2   Q.    Other relevant law enforcement experience to

3   this case or to your current assignment prior to

4   working for ATF?

5   A.    Yes.

6   Q.    Would you explain that to the Court.

7   A.    I was employed as a special agent by the Iowa

8   Division of Narcotics Enforcement where I primarily

9   investigated controlled substance violations.

10  Q.    All right.  And training and experience to be

11  special agent with the ATF.  And if you'll also spend a

12  little bit of time discussing your experience and

13  training with narcotic offenses.

14  A.    I've attended the Drug Enforcement

15  Administration's two-week basic narcotics investigator

16  school.  I also attended a training by the Drug

17  Enforcement Administration on the investigation of

18  clandestine drug manufacturing facilities.

19  Q.    All right.  Would it be an accurate statement if

20  I was to say that although you're employed and you work

21  cases assigned to ATF, frequently those cases involve

22  narcotic offenses, as well, or narcotic controlled

23  substance offenses?

24  A.    Yes, they do.

25  Q.    Can you go ahead and explain to the Court, what

1  started your investigation in to Gerald Beasley and his

2  associates?

3  A.    In approximately October, 2012 I received

4  information from the Sedgwick County District

5  Attorney's Office regarding Gerald Beasley and his

6  alleged involvement in various types of criminal

7  activity.

8  Q.    And what information did you receive?

9  A.    I received that there had been numerous reports

10 where he was associated with alleged bank fraud and

11 that Gerald Beasley had amassed large amounts of

12 assets, including properties, and that he was also

13 alleged to have been involved in narcotics trafficking.

14 Q.    What was suspicious to you about that

15 information?

16 A.    It was suspicious to me because of the number of

17 reports, once I started looking at him where he had

18 been referenced or had been involved in check fraud and

19 then looking at his property that he owned, didn't

20 appear to be consistent with his stated employment.

21 Q.    And what -- at that time what was his stated

22 employment, if you recall?

23 A.    He was running a restaurant called Tiara's Place

24 restaurant.

25 Q.    And where was that restaurant located?

1    A.    It was at 1339 North Hillside in Wichita,

2  Kansas.

3    Q.    If I said it was the intersection of 13th and

4  Hillside, approximately, is that correct?

5    A.    Just south of that intersection.

6    Q.    What else occurred that made the ATF decide to

7  open an investigation?

8          Was there other information that occurred?

9  That you received?

10   A.    Yes, we began conducting surveillance of Gerald

11 Beasley.  We noticed activities that I believed to be

12 consistent with drug trafficking.  For example, meeting

13 with individuals after hours at the restaurant for

14 short periods of time, and then also traveling to a

15 house that we had received anonymous information about

16 as being a possible place where he stored narcotics.

17   Q.    All right.  And were there also historical cases

18 that you've reviewed?

19   A.    Yes.

20   Q.    What historical cases were those?

21   A.    There is quite a few.  There was cases that

22 occurred in Wichita, Kansas related to bank fraud or

23 counterfeit checks; cases in Olathe, Kansas for the

24 same offenses; cases in Western Kansas, as well; and

25 then as well as McPherson, and some others.

1  Q.    Okay.  And were there also narcotic or drug

2  related cases that you located that were relevant to

3  this investigation?

4  A.    Yes.

5  Q.    And what cases were those?

6  A.    There was a search warrant conducted at one time

7  at a residence where Carlos Beasley was found to be at

8  where narcotics and large amount of cash was recovered.

9        There was a search warrant conducted at 660

10 North Estelle which was the residence of Gerald Wilson

11 where a large amount of cocaine and cocaine base, as

12 well as a firearm, ammunition, and large amount of

13 currency also was recovered.  In all those properties,

14 we found that Gerald Beasley had some type of ownership

15 interest in them.

16 Q.    And the case with Carlos Beasley, do you recall

17 what kind of narcotic substance it was?

18 A.    I believe it was cocaine and marijuana.

19 Q.    And to your information, did Carlos Beasley, was

20 he charged for that offense?

21 A.    Yes, he was.

22 Q.    And was that through state court?

23 A.    Yes.

24 Q.    And do you -- to your knowledge, did he actually

25 plead guilty and serve a term of imprisonment related

1  to that offense?

2   A.    Um, I don't know whether he pled or if he was

3  convicted, but he did serve a term of confinement.

4   Q.    Okay.  And the case of Gerald Wilson, would it

5  be an accurate statement that that is the case that

6  entitled or that encompasses a number of charges in the

7  second superseding indictment?

8   A.    That's correct.

9   Q.    Was there also information received on an

10 individual by the name of Herbert Jones?

11  A.    Yes.

12  Q.    And can you tell the Court that information, as

13 well, please.

14  A.    We learned that Herbert Jones was a possible

15 associate of Gerald Beasley's, both through

16 surveillance and also once we obtained the pen register

17 and saw that Gerald Beasley was in telephonic contact

18 with the phone number that we believed to belong to

19 him, found out that Detective Maria Heimerman from the

20 Wichita Police Department had conducted, in an

21 undercover capacity, two purchases of cocaine base from

22 Herbert Jones.

23  Q.    And do you recall approximately when she had

24 those undercover buys with Herbert Jones?

25  A.    I'd have to check my notes or reports for the

1    exact date.

2    Q.    Was it prior to the start of this

3    investigation --

4    A.    Yes --

5    Q.    -- is that correct?

6    A.    -- it was.

7    Q.    Thank you.

8         There were a number of investigative tools

9    used throughout your investigation and I'd like to

10   discuss a few of them with you.

11        First of all, will you go ahead and talk to

12   the Court a little bit about the financial aspect of

13   this investigation.

14   A.    Yes.  We began preliminarily to look in to

15   Gerald Beasley's finances and his assets that he owned.

16   Eventually, Task Force Officer Ronald Goodwyn, who at

17   the time was assigned to the Internal Revenue Service,

18   along with Robert Hawkins, who is an asset forfeiture

19   investigator for ATF, began a more thorough

20   investigation of Gerald Beasley, as well as some of his

21   associates' financial affairs.

22   Q.    All right.  And what was learned?  What

23   information was gathered?

24   A.    In summary, it was learned that he had amassed

25   assets without the -- an apparent legitimate source for

1  obtaining those assets.

2  Q.    Okay.  And we'll discuss that a little bit more

3  when we discuss the money laundering conspiracy later

4  on today.

5         Were there also Grand Jury subpoenas issued?

6  A.    Yes, there were.

7  Q.    And where were those issued to if you recall, or

8  just a couple important or relevant places?

9  A.    They were issued to lots of different places:

10 Primarily financial institutions, including banks, and

11 then also places related to the properties that he

12 owned, mortgage companies, and so forth.

13 Q.    Were there also a number of administrative

14 subpoenas that were issued?

15 A.    Yes.

16 Q.    And what capacity or what type of administrative

17 subpoenas?

18 A.    Those were primarily done through the Drug

19 Enforcement Administration.  There was admin

20 subpoenas -- or administrative subpoenas, excuse me,

21 issued for a rental car, for -- to see who had rented

22 the vehicle, and then also for subscriber information

23 for phones that had been identified and at one point in

24 the investigation for an IP address.

25         Actually, it was two IP addresses, to be -- to

1  be accurate.

2  Q.    And what was the purpose of that administrative

3  subpoena?

4  A.    There was a point in the investigation where a

5  package that had been addressed to 655 North Estelle

6  had been intercepted by the United States Postal

7  Inspection Service.  A search warrant was obtained for

8  that package and was found to contain a large amount of

9  marijuana and marijuana wax.

10  Q.    All right.  And what information did you learn

11  about 665 North Estelle?

12  A.    We learned that that was a property that is

13  associated with Gerald Beasley and his son, Antoine

14  Beasley.

15  Q.    And what information was obtained from the

16  administrative subpoena, or what was the purpose of the

17  administrative subpoena, I guess?

18  A.    We were informed by the postal inspection

19  service that somebody was using the internet to check

20  on the status of that particular package and they

21  provided us two IP addresses that had been used to do

22  that, and one of the IP addresses came back to 618

23  Hedgewood in Andover, which is the address of Antoine

24  Beasley.

25  Q.    You mentioned these -- a lot of these

1  administrative subpoenas were done through DEA.  Would

2  you explain to the Court how DEA and ATF -- how, I

3  guess how they work together, or if they worked

4  together through the pendency of this investigation?

5  A.    Well, this investigation was designated as an

6  OCDETF investigation, which is an Organized Crime Drug

7  Enforcement Task Force which ATF is a full partner in,

8  as well as DEA and other federal agencies, and that

9  allows us to work together on an investigation and

10 provides funding for the investigation.

11 Q.    All right.  Did you and -- well, let me put it

12 this way.

13        Did ATF and DEA work closely together?

14 A.    Yes.

15 Q.    And, in fact, would it be an accurate statement

16 to say there was a case agent with ATF and also a case

17 agent with DEA?

18 A.    Yes, there was.

19 Q.    Sharing information, as well as working,

20 surveillance and the wire and everything else together,

21 would that be correct?

22 A.    That's correct, it was -- it was a joint

23 operation.  Not only DEA, but also with the Wichita

24 Police Department and the Sedgwick County Sheriff's

25 Office.

1    Q.    Okay.  You also employed lots of surveillance

2    throughout this investigation.  Would you describe to

3    the Court surveillance techniques, as well as specific

4    areas that you focussed on in your surveillance.

5    A.    The most frequent type of surveillance that we

6    conducted is mobile vehicle surveillance where agents

7    or investigators would be in vehicles in the area of

8    the target or the target location and they would follow

9    the target around or observe what was happening at the

10   target location.

11          We also had fixed position cameras or

12   otherwise known as pole cameras installed at various

13   locations that we believed to be involved in criminal

14   activity.

15   Q.    Okay.  And were there also interviews that were

16   conducted not only initially but throughout the

17   investigation?

18   A.    Yes.

19   Q.    And what were those interviews related to?

20   A.    Well, prior to the investigation there was -- we

21   found that some people had been interviewed prior to us

22   even beginning the investigation so we reviewed those

23   interviews.

24          Once we began our investigation we found out

25   that some people were in custody or had been arrested

1  and believed that they might have pertinent information

2  so investigators interviewed some of those individuals

3  and they provided some useful information regarding

4  Gerald Beasley and his associates' criminal activities.

5  Q.    What way?

6  A.    For example, Terry Ross was one individual who

7  was interviewed.  Terry Ross provided information that

8  he was a driver for Gerald Beasley on excursions where

9  counterfeit checks were cashed.  He provided us

10 information that Gerald Beasley was carrying a firearm

11 in the recent past and that Gerald Beasley was involved

12 in EBT card fraud and then also drug trafficking.

13 Q.    Just for the record, Terry Beasley -- I'm sorry,

14 Terry Ross was in custody at the time, is that correct?

15 A.    Yes, he was.

16 Q.    On felony offenses, if I remember correctly?

17 A.    That's correct.

18 Q.    And because of this, were you able to or did you

19 attempt to go out and verify or support his testimony

20 through other investigation or reviewing reports?

21 A.    Yes, the check fraud activities that he spoke of

22 had been previously documented, so verified that

23 information.  There was other individuals we

24 interviewed who provided the same or very similar

25 information which tended to corroborate each other's

1   statements, and then the information he provided as to

2   locations was all information that we knew to be

3   truthful from our investigation up to that point.

4   Q.    You were also able to use an administrative

5   subpoena to verify that it was Gerald Beasley who

6   rented him a vehicle to -- was that Terry -- was that

7   another one?

8   A.    Well, Gerald Beasley did rent him a vehicle, it

9   wasn't through an administrative subpoena, that was

10  done by the local detectives who were investigating

11  that particular crime.  They also did a search warrant

12  on Terry Beasley's telephone related to that check

13  fraud incident.

14  Q.    I'm sorry, Terry Ross's telephone?

15  A.    I'm sorry, Terry Ross's.

16  Q.    Thank you.

17  A.    Excuse me.  And found text messages in his phone

18  with what was later determined to be Gerald Beasley's

19  telephone number which seemed to verify that Gerald

20  Beasley was involved in that check cashing incident and

21  had rented a vehicle for him.

22  Q.    And were there also jail calls that you reviewed

23  related to this investigation?

24  A.    Yes.

25  Q.    And if you would describe those to the court, as

1  well.

2  A.    Well, when somebody's an inmate at the Sedgwick

3  County Adult Detention Facility, their calls are

4  recorded and monitored and so I had access to those and

5  once I determined what Gerald Beasley's telephone

6  number was I was able to query phone calls from the

7  jail to that particular phone number and found that

8  quite a few people who had been arrested on financial

9  crimes or other crimes were in contact with that

10  telephone number.

11  Q.    You mentioned pole cameras.  Would you describe

12  to the Court a little bit more about the pole cameras?

13        I guess, specifically, let's ego ahead and

14  start with where they were placed during this

15  investigation.

16  A.    We placed several pole cameras at the Tiara's

17  Place restaurant; we placed a pole camera at 1122 North

18  Piatt; we placed a pole camera at 655 North Estelle; we

19  placed a pole camera at 660 North Estelle; and we also

20  later on placed a pole camera near 618 North Hedgewood

21  in Andover.

22        And then we also had placed a pole camera at

23  one time at who we believed to be a source of supply

24  for the -- for Gerald Beasley and the others.

25  Q.    And would you go ahead and explain to the Court

1  why you placed a pole camera at each of these

2  locations.

3  A.     Well, each of these locations were locations

4  that we believed to either be a place involved in the

5  drug trafficking activities or other criminal

6  activities, or the residence of -- of a person who was

7  involved in those activities.

8  Q.     And you say you believed they were involved.

9  Had you already done surveillance or something else to

10 get to this point before you put the pole cameras up?

11 A.     Yes.

12 Q.     How did they work, if you could describe that to

13 the Court so the Court has an understanding

14 of -- of -- of what you were able to see when you were

15 sitting in the room or what you were able to view.

16 A.     Okay.  The cameras, for the most part, are hung

17 on some type of public utility pole or a light pole and

18 the video from that camera is sent via the internet,

19 which we can access from pretty much anywhere where we

20 have access to the internet and we can pull up that

21 camera on a computer and we can tell the camera to do

22 certain things:  Zoom in, zoom out, or move left,

23 right, up, down, and it also is supposed to record to

24 a -- to a server or to a hard drive of some sort so

25 that it retains that information.

24

1   Q.    Would it be accurate to say these pole cameras

2   were pretty much real time, with the exception of the

3   delay in transmitting through internet?

4   A.    For the most part, when you watch them you'll

5   notice that they can be, at times, depending on the

6   internet speed or various other factors, they can be

7   choppier than at other times but when we're watching

8   them it's near real time when things are happening.

9   Q.    I know that one of the things that we've talked

10  about is there was a lot of activity at night, as well.

11          How well were these pole cameras able to work

12  during evening or dark hours?

13  A.    It depends on a lot of factors.  There's

14  environmental factors such as whether it is raining or

15  snowing or it's windy, which moves the camera around

16  sometimes, and it also depends on how zoomed in the

17  camera is, or zoomed out, as to how detailed of an

18  image you can get of a particular person.

19          But at night they have low light settings on

20  them usually and so you -- you can see still at night

21  vehicles arriving, for the most part, or people going

22  in or out of locations.

23  Q.    And these pole cameras operated 24 hours a day,

24  would that be an accurate statement?

25  A.    They're supposed to.  They're -- as with

1  anything that is mechanical or technical, there are

2  issues that arise that sometimes cause them to

3  malfunction.  That did occur on some instances.  And

4  especially when you have a camera that's outdoors and

5  set up the way they are, sometimes for -- for technical

6  reasons they may not function for a short period of

7  time or for some period of time.

8  Q.    How did these pole cameras assist in your

9  investigation?

10  A.    They allowed us, when we're conducting

11  surveillance, instead of having to have the mobile

12  vehicle units so close to the target location or the

13  individual that we're following around, allows those

14  mobile units to be further away so that they don't

15  become observed by the target.

16       They allow us also to, because of the

17  recording function, to be able to go back and review

18  even when we're not actively monitoring that particular

19  camera to see what happened in the past and then it

20  memorializes, as I said, the recording that takes place

21  so that we have a recording of what happened.

22  Q.    Was there also a use of a vehicle GPS tracker?

23  A.    There was a tracker that was placed on Antoine

24  Beasley's Ford truck at one time.

25  Q.    And was that tracker on his vehicle while you

1  all were up on a wire?

2  A.    Yes.

3  Q.    And I think it was -- it was put on there prior

4  to the wire, for his wire, is that correct?

5  A.    I don't -- I'd have to refer to the report as to

6  when it was actually placed on the vehicle but it was

7  placed at around the time that the wire began, I

8  believe.

9  Q.    And, finally, were there a number of wiretaps

10 that were used in this investigation?

11 A.    Yes, there were two wiretaps.

12 Q.    Will you explain to the Court, I know the

13 Court's heard this before but we do need to make a

14 record.  Will you explain to the Court how the wiretap

15 works and what you're able to see and observe -- not

16 see, but observe while you're in the wire room.

17 A.    So it's -- it's Court authorized wiretap and

18 once the wiretap is approved by the Court, contact's

19 made with the phone carrier to facilitate the

20 interception of that particular phone.  Once that

21 connection is established, it allows us to listen to

22 the phone calls as they're being received or made from

23 that particular telephone and, in this instance, text

24 messages were also allowed, so allowed us to also

25 intercept those, as well.

27

1   Q.    Are text messages received or handled

2   differently?

3   A.    Slightly differently.  The case agent does not

4   initially see each text message, it is reviewed by

5   other people who aren't the case agents to determine

6   whether or not they're pertinent.  If they're deemed

7   pertinent then the case agent at the time looks at

8   them.

9   Q.    All of these phone calls and text messages are

10  recorded, is that correct?

11  A.    Yes.

12  Q.    And that is recorded and maintained by, is it

13  ATF, for the ATF wire, and DEA for the DEA wire, would

14  that be an accurate statement?

15  A.    No, we utilize DEA's personnel and facilities

16  for both of the wiretaps.

17  Q.    Okay.  So it was their wire room and they were

18  responsible for the -- the maintaining of the wire, if

19  you will?

20  A.    Uh, yes, initially, yes.

21  Q.    How did the wiretaps change your investigation

22  or your investigative techniques?

23  A.    Well, it allowed us to understand, because

24  you're receiving more information from the phone calls,

25  and it allows us to corroborate the information that

1  had been previously provided by other people we had

2  spoken to but it allows us to hear in real time

3  criminal activity taking place and to document that.

4  Q.    Were you also able to then employ some wall off

5  stops or other sort of investigative techniques to

6  collect evidence?

7  A.    Yes.

8  Q.    So who was the initial target of this

9  investigation?

10  A.    Initially it was Gerald Beasley.

11  Q.    How quickly were you able to identify other

12  targets?

13  A.    Very quickly, within our first few interceptions

14  we began intercepting calls that we believed to be

15  pertinent to drug trafficking.

16  Q.    All right.  Were you also throughout this

17  investigation able to identify who you believed to be

18  the suppliers of the controlled substances?

19  A.    We did.

20  Q.    Would you explain to the Court how that

21  occurred.

22  A.    Well, we began intercepting calls where it

23  appeared that Gerald Beasley and others, including

24  Antoine Beasley, Stephen Smallwood, Terry Beasley, were

25  gathering large amounts of money together and then

29

1  through our surveillance we saw Antoine meeting with

2  Juan Ibarra or Inocente Ibarra, and we had previously

3  seen Antoine meeting with them prior to the initiation

4  of the wiretap of the phone at 655 North Estelle, which

5  we had already known to be a place where drug activity

6  was taking place from the interception of the package

7  in the mail.

8        And once we observed that, we learned that

9  Juan Ibarra and Inocente Ibarra and Myra Ibarra were

10  believed to be involved in transporting large amounts

11  of cocaine and money back to Texas.

12  Q.    And you had additional outside information from

13  your investigation to support that conclusion, is that

14  correct?

15  A.    Yes, we received that information about the

16  Ibarras from the Drug Enforcement Administration in

17  Texas.

18  Q.    Were you also able to identify the next level

19  down distributors, I think is how I would refer to it?

20  People underneath Gerald Beasley or Antoine Beasley?

21  A.    Yes, we were able to identify many of those

22  individuals.

23  Q.    And then also able to identify individuals who

24  were simply users and obtaining from Gerald Beasley or

25  Antoine Beasley?

1   A.     Yes.

2   Q.     Or others?

3   A.     That's correct.

4   Q.     One thing we haven't discussed in talking about

5   the bank fraud and the forgeries, can you tell the

6   Court a little bit about the individuals that have been

7   arrested and related to the bank fraud?

8           Meaning, who were they, how did they know

9   Gerald Beasley, how had they met him, their background,

10  history, if you would.

11  A.     There's a lot of people.  Terry Ross is one

12  individual that we've already spoken about.  William

13  Parker, Charlotte Akogun, Tradessa Donnell, Raymond

14  Jones.

15  Q.     Were a lot of these individuals users of

16  controlled substances?

17  A.     Yes.

18  Q.     Did they talk about whether or not or how they

19  were paid or how Gerald maybe talked them in to going

20  forward with doing some of these forgeries for him?

21  A.     Well, generally, the information we received

22  from these individuals was that the proceeds from the

23  check fraud activities would be split in thirds, and

24  the -- Gerald Beasley would receive a third; the person

25  driving the individuals that would cash the check would

1  get a third, and; the people cashing the checks would

2  get a third of the proceeds.

3  Q.    Would it be accurate to say that Terry Ross, in

4  particular, and possibly William Parker were what I

5  would have referred to as a recruiter for Gerald

6  Beasley?

7  A.    It -- yes, that would be accurate.

8  Q.    And how did you learn that they recruited

9  individuals?

10  A.    Well, Terry Beasley told us during his

11  interview -- I'm sorry, Terry Ross told us during his

12  interview that that was his role in the organization,

13  was to recruit people and then to drive them to the

14  banks to cash the counterfeit checks.

15         William Parker, prior to the wiretap, was

16  involved in an incident where he had taken Cleo Walker

17  to a bank to cash a counterfeit check, that she got

18  arrested during that attempt, and then which led to

19  William Parker's arrest.  William Parker then, from the

20  jail, called Gerald Beasley and warned him that Cleo

21  Walker had talked to law enforcement and to clean up.

22  Q.    So how many phones in total were there wiretaps,

23  did we wiretap?

24  A.    Two.

25  Q.    And whose phones were they?

32

1    A.    It was a cell phone belonging to Gerald Beasley,

2    and a cell phone belonging to Antoine Beasley.

3    Q.    Do you recall the time or the date that we had

4    wiretap on each phone?

5    A.    We initiated Gerald Beasley's wiretap on

6    May -- or I'm sorry, March 27th, 2013.  And then

7    Antoine Beasley's, I believe began in May, I'm not

8    exactly -- I'd have to refer to the report for the

9    exact date when it was initiated.

10   Q.    And each of these wiretaps was for about 30

11   days --

12   A.    Yes.

13   Q.    -- is that correct?

14         And the subscriber for each phone, did -- was

15   Gerald the subscriber for his phone and Antoine the

16   subscriber for his phone?

17   A.    Yes.

18   Q.    So during the wire, specifically I guess we're

19   moving to March of 2013, how did the wire change how

20   you were moving forward?

21   A.    Well, we were able to identify other associates,

22   we were able to gather the evidence that they were, in

23   fact, engaged in criminal activity of Gerald Beasley,

24   we were able to see or hear Gerald Beasley distributing

25   narcotics to other individuals, and we were able to

33

1  document all that.

2  Q.    Were you also able to identify phone numbers

3  that were incoming to Gerald Beasley?

4  A.    Sometimes.

5  Q.    Or Antoine Beasley?  I guess on both of the

6  phones?

7  A.    Yeah, we would attempt to identify if it was a

8  pertinent -- if it was a phone number related to what

9  we believed to be a pertinent call, we would attempt to

10  identify the caller.

11  Q.    Once you -- once you identified the caller, what

12  kind of follow up would you do?

13  A.    Well, we would look at their criminal history,

14  their background, try and determine what they might be

15  involved in, where they were living at, things of that

16  nature.

17  Q.    And at the end of or at the conclusion of this

18  investigation in June of 2013, you were able to execute

19  search warrants on all the phones as well, is that

20  correct?

21  A.    Well --

22  Q.    Or on the two phones that you did the wiretaps

23  on, I guess is a better statement.

24  A.    Yes, I believe so.

25  Q.    And, again, from those search warrants were you

34

1  able to identify specific phone numbers and

2  individuals?

3  A.    Yes.

4  Q.    Just to put it out there and discuss it right

5  now, during the search warrant of Tiara's Place, did

6  you also obtain the surveillance footage from inside

7  Tiara's Place?

8  A.    Yes, I did.

9  Q.    Would you explain that to the Court.  And I

10  guess, specifically, how it was set up and how many

11  cameras there were --

12  A.    Um, there --

13  Q.    -- if you recall.

14  A.    Well, there's a DVR system in the restaurant

15  which recorded various cameras that had been set up

16  either inside the restaurant or outside of it and it

17  had recorded events that took place at the restaurant

18  for several weeks prior to the initiation of the

19  wiretap on Gerald Beasley's phone, up to the point we

20  turned it off and seized it on June 12th, 2013 during

21  the search warrant.

22  Q.    Have you had an opportunity to sit down and

23  review the two -- maybe two, three months of video

24  footage that was still on this DVR recorder?

25  A.    I have.

1  Q.    And what did that teach you or what did you

2  learn from that about this investigation or about the

3  criminal activity of all of these individuals that are

4  indicted?

5  A.    Well, I was able to see -- I went through and

6  watched the entirety of that video and notated it and

7  compiled that information that I believed to be

8  important that I observed from watching it.  Then when

9  I compared that to the -- the calls that we were

10 intercepting, I was able to see on some instances the

11 actual hand to hands that are being conducted with

12 those -- those individuals that were intercepted on the

13 wire, it was recorded on video.

14        And some of those people we interviewed at the

15 conclusion of the wiretaps and they told us

16 specifically what they were buying or how much they

17 were buying from Gerald Beasley.

18 Q.    All right.  How many calls total were marked

19 pertinent on Gerald Beasley's telephone in that 30-day

20 period?  Approximately.  I don't need the exact number.

21 A.    I'd have to refer for the exact number but I

22 believe it was around 1700 --

23 Q.    Okay.

24 A.    -- calls.

25 Q.    And how many calls for Antoine Beasley did we

1  mark as pertinent that were -- were reviewed and stored

2  and saved and provided to defense counsel?

3  A.    I don't know.

4  Q.    Okay.

5  A.    I would have to review to give you that number.

6  Q.    Do you believe the calls that you listened to

7  and that we've reviewed are coded conversations?

8  A.    Some of them are, yes.

9  Q.    Would you explain to the Court what information

10 you have prior to this investigation or what experience

11 you have about coded conversations or coded phone

12 calls.

13 A.    Well, I know from my own experience, as well as

14 talking to other investigators, and my training, that

15 people engage in drug trafficking where they use the

16 phone, they often talk in code.  They're aware of law

17 enforcement's ability at times to tap phones and that's

18 one of the primary reasons they do that.

19         I also have worked in undercover capacity on

20 numerous occasions.  I've purchased narcotics on

21 numerous occasions and during even those face-to-face

22 deals people use different terms or slang or code for

23 the narcotics that are being transacted.

24 Q.    Could you give me an example of a code or a term

25 that you have used yourself in one of your

1  undercover --

2  A.    Well, using girl, for example, for powder

3  cocaine --

4  Q.    Okay.

5  A.    -- is one example.

6         Using different slang terms for amounts, such

7  as a teener, or an eight ball, or a zip to describe

8  different amounts of narcotics, I've used all those

9  types of terms.

10  Q.    So, again, you believe that you were overhearing

11  what you believed to be coded conversation on some of

12  these wiretap calls?

13  A.    Yes.

14  Q.    Would you describe to the Court what you

15  overheard.

16  A.    Well, one of the specific codes that we were

17  able to determine they were using in this particular

18  investigation was --

19         MR. SEVART:  I'm going to object to "they" and

20  broad brush.

21         THE COURT:  I think being a little more

22  specific probably would be a good thing.

23  BY MS. JACOBS:

24  Q.    You can go ahead if you'll just be a little more

25  specific with the word "they" or maybe identifying

38

1  however it can help to narrow this down.

2  A.    One of the types of codes that Gerald Beasley,

3  Antoine Beasley, Carlos Beasley, Terry Beasley, and

4  Stephen Smallwood would use when discussing amounts of

5  money would be to shorten the amount.

6          So, for example, if they were talking about

7  64, I believed that to be 64,000 they would be talking

8  about.

9          Another example would be if Gerald Beasley was

10 talking to somebody about 9-7-5 or 975, it would really

11 be $9,750 --

12 Q.    Okay.

13 A.    -- they were talking about.

14 Q.    And we're going to get in to some of those

15 conversations a little bit later and I'll ask you to

16 explain why you have that belief, so I'm going

17 to -- I'm going to skip that follow up is what I'm

18 telling you.

19          Was there a certain tone or tenor for some of

20 the phone calls that you found to be interesting?

21 A.    Um, you can sometimes tell or have an indication

22 that somebody might be a heroin addict, for example, by

23 the tone of a call or the content of the call as

24 compared to somebody who might be a -- a cocaine or

25 crack cocaine addict.

1  Q.    So what words did you believe or did you hear

2  that you believe were code words?  You don't have to

3  give me every one of them, but a few of them over this

4  wire.

5  A.    Well, specifically, the term "zip" was used,

6  which means an ounce quantity of a controlled

7  substance.

8        The terms "teener" or "teenager" were used,

9  which is code for 16th of an ounce of a controlled

10 substance.

11       The term -- one individual used the term

12 "quarter pounder with cheese" to refer to a quarter

13 ounce of crack cocaine.  Those are some examples of

14 some of the code that was used.

15       There was also a code that was employed by

16 Gerald Beasley and Antoine Beasley to refer to their

17 sources of the supply.

18 Q.    And what was that?

19 A.    It was Big Brother and Little Brother.

20 Q.    And why did you make that determination that

21 that referred to a source of supply?

22 A.    Well, it begins with the content of the call and

23 the way that they would talk about Big Brother or

24 Little Brother.  It was clear that -- that those

25 individuals were people who were bringing something to

```
 1  them.  Then we were able -- when they would have calls

 2  like that, they would be surrounded by other calls in

 3  reference to getting money together, and then we

 4  observed on both surveillance and then also from

 5  reviewing the pole cameras and the video footage from

 6  Tiara's Place shortly thereafter, meeting with either

 7  Juan Ibarra or Inocente Ibarra.

 8  Q.    Were there a number of words that you believed

 9  were code words that perhaps you weren't able to make a

10  specific determination about until the conclusion of

11  your investigation and until you had done some

12  interviews?  Would that be an accurate statement?

13  A.    Well, it would of the -- we -- when we

14  interviewed individuals afterwards who were buying

15  drugs from Gerald Beasley we would play them some of

16  the calls that we had and they would tell us

17  specifically that they were buying a certain type of

18  controlled substance and a certain amount for a certain

19  amount of money --

20  Q.    Okay.

21  A.    -- which helped us to decipher or to verify what

22  that particular call was exactly about.

23  Q.    Did you also hear phone conversations related to

24  protecting the conspiracy or protecting activities of

25  individuals you were investigating?
```

41

1   A.    Yes.

2   Q.    Would you explain some of those calls and then

3   what you observed.

4   A.    Well, throughout both of the wiretaps there

5   would be calls from different individuals to the phones

6   that were being tapped to warn them about presence of

7   law enforcement.

8   Q.    All right.  And, quite frankly, were a few of

9   these phone calls, had you all actually been burned on

10  surveillance or had they actually seen you and they

11  were correct or accurate phone calls?

12  A.    They had seen the people conducting mobile

13  surveillance on -- on a few occasions, yes.

14  Q.    Was there also conversations regarding Antoine

15  Beasley and a different -- a couple of different

16  occasions in which he confronted law enforcement when

17  he saw them?

18  A.    Yes.

19  Q.    And would you explain those to the Court, as

20  well.

21  A.    There's one time investigators were conducting

22  surveillance of Antoine Beasley and he saw one of the

23  vehicles that he believed to be following him around

24  and he went to that vehicle, looked inside of it, saw

25  police equipment and then made a series of phone calls

42

1  afterwards to Gerald Beasley and others talking about

2  how the law enforcement must be following him around.

3  Q.    A few weeks ago we presented a motion to

4  suppress to the Court.  During that stop -- in that

5  motion to suppress, we presented evidence regarding the

6  stop of Terry Beasley.  Were you present for that

7  motion?

8  A.    Yes.

9  Q.    Do you -- one of the things we learned from that

10  is there -- that there was video surveillance from the

11  law enforcement officers who stopped Terry Beasley.  In

12  reviewing that video surveillance, did you observe

13  anyone associated with this case besides Terry Beasley?

14  A.    Yes, I observed, from the body camera worn by

15  the officer conducting the stop, a maroon colored Ford

16  truck, that appears to be consistent with Antoine

17  Beasley's vehicle, drive by where the traffic stop was

18  taking place.

19  Q.    Was that also confirmed through the GPS tracker

20  that was placed on his vehicle?

21  A.    I don't know.

22  Q.    Okay.  So let's go ahead and start talking

23  specifically about each of the seven conspiracies we

24  have in this case.  So we're going to start with the

25  cocaine conspiracy.

43

1          You've discussed already with the Court the

2     historical case with Gerald Wilson, as well as with

3     Carlos Beasley.

4          What did you learn about the cocaine

5     conspiracy regarding these individuals -- well, let me

6     be more specific.

7          What did you learn about the cocaine

8     conspiracy and what individuals did you have

9     information on?

10    A.    Well, from the entire investigation I learned

11    that Gerald Beasley was obtaining powder cocaine

12    through Antoine Beasley and the sources of supply, the

13    Ibarras, which he would sell, or turn to crack cocaine

14    and sell.

15    Q.    Specifically, with the Ibarras that we're

16    discussing, we believe them to be the source of supply,

17    during the time that you were up on either one of these

18    phones, do you recall, was Gerald Beasley the one

19    making the phone calls to the Ibarras?

20    A.    No.

21    Q.    And, in fact, did we hear any phone calls to the

22    Ibarras?

23    A.    No.

24    Q.    And do you have a theory as to why and can you

25    tell the Court if you -- if you have one and what that

44

```
 1  is?
 2          MR. PRATT:  Objection, Your Honor, this is all
 3  speculation as to what his theory may be as to why.
 4          MS. JACOBS:  I can rephrase that question.
 5          THE COURT:  If you would, thank you.
 6  BY MS. JACOBS:
 7  Q.    There were no phone calls with the Ibarras, is
 8  that correct?
 9  A.    Not that I know of.
10  Q.    To your knowledge, did Antoine Beasley and
11  Gerald Beasley have second phones?
12  A.    Uh --
13  Q.    Or phones that we did not have wiretaps on?
14  A.    Yes, Antoine Beasley had, I believe other cell
15  phones and each of them had access to other telephones
16  besides their cellular telephones, too.
17  Q.    And at the conclusion of this case there were a
18  number of search warrants that were executed --
19  A.    Yes.
20  Q.    -- is that correct?
21          Antoine Beasley, do you recall in June of 2013
22  how many cell phones were seized or obtained from him?
23  A.    Well, at the search warrant at his residence, at
24  616 Hedgewood, there were multiple cell phones, I don't
25  know the exact number but there -- there was multiple
```

 1  cell phones that were seized.

 2  Q.    Through the search warrants that were done on

 3  those search -- on those cell phones, was there

 4  additional information that there were other phones

 5  that he was using to contact the Ibarras?

 6  A.    Uh, there are listed in the contacts for one or

 7  more of the phones Little Bro as a contact, and several

 8  different telephone numbers.

 9  Q.    Okay.  Again, throughout this investigation and

10  throughout specifically the wiretaps, do you believe it

11  was Antoine Beasley who was actually contacting the

12  Ibarras and not Gerald Beasley?

13  A.    Yes.

14  Q.    And would you explain to the Court why you have

15  that belief.

16  A.    There was multiple calls that were intercepted

17  where Antoine Beasley would be talking with Gerald

18  Beasley about Little Brother or Big Brother, and from

19  the content of those calls it was apparent that Gerald

20  Beasley, for example, would ask Antoine Beasley about

21  whether or not he had talked to them or what status was

22  in regards to Little Brother or Big Brother.

23  Q.    Were you able to identify a number of

24  individuals who were obtaining cocaine powder from

25  Gerald Beasley?

46

```
1   A.    Yes.

2   Q.    Would you go ahead and talk just a little bit to

3   the Court about William Jones.

4   A.    William Jones -- well, it's an unidentified

5   male, he's tentatively identified as William Jones but

6   we intercepted calls between his telephone number and

7   Gerald Beasley during Gerald Beasley's wiretap and

8   where they discussed, in code, William Jones obtaining

9   what I believed to be powder cocaine from Gerald

10  Beasley.

11  Q.    Can you tell the Court a little bit about that

12  conversation.

13  A.    Well, it's actually a series of calls between

14  the two and during one call it appears that William

15  Jones is asking Gerald Beasley about --

16        MR. SEVART:  I'm sorry, I am going to object

17  as to foundation; when and where.

18        THE COURT:  I think we've got enough here, he

19  can proceed.  It's overruled.

20        MR. HEPPERLY:  My objection, Your Honor, would

21  be is that I'm not sure what chart she is referring to.

22  I don't know that I have that phone call that the

23  officer may be addressing at this point.

24        THE COURT:  I thought he testified awhile back

25  that it was one of the cocaine conspiracy.  You want to
```

1  get a little more --

2          MS. JACOBS:  Specific?

3          THE COURT:  -- specific?

4          MS. JACOBS:  All right.  So let me go back a

5  little bit.

6  BY MS. JACOBS:

7  Q.    Specifically, let's talk about -- about a

8  conversation you overheard with an individual that you

9  have tentatively identified as William Jones.

10         I believe you're talking about an event that

11  occurred around March 27th, is that correct?

12  A.    Sounds correct.

13  Q.    And possibly session number call 4, correct,

14  163?

15         Will you go ahead and describe to the Court,

16  again, what you have overheard on these series of

17  conversations.

18         And I think the 162 and 163 would be the

19  conversations we're discussing.

20  A.    If -- if it's the ones I'm thinking of, it

21  appears that William Jones is asking Gerald Beasley

22  about prices for nine ounces.

23  Q.    All right.  And why do you believe it's prices

24  for nine ounces and why do you believe it's cocaine?

25  A.    There's other later text messages that are

1  intercepted between the same individuals where William

2  Jones uses the term "girl" which I know to be usually

3  used for powder cocaine.

4  Q.    Okay.  And, again, can you tell the Court what

5  you know about the price for cocaine and whether or

6  not -- and what that number 975 means or whatever

7  number it is that he used.

8  A.    Right.

9  Q.    So what number did he use, I guess I'll

10 be -- specifically?

11 A.    Well, at one point there's a call where Gerald

12 Beasley appears to inform him that the price would be

13 9-7-5 and as I discussed earlier, I believe that to be

14 code for actually being 9,750 and for the nine ounces.

15 Q.    Okay.  And what -- what did you believe -- what

16 is the going price for cocaine?

17         Maybe an ounce of cocaine or -- and why did

18 you believe that to be accurate?

19 A.    The price of all narcotics varies on various

20 factors but 975 -- I'm sorry, $9,750 for nine ounces,

21 if you divide that, that would be approximately $1083

22 per ounce, which would be consistent with the going

23 rate at that time for an ounce of powder cocaine.

24 Q.    Okay.

25 A.    And then there's also other calls that were

1  intercepted with other individuals, including with

2  Brandon Smith later on, where similar prices, if not

3  the same, were also quoted for the price of cocaine.

4  Q.    Let's go ahead and talk about Brandon Smith.

5  He's charged in the Second Superseding Indictment, is

6  that correct?

7  A.    Yes.

8  Q.    And he's alleged to be a part of the marijuana

9  and the cocaine conspiracy?  Do you recall?

10  A.    Yes.

11  Q.    Okay.  What words -- when Brandon Smith would

12  speak with Gerald Beasley, what words or terms would he

13  use?

14  A.    He would -- he would sometimes refer to getting

15  something from Gerald and his people, and then also

16  something from Gerald's son or sons.

17  Q.    All right.  And just to make it clear for the

18  Court, there were numerous phone calls intercepted

19  between Brandon Smith and Gerald Beasley, is that

20  correct?

21  A.    That's correct.

22  Q.    So the statements you're making refers to the

23  statements that he's made over this 30-day time period

24  that Gerald was intercepted?

25  A.    That's correct.  And then also the search

1  warrant that was done on Gerald Beasley's telephone,

2  there was additional text messages that were recovered

3  between Gerald Beasley and Brandon Smith that also used

4  the term "girl," as well.

5  Q.    Did Brandon Smith and Gerald Beasley have

6  specific conversations about the price of cocaine

7  throughout this 30 days?

8  A.    I'm sorry, could --

9  Q.    Brandon Smith and Gerald Beasley, did they have

10 numerous conversations regarding the price of cocaine?

11 A.    Yes.

12 Q.    What did you -- well, first of all, did Brandon

13 Smith -- do you believe he had another supplier?

14 A.    Yes.

15 Q.    And what is that based on?

16 A.    Based on the telephone calls.  There were calls

17 between Gerald Beasley and Brandon Smith where they're

18 talking about the price for what I believed to be the

19 powder cocaine and Brandon Smith, in essence, talks

20 about if Gerald Beasley could get it down under a

21 certain price, he would take so many ounces from him

22 but he also in some of those calls indicates that he's

23 got another supplier who has a different price.

24 Q.    All right.  Is there a specific phone call

25 throughout this case as well with Brandon Smith that

1  leads you to believe he was obtaining cocaine powder as

2  opposed to crack cocaine?

3  A.    Yes.

4  Q.    What occurred in that phone call?

5  A.    There's --

6  Q.    Go ahead.

7         MS. PENNER:  Your Honor, because she has

8  referenced that phone call, if she could please

9  identify which specific phone call.

10         THE COURT:  Certainly.

11         Ms. Jacobs, I think that's legitimate.

12         MS. JACOBS:  That is, Your Honor, and I have

13  it written down and now I can't read my handwriting, so

14  let me check my...

15  BY MS. JACOBS:

16  Q.    Well, at the time -- let me ask you this:  At

17  this time was Brandon Smith still identified as

18  unidentified male 48?

19  A.    Uh, we identified him at some point as Brandon

20  Smith, I don't know without referring to the reports at

21  what point that was.

22  Q.    All right.  So, specifically, we're talking

23  about session number 1115 which occurred on April 2nd

24  of 2013.

25         Would you go ahead and explain to the Court

1  what occurred in that call.

2   A.    Well, if it is the call I think you're referring

3  to, it's a call between Brandon Smith and Gerald

4  Beasley and Brandon Smith makes a statement to the

5  effect that he messed up 10 G's worth of it.

6   Q.    When you say "10 G's," do you believe that

7  refers to 10 grams or that refers to -- well, let me

8  ask you this -- let me go back.

9         So the substance of the conversation is he

10  messed up 10 Gs.  What is -- what does Gerald Beasley

11  say?

12   A.    I -- would it be possible for me to see the

13  linesheet from that particular call?

14   Q.    I'm not sure I have that one.  I have it written

15  down in my book.

16         Well, let me ask you this:  Does Gerald

17  Beasley, do you recall if he says, I'll come over and

18  help you out?

19   A.    In essence, that -- that is what he responds

20  with.

21   Q.    And why do you think that this is 10 grand as

22  opposed to 10 Gs?

23   A.    Based on the amounts in other calls they were

24  talking about and then when people manufacture crack

25  cocaine, generally they use larger amounts than -- than

1  just 10 grams, although it is possible.

2  Q.    And then was there also one other instance in

3  which Gerald Beasley delivers what you believe to be

4  cocaine to Herbert Jones?

5        Or was that crack cocaine?

6  A.    I believe it's powder cocaine.

7  Q.    And why do you believe that Gerald Beasley is

8  distributing powder cocaine to Herbert Jones?

9  A.    There was a -- a call that was intercepted after

10  Gerald Beasley was observed going to the area where

11  Herbert Jones is known to reside at on 8th Street.

12        MR. HEPPERLY:  Same objection, Your Honor,

13  when he refers to phone being intercepted, whatever

14  phone call that was, I do not know.

15        MS. JACOBS:  And, Your Honor, we're going to

16  get in to those specific statements when we talk about

17  the James hearing statement, just for the Court's

18  knowledge.

19        THE COURT:  Well, I think just so that

20  everybody can track at this point, though, Ms.

21  Jacobs --

22        MS. JACOBS:  Sure.

23        THE COURT:  -- it is helpful if you can get

24  some more specificity here.

25  BY MS. JACOBS:

54

```
 1   Q.    Who is Gerald Beasley talking to -- well, who is
 2   Gerald Beasley talking to in discussing what occurred
 3   at Herbert Jones's house?
 4   A.    Well, he talked to Herbert Jones and then he
 5   also talked to --
 6         MR. PRATT:  Your Honor, I'm going to object.
 7   You know, when are we talking about?  The time frame, I
 8   mean, what happened at Herbert Jones's house
 9   encompasses five years.
10         THE COURT:  I don't need that much, Mr. Pratt,
11   but got your point.
12         And, again, Ms. Jacobs, let's, to the extent
13   that we can, try to zero in on times and persons.
14         MS. JACOBS:  Sure.
15         THE COURT:  Thank you.
16   BY MS. JACOBS:
17   Q.    All right.  So let me start back again.
18         Was there a phone call intercepted during
19   Gerald Beasley's wire about delivering cocaine to
20   Herbert Jones?
21   A.    Yes.
22   Q.    What code words did he use in speaking about
23   cocaine?
24   A.    He used the code words "Bebe."
25   Q.    And why is that important to you or did you
```

1  recognize that term from other times?

2  A.    Well, I know it to be the alias of Gerald Wilson

3  and then there was also a call that was intercepted at

4  one point between Antoine Beasley and Gerald Beasley

5  where Antoine Beasley asks Gerald Beasley when he's

6  going to be ready for the ba again.

7  Q.    And so based on those conversations --

8          MR. KERNS:  Your Honor, I didn't hear that,

9  I'm sorry.

10          THE COURT:  Excuse me.

11          MR. KERNS:  For the what again?  I'm sorry, I

12  didn't hear that.

13  BY MS. JACOBS:

14  Q.    Go ahead.  If you will restate your answer.

15  A.    Oh.

16  Q.    Why do you believe that "ba" refers to cocaine?

17  A.    Well, I know that to be Gerald Wilson's alias or

18  nickname is Bae Bae, and I believe they -- that Gerald

19  Beasley, Antoine Beasley are using that as code for

20  powder cocaine.

21          MR. HEPPERLY:  And again, Your Honor, I'm

22  going to make the same objection.  I would just like to

23  know what phone call were those words used in.

24          THE COURT:  She already identified that,

25  Mr. Hepperly.

```
 1              MR. HEPPERLY:  Okay.
 2              THE COURT:  It was about two minutes ago.
 3              MR. HEPPERLY:  All right.
 4              THE COURT:  So it's overruled.
 5   BY MS. JACOBS:
 6   Q.    So there was a phone call initially between
 7   Gerald and Herbert Jones and then another series of
 8   phone calls which would be sessions 1013, as well as
 9   1189 in which he references what occurred at Herbert
10   Jones's residence as well, is that correct?
11   A.    If those are the calls that -- that you're
12   referring to, if I'm accurate, but, yes.
13   Q.    And what does he -- what does he say in those
14   calls?
15   A.    Gerald Beasley informs Antoine Beasley that he
16   dropped a ba.
17   Q.    And then does he also reference an amount?
18   A.    $1200 during one call.
19   Q.    Did you interview anyone at the conclusion in
20   this investigation that discussed with you the
21   distribution of cocaine?  By Gerald Beasley or anyone
22   else indicted?
23   A.    Yes.  We interviewed multiple people who
24   provided information that Gerald Beasley was involved
25   in trafficking powder cocaine.
```

57

1    Q.    And can you go ahead and give the Court maybe

2    just a couple names and then some specific information

3    to help the Court make that finding that there was a

4    distribution of cocaine.

5    A.    Well, I mean we interviewed various people,

6    Leonard Carter, James Arbertha, Alfonso Fisher, Steven

7    Gilkey, Charles Torrence, Lawrence Jordan, and others,

8    and I believe all, if not -- if not all of those people

9    provided information that Gerald Beasley was involved

10   in distributing cocaine.

11   Q.    Will you go ahead and talk to the Court about

12   evidence that was located during the search warrants

13   regarding cocaine, specifically.

14   A.    Yes, when the search warrants were executed on

15   June 12th, 2013 at 1122 North Piatt, there was cocaine

16   that was recovered from that residence.

17   Q.    Do you recall how much?

18   A.    I'd have to refer to the report.

19   Q.    Let me ask you this:  If you don't recall

20   exactly how much, do you recall whether or not it was a

21   personal use amount or a distribution amount?

22   A.    No, it was a distribution amount.

23          MR. PRATT:  Your Honor, I'm going to object.

24   If we can get a quantification of what's a distribution

25   amount.

1          MS. JACOBS:  I'm -- it was my next question,

2   Your Honor.  I'm making some notes.

3          THE COURT:  We'll get there, Mr. Pratt.

4          MR. PRATT:  Thank you, Your Honor.

5   BY MS. JACOBS:

6   Q.    What would be your cut off for determination

7   that it is a distribution amount as opposed to a

8   personal use amount?

9   A.    Well, it varies by the user but most users buy

10  cocaine by the -- a smaller amount, usually less than a

11  half ounce for their own personal use.  And most users

12  even less than that.

13  Q.    And the amount that was obtained or found

14  located at 1122 North Piatt was a larger amount, is

15  that correct?

16  A.    Yes.

17  Q.    Was there cocaine located at any other

18  residences or businesses that search warrants were

19  executed?

20  A.    On June 12th?

21  Q.    Yes.

22  A.    As far as I can recall, it was only at 1122

23  North Piatt.

24  Q.    Was there another round of search warrants at

25  the time of arrests for a number of the individuals?

```
 1   A.     Yes.
 2   Q.     Do you recall, was there cocaine located in any
 3   other residences or any other places once there were
 4   more search warrants, I believe that was in April of
 5   2014?
 6   A.     Yes, there was a search warrant that was
 7   conducted at Terry Beasley's residence at I believe
 8   it's 1250 South Ridgehurst and there was either cocaine
 9   or crack cocaine that was -- that was recovered.
10   Q.     All right.  Well, you've mentioned crack cocaine
11   so let's go ahead and discuss that conspiracy.
12          There's only one individual indicted in that
13   conspiracy and that would be Gerald Beasley.  What did
14   you learn about crack cocaine through this
15   investigation?
16   A.     I believe that -- or I learned that Gerald
17   Beasley was distributing crack cocaine to a various
18   individual.
19   Q.     Can you go ahead and tell the Court how -- and I
20   think you can make it quick, but I think we need to
21   make a record -- how cocaine is made in to crack
22   cocaine.
23   A.     There's different processes but generally
24   speaking, cocaine is dissolved in boiling water and
25   baking soda is added to it.  It's then cooked together
```

60

1  and usually then cooled and strained and laid out to

2  dry and that forms it into a smokeable substance.

3  Q.    Search warrant executed at 1122 North Piatt,

4  again, whose residence was that?

5  A.    I believe that's Gerald Beasley's residence.

6  Q.    Throughout the investigation, did you -- what

7  did you believe the use of this residence was for, up

8  until about two weeks before the search warrants?

9  A.    I believed it was being used as a -- what's

10 commonly referred to by investigators as a stash house

11 for narcotics for Gerald Beasley.

12 Q.    And what is the basis of that belief?

13 A.    From the surveillances, coupled with the

14 interceptions, Gerald Beasley would frequently go to

15 that residence and then meet with people he was going

16 to sell drugs to right afterwards.

17 Q.    Prior to the search warrants being executed in

18 June of 2013, is it accurate to state that Gerald

19 Beasley moved in or was actually living at that

20 residence?

21 A.    I believe he was spending the night there

22 on -- on occasions.

23 Q.    Okay.  So what was located in June of 2013

24 during the search warrant to support a conclusion that

25 Gerald Beasley was distributing and manufacturing crack

61

1  cocaine?

2  A.    Well, there was recovered both powder cocaine

3  and crack cocaine at that residence.  There was also

4  utensils that would be used in the manufacture of crack

5  cocaine.  There was a very large bag of baking soda

6  that was recovered, so those are the primary reasons

7  why I believed he was actually manufacturing crack

8  cocaine there.

9  Q.    Were you able to identify a number of

10  individuals that Gerald Beasley was distributing crack

11  cocaine to during the wire?

12  A.    Yes.

13  Q.    If you can say, do you believe he was

14  distributing more crack cocaine or more powder cocaine?

15         If you don't know, then go ahead and tell us

16  you don't know, but...

17  A.    I -- I don't know but in terms of frequency of

18  transactions I believe there are more transactions

19  where he was distributing individual amounts of crack

20  cocaine than there were powder cocaine.

21  Q.    And what is that based on?

22  A.    That is based on the number of calls with the

23  people that I believe were purchasing crack cocaine

24  from Gerald Beasley.

25  Q.    Were you able to identify that one of the

1  individuals Gerald Beasley was talking to throughout

2  the wire was Steven Gilkey?

3  A.    Yes.

4  Q.    Numerous, numerous phone calls with Steven

5  Gilkey, is that an accurate statement?

6  A.    Many.

7  Q.    Did you have an opportunity at the conclusion of

8  this wiretap to interview Mr. Gilkey?

9  A.    Yes.

10  Q.    And what did he tell you?

11  A.    He told us that he had been purchasing crack

12  cocaine from Gerald Beasley.

13  Q.    Was he able to listen to a few of the phone

14  calls and identify exactly what he was purchasing and

15  amounts and how their scheme worked together?

16  A.    Yes.

17  Q.    Did you also have an opportunity to interview

18  Charles Torrence?

19  A.    Yes.

20        MR. PRATT:  I'm sorry, I didn't catch that

21  name.

22        MS. JACOBS:  Sorry.

23  BY MS. JACOBS:

24  Q.    Did you also interview Charles Torrence?

25  A.    Yes, on two -- two occasions.

1    Q.    And, again, was he intercepted on the wire and

2    telephone conversations with Gerald Beasley?

3    A.    Yes.

4    Q.    And what did Mr. Torrence tell you during his

5    interview?

6    A.    Charles Torrence told me that he was selling

7    stolen property to Gerald Beasley and he was also

8    obtaining narcotics.  Including both crack cocaine and

9    at least on one occasion, heroin, if I remember

10   correctly.

11   Q.    And, again, I know there's a number of

12   individuals, so just one additional one.

13            Did you have an opportunity to interview James

14   Arbertha?

15   A.    Yes.

16   Q.    And what did he tell you about his conversations

17   or his -- yeah, his conversations and his dealings with

18   Gerald Beasley?

19   A.    He was obtaining crack cocaine from Gerald

20   Beasley.

21   Q.    Was there an opportunity that you took to

22   conduct a wall stop of a customer of Gerald Beasley's?

23   A.    Yes.

24   Q.    And was that individual a Richard Jones?

25   A.    Yes.

64

1  Q.    And was that following a phone call and a series

2  of events between -- or, sorry, a meeting with Richard

3  Jones and Gerald Beasley?

4  A.    Yes.

5  Q.    And what did -- what occurred at that wall stop?

6  A.    Richard Jones was found to be in possession of

7  small amount of crack cocaine.

8  Q.    All right.  So we'll move on now to the heroin

9  conspiracy.

10        What did you learn about the heroin conspiracy

11 throughout the investigation?

12 A.    Well, similar to the -- the powder cocaine, I

13 learned that Gerald Beasley was distributing heroin to

14 various customers and I believe from the calls that

15 were intercepted that he was obtaining the heroin from

16 the same source as he was the powder cocaine.

17 Q.    And what source was that?

18 A.    That would be Juan and Inocente Ibarra.

19 Q.    And, again, do you have information that the

20 contact with the Ibarras was through Antoine and not

21 through Gerald?

22 A.    Yes.

23 Q.    What did you learn about Terry Beasley's

24 involvement in the heroin conspiracy?

25 A.    We intercepted telephone calls where it appeared

1   that Terry Beasley was providing a large amount of

2   money to Gerald Beasley for what we believed to be the

3   purchase of heroin and that he did, in fact, receive

4   that heroin and even at one point had called Gerald

5   Beasley and complained about how sticky the heroin was.

6   Q.    Why didn't you believe that was any other

7   controlled substance?

8   A.    Heroin's the only controlled substance,

9   especially black tar heroin, that would be sticky like

10  that where it could potentially cause a distributor

11  problems because of how sticky it is.

12  Q.    Was Terry Beasley the only individual who called

13  and complained to Gerald Beasley about the stickiness

14  of the product?

15  A.    Well, not necessarily about the stickiness but

16  about the quality of the heroin.  There was other

17  individuals that appeared to be complaining about it,

18  as well.

19  Q.    All right.  In going through the phone calls

20  over this 30-day time period, actually I would say 60

21  if you take both -- both phones together, and reviewing

22  the surveillance footage at Tiara's Place, did you find

23  a pattern as to why -- did you find a pattern regarding

24  the heroin and the collection of money?

25  A.    Yes.

66

1   Q.    What did you find?  In general, to start I

2   guess.

3   A.    Well, Leonard Carter, for example, when I

4   interviewed him and we were playing calls and he was

5   identifying what was taking place in those calls had

6   advised me that there was a time period where Gerald

7   Beasley had ran out of heroin and was dry and while we

8   went through those calls he was then able to tell me

9   from the calls that Gerald Beasley then had heroin

10  again and in between that time when Leonard Carter

11  advised me that Gerald Beasley was out of heroin and

12  that he then had it, was a series of phone calls that

13  were intercepted with Gerald Beasley, Terry Beasley,

14  and Antoine Beasley about getting money together and

15  then I observed Antoine Beasley meeting with the

16  Ibarras in that time period.

17  Q.    Was Stephen Smallwood also one of those

18  individuals getting money together?

19  A.    Yes.

20  Q.    When Terry Beasley called and complained about

21  the stickiness of the heroin, what was Gerald Beasley's

22  advice to him?

23  A.    I believe he told him to put it in the freezer.

24  Q.    When you stated earlier that you believed that

25  when Gerald Beasley and others discussed money, that

1  they would drop off the zero or zeros, do you believe

2  that there are phone calls that Gerald Beasley does

3  this with Terry Beasley, and Stephen Smallwood, and

4  Antoine Beasley, as well, referencing heroin?

5  A.    Yes.

6  Q.    What is -- during this -- during the time of

7  this investigation back in 2013, did you have

8  information as to what a kilogram of heroin would cost?

9  A.    Yes.

10  Q.    What is that information based on?

11  A.    It's based on intelligence that the Drug

12  Enforcement Administration puts out to law enforcement

13  which gives a range of prices in this region for

14  various narcotics.

15  Q.    And, again, were there telephone calls -- well,

16  what was the price at that time?

17  A.    I'd have to look at the -- but -- but the price

18  that Gerald Beasley was talking to these other

19  individuals about would be consistent with the price of

20  the kilogram of heroin.

21  Q.    And so, specifically, let's talk about a couple

22  of phone calls that are referenced in our James report

23  or James chart as well but, specifically, conversations

24  with Gerald Beasley, and Terry Beasley, and Stephen

25  Smallwood referencing the money related to heroin.

68

1          I want to go ahead and let counsel know that

2    we're discussing -- specifically, we're going to talk

3    about 14a and --

4          MS. JACOBS:  And, Judge, at this time I am

5    going to go ahead and present the Court, this is again

6    mainly for the James hearing but I think it would be

7    helpful for the Court, I am going to present the Court

8    with Government's Exhibit 1.

9          THE COURT:  Thank you so much.

10   BY MS. JACOBS:

11   Q.    Mr. Fuller, have you -- have you seen or had an

12   opportunity to review Government's Exhibit 1, which

13   would be a notebook with the James hearing chart and

14   then a number of phone calls included?

15   A.    Yes.

16   Q.    And, in fact, you were assisted in putting it

17   together, would that be correct?

18   A.    Correct.

19   Q.    I'm going to go ahead and hand you Government's

20   Exhibit Number 1.

21          All right.  Specifically, let's go ahead and

22   talk about 21a, 21b.  Is this the telephone call

23   between Gerald Beasley and Terry Beasley?

24   A.    Yes.

25          MS. JACOBS:  Your Honor, may I approach with a

1  copy for Brian?

2          THE COURT:  Certainly.

3          MS. JACOBS:  I'm sorry, for Mr. Wood.

4          THE COURT:  Thank you.

5          You don't have to ask to approach, either, Ms.

6  Jacobs.  None of you do, just so we understand.

7  BY MS. JACOBS:

8   Q.    All right.  What is this substance of this

9  conversation?

10  A.    Uh, in this conversation Gerald Beasley tells

11  Terry Beasley that they got that, and Terry Beasley

12  asks him how many and Gerald Beasley tells him whatever

13  he wants.

14          Terry Beasley then asks if he can get it at

15  cost.  He asks that again, and Gerald Beasley says or

16  responds in the affirmative.

17  Q.    And how much does Gerald Beasley state that it

18  costs him?

19  A.    He then states that it costs him 64 per.

20  Q.    What did you -- what do you believe that number

21  refers to?

22  A.    Well, right after that Gerald Beasley again

23  states, 64 per thousand, which I believe would be for

24  kilograms because there's a thousand grams in a

25  kilogram.

1             MR. HEPPERLY:  Your Honor, if I may interrupt

2   for just a second for a point of clarity.

3             THE COURT:  Sure.

4             MR. HEPPERLY:  I believe that you're referring

5   to Exhibit 14a, is that correct, which would be --

6             MS. JACOBS:  21.  21.

7             MR. HEPPERLY:  Oh, 21.  21.  Okay.

8             THE COURT:  That's where I was at least, too,

9   Mr. Hepperly.

10            MR. HEPPERLY:  All right.

11            THE COURT:  Everybody at 21 now?

12  BY MS. JACOBS:

13  Q.    Also, is there also a conversation with Stephen

14  Smallwood around that same time period in which he is

15  also discussing obtaining money from Stephen?

16  A.    I believe so, yes.

17  Q.    During this conversation, and I think --

18            MR. PRATT:  Your Honor, I'm going to object

19  just as to what conversation, because I don't know if

20  she is going to get to it but what conversation is

21  Mr. Smallwood --

22            THE COURT:  I think we're getting there,

23  Mr. Pratt.

24            MS. JACOBS:  Just be patient.

25            MR. PRATT:  Okay.

BY MS. JACOBS:

Q.    All right.  So let me go back.  This conversation with Terry Beasley that we discussed in 1707 occurred on April 5th, is that correct?

A.    Correct.

Q.    And during this time period do you recall, was this the time period that Gerald Beasley was out of heroin?

A.    Yes.

Q.    And then it was shortly after this time period, after he has conversations with Terry Beasley that he meets or that you observe Antoine meeting with the Ibarras, is that correct?

A.    That's correct.

Q.    Was there also conversations with Stephen Smallwood during this same time period?

A.    Yes.

Q.    And I don't know if I have them referenced in here but does Stephen -- and does Gerald -- do you recall, does Gerald ask Stephen -- well, I'm going -- I'll get back to that with the James hearing.

         When you spoke with Leonard Carter at the conclusion of this hearing, or at the conclusion of this investigation, did you go through a number of phone calls in which he had been intercepted speaking

1  with Gerald Beasley?

2  A.    Yes.

3  Q.    And was he able to explain to you what the

4  conversations were about?

5  A.    Yes.

6  Q.    And what did he tell you?

7  A.    He told us that most of the conversations that

8  he was obtaining heroin from Gerald Beasley.

9  Q.    Did he obtain heroin from anyone else involved

10 in this conspiracy?

11 A.    Yes.

12 Q.    Who was that?

13 A.    Stephen Smallwood.

14 Q.    And that's what he told you?

15 A.    Yes.

16 Q.    Did he try to provide or did he attempt in

17 providing any kind of connection between the heroin

18 distribution and the individuals that we have indicted

19 in this heroin distribution?

20 A.    Could you rephrase that question?

21 Q.    Did he talk about them as a group or together,

22 or did he talk about individual dealings with each of

23 these individuals?

24 A.    He -- he talked about what his belief was

25 regarding how the organization operated.

1   Q.    And, I'm sorry, you say that he talked about his

2   belief?

3   A.    Yes.

4   Q.    What did he base that on?

5   A.    His personal experiences of purchasing heroin

6   from both Gerald Beasley and Stephen Smallwood.

7   Q.    Okay.  Did you also have an opportunity to

8   investigate Brandon Richey?

9   A.    Yes.

10  Q.    Is he -- accurate statement to say he's a daily

11  user of heroin?

12  A.    Yes.

13  Q.    Daily -- daily phone calls almost with Gerald

14  Beasley?

15  A.    Yes.

16  Q.    And, again, did -- what did Brandon Richey tell

17  you about his dealings with Gerald Beasley?

18  A.    Brandon told us that he, too, was obtaining

19  heroin from Gerald Beasley and he was also performing

20  work for him.

21  Q.    And how was he paid for the work that he did for

22  Gerald Beasley?

23  A.    Uh --

24  Q.    Was he paid in cash or was he paid in heroin?

25  A.    I think sometimes he was paid in heroin, yes.

1   Q.    Okay.  And, again, one more individual

2  identified through the interception of telephone calls

3  is Jason -- Jacob Watie.

4        Am I pronouncing his last name correctly?

5  A.    Uh --

6  Q.    W-a-t-i-e?

7  A.    That's how it's spelled, I couldn't venture the

8  correct pronunciation.

9  Q.    Again, an opportunity to interview him or listen

10  to his phone calls.  Did you interview him?

11  A.    No, I did not.

12  Q.    Was he one of the individuals that called Gerald

13  Beasley and complained about the stickiness of the

14  heroin?

15  A.    Yes, I believe he was.

16  Q.    All right.  So, let's talk about the search

17  warrants that were done in June of 2013.

18        What evidence did you find at 1122 North Piatt

19  to support the finding of -- of heroin distribution?

20  A.    There was a large amount of black tar heroin

21  that was recovered from the 1122 North Piatt.

22  Q.    And when you say "a large amount," can you give

23  us maybe a specific number or even show us with your

24  hands or something to tell the Court?

25  A.    I believe it was over 300 grams.

1   Q.    And where was that located?

2   A.    Um, I -- from reviewing the reports, I believe

3   it was located in a shoe that was found in one of the

4   bedrooms.

5   Q.    All right.  How about evidence of heroin

6   distribution at Tiara's Place?

7   A.    Yes, in the office at Tiara's Place there was

8   recovered a scale and several knives, as well as what

9   appeared to be packaging materials that had a black,

10  tarry substance on them which was later tested and

11  found to be heroin residue.

12  Q.    Any other residences with search warrants in

13  which heroin or heroin paraphernalia or packaging was

14  located?

15  A.    Not to my knowledge.

16  Q.    What did you -- well, when we were preparing for

17  this hearing, you made a statement or we

18  discussed -- we talked about a black bag that is

19  observed not only in Tiara's Place video but is also

20  located at Piatt.

21        Can you tell the Court just about that bag

22  and -- and the importance of that bag.

23  A.    At 1122 North Piatt when the search warrant was

24  served, law enforcement found a black travel-type bag

25  about this size (indicating) with a strap on it.

1    Q.    If I called it a fanny pack, would that be

2    somewhat -- I mean, it was kind of that size, wasn't

3    it?

4    A.    I mean, about the same size but it wasn't a

5    fanny pack, it was a strap, I believe to be worn over

6    the shoulder.

7    Q.    Okay.

8    A.    And inside that small black bag was a large

9    amount of currency and that was discovered not far from

10   where the -- the heroin was.

11          I believe that was located in an air vent,

12   actually, inside the residence.

13   Q.    All right.  And --

14          THE COURT:  What's a large amount of currency?

15          THE WITNESS:  Um, I would have to refer to my

16   report for the exact amount but it -- I believe it was

17   over $10,000 in cash.

18          THE COURT:  Thank you.

19          MS. JACOBS:  Thank you.

20   BY MS. JACOBS:

21   Q.    And why did that black bag stick out to you or

22   why does it stick out to you now?

23   A.    It's the -- from watching the surveillance video

24   that was recovered from Tiara's Place, Antoine Beasley

25   can be seen on that video meeting with Gerald Beasley

1  and carrying what appears to be a bag very similar, if

2  not the same, as that one.

3          MR. PRATT:  I'm sorry, just to clarify, who

4  was carrying the bag?

5          THE COURT:  Antoine Beasley.

6          MR. PRATT:  Okay, thank you.

7  BY MS. JACOBS:

8  Q.    And that was at -- you observed this on the

9  surveillance from the Tiara's Place video you said?

10  A.    Yes.

11  Q.    Can you tell the Court what occurred prior to

12  you seeing through the surveillance video what -- what

13  occurred prior to Antoine leaving with this bag at

14  Tiara's Place?

15  A.    It appears to coincide with -- with the calls

16  where they're either getting money together or having

17  just met with the Ibarras.

18  Q.    And then, finally, speaking just a little bit

19  more about Stephen Smallwood, information through

20  interviews and through the wire that you believe

21  Stephen Smallwood was working with Gerald Beasley and

22  obtaining heroin and, in fact, is there a telephone

23  call, and it's in the chart that's been provided to the

24  parties as Number 12, in which Gerald is having a

25  conversation with an individual about Stephen Smallwood

```
 1   or about who you believe is Stephen Smallwood?

 2            Is that correct?

 3   A.    Yes, that's correct.

 4   Q.    So let's -- I want to back you up a little bit.

 5            Can you go ahead and tell the Court who he was

 6   talking to?

 7   A.    This is a call between Gerald Beasley and Anita

 8   Burkley.

 9   Q.    Who is Anita Burkley?

10   A.    I believe Anita Burkley is a -- an associate of

11   Gerald Beasley's and that she had possibly been

12   involved in check fraud activities with him at one

13   point.

14   Q.    Okay.  And, specifically, would you go ahead now

15   and tell the Court what you overheard and what you

16   believe that conversation to be -- to be about.

17   A.    During this call Gerald talks about someone

18   bringing in five, ten, or 15 at a time and now that

19   person only brings in two.  And about how he doesn't

20   need to be on that side of the street.

21            And then, again, Gerald talks about how this

22   person used to bring him, five, ten, 15 at a time and

23   that how they needed to get it down and Anita responds

24   with saying that that person 's not understanding him

25   that day.
```

79

1    Q.    Prior to this phone call, had -- do you recall

2    if Mr. Beasley actually had a conversation with

3    Mr. Smallwood, whether or not it was in person or

4    through a phone?

5    A.    I don't recall.

6    Q.    All right.  Were there a number of phone calls

7    between Anita Burkley and Gerald Beasley?

8    A.    Yes.

9    Q.    And in a number of those phone calls did

10   they -- I say a number.  I think I know of three or

11   four in which did they discuss Stephen Smallwood?

12   A.    Uh, there's -- there's calls between Gerald

13   Beasley and Anita Burkley where they're talking about

14   an individual, and there's one call in particular where

15   it appears she lets it slip and says the name Steve

16   and -- and the conversation kind of comes to a halt at

17   that point and they laugh about it.

18   Q.    All right.  And I think that's a call that we'll

19   discuss again in a little bit more once we start going

20   through some of those phone calls.

21         The final drug conspiracy is the marijuana

22   conspiracy.  What did you learn about the marijuana

23   conspiracy throughout this case?

24   A.    Well, what we learned was that Antoine Beasley

25   was traveling to Colorado and California where he had a

1  medical marijuana ID and he was purchasing large

2  amounts of marijuana and shipping them back to Wichita,

3  Kansas.

4  Q.    All right.  So, you give us a lot of information

5  so I'm going to go back and piece through it a little

6  bit.

7          Were you able to get a copy of the medical

8  marijuana card and the medical marijuana application

9  that he obtained in Colorado?

10  A.    Yes.  We seized that during the search warrant

11  at his residence in June of 2013.

12  Q.    And his residence, again, just for the Court?

13  A.    At 618 North Hedgewood.

14  Q.    Hedgewood.  And that's in Andover?

15  A.    Andover.

16  Q.    And what information did you learn from the

17  medical marijuana card and from the application?

18  A.    On -- there were several applications but on one

19  it listed the reason for him obtaining the card to be

20  that he's HIV positive.

21  Q.    And, again, a -- was this -- do you recall, was

22  there a legitimate address on this application?

23  A.    There -- there was an -- I believe there was an

24  address listed in Colorado.

25  Q.    All right.  And do you recall, was there -- did

1  we obtain video of Antoine Beasley at a medical

2  marijuana dispensary in Colorado?

3  A.    Not that I recall.

4  Q.    Was there at one point a postal interception of

5  marijuana being shipped back in to Kansas?

6  A.    Yes.

7  Q.    Would you go ahead and tell the Court about

8  that.

9  A.    I believe it was in February of 2013, I received

10  information from the postal inspection service that

11  there was a package that they believed to contain some

12  sort of narcotics in it that was addressed to 655 North

13  Estelle in Wichita, Kansas.

14          The postal inspection service obtained a

15  federal search warrant for the package and once they

16  opened the package, they found that it contained a

17  large amount of marijuana and marijuana wax.

18  Q.    All right.  And was there another postal package

19  that we identified while we were up on Gerald Beasley's

20  phone in which Antoine was in either California or

21  Colorado and shipping a package back?

22  A.    Yes.

23  Q.    And was surveillance set up to observe or watch

24  Gerald Beasley?

25  A.    Yes.  I -- I'm not sure the date on that.

82

```
 1   Q.    Okay.
 2   A.    If it was during Gerald Beasley's wire or
 3   Antoine Beasley's wire, I'd have to check my report for
 4   the exact date.
 5   Q.    I guess we assumed Gerald, but you're right, we
 6   were hearing both of them.
 7         So what -- well, will you go ahead and tell
 8   the Court what occurred as we were doing surveillance
 9   on Gerald Beasley?
10   A.    He went to a residence located on Del Rose in
11   Wichita, Kansas, I believe it was 1311, and we
12   intercepted calls between Gerald Beasley and Antoine
13   Beasley where it appeared they were making arrangements
14   for Gerald Beasley to be present when the package was
15   delivered.
16   Q.    Did you all believe that package to contain
17   marijuana?
18   A.    Yes.
19   Q.    Did you go ahead and allow that package to be
20   delivered?
21   A.    Yes.
22   Q.    What ob -- what did surveillance observe once
23   the package was delivered to the Del Rose address?
24   A.    They observed Gerald Beasley take the package,
25   put it in his vehicle, and then I believe he drove over
```

1   to 655 North Estelle.

2   Q.    All right.  And let's talk just a little bit

3   about -- well, let me ask you this:  Do you know where

4   Antoine Beasley was at that time?

5   A.    I believe he was out of state and I believe it

6   was in California, if I'm correct.

7   Q.    Would it be accurate to state that Antoine

8   Beasley traveled not only to California but also to

9   Colorado during this investigation?

10  A.    Yes.

11  Q.    So you said that Gerald Beasley picked up the

12  package as it was sitting on -- was it sitting on the

13  front porch, I'm assuming?

14  A.    I believe so.

15  Q.    And he went over to 655 North Estelle.  Would

16  you go ahead and explain what you learned about that

17  address or that residence to the Court.

18  A.    I believe that that was also a stash house that

19  was being utilized primarily by Antoine Beasley --

20  Q.    Okay.

21  A.    -- at that time.

22  Q.    Was there a pole cam up at that residence?

23  A.    Yes.

24  Q.    What did you observe throughout the pole cam as

25  you reviewed it in the past couple of years?

1  A.     Uh, you can observe Antoine Beasley traveling to

2  that residence, entering, and then exiting.

3         You also can observe Antoine Beasley on some

4  occasions meeting with either Juan or Esentia Ibarra at

5  that residence.

6  Q.     What is that based on?  That information that he

7  was meeting with a Juan or Esentia Ibarra?

8  A.     It's based on watching the video and seeing him

9  meet them and also on some of those occasions we had

10 surveillance personnel in the area who were also able

11 to observe that, or to obtain license plates --

12 Q.     Okay.

13 A.     -- that came back to them.

14 Q.     Okay.  Did you identify Helen Beasley as an

15 individual that you believed to be involved in the

16 marijuana conspiracy?

17 A.     Yes.

18 Q.     What did you believe her role to be?

19 A.     I believe that she was obtaining marijuana for

20 her own use but also on some occasions to redistribute

21 to others.

22 Q.     And is there a specific phone call or phone

23 calls that you would hear her ask for marijuana for

24 other individuals?

25 A.     Yes.

1    Q.    Do you recall who that other individual was?

2    A.    One of the calls was for who I believed to be

3    Loretta Beasley.

4    Q.    Do you know who Loretta Beasley is?

5    A.    I know that she is a family member.

6    Q.    Do you also -- did you also obtain video footage

7    of Helen Beasley obtaining marijuana at Tiara's Place?

8    A.    There -- from watching the video, it does appear

9    that Gerald Beasley provides her with a -- a bag about

10   that size (indicating) which she -- that I believe

11   contained marijuana which you can see on the video she

12   appears to then stuff it in her pants.

13          MR. HEPPERLY:  I ask for clarification, Your

14   Honor.

15          Could he be more specific as to what video he

16   was referring to?

17          THE COURT:  Thank you, Mr. Hepperly.

18   BY MS. JACOBS:

19   Q.    Will you go ahead and explain to the Court

20   exactly what you were referring to.

21   A.    It was the video that was obtained from the

22   seized DVR from Tiara's Place during the search warrant

23   on June 12th, 2013.

24   Q.    And at the time, when you watched this they were

25   inside the restaurant, would that be an accurate

```
 1  statement?
 2  A.    Yes, that is correct.
 3         MR. PRATT:  Could we get a date on that?
 4         MR. KERNS:  June 13.
 5         MR. PRATT:  No, that was the date it was
 6  seized.  The date of this alleged incident.
 7         MS. JACOBS:  Your Honor, I don't see it for
 8  the Court.  I can find it for the parties.
 9         THE COURT:  Thank you.
10         MS. JACOBS:  I am just trying to find the
11  means of the conspiracy here.
12         THE COURT:  Thank you.
13  BY MS. JACOBS:
14  Q.    Did Helen Beasley also assist Antoine Beasley
15  throughout this investigation in intercepting or
16  obtaining mail packages?
17  A.    There was calls that were intercepted during the
18  wiretap of Antoine Beasley's cell phone between him and
19  Helen Beasley where it appeared that he was having
20  marijuana smoking devices shipped to Helen Beasley's
21  residence at 201 Colt --
22  Q.    Okay.
23  A.    -- and was having her check on the mail for him.
24  Q.    And interceptions --
25         MR. LOEFFLER:  Your Honor, can we have this
```

1 call identified?

2          THE COURT:  I'm sorry, I can't hear you,

3 Mr. Loeffler.

4          MR. LOEFFLER:  Could we have this call

5 identified?

6          MS. JACOBS:  Your Honor, I think his testimony

7 was that there are numerous phone calls in which there

8 was -- Helen Beasley was speaking with Antoine Beasley

9 identifying that she would check mail packages or have

10 packages delivered.

11          If Mr. Loeffler wants, I'll make sure I get

12 those to him.

13          THE COURT:  Thank you.

14          MS. JACOBS:  But, again, we're -- on a 30-day

15 wire, there were numerous phone calls here.

16          THE COURT:  All right.

17 BY MS. JACOBS:

18 Q.    Also, during this 30-day time period that we

19 were up on Antoine Beasley's phone, did you overhear

20 conversations with Antoine Beasley and other

21 individuals about distributing these marijuana smoking

22 pens?

23 A.    Yes.

24 Q.    Would you identify for the Court and for counsel

25 and a couple of names of those individuals that he was

1  distributing these pens to?

2   A.    There was calls about the pens that were

3  intercepted between Antoine Beasley and Terry Beasley.

4  I believe Jerry Beasley.

5   Q.    When you say Jerry Beasley, would that actually

6  be Jerry Beasley, Junior?

7   A.    That would be correct.

8   Q.    And Jerry Beasley, Junior is related how to

9  Antoine?

10  A.    I believe they are cousins.

11  Q.    Okay.  Also, during the wire, did you overhear

12 between Gerald Beasley's phone and Antoine Beasley's

13 phone a number of words referencing marijuana that

14 maybe didn't say marijuana?

15        You know what I'm trying to say?  What words

16 would people use to talk about marijuana?

17  A.    There was terms such as "cush", "weed" was used,

18 other terms like that.

19  Q.    What about the word "urkle"?

20  A.    Urkle was another term.

21  Q.    Where -- do you know where the word "urkle"

22 comes from?

23  A.    I know that urkle is a strain of marijuana.

24 There's different strains and that's one name that's

25 commonly used for a strain of marijuana.

89

1    Q.    All right.  And what about the word "cush"?

2    A.    Cush is, likewise.

3    Q.    It's another strain?

4          Again, over the wire, and not -- specifically,

5    but did you hear people talk about the effects of

6    marijuana and how it was affecting them?

7    A.    Yes.

8    Q.    All right.  While you were up on either Gerald's

9    phone or Antoine's phone, did you overhear a

10   conversation with Antoine and Gerald about Antoine

11   talking about smoking marijuana while he was driving?

12   A.    Yes.

13   Q.    And what -- what did he say?

14   A.    Well, there's several calls but --

15         THE COURT:  I'm sorry, which one, Antoine or

16   Gerald?

17         MS. JACOBS:  I'm sorry, you're right.

18   BY MS. JACOBS:

19   Q.    If you'll identify the party and what they said

20   or what was pertinent to this.

21   A.    There is one call where, that I recall, where

22   Antoine was talking -- Antoine Beasley was talking to

23   Gerald Beasley about how strong the smell was from the

24   marijuana that he was smoking in his car.

25   Q.    Okay.  So let's talk specifically about a number

1  of customers or -- or individuals that Antoine Beasley

2  was dealing marijuana to.

3          THE COURT:  Before we get into that, Ms.

4  Jacobs, we've been at this for about an hour and 45

5  minutes.  Why don't we take about a 10-minute break and

6  we'll pick up at 5 'til 11:00.

7          Thanks so much.  We'll be in recess until

8  then.

9          (Recess was taken from 10:45 a.m. until

10         10:55 a.m.)

11         THE COURT:  Special Agent, if you'd get back

12  on the stand.

13         THE WITNESS:  Yes, sir.

14         THE COURT:  You are still under oath, as I'm

15  sure you understand.

16  BY MS. JACOBS:

17  Q.    All right.  So right before we broke we were

18  going to discuss just a few individual phone calls,

19  people we've identified as customers of Antoine Beasley

20  or Gerald Beasley with the marijuana conspiracy, is

21  that correct?

22  A.    Yes.

23  Q.    All right.  So let's go ahead and start with

24  Gerald Beasley on his wire.  I know that once we get

25  into some of the statements we're going to talk a lot

1  more about Brandon Smith but besides Brandon Smith, did

2  you identify other individuals obtaining marijuana from

3  Gerald Beasley?

4  A.     Yes.

5  Q.     Specifically, is Denise Davis one of those

6  individuals?

7  A.     Yes.

8  Q.     What is the relationship between Denise Davis

9  and Gerald Beasley?  Or who is she, I guess is really

10 my question?

11 A.     I believe she was a girlfriend of Gerald

12 Beasley's.

13 Q.     All right.  And in particular, in session 2420,

14 just for the Court, or just for the defense counsel's

15 information, on April 8th, was there a conversation

16 with Denise Davis and Gerald Beasley about marijuana?

17 A.     Yes.

18 Q.     What occurred during that conversation?

19 A.     I believe Denise was talking about smoking

20 marijuana and Gerald made a statement indicating there

21 was marijuana, that he gave it to her.

22 Q.     All right.  And does she talk about the quality

23 of the marijuana at that time?

24 A.     Yes.

25 Q.     All right.  Were you able to identify

1  individuals through Antoine Beasley's phone that you

2  believe he was distributing marijuana to?

3  A.    Yes.

4  Q.    If I said the name Eric Charles, Isaac Woods, as

5  well as Cameron James, either of those names sound

6  familiar as just a few of the individuals?

7  A.    Yes.

8  Q.    All right.  Let's go ahead and talk about

9  Cameron James just a little bit.

10         Were you able to identify a number of phone

11  calls with an individual by the name of Cameron James?

12  A.    Yes.

13  Q.    Did law enforcement set up a wall stop or a stop

14  with Cameron James after he met with Antoine Beasley?

15  A.    Yes.

16  Q.    So instead of me testifying I'm going to go

17  ahead and ask you, would you go ahead and tell the

18  Court what occurred with that occasion.

19  A.    Law enforcement observed Antoine Beasley meet

20  with, who was later found to be Cameron James.

21  Q.    Where did they meet?

22  A.    I believe it was at a QuikTrip.

23  Q.    Okay.

24  A.    And when Cameron James departed, they attempted

25  to stop his vehicle.  Short pursuit followed, at which

1 point Cameron James wrecked his vehicle.  He ran and

2 was subsequently taken into custody.

3 Q.    All right.  Any controlled substances located

4 either on Cameron James or in the vehicle?

5 A.    In the vehicle approximately two ounces of

6 marijuana was recovered.

7 Q.    Following that stop with Cameron James, was

8 there another phone call a few days later between

9 Cameron James and Antoine Beasley?

10 A.    Yes.

11 Q.    And, again, for defense counsel's information,

12 section 746 on Antoine Beasley's phone, would that be

13 correct?

14 A.    I believe so.

15 Q.    Okay.  And this occurred on May 17th.

16        Will you just go ahead and tell the Court the

17 important part of this conversation related to the

18 marijuana distribution.

19 A.    It's a heated phone call between Antoine Beasley

20 and Cameron James and Antoine Beasley threatens Cameron

21 James about going around and telling people that he was

22 the one who set him up.

23 Q.    So did -- from this phone call did it sound like

24 Antoine Beasley thought that Cameron James was telling

25 people that Antoine was working with the police?

94

```
1   A.    Yes.

2   Q.    Okay.  And then would you identify who Eric

3   Charles is.

4   A.    Eric Charles is an individual, I believe he was

5   a customer for marijuana.

6   Q.    All right.

7   A.    And he was buying it from Antoine Beasley.

8   Q.    And, again, numerous phone calls between Eric

9   Charles and Antoine Beasley on Antoine Beasley's phone,

10  is that correct?

11  A.    Yes.

12  Q.    Okay.  And then also Isaac Woods, would you

13  identify him for the Court?

14  A.    Isaac Wood was an individual who was working at

15  Tiara's Place restaurant at that time.

16  Q.    Did -- and was he intercepted both on Gerald's

17  phone and on Antoine's phone?

18  A.    Yes.

19  Q.    And based on the phone conversation -- well, how

20  many phone conversations -- how many, because that's a

21  bad question.

22        Were there numerous phone conversations

23  between Isaac Woods and Antoine Beasley?

24  A.    Yes.

25  Q.    It -- would it be accurate to say they appeared
```

1  to be more than just a customer relationship?  They

2  appeared to be friends?

3  A.    Yes.

4  Q.    And based on the conversations did you believe

5  that Antoine Beasley was distributing marijuana with

6  Isaac Woods?

7  A.    Yes.

8  Q.    And what is that based on?

9  A.    Based on the contents of the calls, that there

10 was some calls, I believe, that were intercepted where

11 he indicated that he had gotten some from Antoine --

12 Q.    Okay.

13 A.    -- Beasley.

14 Q.    During this search warrant of Antoine Beasley's

15 residence, as well as the 655 North Estelle believed to

16 be his stash house, would you go ahead and tell the

17 Court what was located that you believe shows that he

18 was involved in the marijuana distribution.

19 A.    At 655 North Estelle law enforcement located a

20 quantity of marijuana.  They also located equipment

21 that's believed to have been used in the growing of

22 marijuana at one time.

23        MR. PRATT:  Your Honor, I'm going to be object

24 as to how much a "quantity" is.

25        THE COURT:  I can't hear you.  If

1  your -- you're going to have to get a mike.

2          MR. PRATT:  I'm sorry.  I am going to object

3  as to what a quantity is.

4          MS. JACOBS:  And there will be some follow up

5  questions, Your Honor.  I think he's just trying to

6  give a general overview at that point.

7          THE COURT:  Okay.  We'll hold you to that, Ms.

8  Jacobs.

9          MS. JACOBS:  Okay.

10          THE COURT:  Thank you, Mr. Pratt.

11  BY MS. JACOBS:

12  Q.    A quantity of marijuana, you said grow

13  equipment, as well?

14  A.    Yes, equipment that appears to have been used to

15  grow marijuana plants at one time, as well as a firearm

16  and -- actually, two firearms.  One's a little receiver

17  that was incomplete.

18  Q.    Okay.  So let's go back and talk a little bit.

19  You talked about a quantity of marijuana.  Can you give

20  us a better description of an amount?

21  A.    I had -- for the exact amount, I would have to

22  refer to the lab report.

23  Q.    Can you give us an estimation as in terms of a

24  user amount or a distribution amount or what it was

25  stored in to help the Court?

1  A.    It -- it -- it was a large amount, it would be

2  more than a user amount, in my opinion.

3  Q.    And what was important about the grow equipment

4  that you located at North Estelle?

5          Did that come up later on in another search

6  warrant?

7  A.    Yes.  When we searched the digital devices that

8  were recovered from 618 North Hedgewood, which was

9  Antoine Beasley's residence, on some of the digital

10 devices there were either pictures or videos that

11 appeared to be of the same equipment but with actual

12 marijuana plants in them.

13 Q.    And that was on cell phone footage or video

14 or -- or photographs from Antoine's phone?

15 A.    From digital devices, so there was a computer

16 that had photographs and video on it, and it appears

17 that those came from an iPhone that had been hooked up

18 to it and then also there was some pictures on a phone.

19 Q.    How were you able to make a determination that

20 these grow operation photographs came from 665 North

21 Estelle?

22 A.    I had one of our digital investigators examine

23 some of the photographs that had been recovered from

24 these digital devices and there's what's called

25 metadata attached to some of them which provides

98

1  locations where the photos were taken at.

2  Q.    Okay.  And what did you learn from this

3  metadata?

4  A.    It appears that some of these photos had been

5  taken in the vicinity or near or at 655 North Estelle.

6  Q.    From looking at the photographs and also

7  comparing the evidence located inside the basement at

8  655 North Estelle, did they appear to be similar or

9  substantially similar?

10  A.    Appeared to be almost exactly the same.

11  Q.    Okay.  Search warrant also executed at Antoine

12  Beasley's residence in June of 2013, is that correct?

13  A.    Yes.

14  Q.    And what did you locate there at the residence

15  related to the marijuana distribution?

16  A.    Other law enforcement located approximately

17  $249,970 in cash in a safe.  They also located numerous

18  documents related to marijuana or marijuana

19  dispensaries or marijuana cards in the name of Antoine

20  Beasley.  I believe they also located some marijuana

21  there at the house.

22  Q.    And, again, to your knowledge, is this

23  distribution amount marijuana?

24  A.    I'd have to look at the reports.

25  Q.    Okay.  And then so we've covered Estelle and

1   Hedgewood, is that right?

2   A.    Right, Hedgewood for Antoine Beasley.

3   Q.    Was another search warrant executed at Antoine

4   Beasley's residence in April of 2014?

5   A.    Yes.

6   Q.    And do you recall information or what evidence

7   was located at that time related to marijuana and

8   marijuana distribution?

9   A.    Investigators again located some additional

10  marijuana.

11  Q.    Do you recall, again, was it a distribution

12  amount marijuana or was it a personal use?

13  A.    I'd have to again refer to the reports.

14  Q.    Okay.  And we'll get those for you, so we'll

15  come back to that and make sure that you can give an

16  accurate testimony regarding that issue.

17        Was there evidence to support marijuana

18  distribution at the Colt address which in June of 2013

19  belonged to Helen Beasley and Gerald Beasley?

20  A.    I -- I'd have to read the report, or refer to

21  the report.

22  Q.    That wasn't a search warrant that you

23  participated in, is that correct?

24  A.    I was not there.

25  Q.    Okay.  And you were at the Tiara's Place?

1  A.    I was at Tiara's Place for the most part.

2  Q.    And then was there evidence related to marijuana

3  at Tiara's Place?  Or was that mainly just heroin?

4  A.    That was just heroin.

5  Q.    Okay.  And then, do you recall, was there

6  evidence on Piatt on the June, 2013 search warrant

7  related to marijuana?

8  A.    Yes.

9  Q.    Marijuana distribution?

10        What did you locate?  Or what was located

11 since it wasn't use?

12 A.    Again, I believe there was marijuana located,

13 for the amount I would have to refer to the report.

14 Q.    Again, you believe that it was a distribution

15 amount?

16 A.    I would have to refer to the report.

17 Q.    Let me ask you this:  Was -- to your knowledge,

18 is Gerald Beasley a user of controlled substance?

19 A.    No, he's not at the current time.

20 Q.    And where is that information based on?

21 A.    Phone calls that were intercepted where Gerald

22 Beasley told others that he -- at one time he used to

23 use narcotics but doesn't any more.

24 Q.    All right.  So let's move on to a bank fraud

25 conspiracy.  I know we've talked a lot about these

1  forgeries and these historical forgeries when we

2  started but would you go ahead and describe for the

3  Court the overall scheme of the bank fraud

4  for -- for -- for frame of reference.

5  A.    Well, from reviewing these cases and

6  interviewing some of these individuals that we did, the

7  general scheme was is that a person would obtain a

8  check, provide that to Gerald Beasley, who would then

9  counterfeit it by putting other people's names on that

10  check, and then they would go and cash these

11  counterfeit checks at various bank locations.

12  Q.    And you were able to identify the, what I would

13  call the main players or the repeat offenders, would

14  that be an accurate statement?

15  A.    Some of them.

16  Q.    All right.  Again, Terry Ross, Gerald Beasley,

17  Larry Reed, an individual who was charged and has pled

18  guilty in this case, is that correct?

19  A.    That's correct.

20  Q.    And as well as Charlotte Akogun, another

21  individual charged and who is a fugitive at this point,

22  is that correct?

23  A.    That's correct.

24  Q.    What was William Parker's -- what did you learn

25  as William Parker's role in this bank fraud conspiracy

1  and the check forgeries?

2  A.    Well, specifically, there's one case in

3  particular that I believe already touched on a little

4  bit where he took Cleo Walker --

5  Q.    Where he -- and I want you to specify, who "he"

6  is.

7  A.    William Parker did.

8  Q.    Thank you, sir.

9  A.    Took Cleo Walker, and according to her

10 statement, they stopped in the area near where Tiara's

11 Place restaurant would be.

12        William Parker then went inside, came back,

13 they went to a bank.  He provided her with a check.

14 Cleo Walker went inside the bank, attempted to cash it.

15 She was then arrested.  She advised that William Parker

16 was the one who had driven her there.  He was then

17 subsequently arrested.

18 Q.    All right.  Did Cleo Walker give a statement

19 following her arrest?

20 A.    To the law enforcement on the scene, yes.

21 Q.    And that's where most of this information comes

22 from regarding where they picked up the check and who

23 drove her in, that -- is that correct?

24 A.    Yes.

25 Q.    All right.  And how did she identify William

1    Parker's role?

2    A.    As the person who provided her with the check

3    and drove her to the bank.

4    Q.    And he provided her with the check after they

5    made a stop at the Tiara's Place restaurant, is that

6    correct?

7    A.    Yes.

8    Q.    And, again, this is the same William Parker that

9    you reference earlier who made the phone call after

10    this arrest and called Gerald Beasley from the jail

11    phone call and told him to clean up?

12    A.    That's correct.

13    Q.    By the time we started intercepting telephone

14    calls on Gerald -- Gerald Beasley's wire, would it be

15    accurate to state that he had, for the most part, kind

16    of cut down or reduced his involvement in the check

17    fraud conspiracy?  In the bank conspiracy?

18    A.    It appeared that way to us.

19    Q.    Was there evidence collected in the search

20    warrants in June of 2013 related to bank fraud at all?

21    A.    Yes, I believe there was.

22    Q.    And what -- where was that evidence located?

23    A.    I believe it was at 1122 North Piatt.

24    Q.    And what did you find?

25    A.    I wasn't there.  I was -- well, I -- I was

104

1  briefly at Piatt --

2  Q.    Sure.

3  A.    -- but I wasn't conducting the search there,

4  other law enforcement was.

5          I believe they found documents that appeared

6  to be attempts at making counterfeit checks.

7  Q.    And then was there any other documents obtained

8  at any other search warrant or any other place that

9  they searched?

10  A.    Related to the bank fraud?

11  Q.    Yes, sir.

12  A.    I would have to refer to my reports.

13  Q.    So, again, the bank fraud, most of it comes from

14  old historical cases and then also from the five

15  specific bank fraud counts that are charged out in the

16  indictment, is that an accurate statement?

17  A.    Yes.

18  Q.    All right.  Over the course of -- of

19  investigating this case and obtaining all those old

20  documents, as well as speaking with individuals who

21  were involved in that bank fraud conspiracy, were there

22  different numbers that came out about how much money

23  Gerald Beasley made related solely to the bank fraud

24  conspiracy?

25  A.    Well --

1    Q.    Like, did people tell you he had made a certain

2    amount of money or were you able to figure out a

3    certain amount of money that he had made based on the

4    number of checks that were cashed?

5            Do you know what I'm trying to ask you?

6    A.    Not really.

7    Q.    No, because you have that look on your face that

8    says, What are you trying to say.

9            Were there specific interviews done with

10   specific individuals about Gerald Beasley's involvement

11   with bank fraud?

12   A.    Yes.

13   Q.    And did some of those individuals tell you that,

14   I cashed so many checks, or, I was involved in a crew

15   that cashed so many checks that I know a specific

16   amount of money at least was made with this check or

17   with this crew?

18   A.    I -- not in the interviews I participated.

19   Q.    Okay.

20   A.    That I can recall.

21   Q.    Okay.

22   A.    There was people that talked about his

23   involvement in that and that they had participated in

24   either driving people to cash those checks or cashing

25   them or providing the check that was later

1  counterfeited --

2  Q.    Okay.

3  A.    -- but as far as anybody telling me exactly how

4  much he made from all that activity?  I don't recall.

5  Q.    Okay.  A lot of this information was actually

6  gained through Detective Brad Tuzicka with the Wichita

7  Police Department, would that be an accurate statement?

8  A.    Yes.

9  Q.    And his part of that investigation, is that

10  accurate?

11  A.    Yes.

12  Q.    There was one more question.  Sorry.

13         I'll remember it later and I'll come back to

14  it.

15         All right.  So we're going to move on to the

16  EBT card conspiracy or the program fraud conspiracy.

17         Will you go ahead and describe to the Court

18  what you learned about program fraud conspiracy.

19  A.    Well, what I learned is that Gerald Beasley was

20  purchasing what's called EBT, or Electronic Benefit

21  Transfer cards, or also known as Vision cards from

22  individuals for approximately half price.  Whatever was

23  on the card, he would give them approximately 50

24  percent of what was on the card.

25  Q.    Will you go ahead and explain to the Court what

1  an EBT card is.

2  A.    It's a -- a card -- it's Government assistance

3  program run by the U.S. Department of Agriculture, used

4  to be food stamps benefits.  They are now provided to

5  eligible recipients in the form of a card.

6  Q.    And would it be an accurate statement to say

7  that it's kind of -- it's used like a debit card or a

8  credit -- credit card or a debit card?

9  A.    That would be accurate.

10  Q.    Do you know or did you learn in your

11  investigation in working with the individuals from the

12  Department of Agriculture, are individuals able to

13  assign or to allow other individuals to use these

14  benefits?

15  A.    They are not supposed to sell them to other

16  individuals, no.  It's a violation.

17  Q.    So, is it your testimony that Gerald Beasley

18  would -- would buy or purchase Vision cards?

19  A.    Yes.

20  Q.    And you intercepted a number of phone calls in

21  which he is discussing with numerous individuals the

22  purchase of their Vision cards, is that correct?

23  A.    That's correct.

24  Q.    Would it be accurate to say that there's

25  actually -- they don't use coded conversation when they

1  are talking about the Vision cards?

2  A.    No, not really.

3  Q.    What did surveillance observe related to the

4  Vision cards?  Or the EBT cards?

5  A.    One agent from my office actually stood behind

6  Gerald Beasley in line at a store while he used a

7  Vision Card to purchase groceries or -- or supplies for

8  the restaurant.

9  Q.    And was that at Sam's Club, is that an accurate

10  statement?

11  A.    Yes, I believe it was.

12  Q.    Were you all able to do the research and

13  determine whether or not Gerald Beasley or Helen

14  Beasley was eligible to receive a Vision card?

15  A.    Yes.

16  Q.    And were either one of them eligible or did

17  either one of them receive EBT benefits?

18  A.    I don't believe either one of them was at that

19  time.

20  Q.    So, will you go ahead and just explain to the

21  Court, I guess, like I said, we have numerous, numerous

22  phone calls with a number of individuals, just in

23  general of the scheme that would occur with other

24  individuals, unindicted individuals, as to how -- how

25  that Vision fraud scheme worked.

1  A.    Well, in this particular investigation, Gerald

2  Beasley was buying these cards, sometimes providing

3  cash, sometimes providing narcotics in exchange for the

4  use of that card that was assigned to somebody else.

5          Gerald Beasley would then use those cards to

6  purchase items at the store, both for his personal use

7  or his family's use, or for to supply the restaurant.

8  Q.    And was there actually surveillance from the

9  Tiara's Place DVR security footage that supported

10 these -- this finding?

11 A.    Yes.

12 Q.    Would you explain that to the Court.

13 A.    There's instances where Gerald Beasley has

14 telephone conversations with individuals in regards to

15 buying the EBT cards and on some of those occasions,

16 those individuals can be seen on the video from the DVR

17 exchanging what appears to be a card, or cash for the

18 card.

19 Q.    Okay.  So after the phone call, a period of time

20 later they would come up to the restaurant and you

21 would see this exchange on the video?

22 A.    That's correct.

23 Q.    And, again, you can't overhear, there is no

24 audio on this video, is that correct?

25 A.    That's correct.

1    Q.    But it appeared to be Vision cards or cards that

2    were being exchanged as opposed to a drug dealing that

3    you had observed?

4    A.    It appears to be a card, the way they hand it or

5    hold it.

6    Q.    Okay.  And then there's other calls in which

7    individuals call and they actually need their -- their

8    number so that they can use it themselves, would that

9    be an accurate statement?

10   A.    Yes.

11   Q.    Helen Beasley is charged in this Vision card or

12   EBT card fraud.  Just in general, would you describe to

13   the Court the number of calls or the calls that you

14   overheard between Gerald Beasley and Helen Beasley

15   related to the EBT card?

16   A.    Yes, there was one series of calls, for example,

17   where an individual called Gerald Beasley and asked for

18   the number off the card, at which point Gerald Beasley

19   then called Helen Beasley to obtain the card number,

20   indicating to me that she had possession of that card,

21   and then he would call that original caller back to

22   give that person their card number.

23   Q.    And other phone calls in which they have

24   conversations about the cards that they have and

25   needing to get them cleared off or empty them before

1    more money is put back on them, is that an accurate

2    statement?

3    A.    Yes, there is a call between Gerald Beasley and

4    Helen Beasley where she tells Gerald Beasley that she

5    got the cards emptied off.

6    Q.    All right.  And do you recall if she went to

7    Walmart or Sam's or, I guess, I just remember it was

8    one of those places?

9    A.    I believe in the call she -- she states what

10   stores she went to.

11            MS. JACOBS:  And for defense counsels'

12   information if I recall correctly, it's on April 10th,

13   and that would be session 2739 and 2803.

14            MR. HEPPERLY:  Would you repeat those again,

15   please.

16            MS. JACOBS:  Sure, 2739, 2803, I believe.

17   BY MS. JACOBS:

18   Q.    And then also William Parker is charged in this

19   Vision card or debit card -- EBT card conspiracy, as

20   well.

21            What information did you learn about William

22   Parker with EBT cards?

23   A.    Well, I learned from Detective -- well, Task

24   Force Officer at the time, Ronald Goodwyn, who was

25   conducting the financial investigation, that a card

1 belonging to William Parker had been used by Gerald

2 Beasley under his account at Sam's Club at one point.

3          Also intercepted a call between William Parker

4 and Gerald Beasley where, in essence, he offered to

5 sell him a Vision card.

6          I also observed from the video obtained from

7 the DVR at Tiara's Place restaurant what appears to be

8 William Parker and I believe a female individual

9 meeting with Gerald Beasley, and at which point they

10 appeared to exchange a card.

11 Q.    And, to your information, is William Parker

12 eligible to receive benefits?

13 A.    I believe at that time he was.

14 Q.    Okay.  And do you recall, was there a voicemail

15 on April 19th in session 5109 in which William Parker

16 leaves -- you don't have it there in front of you, I

17 have it over here if you want to -- but William Parker

18 leaves him a voicemail stating that, I have the card

19 for you, or I still have it waiting for you or

20 something to that effect?

21 A.    Yes.

22          MR. ROBINSON:  Can you tell me the date of

23 that again?

24          MS. JACOBS:  I'm sorry, April 19th.

25          MR. ROBINSON:  April when?

1          MS. JACOBS:  19.

2          MR. HEPPERLY:  2013?

3          MS. JACOBS:  Yes, sir

4    BY MS. JACOBS:

5    Q.    All right.  And moving on now to the money

6    laundering conspiracy.

7          MS. JACOBS:  Your Honor, as the Court is

8    aware, there is a document filed under seal, it's the

9    Civil Forfeiture Complaint.  At this time we have not

10   moved to unseal it.  I think it's something we have

11   intended to do for about six months and we haven't done

12   it at this point.  I think we need to for all counsel.

13          As part of the money laundering conspiracy, to

14   prove that part of this conspiracy, the Government

15   would like to present the Court with attachment B to

16   this civil complaint.  I think that it would lay out a

17   lot of information.

18          I've just recently today provided copies to

19   all defense counsel and we're going to attempt to get

20   that unsealed.

21          So I guess my question is, asking the Court

22   here in open court if we could unseal that document at

23   least for the purposes of today's hearing.

24          THE COURT:  Does anybody have a problem with

25   unsealing it for purposes of the hearing today?

```
 1            MR. HEPPERLY:  No, sir.

 2            MR. FALK:  No, Your Honor.

 3            MR. WACHTEL:  No, Your Honor.

 4            MR. PRATT:  Your Honor, I don't have any

 5   objection to unsealing it, my objection would be to

 6   admittance.  I mean, I know she --

 7            THE COURT:  I'm sorry, Mr. Pratt, I can't hear

 8   you.

 9            MR. PRATT:  I'm sorry, Your Honor.  I don't

10   have any objection to unsealing it for this hearing, my

11   objection would be at the point she would try to admit

12   it, as she has indicated she would.

13            It appears that this document was written by

14   Ron Goodwyn, a detective for the sheriff's -- excuse

15   me, Sedgwick County Sheriff's Office.  Certainly we

16   can't cross examine the document and it is my

17   understanding that Ron Goodwyn will not be testifying

18   in this hearing.

19            THE COURT:  Well, I'm not going to worry about

20   admissibility right now, so we'll go ahead and unseal

21   the document.

22            MS. JACOBS:  At this time, I'll present it to

23   the Court, as well as to the agent then.

24            THE COURT:  Thank you.

25   BY MS. JACOBS:
```

1  Q.    All right, Special Agent Fuller, would it be an

2  accurate statement to say that the -- part of this case

3  dealing with the money laundering conspiracy was mainly

4  investigated through Ron Goodwyn, as well as Bob

5  Hop -- Hawkins, and -- and then put together the

6  financial piece of the case, would that be an accurate

7  statement?

8  A.    Yes.

9  Q.    And then all parties came together to sit down

10 and discuss assets and the amount of money learned or

11 amount of money that was obtained through bank fraud,

12 drug conspiracies, and able to come up with the belief

13 of how much money was -- was used to buy assets?

14        Kind of a bad statement, but -- I mean

15 everyone was part of sitting down and making lists of

16 assets that believe were purchased or facilitated

17 drug -- criminal activity?

18 A.    Yes.

19 Q.    Okay.  So, through the investigation, what did

20 you learn, in conjunction with Ron Goodwyn and Bob

21 Hawkins, about money laundering?

22 A.    From speaking with them or reviewing their

23 reports or affidavits, learned that Gerald Beasley and

24 Antoine Beasley and their company that they had,

25 Reltsuh, had amassed assets, including properties that

1   were believed to have been paid for with funds derived

2   from illegal activity.

3   Q.    Through the investigation, what did you learn

4   about employment for Antoine Beasley, Helen Beasley,

5   Terry Beasley, and Gerald Beasley?

6   A.    Well, to be more specific, I mean --

7   Q.    I mean, were they employed?  Did they go to a

8   job every day?  Were they -- you know, what did you

9   learn in terms of their employment?

10  A.    Well, during the wiretaps, Gerald Beasley

11  operated his restaurant.

12  Q.    All right.

13  A.    Antoine Beasley, you know, I didn't observe ever

14  going to any type of job, nor did we observe Terry

15  Beasley or Helen Beasley doing that, either.

16  Q.    Okay.  Speaking of the restaurant, throughout

17  the investigation and specifically those two months of

18  the wire, what did you observe about the restaurant's

19  hours, amount of business, anything related to, you

20  know, how busy you saw?

21  A.    The restaurant normally would close around 6

22  o'clock and it was open normally Tuesdays through

23  Saturday and oftentimes we saw Gerald Beasley meeting

24  with other individuals after the restaurant had been

25  closed at the restaurant.

1    Q.    What did you learn about how Gerald Beasley and

2    Antoine Beasley purchased the restaurant and the

3    residences that they lived?  I mean, for the most part

4    were these cash payments that were made?

5    A.    I -- I think it varied by the property you're

6    talking about.

7    Q.    Okay.  And all of their -- I think all -- all of

8    their -- their transactions in dealing with real

9    estate, for the most part, they were through Smith and

10    Company, is that correct?

11    A.    For some of the properties they did but not all

12    of them.

13    Q.    And to your knowledge, was Ron Smith indicted

14    for his role in I think I believe it was a money

15    laundering conspiracy, along with Gerald Beasley in a

16    separate case?

17    A.    Yes.

18    Q.    And to your knowledge, is he currently serving a

19    term of diversion, I believe, or probation term in that

20    case?

21    A.    I believe so.

22    Q.    Prior to 2003, did Gerald Beasley have any

23    assets or property that Ron was able to find?

24         And if you don't recall, I guess I am just

25    speaking in general how many assets Gerald Beasley had

1  back in 2003, approximately ten years before we started

2  this investigation.

3  A.    Well, on December 20th, 2002, Gerald Beasley

4  filed for bankruptcy under Chapter 7.

5  Q.    Okay.

6  A.    And Helen Beasley filed for bankruptcy on May

7  21st of 1999.

8         At the time of the bankruptcy filing Gerald

9  Beasley listed his address as 660 North Estelle,

10  Wichita, Kansas

11  Q.    To your knowledge, does Gerald Beasley still own

12  that residence, the 660 North Estelle?

13  A.    I don't know that he currently does but at the

14  time of this investigation occurring in early 2013, I

15  believe he did.

16  Q.    Okay.

17  A.    Um --

18  Q.    Let me -- let me just go ahead and ask you a few

19  pointed questions because we're going to let the Court

20  review this.

21         The house that Antoine Beasley lives in, do

22  you know how that -- do you know if there was a large

23  cash payment made on that house?

24         MR. PRATT:  Objection, can we specify the

25  address of this house?

```
 1            MS. JACOBS:  Sorry.
 2            THE COURT:  I thought it was 660 North
 3  Estelle.
 4            THE WITNESS:  Your Honor, that would be the
 5  house that is on Estelle.
 6            The house that Antoine Beasley lived in during
 7  the investigation, which I believe is Hedgewood.
 8            THE COURT:  Thank you.
 9            MS. JACOBS:  Out in Andover, Kansas?
10            THE WITNESS:  Yes, that I believe the
11  investigation that was conducted revealed that a lot of
12  that house was purchased with cash.
13  BY MS. JACOBS:
14  Q.    All right.  And, in fact, was there at one point
15  that a large cash payment of over $90,000 was put down
16  either on that house or was it on that house or the
17  Colt house, do you recall?
18  A.    I believe it was 618 North Hedgewood in Andover.
19  Q.    And that was on the Hedgewood address, is that
20  correct?
21  A.    Yes.
22  Q.    And was there a receipt located in the documents
23  from Smith and Company related to that large cash
24  payment?
25  A.    There was a receipt actually located when we
```

1  conducted the search warrants in June, 2012.

2  Q.    And who -- whose name was on that receipt as the

3  individual who brought in that amount of money?

4  A.    Helen Beasley.

5  Q.    There were -- were you involved in any of this

6  financial collection of financial documents and the

7  financial analysis at all?

8  A.    To a minimal extent.

9  Q.    To what extent?  Go ahead and explain that to

10  the Court.

11  A.    Well, I spoke with Ron Goodwyn and AFI Hawkins

12  about their investigation and that they were

13  conducting.  I reviewed other documents related to the

14  financial investigation but as far as actually going

15  through those documents and compiling it and doing the

16  analysis of it, that was primarily Ron Goodwyn and AFI

17  Hawkins.

18  Q.    Okay.  So all the information regarding the

19  financial -- the amount of money in the bank, the cash

20  deposits, the obtaining assets, all of that, that was

21  all done by Ron Goodwyn, correct?  Or Bob Hawkins?

22  A.    For the most part it was done by them.  They

23  probably had assistance from other people, as well.

24  Q.    Sure.  And for the most part, those findings and

25  information that they learned were placed into the

1  Exhibit B that was attached to the civil -- Civil

2  Forfeiture Complaint?

3  A.    I believe so.

4  Q.    Okay.  Specifically, let's talk about a couple

5  different events then just to also show the Court that

6  beyond the money laundering, in terms of moving money

7  or facilitating that, there was also some specific

8  instances.

9        A few weeks ago we were here in front of the

10  Court on a motion to suppress regarding Terry Beasley,

11  and Antoine Beasley, Helen Beasley, and Gerald Beasley.

12  Again, would you go ahead and explain to the Court why

13  we believe that money is -- is -- that we seized from

14  that car stop is facilitating drug proceeds.  Or

15  facilitating a drug crime.

16  A.    Yeah.  Well, the -- several reasons.  The amount

17  of cash that was seized from that safe was $55,100 in

18  currency and it was bundled into two stacks:  One stack

19  was $54,000; the other was $1100 and that would

20  correspond with calls that we intercepted between

21  Gerald Beasley and Terry Beasley where, in my opinion,

22  Gerald Beasley -- or Terry Beasley is providing that

23  amount of money to Gerald Beasley --

24  Q.    Okay.

25  A.    -- for the purchase of narcotics.

1   Q.    Okay.  To your knowledge, is it an accurate

2   statement to say that Terry Beasley was on disability?

3   A.    That's what I've been told.

4   Q.    And yet we also identified that he had -- he

5   drove a Lexus and lived out in Andover.

6         Do you recall whether or not his current

7   girlfriend or wife, whoever she was, if she worked

8   during this wire?

9   A.    I don't recall.

10  Q.    Okay.  So the other theory, or when we move

11  forward on this money laundering conspiracy, is that

12  this property was actually used to facilitate these

13  drug transactions or drug criminal activity.

14        Would you go ahead and state for the Court how

15  you -- or if you observed any of these properties being

16  used to facilitate any kind of drug activity?

17  A.    Well, 655 North Estelle I believe was being used

18  by Antoine Beasley and Gerald Beasley as a stash house

19  for narcotics, and as a place to meet with their

20  sources of supply on occasion.

21        I believe that 1122 North Piatt was also being

22  used for the same purposes.

23        I believe that Tiara's Place restaurant

24  located at 1339 North Hillside was being used by Gerald

25  Beasley to provide what -- an appearance of legitimacy,

1   as well as a base of operations for conducting his drug

2   trafficking activities.

3   Q.    Okay.

4   A.    And the rest of the properties I believe were

5   being used as a means of laundering the proceeds they

6   were obtaining from their illegal activities in order

7   to hide the assets.

8   Q.    All right.  So we're going to open up

9   Government's Exhibit 1 and start here, talk about a few

10  specific statements that we believe show the conspiracy

11  to be attributable to all these individuals, but also

12  firm up a few of the accounts for the Court.

13         So let's just go ahead and start with what

14  we've identified as Number 1, behind Tab Number 1 we

15  should have a few different statements that we would

16  like to discuss.

17         Will you go ahead and tell the Court who the

18  callers or speakers are in statement number 1, which I

19  believe is actually 1a, and b, and c.

20  A.    In what's been marked as statement 1a, and b,

21  and c, it's a call in session number 980 that occurred

22  on May 22nd, 2013 between Antoine Beasley and Helen

23  Beasley.

24  Q.    All right.  And would you go ahead and give the

25  Court kind of some background of this call just so the

1  Court can have an understanding as to what is going on

2  at this point.

3  A.    This was at a point in the investigation where I

4  believe that Gerald Beasley was having a dispute with

5  his wife, Helen Beasley, because of some activity he

6  had been conducting with other girlfriends.

7  Q.    Okay.  And, in fact, would it be accurate to

8  state Ms. Beasley had found out about it and they were

9  separated at this point?

10  A.    I believe they're in the process of separating,

11  yes.

12  Q.    Okay.  So the first statement that we've

13  identified as -- well, I'll let you go ahead, it's on

14  the James sheet, but I'll let you go ahead and identify

15  it and then tell the Court the basis or the importance

16  of it.

17  A.    Statement 1a is Helen Beasley telling Antoine

18  Beasley that she gave the attorney the $300 that

19  Antoine Beasley gave her last night.

20  Q.    And why is that statement -- why did you deem

21  that statement to be pertinent to this case?

22  A.    It's in reference to Helen Beasley getting some

23  of the assets that were obtained from the money

24  laundering conspiracy, since she was separating from

25  Gerald Beasley.

1  Q.    All right.  Is there another statement in

2  there -- or there's two other statements in there that

3  we've identified.

4  A.    Statement number 1b, Helen Beasley talks about

5  how Gerald bought a 2013 car for Bianca.

6  Q.    And, again, why is that important?

7  A.    It's, again, in reference to Gerald Beasley

8  obtaining assets that would be part of the money

9  laundering conspiracy.

10  Q.    All right.  And, finally, there's one more under

11  1c in which Gerald talks again about more of his

12  assets, is that correct?

13  A.    Yes, Helen in statement 1c talks about how

14  Gerald bought a house full of furniture, cars, and

15  everything else.

16  Q.    And, again, related to the assets and money used

17  from controlled substances to purchase these?

18  A.    Derived from different types of illegal activity

19  but controlled substances being one of them.

20  Q.    And in that last statement, do you recall, was

21  he also talking about Bianca there, or do you recall if

22  he was talking about someone else, or do you even know?

23  A.    Well, I believe -- I believe it's about Bianca

24  Holly.

25  Q.    Okay.  All right.  And in the second statement

1  Number 2 that we've identified, will you identify the

2  individuals that are talking on the phone.

3  A.    Statement Number 2 is a call in session number

4  1799 between Anita Burkley and Gerald Beasley.

5  Q.    And what have we identified as important in this

6  call?

7  A.    At one point in the conversation Gerald tells

8  Anita Burkley that he is sitting there trying to get

9  the people's money together.

10 Q.    All right.  And, again, why -- what is

11 the -- maybe the background or what occurred prior to

12 this that we have identified this call as a pertinent

13 call that should be attributable to everyone in this

14 conspiracy?

15 A.    The -- as I discussed earlier, this is at a time

16 when we have learned from subsequently talking to

17 Leonard Carter that Gerald Beasley was out of heroin

18 and coincides with the intercepted calls that we talked

19 about earlier of Gerald Beasley obtaining what I

20 believed to be large amounts of money in order to

21 purchase additional heroin from their source of supply.

22 Q.    And those phone calls were with Stephen

23 Smallwood and Terry Beasley, is that correct?

24 A.    That's correct.

25 Q.    And were there other phone -- well, were there

1  also meetings around this time that you observed either

2  through surveillance, pole cams, or through Tiara's

3  Place video to support this finding that he was getting

4  money together for the -- to obtain more controlled

5  substances?

6  A.    Yes, it was not long after that that we observed

7  Antoine Beasley meeting with one of the Ibarras.

8         MR. PRATT:  Objection, Your Honor, I would ask

9  that he quantify "not a long time."

10        THE COURT:  I -- I think that's appropriate.

11 Sustained.

12 BY MS. JACOBS:

13 Q.    Can you identify a time period?

14 A.    I believe it was the following day, on April

15 6th, 2013, if I'm not mistaken.

16 Q.    Okay.  All right.  Statement 3 you've identified

17 3a and 3b.  Again, will you identify the individuals

18 that were part of this conversation.

19 A.    Statement 3 appears in session 1672 on April

20 5th, 2013 and it's a conversation between Antoine

21 Beasley and Gerald Beasley.

22 Q.    All right.  And what -- what statements have we

23 identified as being pertinent?

24 A.    In that call, Gerald Beasley states that he is

25 going to go sit and get it together.

128

1   Q.    All right.  And why did -- why did you believe

2   that this is important?

3   A.    For the same reasons that statement 2 was:  That

4   I believe he's telling Antoine Beasley that he's

5   getting all the money together at that point.

6   Q.    All right.  And then this is also another

7   statement that he makes, a statement of, they're coming

8   to -- or they're coming to the thing.

9          Would you go ahead and identify to the Court

10  why that's important and what that means?

11  A.    I believe that Gerald Beasley is telling Antoine

12  Beasley that another person who is bringing him money

13  is going to be coming there to -- to the restaurant.

14  Q.    Was there a prior phone call with Terry Beasley

15  referencing collecting money from him?

16  A.    Yes.

17  Q.    And was that prior to all of them going to a

18  family party or a family get-together?

19  A.    I believe so, yes.

20  Q.    And is he trying to tell Antoine that he's going

21  to get the rest of the money at that thing, wherever

22  he's meeting Terry Beasley?

23          And I can't recall if it was a family

24  graduation or party or something?

25  A.    I believe so.  So, and it -- also during that

1  same call, Antoine Beasley also tells Gerald Beasley

2  that Little Brother wanted to see him.

3  Q.    Okay.

4  A.    And that he's going to head over to the other

5  side of the tracks.

6  Q.    Okay.  And what does that mean to you when he

7  says the other side of the tracks?

8  A.    A business that was associated with the Ibarras

9  was located on North Broadway and from where Tiara's

10  Place is located at, that would be on the other side of

11  the train tracks that run through the center part of

12  Wichita.

13  Q.    And statement 4 we've identified, as well.

14        Again, will you go ahead and tell the Court

15  the callers or the parties to this call.

16  A.    Statement 4 occurs in session 525 which occurred

17  on March 29th, 2013 and it's a call between Terry

18  Beasley and Gerald Beasley.

19  Q.    All right.  What is the background or -- or what

20  occurred to -- prior to this call that made this call

21  important to you?

22  A.    In the call, Gerald Beasley says that -- that

23  tomorrow -- tomorrow night is they, they made some

24  promises.  But if it's look like what they had the day

25  before it was garbage.  You know, and I told them to

1  keep that.

2  Q.    All right.  And can you go ahead and tell the

3  Court what you believed they were discussing at that

4  point?

5  A.    I believe he's relating to Terry Beasley that

6  their source of supply had said that they were going to

7  be there soon and made some promises about delivering

8  narcotics to them.

9  Q.    Okay.  And does it mean anything to you, the

10  next part where he talks about, The stuff they had

11  before was garbage?

12  A.    Yes, I believe he's talking about other heroin

13  that they had obtained --

14  Q.    All right.

15  A.    -- at some other point.

16  Q.    And it appears that Gerald told them that he

17  sent it back or he didn't accept delivery, would you

18  agree?

19  A.    Well, I believe Gerald tells him he doesn't want

20  any more like that.

21  Q.    Okay.  On statement -- well, let's do it this

22  way.  Behind tab Number 5 I have five different calls

23  that we've identified, so let's go ahead and start.

24         Will you go ahead and identify to the Court

25  behind tab number 5, I believe there is actually two

1  phone calls, would that be correct?

2  A.    Uh --

3  Q.    Session 587 and session 604.

4  A.    Yes, that's correct, those two phone calls.

5  Q.    And who is talking in these phone calls?

6  A.    In session 587 it's a call between Stephen

7  Smallwood and Gerald Beasley that occurred on March

8  30th, 2013.

9  Q.    And what are Stephen and Gerald talking about?

10 A.    In that call Gerald tells Stephen Smallwood that

11 he didn't have the money to do it because he was

12 waiting what was going to happen that day and that he

13 had enough money to cover that but that he got spreaded

14 so thin the other way.

15 Q.    Does -- just how does Stephen reply?

16        And in fact on the second page, about a fourth

17 of the way down, does he talk about wanting to

18 keep -- keep the other seven?

19 A.    Yeah, Stephen Smallwood responds and states,

20 Yeah, no, I wasn't going to go out here do nothing

21 that -- that wasn't going to be covered any way cause

22 like I say, I always need to have that right you know,

23 the very next day just, unintelligible, just bring it

24 back up there then.

25 Q.    And then on the next statement does he say, I'm

132

1  going to go ahead and try to keep the seven for what

2  we're doing?

3  A.    Um, yes, later on in the conversation Stephen

4  Smallwood states, yeah, and that -- that's what I was,

5  unintelligible, you know I said, well, I just -- and

6  then I will try to keep the other seven for

7  what -- what we was doing anyways, so...

8  Q.    And then about an inch further, Gerald Beasley

9  in statement we've identified as 5c talks about trying

10 to get his debt paid off, is that correct?

11 A.    Uh, yes, that is correct.

12 Q.    All right.  And then also talks about -- well,

13 would you go ahead and read that statement.

14 A.    Gerald states:  Trying to just get them paid off

15 on the other thing and -- and -- and, unintelligible,

16 the, uh, try -- try to get busy.  Go into one of those

17 myself.  Cause from what -- what I understand is -- is,

18 uh, uh, they got quite a few of them.

19 Q.    And then Stephen replies and says he's got a

20 regular payment deal going on, is that correct?

21 A.    That is correct.

22 Q.    And then, finally, we have Stephen Smallwood at

23 the end talking about -- Stephen Smallwood and Gerald

24 Beasley talking towards the end of that conversation

25 about how much money Stephen Smallwood owes, is that

1  correct?

2  A.    That is correct.

3  Q.    And Stephen -- would you go ahead and tell the

4  Court what Stephen says he owes and how Gerald replies.

5  A.    So Gerald says:  What you gave it to it was, uh,

6  yeah, it was, uh, yeah, it was -- it was, uh, what was

7  it?  64.

8        Stephen Smallwood says:  Yeah, yeah.

9        Gerald Beasley then says:  And -- and it down

10  to 44 now you know.

11       Stephen Smallwood then says:  And I bringing

12  the two and that was knocking down to 24 and then

13  trying to the, unintelligible.

14       Gerald Beasley then states:  Yeah, cause I --

15  I want to get them out of my hair, man, cause I'm tired

16  of dealing with them.  They -- they becoming a

17  headache, you know, because when they -- bad audio,

18  started not demanding but you know it, it -- I just

19  want to get them gone.  Once I get them gone I get a

20  piece and then -- then I can do what I need to do.

21  Q.    And what did you believe these two individuals

22  were discussing at that point?

23  A.    I believe they were discussing paying back money

24  that they owed for heroin and so that they could then

25  resupply.

1  Q.    Does this conversation -- do you believe in this

2  conversation it shows that Stephen Smallwood is

3  actually bringing money or paying money to Jerry -- to

4  Jerry -- try that again.  To Gerald Beasley?

5  A.    Yes, I do.

6  Q.    And then the other phone conversation that I

7  also put in here is a conversation with Terry Beasley

8  which occurred less -- about an hour later, is that

9  correct?

10  A.    Yes, just a little over an hour later.

11  Q.    All right.  And who are -- who's involved in

12  this conversation?

13  A.    It's a call in session 604 that occurred on

14  March 30th, 2013 and it's a call between Terry Beasley

15  and Gerald Beasley.

16  Q.    All right.  And does Terry ask -- well, what

17  does Terry ask Gerald?

18  A.    In summary, Terry Beasley asked Gerald Beasley

19  if he talked to a person that morning.  Gerald replies

20  in the affirmative.

21        Terry Beasley then asks if Gerald had already

22  seen him and Gerald again says, I said yes, Terry.

23        Terry Beasley then asks how long ago was that?

24        And Gerald Beasley indicates that it was, uh,

25  10 o'clock.

1   Q.    And, again, it appears that throughout this

2   conversation there's no names that are mentioned, is

3   that correct?

4   A.    That's correct.

5   Q.    And so what did this conversation tell you about

6   the prior conversation between Mr. Smallwood and

7   Mr. -- and Gerald Beasley?

8   A.    Well, between Gerald Beasley and Terry Beasley

9   but I believe Terry Beasley is asking about the status

10  of Gerald Beasley getting those supplies from Stephen

11  Smallwood.

12  Q.    So he knows about this individual even though

13  that name is never mentioned or they never said this

14  individual's name?

15  A.    That's my belief.

16        THE COURT:  You know, before we go any

17  further, let's go ahead and break for lunch.  It's just

18  after noon, we'll break until 1 o'clock.  Start up

19  again at 1 o'clock.

20        Thanks so much.

21        (Recess taken from 12:02 p.m. until 1:00 p.m.)

22        THE COURT:  All right.  Special Agent, if

23  you'd come back up, take the stand again.

24        And we'll pick up where we were, Ms. Jacobs.

25  BY MS. JACOBS:

1  Q.    Before we get started, I believe I have your

2  notebook.  Is that one -- do you have it still?

3  A.    Yes, ma'am.

4  Q.    Okay.  I just wanted to make sure.  Sorry.

5        Special -- Special Agent Fuller, during the

6  lunch break, did you have an opportunity to meet with

7  Ms. Sherwood, as well as review a few reports so that

8  we could provide some information for the Court on the

9  marijuana conspiracy marijuana drug amounts?

10 A.    Yes, ma'am.

11 Q.    And just to provide the Court -- that

12 information to the Court, when the search warrant was

13 executed at Estelle in June of 2013, now that you've

14 been able to look at the reports and the numbers, do

15 you believe there was a distribution amount of

16 marijuana at the Estelle residence, which is Antoine

17 Beasley's stash house?

18 A.    Yes.

19 Q.    And how about the search warrant executed at

20 Antoine Beasley's residence, which is Hedgewood, in

21 June of 2013.

22 A.    There was -- these are gross weights, but there

23 was three items of marijuana that were recovered:  One

24 was 52 grams; one was 87 grams, and; one was 57 grams.

25 Q.    All right.  And, again, those were gross weights

1  so those would include any kind of packaging?

2  A.    It would include packaging.

3  Q.    Right.  And then, finally, a search warrant

4  executed at Hedgewood in April of 2014, again,

5  distribution amounts of marijuana located at Antoine

6  Beasley's residence?

7  A.    Yes.

8  Q.    All right.

9        MR. PRATT:  Your Honor, I'm -- Your Honor, I'm

10  going to object.  The question was simply distribution

11  weights.  We still don't know what the weights are.

12        MS. JACOBS:  I'm sorry, and I'll put that on

13  the record.

14  BY MS. JACOBS:

15  Q.    And what weights were located at the Hedgewood

16  address in April of 2014?

17  A.    Again, there's three items that were recovered,

18  one was -- and, again, these are gross weights:  One

19  was 30 grams; another was 117 grams, and; another was

20  436 grams.

21  Q.    And then the weights at the Estelle residence at

22  Antoine Beasley's stash house in April -- nope, in June

23  of 2013?

24  A.    There was a -- an item recovered of marijuana

25  and its net weight was 287.2 grams.

138

1  Q.    Okay.

2          THE COURT:  Just a moment, Ms. Jacobs.

3          Jana, can you help me?  My realtime is not

4  operating.

5          (Pause.)

6  BY MS. JACOBS:

7  Q.    All right, Mr. Fuller, had conversation with

8  defense counsel, and I think we've confused them so,

9  good job.

10         We're going to do this again just to make sure

11 they can all be on the same page.

12         Search warrants executed on June 12th of 2013.

13 We did one at Estelle, which is Antoine Beasley's stash

14 house.  Would you again go ahead and give the weights

15 for counsel.

16 A.    Okay.  According to the spreadsheet I'm looking

17 at, at 655 North Estelle there was 287.2 grams of

18 marijuana that was recovered.

19 Q.    Okay.  And same thing for Hedgewood, in June of

20 2013.

21 A.    There were three items of marijuana -- suspected

22 marijuana that were recovered:  The first item had a

23 gross weight of approximately 52 grams; the second item

24 had a gross weight of approximately 87 grams, and; the

25 third item had a gross weight of approximately 57

1  grams.

2  Q.    And, again, when you say "gross weight," just to

3  make it clear for the Court and counsel that these are

4  the weights that were seized that day, that may include

5  packaging?

6  A.    Yes.

7  Q.    And, finally, when we did arrests in April of

8  2014 we drew up another search warrant for the

9  residence of Antoine Beasley's house at Hedgewood, is

10  that correct?

11  A.    Correct.

12  Q.    And what were the weights of marijuana seized on

13  that occasion?

14  A.    There were, again, three items and these are,

15  again, gross weights:  The first item was approximately

16  30 grams; the second item was approximately 117 grams;

17  and the third item was approximately 436 grams.

18  Q.    Based on your training and experience, are you

19  able to make a determination as to whether these

20  amounts, to you, represent distribution amounts?

21  A.    The amounts in these quantities would, in my

22  opinion, be distribution amounts.

23  Q.    And what is that based on?

24  A.    The fact that most marijuana users, if they

25  weren't engaged in also redistribution would not keep

1  on-hand this amount and then, also, there was other

2  items recovered from some of these locations that would

3  be indicative of distribution.

4  Q.    Such as?

5  A.    For example, at the search warrant at 655 -- I'm

6  sorry -- at 655 Estelle there -- I believe there was a

7  scale that was located and a scale would be used by

8  somebody who is distributing narcotics to weigh them.

9  There is also additional packaging to be used to

10 package narcotics.

11        At the search warrant at Hedgewood in June of

12 2013 -- oh, I'm sorry, in 2014, the amounts there

13 are -- are rather large for somebody to be maintaining

14 that amount of marijuana for personal use.

15 Q.    Okay.  You mentioned packaging material.  What

16 do you mean?

17        Do you mean what it was packaged in originally

18 or bags used to repackage it for sale?  Or both?

19 A.    Bags used to repackage for sale.

20        There was a particular type of bag, I believe

21 it was called Smelly Proof that was found at the search

22 warrant at 655 Estelle.

23 Q.    Okay.  And had you seen those baggies before in

24 your -- during the investigation?

25 A.    I believe -- I believe similar bags were

1  discovered during the search warrant by the postal

2  inspection service of the marijuana that was obtained

3  prior to the wiretaps.

4  Q.    Okay.  And -- second time I've done this.

5  There's another question in there.

6         Did you also find packaging material to

7  repackage controlled substances, would it be accurate

8  to say that at the residence of 655 Piatt, as well as

9  Terry Beasley's residence when the search warrant was

10  executed there?

11  A.    I would have to refer to the reports.

12  Q.    Okay.

13  A.    Which locations again?

14  Q.    655, as well as 1122 Piatt.  655 Estelle, 1122

15  Piatt.

16         And if you don't recall, that's fine, I just

17  didn't know if you had that information on the top of

18  your head.

19  A.    I'd have to refer to the reports from the search

20  warrants --

21  Q.    Okay.

22  A.    -- to be accurate.

23  Q.    All right.  Then let's go back and start

24  discussing our statements again, I believe we were on

25  statement 6, if you are prepared to do that.

1          Will you go ahead and identify for the Court

2   the individuals involved in this conversation.

3   A.     In statement 6 it's a call between Gerald

4   Beasley and Brandon Smith in session 304 intercepted on

5   March 28th, 2013.

6   Q.     And just for the record, we have this individual

7   at least on this linesheet provided to the Court

8   identified as an unknown male 48.

9          Would it be accurate to state that at this

10  time, when this linesheet was prepared during the wire,

11  he had not been identified as Brandon Smith yet?

12  A.     It would appear that way.

13  Q.     At a later point you're able to identify this

14  individual as Brandon Smith and then at that point

15  forward on the linesheets he's actually referred to as

16  Brandon Smith, is that right?

17  A.     That's correct.

18  Q.     So what are the two statements from this

19  conversation between Brandon and Gerald Beasley that

20  you believe are pertinent to the underlying

21  conspiracies?

22  A.     Brandon Smith tells Gerald Beasley, let me get

23  my money together, I really need to have you go talk to

24  your son for me.  Cuz I need one of them.  Let me get

25  my ins together so I can do both at the same time.

1  Q.    And why was that -- why did you mark that as

2  conversation or that statement by Brandon Smith as

3  pertinent?

4        What do you believe is going on in that

5  conversation?

6  A.    I believe Brandon Smith is telling Gerald

7  Beasley that he needs to get his money in order to

8  purchase additional controlled substances,

9  specifically, cocaine and marijuana, and he's asking

10  Gerald Beasley to go talk to Antoine Beasley about the

11  marijuana that he wants.

12  Q.    And earlier in that conversation they reference

13  a number, that they couldn't get it under 11.  Do you

14  see that in maybe the first couple of lines of the

15  conversation?

16  A.    Yes.

17  Q.    And will you go ahead and explain to the Court

18  what you believe they're talking about and the basis

19  for that belief?

20  A.    I believe they're talking about ounce quantities

21  of powder cocaine and $1100 would be consistent with

22  the price one would pay for an ounce of powder cocaine.

23  Q.    Throughout the wire, was it -- and I say the

24  wire, so I should specify.

25        Throughout both of these wires, did you

1  observe or listen and hear that the price of cocaine

2  may have changed while -- while the wire was ongoing?

3  A.    Yes.

4  Q.    Can you explain that to the Court.

5  A.    We intercepted calls, for instance, between

6  Gerald Beasley and Brandon Smith where during those

7  calls Brandon Smith talked about how much he had been

8  paying and Gerald Beasley then provided him with a -- a

9  new price that, from the content of the call, appeared

10 to be higher than what he had previously been paying.

11 Q.    Okay.  Do you know, and if you don't, that's

12 fine, but do you know why the price of cocaine or any

13 of the controlled substances discussed in this case may

14 change?

15 A.    Yes, prices of controlled substances frequently

16 change depending on supply and demand.

17 Q.    Okay.  In statement number 7 we've identified

18 another phone call between Brandon Smith and Gerald

19 Beasley and I say it's a statement.  Is it actually a

20 text message, would that be accurate?

21 A.    I'm sorry, could you direct me to which --

22 Q.    Statement 7.

23 A.    Statement 7?

24       Yes, that is a text message.

25 Q.    And what does that text message say?

1  A.    I do not have that in my book.  The -- the

2  actual linesheet for that but --

3  Q.    I'm sorry.

4  A.    -- but I have it on the chart here.

5  Q.    And I think the chart is an exact duplicate of

6  the book.

7  A.    Okay.  In that text message Brandon Smith texts

8  Gerald Beasley and says, okay, sir, what you want to do

9  cause someone wants some out of one, and you can bring

10  one of your sons with you.

11  Q.    Okay.  And, again, what did you believe that was

12  referencing?

13  A.    During that text message, I believe that was in

14  reference to some marijuana that Brandon Smith had that

15  he was offering for sale of Gerald Beasley and then he

16  was also wanting Gerald Beasley to bring some of

17  the -- the marijuana that Antoine Beasley was

18  obtaining.

19  Q.    All right.  In statement 8 that we've

20  identified, will you identify the individuals involved

21  in this call.

22  A.    This call is between Brandon Smith and Gerald

23  Beasley.

24  Q.    And, again, session number 1572, would that be

25  correct?

146

1    A.    That's correct.

2    Q.    All right.  And would you identify what you have

3    deemed as important to the conspiracy.

4    A.    During that call Brandon Smith tells Gerald

5    Beasley to bring one of those urkles.

6    Q.    And what is an "urkle"?  Or what did you believe

7    he meant when he said "urkle"?

8    A.    I believe that is a strain or particular type of

9    marijuana.

10   Q.    In listening to the phone conversations between

11   Brandon Smith and Gerald Beasley on this 30-day wire,

12   do you believe that Brandon Smith was ordering more

13   than one type of controlled substance from Gerald

14   Beasley?

15   A.    Yes.

16   Q.    And what is that based on?

17   A.    Based on the calls where he discusses the

18   marijuana and then also in code, the cocaine.

19   Q.    Okay.  And in statement 9 we have another phone

20   call between Gerald Beasley and Brandon Smith, session

21   1889.

22         Again, would you identify for the Court why

23   you believe this statement is relevant to the entire

24   conspiracy?

25   A.    In this call Brandon Smith asks Gerald Beasley

1  if his son had any more urkle and did he have at least

2  one.  And I believe in that call, Brandon Smith is

3  asking about getting an ounce quantity of marijuana

4  from Gerald Beasley through Antoine Beasley.

5  Q.    All right.  And we have one more telephone

6  conversation between Brandon Smith and Gerald Beasley

7  in statement 10 we've identified.

8  A.    Yes.  In statement 10, Brandon Smith is talking

9  with Gerald Beasley and tells Gerald Beasley that he

10  wants to see what his son has on the other since she

11  said it wasn't the same.  He then says that it's about

12  the same or better, then I really need to mess with

13  that, too.

14  Q.    And, in fact, that would be on the last page of

15  that 3-page phone call, is that correct?

16        Just for the Court's and defense counsels'

17  reference.

18  A.    Yes.

19  Q.    And, again, what is -- what did you believe was

20  pertinent or important about that conversation related

21  to the entire conspiracy?

22  A.    Again, it shows that Brandon Smith is obtaining

23  marijuana from Gerald Beasley that he knows to be from,

24  originally, Antoine Beasley.

25  Q.    And then statement 11 identified by the

1  Government is in session 760 between Gerald Beasley and

2  Antoine Beasley, is that correct?

3  A.    That is correct.

4  Q.    There's a number of different statements --

5  actually, I guess there is actually just two

6  identified.

7        Would you go ahead and talk about 11a that

8  we've identified, which is the start of the second page

9  or the top of the second page.

10  A.    In statement 11a, Antoine Beasley is speaking

11  with Gerald Beasley and he tells Gerald Beasley that

12  there was a delay that Little Brother, Big Brother

13  selling because his people are on vacation.

14  Q.    And what is that conversation referencing?

15  A.    That's in reference to their sources of supply

16  for cocaine and heroin, Juan and Inocente Ibarra, and

17  Antoine Beasley is telling Gerald Beasley that there's

18  been a delay with the shipment.

19  Q.    Sorry.  Do you recall at that time, you may not,

20  but do you recall, is that the time that Gerald Beasley

21  was actually out of heroin?

22        And if you don't recall, that's fine, I didn't

23  really tell you I was going to ask that question.

24  A.    Um, it -- I don't know if it was when he was

25  actually out but it's either during that time or close

1  to it.

2  Q.    All right.  Now later on in the conversation

3  Antoine Beasley and Gerald Beasley have a conversation

4  about Uncle Terry, is that correct?

5          MR. PRATT:  I'm sorry, I can't hear you.

6          MS. JACOBS:  Okay.  Sorry.

7  BY MS. JACOBS:

8  Q.    Is there a conversation later on between Antoine

9  Beasley and Gerald Beasley in which they discuss their

10 Uncle Terry?

11 A.    Yes, there is.

12 Q.    And do you recall where that is?

13 A.    It's statement 11b, and you want to know where

14 it's at in the --

15 Q.    Yes, if you recall.

16 A.    In the actual sheet?

17 Q.    Sure.  Mainly because I have most of mine marked

18 and I don't have mine marked on here and I didn't know

19 if you have it.

20          How about on the third page, about an inch

21 down.

22          Do you see it starts off at the top with

23 laughing and then about four down Antoine Beasley is

24 speaking?

25 A.    Yes, I see where you're talking about now.

1  Q.    Again, we've marked that conversation as

2  important to this conspiracy.

3         Would you go ahead and explain or go ahead and

4  read that statement out loud as to what -- as to what

5  Antoine said?

6  A.    Well, Antoine says to Gerald that he knows

7  exactly what he means and that Big Terry, though, he

8  showing us -- he's showing his son some action.

9  Q.    And how many -- let me ask you this:  Does Terry

10 Beasley have any -- well, let me start off this way.

11        Who do you believe Uncle Terry is?

12 A.    Terry Beasley.

13 Q.    All right.  And you were -- did you identify any

14 other uncles?

15        MS. SCHMIDT:  Excuse me, Your Honor, could you

16 read that statement again because I don't think it says

17 Uncle Terry.

18        MS. JACOBS:  Okay, so then let me go back.

19 BY MS. JACOBS:

20 Q.    Earlier, do they mention the word Uncle Terry?

21 Are they talking about Uncle Terry in a few lines

22 before that?

23        MR. HEPPERLY:  Just for point of

24 clarification, what page are you on?

25        MS. JACOBS:  Third page of --

```
 1              MR. HEPPERLY:  Is it 261 of 1709?

 2              MS. JACOBS:  Yep.

 3   BY MS. JACOBS:

 4   Q.    Okay.  So let's go back.

 5          Through this conversation, Gerald Beasley and

 6   Antoine Beasley after talking about Little Brother,

 7   they then start talking about Uncle Terry, is that a

 8   correct statement as to the conversation that occurs on

 9   the second page of this transcript -- transcribed

10   telephone conversation?

11   A.    I believe that is who they are talking about, he

12   references chopping his uncle's head off.

13   Q.    And then a little bit further down, Antoine

14   makes the comment that we're asking the Court to

15   consider, which is that Uncle Terry showed his son some

16   actions or Uncle Terry showed his son some action, is

17   that correct?

18   A.    Yes, as to Big Terry.

19   Q.    And any other uncles that you know of of Antoine

20   Beasley's or that you were able to identify during the

21   investigation whose name is Terry?

22   A.    Not that I know of.

23   Q.    All right.  And to your knowledge, does Terry

24   have any -- Terry Beasley have any sons?

25   A.    Yes.
```

1    Q.    And how many?

2    A.    I don't know exactly how many sons he has.

3    Q.    Is there at least one son that's charged in this

4    Second Superseding Indictment?

5    A.    Yes.

6    Q.    And who would that be?

7    A.    Carlos Beasley.

8          THE COURT:  Would you mind shutting your phone

9    off, please.

10          MR. FALK:  I'm sorry, I thought I did.

11          THE COURT:  No, I just don't think we need to

12    be distracted by anything --

13          MR. FALK:  I apologize.

14          THE COURT:  -- beyond the hearing so if you'd

15    shut it off at this point, I would appreciate it.

16    BY MS. JACOBS:

17    Q.    So what was important about that -- that

18    specific statement by Antoine Beasley that was relevant

19    again to this ongoing drug conspiracy?

20    A.    The statement about showing his son some action

21    that, to me, is a reference to giving them narcotics to

22    sell.

23    Q.    All right.  And you stated earlier at the

24    beginning, hours and hours ago, at the beginning of

25    this hearing, about a search warrant that was executed

153

1  on Carlos Beasley's residence back in 2009.

2          Have you had an opportunity to read those

3  reports and the statements that were made at the time

4  of that search warrant back in 2009?

5  A.    Well, it -- it was --

6          MR. SEVART:  Your Honor, I am going to object

7  to -- to trying to go back to 2009 with respect to

8  Carlos Beasley.  He's not charged with -- he's charged

9  with one count of money laundering and that case, as I

10 understand, has already been through judgment.

11         THE COURT:  Well, that's overruled.

12         We are, at this point, not doing anything

13 beyond trying to establish whether there is a

14 conspiracy and, if so, who was involved for purposes of

15 what fits the hearsay rule and what doesn't so I'm not

16 concerned with that at this point, I'm going to

17 overrule the objection but I appreciate you making it.

18         MR. SEVART:  Thank you.

19         THE COURT:  Sure.

20 BY MS. JACOBS:

21 Q.    Were there statements -- were there statements

22 made by Carlos Beasley at the time of -- I believe it

23 was a search warrant back in 2009?

24 A.    It was a search warrant at a house on Funston.

25 It was -- you'd stated it was Carlos Beasley's

1  residence but it was -- Carlos Beasley was there -- -

2  Q.    Okay.

3  A.    -- but it was also Terry Beasley's residence --

4  Q.    All right.

5  A.    -- as well.

6        Carlos Beasley, when asked by law enforcement

7  stated that -- about the drugs that were found in the

8  house, that it was his dad's business and that they

9  would need to talk to him.

10  Q.    Okay.  And, again, we stated that Carlos Beasley

11  was either found guilty or pled guilty to those

12  charges, is that correct?

13  A.    It's my understanding.

14  Q.    So now we're -- what are we at this point, five

15  years later, four years later in 2013 and there's this

16  statement.  Was Carlos Beasley intercepted on either

17  Antoine Beasley's wire or Gerald Beasley's wire?

18  A.    He was intercepted on Antoine Beasley's wire.

19  Q.    And there's a few statements that he made that

20  we're going to -- or that Antoine made related to

21  Carlos that we're going to discuss with the Court but

22  throughout your investigation, beyond the money

23  laundering conspiracy that we're also about to talk

24  about, were -- money laundering count, were

25  there -- was there information provided to you or that

1  you learned that you believe Carlos Beasley was

2  involved in the cocaine conspiracy?

3  A.     Uh, people that we interviewed had mentioned

4  that nephews of Gerald Beasley's were involved in drug

5  trafficking.

6  Q.     Okay.  So this statement that Antoine makes that

7  he is showing his sons some action was, you believed,

8  relevant to the overall conspiracy based on everything

9  that you had learned about Carlos Beasley?

10  A.     Yes.

11  Q.     Okay.  And statements that have been identified

12  as statement 12, again, conversations between Anita

13  Burkley and Gerald Beasley, is that correct?

14  A.     It -- I'm sorry, which statement?

15  Q.     12.

16  A.     12?

17          Yes, that's a call between Anita Burkley and

18  Gerald Beasley.

19  Q.     And, again, for the record, 1196 is the session

20  number and this occurred on April 2nd of 2013, correct?

21  A.     Yes.

22  Q.     All right.  Will you go ahead and provide to the

23  Court the pertinent -- pertinent statement made by

24  Gerald Beasley that you believe was attributable to

25  this conspiracy and, specifically, the heroin

1  conspiracy?

2  A.    Gerald Beasley and Anita Burkley are talking

3  about someone who -- and Gerald says someone used to

4  the green was bringing them five, ten, 15 at a time and

5  now he only brings me two.

6        Gerald Beasley tells Anita Burkley that he,

7  Gerald, does not need to be on that side of the street,

8  especially when people are calling -- or on that side

9  of the street.

10  Q.    And, again, what is this -- you -- we attribute

11  this statement specifically to Stephen Smallwood but

12  also to the conspiracy.

13        What information do we have that we attribute

14  this to Stephen Smallwood, specifically, that he is

15  talking about Stephen only bringing him, five, ten or

16  15?

17  A.    Because there's another call where they're

18  talking --

19  Q.    Where who?

20  A.    Anita Burkley and Gerald Beasley.

21  Q.    Okay.

22  A.    And like I mentioned earlier, where she slips up

23  and says the name of the person they're talking about

24  and says Steve.

25  Q.    Okay.

157

1    A.    And I -- and it appears that she made a mistake

2    by actually saying the name out loud.

3    Q.    Do you recall exactly -- do you recall the time

4    period between these two phone calls?

5    A.    No.

6    Q.    Okay.  And so they have the first phone call and

7    then they have this other one and -- and Gerald makes

8    this statement to Anita Burkley, was she involved at

9    all in the heroin conspiracy that you know of?

10   A.    Not that I know of.

11   Q.    Okay.  And do you -- do you know what Gerald

12   Beasley means when he says, I don't need to be in front

13   of the LC of things?

14          While I can't exactly say it the way he does

15   or the way it's transcribed, I don't need to be in

16   front of the LC of things, I don't need to be on that

17   side of the street.

18   A.    I don't know exactly what he's talking about

19   there.

20   Q.    So in statement 13 we identify another

21   conversation between Gerald Beasley and Helen Beasley,

22   is that correct?

23          Nope, Gerald Beasley and Antoine Beasley?

24   A.    Yes, between Gerald Beasley and Antoine Beasley.

25   Q.    And I know that we have discussed this prior,

158

 1  would you go ahead and give the Court some reference

 2  for this?  What occurred in the phone conversation

 3  between Gerald and Herbert before this conversation

 4  occurs with Antoine?

 5           MS. JACOBS:  And Herbert Jones, for the

 6  Court's information.

 7  A.    Surveillance observed Gerald Beasley travel down

 8  to the area on 8th Street where Herbert Jones lives at.

 9  Afterwards, we intercepted a call between Gerald

10  Beasley and Herbert Jones where, in summary, they

11  discussed Gerald dropping what I believe to be an ounce

12  quantity of cocaine.  This call is then made between

13  Gerald Beasley and Antoine Beasley where they discuss

14  that happening.

15  BY MS. JACOBS:

16  Q.    Okay.  And, specifically, what does Gerald say

17  to identify that he dropped what you believe to be an

18  ounce quantity of cocaine?

19  A.    Gerald tells Antoine that -- that he just

20  dropped a Bebe and it fell out of his pocket.

21           Antoine asks him to say that again, and again

22  Gerald says that he just dropped a Bebe and that it

23  fell out of his pocket.

24           Gerald tells him that he didn't have it all

25  the way zipped up and that was the way that it goes.

1  Antoine Beasley tells Gerald Beasley that he's starting

2  to hear that and then Gerald Beasley tells Antoine

3  Beasley that he can't let that get him down, that if he

4  had bigger fish to fry than that, and then which

5  Antoine acknowledges, and then Gerald Beasley tells

6  Antoine that he'll make that up somewhere down the

7  line.

8  Q.    The next day Gerald is on the phone -- I believe

9  it's the next day, I'll verify.

10        Gerald is on the phone with Antoine again and,

11  again, references an amount of money that he lost, is

12  that correct?

13  A.    Yes.  That's correct.

14  Q.    Session 1189 on April 2nd?

15  A.    Correct.

16  Q.    Would you go ahead and identify for the Court

17  again the statement that Gerald makes.

18  A.    Okay.  Again, this is a call between Antoine

19  Beasley and Gerald Beasley and --

20  Q.    It's about an inch down on the second page.  Or

21  five lines, if you want to know specifically.

22  A.    Gerald Beasley tells Antoine that he just

23  dropped -- or he dropped $1200 yesterday.  Antoine

24  acknowledges that.

25        Gerald Beasley states there's just nothing he

1  could do about it but keep stepping.

2  Q.    And --

3  A.    Antoine --

4  Q.    Go ahead.

5  A.    Antoine Beasley states, uh, uh-huh, and you made

6  sure you look, you, uh, look before you went and gave

7  them back this stuff?

8       Gerald Beasley says:  I looked everywhere.

9  Twice.

10       And then Gerald Beasley tells Antoine, And I

11  know -- I know they got it so if they ain't show back

12  up since.  Antoine acknowledges that.

13       Gerald Beasley states, And they was showing up

14  every -- every ten minutes.  You know what I'm saying?

15  Which Antoine again acknowledges.

16       Gerald Beasley says, So you know what I'm

17  saying.  It is what it is.  I can't just -- I can't

18  blame anybody but myself.

19  Q.    The --

20  A.    It goes on.

21  Q.    The reference to the amount of $1200, does

22  that -- well, does that mean anything to you in terms

23  of what that $1200 represents -- $1200 represents?

24  A.    It -- again, all those prices would be

25  consistent with a price for approximately an ounce of

161

1  cocaine.

2  Q.    Okay.  And he references, as you've read, and

3  there is conversation about that she had it by the way

4  she went to the car, do you know what they're talking

5  about there?

6  A.    In those calls I believe Gerald was talking with

7  Herbert Jones and they were speculating that another

8  individual must have picked it up once he dropped it

9  and that's what they were talking about.

10  Q.    Okay.  All right.  Moving on to the statements

11  identified in 14, I believe, again, we're dealing with

12  two statements.

13        Can you identify the individuals involved in

14  this conversation?

15  A.    It's session number 802 on March 31st, 2013 and

16  it's a telephone call between Gerald Beasley and Terry

17  Beasley.

18  Q.    And we've identified two different statements.

19  It's -- and I say two different statements.  We've

20  actually identified a number of different statements by

21  two different individuals but it actually is just a

22  series in a conversation, would that be correct?

23  A.    I'm sorry, could you repeat the question?

24  Q.    It's a number of statements made as they are

25  having a conversation, is that correct?

162

A.    Yes.

Q.    All right.  And, in fact, we're actually going to move towards the end of the conversation, towards the bottom of the last full page before we move on to the -- to the actual last page.

And does it start with Gerald Beasley asking Terry if he's going to bring me -- bring me your money. Bring me my money, guess it would be?

A.    Um, yeah, towards the end of their conversation Gerald asks Terry Beasley when he was going to pay him his money and that Terry Beasley had told him that he was going to bring it.

And then Terry Beasley tells Gerald Beasley that as soon as he gets down and he says, Hey, how much -- and then there's unintelligible, 2100 in morn in 20s.

Gerald says:  You say what?  And Terry Beasley again, there's somewhat unintelligible conversation but it says 21.

Gerald Beasley says:  2100.

Terry Beasley says:  Yeah.

Gerald Beasley says, No, you told me it was 2200.  I told you I put it up, I never counted it.

Terry Beasley says, in essence, you never counted the hundreds?  You need to count them.  It was

1    uh, 200 -- it was 200 in, uh, 50s, that should have

2    been, unintelligible, 2100 in hundred dollar bills.

3            Gerald Beasley tells Terry Beasley that he'll

4    go look.

5    Q.    All right.  So I guess my first initial question

6    is this conversation occurred on March 31st, is that

7    correct?

8    A.    That's correct.

9    Q.    And this actually occurred, this conversation

10   occurred after the statements that we've discussed in

11   statements 11a and 11b which occurred on March 30th,

12   would that be correct?

13   A.    That is correct.

14   Q.    What did these statements made by Terry and

15   Gerald, what did you attribute these -- these -- this

16   conversation to?

17   A.    I believed Terry Beasley and Jerry Beasley are

18   talking about $21,000 that Terry Beasley gave to Gerald

19   Beasley.

20   Q.    It also appears that Gerald didn't count all of

21   it, would you agree with that?

22   A.    Yes, I would agree with that.

23   Q.    And, again, this was at the same time that he

24   was trying to reup and he was out of heroin, would that

25   be an accurate statement?

164

1  A.    Yes, it would.  Well, it would be prior to or at

2  the time he was out of heroin.

3  Q.    Okay.

4  A.    And just prior to reupping.

5  Q.    All right.  Statement 15, conversation between

6  Antoine Beasley and -- I don't know.  How about Isaac

7  Woods?  Would you agree?

8  A.    Yes, it's session 172 heard on May 10th, 2013

9  and I believe it's a call between Antoine Beasley and

10  Isaac Woods.

11  Q.    All right.  What occurred prior or right prior

12  to this phone call with Isaac Woods?

13  A.    Could -- could you be more specific?  What --

14  Q.    Sure.  Prior to this phone call with Isaac

15  Woods, did Antoine Beasley have a telephone

16  conversation with Carlos Beasley?

17  A.    At some point prior to this, yes.

18  Q.    And did they have a conversation about somebody

19  not having enough money for that amount or something to

20  that effect?

21  A.    Yes, that's correct.

22  Q.    All right.  And then he has a phone conversation

23  with Isaac Wood, is that correct?

24  A.    Yes.

25  Q.    And towards the end of a long -- a long

1  paragraph by Antoine Beasley on the second page, does

2  he start talking about that conversation that he has

3  with Carlos?

4  A.    Yes, he does.

5  Q.    And what does he say?

6  A.    Um, do you want me to read it verbatim?

7  Q.    I think it's important to read it so we can

8  inform the Court what we would like to -- what we'd

9  like to attribute to the conspiracy.

10  A.    Okay.  Antoine Beasley states:  No, nigga,

11  that -- that's what I told, I was, I told him what it

12  was -- I was like, but shit just tell me, you know what

13  I'm saying?  I thought I had said that but, I don't

14  know, bro, you know what I mean?

15  Q.    And then after Isaac Wood says something, what

16  does Antoine follow up with?

17  A.    Antoine says:  Yeah, yeah, like I said, I

18  probably, I was like, but she was like 800 bucks, I was

19  like but, I was like, but you know what I'm saying,

20  shit, nigga, you ain't got that much, shit, I break,

21  you know what I'm saying, I break that shit down to

22  whatever.

23  Q.    What did you believe Antoine and Isaac Woods

24  were having a conversation about at that point?

25  A.    I believed they were talking about other people

1  that were distributing marijuana for Antoine Beasley

2  and how they should break that down in smaller amounts

3  in order to sell it.

4  Q.    Okay.  And, specifically, was he speaking

5  about -- do you believe he was speaking about his phone

6  conversation with Carlos Beasley that occurred just

7  prior?

8  A.    Yes, I believe it was related to that.

9  Q.    And statement 16, there's again 16a and a 16b

10 identified between Antoine and Gerald on Antoine's

11 wire.

12         For the Court's record, session 633.

13         Again, we're looking at May 16th of 2013.  We

14 identify a pertinent part of the conversation as a

15 statement by Antoine Beasley initially about iPads.

16 Would you go ahead and tell the Court what's important

17 about -- or what's important about this statement and

18 why we're asking the Court to consider it.

19 A.    Um, the iPads are important because from

20 reviewing the video from the DVR that was obtained from

21 Tiara's Place it appears that iPads were provided to

22 Juan Ibarra at one point.  Also, when we did a search

23 warrant at Tiara's Place, in some empty iPad boxes

24 there was discovered large amounts of U.S. currency.

25 Q.    Okay.  And when you say "large amounts" do you

1  remember exactly how much?  Or a good estimate?

2  A.    I believe it was more than $49,000, if I'm

3  correct.

4  Q.    All right.  So you have that information based

5  on obtaining the surveillance, so let me ask you this:

6          During the wire when they're talking about the

7  iPads, did that necessarily mean anything to you?  As

8  you were listening to this phone call?

9          Or did it have more meaning later on, after

10 you were able to watch this video surveillance out of

11 Tiara's Place?

12 A.    It -- it had more meaning later on once we

13 discovered the cash in the iPad boxes and then when we

14 were viewing the video or the pole camera footage, it

15 obviously had added significance at that point.

16 Q.    Okay.  Was there also a time that you observed

17 Stephen Smallwood leave the Tiara's Place with an iPad

18 box?

19 A.    There was what I believed to be iPad boxes.

20 Q.    Do you recall that date?

21 A.    Not off the top of my head.

22 Q.    Okay.

23          MR. HEPPERLY:  I'm sorry, just for a point of

24 clarification, can you state what your last statement

25 was to her last question?

```
 1             MS. JACOBS:  I think my last question was do
 2   you recall that date, is that --
 3             THE WITNESS:  Not off the top of my head.
 4             MR. HEPPERLY:  It was the question before
 5   that, I'm sorry.
 6             THE COURT:  Jana, why don't you read it back
 7   for us.
 8             (Read back was had:
 9             Q. Okay.  Was there also a time that you
10             observed Stephen Smallwood leave the Tiara's
11             Place with an iPad box?
12             A. There was what I believed to be iPad
13             boxes.)
14   BY MS. JACOBS:
15   Q.   And, again, was that through the surveillance
16   video at Tiara's or was that through mobile
17   surveillance during the wire?
18   A.   It was from reviewing the DVR footage from
19   Tiara's Place.
20   Q.   Okay.  And, finally, to make sure our record on
21   this issue is -- is clear, throughout this case, did
22   you also learn that Gerald Beasley obtained, accepted,
23   or paid for stolen property as well from other
24   individuals?
25   A.   Yes.
```

1  Q.    To your knowledge, was times that property iPads

2  or electronic devices or computers?

3  A.    Yes.

4  Q.    I just want to make sure the record is clear

5  that there were other individuals coming in and out

6  with maybe computer boxes or iPad boxes, as well?

7  A.    That is correct.

8  Q.    All right.  Do you recall how soon after this

9  conversation with Antoine Beasley about the iPad boxes,

10  how soon thereafter Antoine actually met with the

11  Ibarras?

12  A.    Um, I'd have to refer to my reports to give you

13  the exact date.  Dates.

14  Q.    If I was to say it was actually later on that

15  day, would that refresh your memory or not?

16  A.    He met with them often --

17  Q.    Okay.

18  A.    -- so it's very possible but, again, I would

19  have to -- I would have to look at my notes from

20  reviewing the -- the footage.

21        MS. JACOBS:  Your Honor, do you mind if I

22  present my spreadsheet to Mr. Fuller to refresh his

23  recollection?

24        THE COURT:  No, that's fine.

25  BY MS. JACOBS:

170

 1   Q.    It is huge.  And I may have marked it, as well,

 2   in the bottom corner.

 3          Do you see it, Jason?  Did you see it?

 4          Perhaps on the bottom part of that page that

 5   was open, is there a notation that Juan Ibarra, I

 6   believe it was, that shows up to Tiara's Place and

 7   that's picked up on the DVR surveillance footage?

 8   A.    Uh, yes, that's correct.  And that was also

 9   observed by surveillance personnel.

10   Q.    Okay.  After that meeting on that date, on this

11   same date with the Ibarras, was there another phone

12   call between Antoine Beasley and Gerald Beasley

13   regarding police and -- and whether or not they were

14   being investigated or surveilled at that time?

15          And actually that would be, um, under 16 and

16   it would be the second conversation, 637.  Session 637.

17   A.    Yes, in session 637 it's a conversation between

18   Antoine Beasley and Gerald Beasley.

19   Q.    So before we get to that I just want to make

20   sure this is clear.  The first conversation that we

21   just discussed between Antoine and Gerald about the

22   iPads occurs on May 16th at 1339, which is 1:39?

23   A.    I'm sorry, the time?  What was that?  1339?

24   Yes, that would be 139 p.m.

25   Q.    All right.  And then they meet with the Ibarras,

1    do you have on there through your notes what time the

2    meeting was with the Ibarras?

3    A.      On May 16th, 2013, it appears to be at

4    approximately 1335 hours, which would be 1:35 p.m.

5    Q.      Okay.

6    A.      What appears to be Juan Ibarra arrives in a

7    silver Honda Ridgeline and backs in to a parking spot

8    at the rear of the lot at Tiara's Place restaurant.

9    Q.      And then about two hours later Antoine Beasley

10   calls Gerald again and that's the next phone that's

11   been identified as 16b, session 637.  What does Antoine

12   say in this phone call to Gerald?

13   A.      Antoine tells Gerald that he thinks it's true

14   and Gerald asks him what he says and then Antoine says,

15   'cause Big Brother -- Big Brother just called him and

16   said, Man, when I left, when I left him over there --

17   and then he tells Gerald to hold on while he switches

18   to another call -- and then when he comes back they

19   resume speaking and Antoine tells Gerald Beasley that,

20   yeah, he said that, uh, and he don't know nothing about

21   what was going on.  He said he got followed.  And then

22   they go on to talk about what appears to be the color

23   of the cars and -- and how many there were.

24   Q.      So at this point was there -- was there mobile

25   surveillance still ongoing on Antoine Beasley, Gerald

1  Beasley, and other people associated?

2  A.    Yes.

3  Q.    Do you know when Big Brother, otherwise probably

4  known as Juan Ibarra calls Antoine and says, I was

5  followed, do you know whether or not there was actual

6  law enforcement surveillance out at that time

7  surveilling the Ibarras?

8  A.    Yes, there was.

9  Q.    So his comment that it was a white car, would

10 that be an accurate statement?

11 A.    Uh, I can't tell you what color the cars were

12 that were out there that day, but...

13 Q.    But there was mobile surveillance occurring on

14 the Ibarras at that time?

15 A.    Yes.

16 Q.    And this call is important -- well, let me ask

17 you this:  Had there been other phone calls about

18 individuals in this conspiracy observing law

19 enforcement, seeing them following them and other types

20 of conversations?

21 A.    Yes, there were.

22 Q.    And, so were there also -- based on what you

23 observed in phone calls, were they also doing some

24 counter surveillance or counter measures to figure out

25 our surveillance or figure out what was going on?

173

```
 1   A.    I would say that is a fair statement.

 2   Q.    Can you give the Court some examples and explain

 3  that a little bit.

 4   A.    Well, there -- there were calls that were

 5  intercepted between -- from Jerry Beasley, Junior, who

 6  was attempting to alert Antoine Beasley that he was

 7  being followed by law enforcement.  And from listening

 8  to the various calls that Antoine Beasley had with

 9  Gerald Beasley about that, at first it seemed that they

10  were dismissive of it and then when this happened, for

11  example, he seemed to become much more cognizant of the

12  law enforcement surveillance.

13   Q.    Do you believe based on what you observed and

14  what you overheard, they may have tried to change the

15  way they did things a little bit or more cognizant of

16  how they did things because they believed they were

17  actually being surveilled and they were being followed?

18   A.    Yes, I believe they became more cautious at that

19  point.

20   Q.    In statement 17 we have another conversation

21  between Antoine Beasley and Helen Beasley and -- I'm

22  sorry, I have these out of order and I'm not sure why I

23  did that.  But so this one is a little bit confusing

24  because it's thrown towards the end of this

25  investigation but for the Court's record, this is on
```

1  May 22nd, session 1032.

2          Again, conversation between Antoine and Helen

3  Beasley, is that correct?  Or, no, wait.  Maybe it's

4  Antoine and Gerald, I'm sorry.

5  A.    Could you tell me what statement you are

6  speaking about?

7  Q.    We're statement 17 now.

8  A.    17, yes, that is a call between Antoine Beasley

9  and Gerald Beasley that took place in session number

10  1032 on May 22nd, 2013.

11  Q.    And would you go ahead and provide the

12  background to the Court as to what was going on within

13  the immediate family structure of Antoine, and Helen,

14  and Gerald Beasley at the time of this phone call.

15  A.    It would appear that Gerald Beasley and Antoine

16  Beasley had a falling out and prior to this call.

17  Q.    Okay.  And, in fact, Antoine is pretty upset

18  with his dad, would you say, with Gerald Beasley during

19  this phone call?

20  A.    Yes.

21  Q.    On the second page, a little bit over half way

22  down, Antoine is discussing with his father the -- the

23  nicest way to say it is his relationship with other

24  women and his spending of money on other women, would

25  that be correct?

1    A.    Yes.

2    Q.    And would you go ahead, after Gerald says, Me,

3    I'm setting this up for failure, how does Antoine

4    respond?

5    A.    Antoine says:  Yeah, yeah, you settin' us up

6    'cause if we come, if we come as a team, I ain't gotta

7    do, I ain't gonna do nothing.  I ain't gonna do nothing

8    ignorant to -- to -- to jeopardize the scene, you know

9    what I'm saying?  Getting cars, lettin' people stay in

10   houses free, they all, these are things that are

11   jeopardizing the team because at the end of the day,

12   it's about -- it's about building the financial, uh,

13   uh, uh, a financial foundation for us.  For us,

14   the -- for the family -- for -- for us, you know, and

15   it just seems like, you know what I mean?  When it

16   comes to you and what you got going, you don't -- you

17   don't even care, you know what I'm saying?  It don't

18   even matter to you, you know what I mean?

19   Q.    Would it be an accurate statement to say that

20   Antoine is upset with his dad for spending money that

21   belongs to the family or organization on other women?

22   A.    I believe that would be a fair statement.

23   Q.    And in your opinion, is this money that's

24   obtained through, more than likely, the conspiracies to

25   distribute the drug and hiding or moving his money in

1  ways so that it is in houses and cars?

2  A.    I believe that's correct.

3  Q.    And statement 18 there's one phone call between

4  Antoine Beasley and Gerald Beasley again on, I believe

5  it's on Gerald's wire, on April 4th of 2013?

6  A.    That's correct.

7  Q.    The statement kind of talks about the status of

8  where a few of the individuals are in the conspiracy of

9  marijuana but specifically they talk about Helen

10 Beasley, is that correct?

11 A.    That's correct.

12 Q.    All right.  Now I think we're going to discuss

13 just the initial part, or the initial few lines.  Would

14 you go ahead and tell the Court -- well, let me ask

15 you -- let me go ahead and back up.

16        You discussed earlier that Gerald Beasley had

17 conversations with Helen Beasley during the wire

18 regarding marijuana, is that correct?

19 A.    That's correct.

20 Q.    And you observed through the Tiara's Place

21 surveillance video Helen Beasley obtained marijuana up

22 at Tiara's Place?

23 A.    What I believed to be marijuana, yes.

24 Q.    And during Antoine Beasley's wire, did you

25 ob -- did you overhear conversations between Antoine

1  Beasley and Helen Beasley about obtaining marijuana?

2  About Helen obtaining marijuana from Antoine?

3  A.    Yes.

4  Q.    All right.  So before Antoine's wire goes up,

5  though, there's this conversation between Gerald

6  Beasley and Antoine Beasley about Helen's

7  act -- criminal activity with marijuana, is that

8  correct?

9  A.    Yes.

10  Q.    And would you go ahead and read -- either read

11  this conversation or at least tell the Court the

12  substance of this conversation.

13  A.    Gerald states -- actually, let me start with

14  Antoine.

15       Antoine states:  Yeah, yeah I didn't even know

16  until you know what I'm saying but it's all good.  I'm

17  a get her something to get her through the night and

18  that's all I got.

19       Gerald Beasley then says:  Yeah, yeah, she

20  come here, man, she killing it.  I don't know.  I don't

21  understand that.

22       Antoine Beasley says:  Man, yeah, she's

23  selling it.  She's selling it.

24       Gerald Beasley says:  I believe that.

25       Antoine Beasley says:  She's selling that

178

1  stuff.  Gerald Beasley again states:  I believe that.

2          Antoine Beasley states:  That's exactly what's

3  going on.  It's getting sold.

4  Q.    Does Antoine then make a statement about how if

5  he wanted it sold he would do it himself?

6  A.    Yes, he does.

7  Q.    And, again, Helen Beasley's not a participant to

8  this conversation, is that correct?

9  A.    No, she is not.

10  Q.    All right.  And then in statement 19, I think we

11  can move on, again, another conversation between

12  Antoine Beasley and Gerald Beasley?

13  A.    That's correct.

14  Q.    This occurs on April 5th of 2013, session number

15  1801.

16          What is the pertinent part of this

17  conversation?  Does Antoine ask if Gerald has all of

18  his money together?

19  A.    He does.  And it begins with Gerald asking if

20  Antoine's down with this for tonight and Antoine asks

21  Gerald if he, later on, if in the conversation if he

22  got everything together and Gerald says, Yep, I do.

23  Q.    And then does he say he needs to go see

24  somebody?

25  A.    Gerald Beasley says, uh, he was just going to go

1  see, uh, Terry.

2  Q.    And again, any other Terry that was mentioned or

3  discussed during the wire, besides Terry Beasley?

4  A.    Uh, I believe there was some calls about Terry

5  Ross at one point with -- with Gerald talking to other

6  individual.

7  Q.    Okay.  But at the time of this phone

8  conversation, is Terry Ross still in custody or still

9  incarcerated?

10 A.    Yes.

11 Q.    Okay.  And just to be clear, at this point,

12 Gerald Beasley and Terry Ross have no relationship,

13 would that be correct?

14 A.    And Terry Ross?

15 Q.    Yes.

16 A.    Yeah, none that I know of --

17 Q.    No talking on the phone --

18 A.    -- in that context.

19 Q.    -- from jail or anything like that?

20 A.    I don't believe they were speaking with each

21 other.

22       And then it also should be noted that in this

23 call, Gerald then, Beasley, uh, tells Antoine that he

24 can take it to -- to someplace basically and Antoine

25 says, Yep, do that, and then Gerald says, Up -- up

1 there to your place and Antoine says, Okay, and then

2 Gerald says, Yeah, that way whenever you get it.  And

3 then he asks, 54, right?  And Antoine says, Yeah, yeah,

4 yeah, yeah.

5 Q.    And what's the important or the pertinent part

6 of that 54?

7 A.    Because there's those other conversations with

8 other co-conspirators reference 54, with Terry Beasley

9 and Stephen Smallwood, and -- and then when we did that

10 wall off stop on Terry Beasley on June 3rd, 2013, the

11 money that was recovered from the safe was bundled in

12 two bundles, one in which was $54,000.

13         MS. JACOBS:  Your Honor, at this point I would

14 add that statement to number 19 and maybe do 19a and

15 19b, because I think that that -- that reference to

16 that 54 is -- is pertinent to this conspiracy --

17         THE COURT:  Fine.

18         MS. JACOBS:  -- and then --

19 BY MS. JACOBS:

20 Q.    And then statement 20 -- we're getting there --

21 conversation with an unknown male but we've identified

22 this individual as most likely William Jones, is that

23 correct?

24 A.    That's correct.

25 Q.    And, again --

```
 1            MR. KERNS:  Most likely, who?  I'm sorry.

 2            MS. JACOBS:  William Jones.

 3            MR. KERNS:  William, thank you.

 4  BY MS. JACOBS:

 5   Q.    And, again, reference there to the 975, and I

 6  know we discussed this earlier in the cocaine

 7  conspiracy so I will let you discuss it quickly, if you

 8  would.

 9   A.    Um, this is just one of several calls between

10  Gerald and William Jones around this time but unknown

11  male 162 tells Gerald that it can happen any time, that

12  he was ready.  And Gerald says, Yeah, I can do it in

13  the next 30 minutes if they ready, and then the unknown

14  male basically asks Gerald if he had said it was 975

15  and Gerald says, Yeah, and then the unknown male says,

16  Okay, let me -- let me -- let me hit him up and I'll

17  hit you back and then Gerald tells the unknown male, If

18  not, they're going to have to wait.  They got to be

19  within the next 30 minutes.

20   Q.    So this phone call occurred on March 28th of

21  2013, real soon after we started this -- started the

22  wire, would that be correct?

23   A.    That's correct.

24   Q.    Is that our first day, around the 27th or

25  something to that?
```

1    A.    That's correct.

2    Q.    Okay.  So at this time, Gerald was charging

3    about 975 and you believe that was for an ounce

4    quantity?

5    A.    No, I believe -- I believe there is other calls

6    where William, the unknown male who we believe to be

7    William Jones, talks with Gerald about that being the

8    price for nine of them.

9    Q.    Okay.

10   A.    And I believe that 975 is actually $9,750 for

11   nine ounces.

12   Q.    Okay.  And so then does that match up with the

13   cost of cocaine at the beginning of the wire when you

14   started with the other phone calls and with how much

15   Gerald was charging for cocaine?

16   A.    It does, specifically, it matches up with calls

17   between Gerald Beasley and Brandon Smith that I believe

18   to be about powder cocaine where they talk about the

19   price of -- of it in code being 1083.

20   Q.    Okay.  And that was towards the end of the wire,

21   is that correct?

22          No, that was -- no, that was around the same

23   time because you said that you did the math and the

24   97 -- 9750 divided by 9 is -- comes out to 1083, is

25   that correct?

1   A.     Approximately, yeah.

2   Q.     All right.  And statement 21 identified by the

3   Government in 21a and 21b, again, another phone call

4   here between Gerald Beasley and Terry Beasley.  It's a

5   pretty short phone call, it's on the second page is the

6   most important or pertinent parts.

7          Would you go ahead and explain the statements

8   here that -- that -- that we've identified.

9   A.     This is a call between Gerald Beasley and Terry

10  Beasley in session 1707 on April 5th, 2013 and during

11  the call Gerald Beasley tells Terry Beasley that he got

12  that, and Terry Beasley says, Is that right?  And

13  Gerald Beasley responds in the affirmative and Terry

14  Beasley, there's an unintelligible part, but then says,

15  How many?  And Gerald Beasley tells Terry Beasley,

16  Whatever you want.

17          And Terry Beasley then says, Okay, I'm here

18  and there's a little unintelligible part, and it says,

19  I get it at cost.  Gerald Beasley says, Huh?  Terry

20  Beasley then says, I get it at cost.  Gerald Beasley

21  says, Yeah.  Terry Beasley says, Okay.  Gerald Beasley

22  then says, Yeah, you know, you know my cost, it cost me

23  64 per.  Terry Beasley says, Uh-Huh.  Gerald Beasley

24  then says, Yeah, 64 per thousand.  Terry Beasley

25  acknowledges that.

1          And then Gerald Beasley states -- there's an

2   unintelligible part and then he says, Something like

3   60, 64, uh, 64, uh, each, uh, each little one.   Terry

4   Beasley says, Okay, and then the call proceeds and goes

5   on.

6   Q.     All right.  And, again, based on everything that

7   you knew up to this point, what did you believe they

8   were discussing?

9   A.     I believed they were discussing the cost for a

10  kilogram of heroin.

11  Q.     And Terry was asking Gerald if he was going to

12  get it at cost, meaning he was going to get it at the

13  same price that Gerald was paying for it, would that be

14  accurate assessment?

15  A.     That's correct.

16  Q.     And that phone call occurred on April 5th, and

17  is that another time that Gerald Beasley was still

18  getting money or was again getting money together?  Do

19  you recall?

20  A.     Yes, I believe, yes, that -- that it was during

21  that time.

22  Q.     All right.  22, we have a number of convo -- 22a

23  and 22b, I got a little ahead of myself, conversation

24  between -- well, there's two of them, if I remember

25  correctly.  First one between Gerald Beasley and Gerald

1  Wilson.  No, maybe there is just one, we'll see.

2           All right.  Conversation between Gerald Wilson

3  and Gerald Beasley.  Would you identify for the Court

4  who Gerald Wilson is.

5  A.    Gerald Wilson is a son of Gerald Beasley's who

6  worked up at Tiara's Place restaurant during the time

7  of this investigation and early part of 2013.  He was

8  also the resident or occupant at 660 North Estelle

9  which is located across from 655 Estelle, which I

10 believe to be the stash house for Antoine Beasley, and

11 is also the location where the search warrant was done

12 by the Wichita Police Department where they recovered

13 approximately two pounds of cocaine and cocaine base

14 and firearm and ammunition.

15 Q.    And that was in 2009?

16 A.    Excuse me?

17 Q.    And that was in 2009?

18 A.    Yes, that's correct.

19 Q.    And those charges are adopted in part of this

20 case, is that correct?

21 A.    That's correct.

22 Q.    During this investigation, did you overhear

23 Gerald Wilson and Gerald Beasley speak on the phone

24 very often?

25 A.    Not very often.

1  Q.    Do you -- do you know why that is or do

2  you -- do you know if they had daily contact besides

3  the phone, or constant contact besides the phone?

4  A.    They had frequent contact by the fact that he

5  worked up at the restaurant where Gerald Beasley ran.

6  Q.    Okay.  So the phone call in 22a, 22b that we're

7  discussing on April 11th of 2013, what occurs in that

8  call?

9  A.    Um, to get some context, the Wichita Police

10 Department had executed a search warrant at Herbert

11 Jones's residence at the time, unbeknownst to us

12 working on this investigation, and during this call

13 Gerald Wilson calls Gerald Beasley and, in essence,

14 warns Gerald Beasley, or informs him that the police

15 are -- are executing that search warrant at Herbert

16 Jones's house.

17 Q.    Okay.  And what is Gerald Beasley's response?

18 A.    Gerald Beasley says, Yeah, well, he probably was

19 ready for them.

20 Q.    Okay.  And, again, why did you believe this

21 conversation between Gerald Wilson and Gerald Beasley

22 to be important or related to an ongoing conspiracy?

23 A.    Because it alerts him to the investigation by

24 law enforcement of one of the other co-conspirators and

25 helps to inform him of the status of the conspiracy.

1  Q.    Okay.  And our final phone call we're going to

2  discuss today would be 23, I think there is five, maybe

3  six different statements specifically that I've

4  identified for the Court and there are just a number of

5  different phone conversations, so because we were here

6  a few weeks ago on a motion to suppress, would you do a

7  quick recap of what occurred on June 3rd of 2013?

8        The Court's heard a lot of detail evidence on

9  that but I think we need to make a record today.

10  A.    Sure.  As discussed previously to the Court,

11  there was a series of phone calls intercepted between

12  Antoine Beasley, Helen Beasley, Carlos Beasley, and

13  Gerald Beasley on that date in reference to getting

14  something of value out of the storage unit that

15  apparently only Helen Beasley had access to at that

16  time.

17        There is also calls with Isaac Woods and

18  Antoine Beasley discussing what was going on amongst

19  those other individuals --

20  Q.    Okay.

21  A.    -- at that time.

22        Antoine Beasley, Terry Beasley and Helen

23  Beasley met at the storage facility while we surveilled

24  them.  They departed from that location.  A wall off

25  stop was conducted on Terry Beasley's vehicle.  A safe

1  was seized and inside the safe was located $55,100 in

2  United States currency.

3    Q.    So during the wire and during the investigation,

4  is it accurate to say that you believed that

5  Jerry -- Gerald Beasley, and Terry Beasley, and Antoine

6  Beasley, maybe even Helen Beasley were all working

7  together to obtain and distribute controlled

8  substances?

9    A.    Could you tell me the people again?

10   Q.    I just mentioned a few of them but I just wanted

11  to mention the people we're going to talk about here

12  but Terry Beasley, Antoine Beasley, Gerald Beasley, and

13  even Helen Beasley to an extent?

14   A.    Yes, that's correct.

15   Q.    So but things had changed a little bit by the

16  time the June 3rd events come around, is that correct?

17   A.    That's correct.

18   Q.    Would you go ahead and fill the Court in on that

19  information, again, just to give the Court the status

20  of where this case is at or where the family is at.

21   A.    At this time?

22   Q.    At the time on June 3rd.

23   A.    As -- as mentioned previously, there was a

24  dispute that began prior -- at first between Antoine

25  and Gerald and it seems to have arose based on the

1  calls that were intercepted because of Gerald Beasley's

2  relationships with other women besides Helen Beasley,

3  as well as his purchasing of vehicles and other items

4  for them.  And it appeared that Gerald Beasley and

5  Antoine Beasley were even separating to a certain

6  extent, or starting that process to go their own

7  separate ways, and on June 3rd, apparently Helen

8  Beasley had changed the locks.  She had been, by this

9  point informed or learned that Gerald Beasley had other

10  girlfriends and had become also in a dispute with them,

11  apparently, over that and so she only had access at

12  that point by changing the locks to a storage unit.

13  Q.    So, at the time that these series of phone calls

14  are going on, it appears that there is kind of

15  splitting up some property but do we know for sure

16  whether or not they are withdrawing from the

17  conspiracy?

18  A.    No, we don't know if they were withdrawing from

19  the conspiracy at that point.

20  Q.    All right.  And, in fact, from viewing

21  surveillance through Tiara's Place and the ongoing

22  investigation, did it appear that these individuals

23  were still engaged in the same activities that they had

24  been engaged in for the last two months?

25  A.    For the most part, yes.  There -- there

1  is -- there is still contact between all those parties

2  during that -- that time and, in fact, even this,

3  obtaining what I believed to be that safe with that

4  amount of money in it was still furtherance of that

5  conspiracy.

6  Q.    All right.  And, in fact, that was Terry Beasley

7  obtaining that -- the amount of money back that

8  he -- that you believe was provided to Gerald Beasley

9  to -- for payment of controlled substances, is that

10 correct?

11 A.    Correct.

12 Q.    All right.  So let's get in to these calls just

13 a little bit.  Like I said, there is a series of them

14 so I'll try to make it not too painful.

15         The first one is between Antoine Beasley and

16 Carlos Beasley, is that correct?

17 A.    That's correct.

18 Q.    This one occurs at 1710, which is right after 5

19 o'clock, would you agree?

20 A.    That's correct.

21 Q.    All right.  Identified specifically as statement

22 of Carlos stating that, You know what's going on right

23 now, with Terry, you need to get into it.  You need to

24 get -- pretty much saying you need to get involved in

25 it, would you agree?

1         And it's right at the top of the second page.

2   A.    That's correct.  Carlos Beasley tells Antoine

3   Beasley, That's going to be some bullshit, man, you

4   need to check into that better than just, I mean, me

5   saying a little something and then letting that go

6   'cause it's going to be way more bullshit than you

7   think.

8         And, uh, I believe that that's Carlos Beasley

9   really, um, pushing for Antoine Beasley to get that

10  money out of that storage unit for his father, Terry

11  Beasley.

12  Q.    And then about half way down through the page

13  Carlos Beasley tells Antoine that he has more pull than

14  what he actually acts like or than he actually has?

15  A.    That's correct.

16  Q.    And then in the next phone call has been

17  provided to the Court, session 1564, this occurs at

18  about 5:30, is that correct?

19  A.    Yes, it appears to occur at 1731 hours or 5:31

20  p.m.

21  Q.    And who is this phone call with?

22  A.    That's a phone call between Antoine Beasley and

23  Isaac Woods.

24  Q.    And, specifically, on the top of the second

25  page, what does Antoine say when he is talking with

1    Isaac?

2    A.    Yes, Antoine Beasley tells Isaac Woods, Nigga,

3    apparently pops done allow Uncle Terry to, to, to put

4    some money up.  Well, mama done changed the lock to

5    wherever it's at.  Mama done changed the locks.

6    Q.    And then a little bit later, or the next

7    statement he says that he has -- that Carlos is calling

8    him to talk about it?

9    A.    Uh, yes, he indicates that they had Los, which

10   is the nickname for Carlos Beasley, call him and then

11   that he had told Carlos Beasley, that he doesn't have

12   anything to do with that.

13   Q.    Okay.  The next phone call that Antoine makes or

14   is involved in is with Helen Beasley, is that correct?

15   A.    That is correct.

16   Q.    And this would be 23c, is that -- or I'll

17   identify it for the Court as 23c.

18   A.    Yes.

19   Q.    And what does Antoine say about the second line

20   on the second page?

21   A.    During that call, Antoine Beasley tells his

22   mother Antoine -- or his mother, Helen Beasley, that,

23   um, that apparently there's something valuable in

24   there, in essence.

25   Q.    All right.  So then the phone calls continue

1  throughout the day, by about 5:55, the next phone call,

2  session 1578, again, Antoine is talking to Helen

3  Beasley and Helen states there at the bottom of the

4  first page, kind of her position at this point, after

5  speaking with Gerald of where -- where she's at.

6          What does she say?

7  A.    She states to Antoine Beasley, nuttin', your

8  daddy on the phone with that shit, talk about, yeah,

9  well, yeah, do whatever you want to do.  I -- I ain't

10 got shit in there.  Uh, I said, I'll take the police

11 out there since they want to kick 'em out some threats,

12 talking about might get ugly, I can make it real ugly.

13 Q.    And how does Antoine respond to that?

14 A.    Antoine responds by stating, Yeah, mama, don't,

15 no, don't get the police or nothing.  We just gonna, we

16 gonna give them their stuff and that's going to be the

17 end of that, that's going to be the end of that fo'

18 sho'.  So we just going to, yeah, leave that alone.

19 I'm a call you as soon as I get done.

20 Q.    Okay.  And then eventually there's a couple more

21 telephone calls between Terry Antoine and Helen and

22 that they meet up at the storage shed, is that correct?

23 A.    That's correct.

24 Q.    And then the final phone call that we've

25 identified from this date that's pertinent to this

1 conspiracy is a phone call between Gerald Beasley and

2 Antoine Beasley in session 1623, is that correct?

3 A.    That's correct.

4 Q.    And what does Antoine -- I'm sorry, what does

5 Gerald tell Antoine?

6 A.    Gerald tells Antoine, and this is taking place

7 after the car stop on Terry Beasley and the money being

8 seized, Gerald Beasley tells Antoine Beasley, Yeah,

9 they let him go, they took that money though.

10        Antoine Beasley says:  For real?

11        Gerald Beasley says:  Yeah, they tore that car

12 up, they was trying to find it.

13        Antoine Beasley says:  That is crazy.

14        Gerald Beasley says:  Yeah, they took that

15 money.

16        Antoine Beasley then says:  That's crazy,

17 they're probably going to be trippin' in the morning.

18 Q.    Okay.  There's one more statement we've

19 identified, statement 24.  There is not a telephone

20 call that goes along with it.

21        Would you go ahead and tell the Court about

22 who Steven Gilkey is.

23 A.    Steven Gilkey is an individual that -- oh,

24 that's fine -- is an individual that we intercepted

25 during the wiretap of Gerald Beasley's phone and then

1  after we were done with the wiretaps I interviewed him,

2  and he advised that he had been buying crack cocaine

3  from Gerald Beasley.

4  Q.    All right.  As part of Mr. Gilkey's interview,

5  did he discuss with you a conversation that he had with

6  Gerald Beasley after he was arrested in this case

7  initially but released and out on bond?

8  A.    After Gerald Beasley was arrested and out on

9  bond?

10  Q.    Yes.

11  A.    Correct.

12  Q.    So I just want to make sure we are clear for the

13  Court.  Gerald Beasley was arrested in June of 2013,

14  during the time of the search warrants, as a felon in

15  possession of a firearm, is that correct?

16  A.    That's correct.

17  Q.    And he was in custody for two, three months,

18  approximately, before released?

19  A.    I don't --

20  Q.    And you don't --

21  A.    I don't recall the exact dates that he was in

22  custody.

23  Q.    So Steven Gilkey was clear with you that he

24  was -- had a conversation with Gerald Beasley, though,

25  and it was after he was placed on bond in this case?

1  A.    That's correct.

2  Q.    And what did Mr. Gilkey tell you regarding the

3  furtherance of this conspiracy and the collection of

4  drug debts that -- that Gerald Beasley said.

5  A.    Steven Gilkey told us that several people owed

6  Gerald Beasley large amounts of money, including

7  Stephen Smallwood, who he believed owed Gerald Beasley

8  approximately $40,000 and that he only wanted to give a

9  little bit of it back to Gerald Beasley, which made

10 Gerald Beasley angry or upset, and that Gerald Beasley

11 was looking for a firearm.

12 Q.    And to make clear, it was -- this wasn't Steven

13 Gilkey's belief, this was the statements Gerald had

14 made to him in the conversation?

15 A.    That -- that's what I believed.

16 Q.    Mr. Fuller, would it be accurate to say that we

17 had approximately 3,000, give or take, phone calls that

18 we reviewed in the process of preparing for this

19 hearing?

20 A.    I'm not sure the exact number, there were

21 thousands, yes.

22 Q.    All right.  And, in fact, the -- the

23 con -- the -- the statements at this point that we have

24 brought to the Court's attention and identified in our

25 chart, would you think it would be an accurate

1  statement to say we have 50 to 70 more

2  similar -- similar statements to that effect?

3  A.    Yes.

4  Q.    All right.  And we haven't presented all this to

5  the Court at this point because we didn't want to be

6  here for two weeks, would be maybe a good statement of

7  way to put it?

8  A.    Yes.

9  Q.    I didn't want to be here for two weeks, let's

10  just put it that way.

11        Accurate statement to say we picked out some

12  statements that we believe encompass a number of

13  individuals, all of the conspiracies, and to try to

14  show the Court how everything ties together?

15  A.    That -- that's correct.  These aren't all

16  inclusive --

17  Q.    All right.

18  A.    -- statements.

19  Q.    So the statements that we have identified and

20  that we have discussed, do you believe that these

21  statements were made in furtherance of one of the

22  conspiracies in some way?

23  A.    Yes, that's correct.

24  Q.    And -- and what is that basis of that belief?

25  Yes, I know that's a very broad question.

1          Where do you come up with that information?

2    A.    Well, it's -- the totality of the

3    investigation --

4    Q.    Okay.

5    A.    -- from having reviewed all those historical

6    cases, having interviewed criminal associates, having

7    listened to the calls, having watched months of pole

8    cam video footage at the two stash houses that were

9    identified, having watched months of video obtained

10   from inside Tiara's Place, and looking at all that and

11   how it fits together and look -- and then also the

12   financial investigation that was conducted, is what

13   grabs me as to why those statements are pertinent to

14   those various conspiracies.

15   Q.    And the statements that we have identified again

16   for the court today, in some way we're trying to either

17   obtain controlled substances, or trying to notify other

18   parties of the conspiracy of the status of the case,

19   we're trying to address money or proceeds of controlled

20   substance offenses, or some of the other conspiracies,

21   is that correct?

22   A.    That's correct.

23         MS. JACOBS:  Your Honor, just for a

24   housekeeping matter, I think I provided the Court with

25   Exhibit 1 and Exhibit 2.  At least for the purposes of

1  this hearing, I would ask that those two documents be

2  admitted.

3          If the Court would like any kind of further

4  foundation, we can do that for the Court.

5          THE COURT:  Counsel?  Any objection?  For

6  purposes of this hearing?

7          MR. PRATT:  Can we just -- can we just

8  clarify -- can we just clarify what the exhibits were?

9  Exhibit 1 was the -- this attachment B.

10          MS. JACOBS:  The Exhibit 1 was the notebook --

11          MR. PRATT:  Okay, thank you.

12          MS. JACOBS:  -- with the calls and then,

13  sorry, did I not put numbers on yours?

14          MR. PRATT:  No.

15          MS. JACOBS:  Sorry.

16          And then, yes, Exhibit 2 would be the

17  attachment B to the Civil Forfeiture Complaint.

18          MR. PRATT:  No objections for purposes of this

19  hearing.

20          THE COURT:  Does anybody object for purposes

21  of this hearing?

22          MR. SEVART:  Your Honor, briefly with respect

23  to purposes of this hearing, with respect to Exhibit A,

24  you know, those portions that specifically deal with

25  Carlos Beasley I wouldn't have an objection but there

1  is a number of those statements that are not in any way

2  affiliated with those and I don't know if I even need

3  to object to those but we would certainly ask that

4  those not be considered with respect to Carlos Beasley.

5           And Exhibit B, in reviewing that document, I

6  don't see Carlos Beasley mentioned at all in there and

7  so I would ask that Carlos -- that Exhibit B not be

8  used against Carlos Beasley.  Even in this hearing.

9           THE COURT:  Okay.  I'm going to go ahead and

10 admit both 1 and -- Government's 1 and 2 and, of

11 course, I'll only consider what's there against the

12 people that are involved or named or in some manner

13 mentioned or tied in through the testimony of the

14 special agent here today.

15          So, all right.

16          MS. JACOBS:  Then at this time I have no

17 further questions for this witness.

18          THE COURT:  Thank you.

19          Who wishes to go first?

20          MR. HEPPERLY:  Your Honor, if I could have

21 just a couple of minutes to talk to my client --

22          THE COURT:  Sure.

23          MR. HEPPERLY:  -- and I'll be glad to go.

24          And my client is in the back of the room.

25          MR. SEVART:  Your Honor, would it be okay to

1  just maybe take a brief recess?

2     THE COURT:  Why don't we do that.  Let's take

3  about ten minutes.  We'll start back up again about

4  2:45.

5     (Recess taken from 2:35 p.m. until 2:45 p.m.)

6     THE COURT:  Sir, if you'd come back up.

7     Mr. Hepperly, you're going to take the first

8  crack here?

9     MR. HEPPERLY:  Yes, I tried to get out of it

10  and nobody would let me out of it.

11     THE COURT:  There you go.

12         **CROSS EXAMINATION**

13  BY MR. HEPPERLY:

14  Q.    Agent Fuller, do you have in front of you the

15  exhibit, I think that would be Exhibit Number 1, which

16  is a notebook that Michelle Jacobs put together of

17  these telephone calls?

18  A.    Yes, sir.

19  Q.    Okay.  If you would move to what I would call

20  1a, Helen Beasley to Antoine Beasley?

21  A.    Yes, sir.

22  Q.    And it says, I gave the attorney $300 you gave

23  me last night.  So you think that's a furtherance of a

24  conspiracy of money laundering?

25  A.    I think that in totality with the -- the rest of

1  the phone calls where the purpose of that is to divide

2  up the assets --

3  Q.    Well, you don't understand where the money came

4  from, do you?  You don't specifically understand where

5  this $300 came from, correct?

6  A.    Other than it came from Antoine Beasley.

7  Q.    Yes.

8         Also it says that Gerald, in number 1b, which

9  is Helen Beasley to Antoine Beasley on 5-22-13, it

10 talks about Gerald buying Bianca a 2013 car.

11 A.    Yes, sir.

12 Q.    Okay.  You didn't -- you don't have any evidence

13 that shows whether or not Gerald Beasley purchased a

14 2013 car, do you?

15 A.    Well, I know she was driving that car at that

16 time.

17 Q.    Do you have any evidence that shows Mr. Beasley

18 paid for that car?

19 A.    There was a call that was intercepted where

20 Gerald Beasley, I believe, admits that he cosigned for

21 that car.

22 Q.    Do you know specifically what that phone call

23 number is?

24 A.    Not off the top of my head, no.

25 Q.    Okay.  You say he cosigned for the vehicle?

1    A.    Uh --

2    Q.    Is that what that telephone call said?

3    A.    There was a call where somebody mentioned Gerald

4    Beasley cosigning for that car.

5    Q.    Okay.  Do you recall any phone calls in which

6    Gerald Beasley stated or someone stated for him that he

7    paid for the vehicle?

8    A.    Not -- not that I recall.

9    Q.    Okay.  Further, have you checked any suspicious

10   activities reports that would have been filed by the

11   owner of that particular vehicle if cash had been paid

12   for the 2013 vehicle purchased allegedly for Bianca

13   Holly?

14   A.    I don't recall but if that had taken place, it

15   probably would have been done by --

16   Q.    I'm just asking whether or not you checked as

17   whether or not there is a sus -- it's easy for me to

18   say -- suspicious activities report on this vehicle?

19   A.    I personally did not.

20   Q.    Okay.  Also on 1c, which is Helen Beasley and

21   Antoine Beasley, and it's session number 980 on May

22   22nd, 2013, it says that Gerald bought full -- a house

23   full of furniture and everything else.

24         You don't know what the cost of that furniture

25   is, do you?

```
 1   A.    No, I do not.

 2   Q.    You don't know whether or not that was old

 3   furniture or new furniture?

 4   A.    No, I do not.

 5   Q.    You don't even know if, in fact, there was any

 6   furniture in that house, correct?

 7   A.    No, I do not.

 8   Q.    Okay.  That was just something stated by Helen

 9   Beasley, who was in the process of divorcing her

10   husband, correct?

11   A.    Yes, correct.

12   Q.    Okay.  Second one, which is number 2, which is

13   session number 1799, it's a telephone call from Gerald

14   Beasley to Anita Burkley, do you see that phone call?

15   A.    I do.

16   Q.    And it says, I'm doing all right sitting here

17   trying to get these people's money together, do you see

18   that?

19   A.    Yes, sir.

20   Q.    And you're saying that this is a part of a

21   heroin conspiracy between Antoine Beasley,

22   Gerald -- Terry Beasley, and Mr. Smallwood, correct?

23   A.    Correct.

24   Q.    Do you have any idea whether or not Mr. Beasley

25   was talking about a restaurant that he owns?
```

1  A.    I don't believe that's what that call is in

2  reference to.

3  Q.    You have any idea that it was talking about a

4  graduation dinner for his granddaughter?

5  A.    Again, I don't believe that's what this call is

6  in reference to.

7  Q.    Okay.  Did you interview Anita Burkley?

8  A.    I attempted to, yes.

9  Q.    Okay.  Did she make any comment in that

10  interview about that particular statement?

11  A.    Uh, I played her, I believe a call, I can't

12  recall if it was -- I would have to refer to my report

13  as to what call I played for her and if the statement

14  she made pertained to this particular call or not.

15  Q.    Would you be surprised to know that there was no

16  question presented by you to Anita Burkley regarding

17  this phone call?

18  A.    I -- I'd have to refer to my report documenting

19  my contact with Anita Burkley.

20  Q.    Go to 3a, Gerald Beasley to Antoine Beasley.  Do

21  you see that?

22  A.    Yes, sir.

23  Q.    Do you understand what time -- you understand

24  that Mr. Gerald Beasley had a restaurant, correct?

25  A.    Correct.

1  Q.    Did you ever observe at any time whether or not

2  there were family gatherings at the restaurant?

3  A.    There were.

4  Q.    Do you know whether or not there was a family

5  gathering at the restaurant for a graduation?

6  A.    I believe at one point there was.

7  Q.    Okay.  Go to 3b, Gerald Beasley and Antoine

8  Beasley.  See -- and that is in session number 1672?

9  A.    Yes, sir.

10  Q.    On April 5th, 2013.  Do you see that?

11  A.    Yes, sir.

12  Q.    Do you see on the second page, which would be

13  574 of 1709, are you on that page?

14  A.    Yes, sir.

15  Q.    Do you see maybe a quarter of the way down, I

16  know that's right, laughing, they want a dinner on

17  Sunday.  Man I hope I'm feeling better Sunday.  I give

18  it to them, I go in, cook fish for them.  I got to go

19  see Jerry, see Jerry in the morning?

20  A.    Yes, sir.

21  Q.    Do you think that's a discussion about a dinner

22  on Sunday?

23  A.    I think so.

24  Q.    Mm-hmm.  And in those three -- or those two, 3a

25  and 3b, if it's a discussion about the restaurant, that

1  certainly wouldn't be in any furtherance of any kind of

2  conspiracy regarding heroin, if you looked at -- at

3  that particular statement, correct?

4  A.    If that were the case, that would be correct.

5  Q.    Okay.  Let's go to Number 4, is Gerald Beasley

6  to Terry Beasley, which is 525, session 525.  Do you

7  see that?

8  A.    Yes, sir.

9  Q.    And in your testimony you said that this was a

10  discussion about heroin, correct?

11  A.    Yes, sir.

12  Q.    And do you see the term "garbage" in there?

13  A.    Yes, sir.

14  Q.    That wouldn't surprise you that that applied to

15  restaurants either, would it, sir?

16  A.    That's not what I believe that pertains to, no.

17  Q.    Okay.  But if you just look at the statement,

18  "garbage," certainly one could interpret that as

19  applying to a restaurant, could they not, sir?

20  A.    Restaurants have garbage, yes.

21  Q.    Okay.  Look at 5a, section 587 about Gerald

22  Beasley and Mr. Smallwood?

23  A.    Yes, sir.

24  Q.    Okay.  You have mentioned during your direct

25  examination about Mr. Smallwood coming to the

1  restaurant at Tiara's, do you remember those

2  conversations that you had with Michelle Jacobs?

3  A.    Yes, sir.

4  Q.    Okay.  And did you see any footage where

5  Mr. Smallwood was placing money on the counter for

6  anyone at Tiara's?

7  A.    Yes, I did observe on the -- the video from

8  Tiara's Place on one instance where it appears that

9  Mr. Smallwood is putting down what looks like money on

10  the counter and then Gerald Beasley picking up

11  something that would be perhaps consistent with a bag.

12  Q.    Okay.  And then you saw Mr. Smallwood get a

13  package?

14  A.    I believe he puts his hand over those items, and

15  in particular the bag, and I think, again, you can't

16  see everything from the video, but I believe he did

17  take that with him.

18  Q.    Did you see Mr. Smallwood go out with some kind

19  of laptop or computer?

20  A.    I saw him exit with a box one time that would be

21  consistent with a lap -- laptop box.

22  Q.    So, in other words, it would be a laptop box

23  that could potentially have a laptop?

24  A.    It could.

25  Q.    Okay.  And do you know whether or not

1 Mr. Smallwood picked up a number of electronic items

2 from Mr. Beasley?

3 A.    I know from reviewing the video that he got a TV

4 on at least one occasion.  I know that he did exit on

5 some occasion with boxes, including the box you

6 previously asked about.

7 Q.    When you -- did you ever go to Mr. Smallwood's

8 house?  Did you ever search his place?

9 A.    No.

10        MR. HEPPERLY:  If I may have just a moment,

11 Your Honor.

12        THE COURT:  Of course.

13        MR. HEPPERLY:  I have a lot of notes.

14        THE COURT:  Take your time, Mr. Hepperly.

15 BY MR. HEPPERLY:

16 Q.    On session number -- is Gerald Beasley having a

17 telephone conversation -- hold on just a

18 moment -- session number 587, which would be March

19 30th, 2013.

20        You had indicated that the statement, I'm

21 trying to get them paid off, and throughout that

22 paragraph is talking about a heroin -- heroin

23 conspiracy, is that correct?

24 A.    That's correct.

25 Q.    Can you specifically tell me what words you

1  believe are describing a heroin transaction?

2  A.    Well, the statement --

3  Q.    And that --

4  A.    -- the statement that you just read, that --

5  Q.    Excuse me?

6  A.    Well, the statement that you just read, for

7  example, is part of the statement.

8  Q.    Can you show me -- can you show me what page

9  that's on?

10  A.    On -- well, the call is on Page 226 of 1709 --

11  Q.    Okay.

12  A.    -- is where it begins.  And then on the

13  following page --

14  Q.    So on 226, what specifically are you saying that

15  that is a heroin transaction between Mr. Smallwood --

16  A.    Well, I'm saying that --

17  Q.    -- and Mr. Beasley?

18  A.    I am just saying that's where this call begins.

19  Q.    That's where the call begins but there is

20  nothing on that page, is that a fair statement?

21  A.    Yeah, that's just beginning conversation between

22  Gerald Beasley and Stephen Smallwood --

23  Q.    Okay.

24  A.    -- on that part of the page.

25        But when they begin talking about getting

1  people paid back, so at the top of Page 227 here --

2  Q.    Okay.

3  A.    -- Stephen Smallwood says, Yeah, 'cause, well, I

4  thought you wasn't going to do it.

5  Q.    What paragraph are you on, sir?

6  A.    Well, they're not paragraphs but one, two,

7  three, four.

8  Q.    Is it Gerald Beasley speaking or Mr. Smallwood?

9  A.    No, Mr. Smallwood speaking.

10 Q.    Okay.

11 A.    So it is the fourth speaker from the top on Page

12 227 of that call.

13 Q.    Okay.

14 A.    Okay.  So Stephen Smallwood says, Yeah, 'cause,

15 well, I thought you wasn't going to do it 'cause you

16 was saying that you -- they -- way you was talking you

17 just wasn't going to do it no ways so I didn't even, I

18 wasn't trippin' over that.

19       Gerald Beasley then says:  No, no, I didn't

20 have the money to do it 'cause I'm -- I'm waiting on

21 what's going to happen today.  That's what I'm waiting

22 today, what's going to happen today.  And I got enough

23 money to cover that, you know, I got spreaded so thin

24 the other way so I have enough money to cover that and

25 that's what I'm trying to do just cover that, you know.

212

1          And then Stephen Smallwood says, Yeah, no, I

2    wasn't go out there -- I'm sorry, out here to do

3    nothing that that wasn't going to be covered any way

4    'cause, like I say, I always need to have that right,

5    you know, the very next day just, unintelligible, just

6    bring it back up there then.

7          Gerald Beasley states:  Yeah, okay, I

8    understand that, you know, but you know just the night

9    before I didn't have it and I, they wanted it then so I

10   didn't -- unintelligible, I didn't mess with things,

11   you know.  You said -- I'm sorry, you -- you said that

12   you had it so I was going to get it from them and, uh,

13   just take it back to them later.

14          If I could --

15   Q.    Sir, you don't know whether or not that is

16   electronic equipment, do you?

17   A.    I believe because of the timing of this

18   conversation, in conjunction with the other calls that

19   were taking place between Gerald Beasley and others

20   around this time, and then the subsequent surveillance

21   or observations from the pole cameras or from the

22   restaurant, that this was a call related to them

23   obtaining heroin from the Ibarras.

24   Q.    You're stating, just so I understand, that

25   you're basing it -- that is a transaction of heroin

1  based upon phone calls specifically that you're not

2  stating, correct?

3  A.    I'm sorry.

4  Q.    I am just saying there are some phone calls --

5  A.    Yes.

6  Q.    -- but you don't specifically remember which

7  ones, is that correct?

8  A.    I -- I would have to -- to tell you the exact

9  session numbers or the times --

10  Q.    Okay.

11  A.    -- I would have to have all the linesheets in

12  front of me.

13  Q.    On those pole cameras, did that specifically

14  show a heroin transaction or any one from the Ibarras

15  bringing any drugs into Tiara's?

16  A.    You can see on some instances where Antoine

17  Beasley meets with one of the Ibarras, bags being

18  exchanged and --

19  Q.    I'm talking about Tiara's Place.

20        THE COURT:  Mr. Hepperly, let him finish his

21  answer before you cut him off.

22        MR. HEPPERLY:  I'm sorry.

23        THE WITNESS:  Bags being exchanged or brought

24  but as far as actually seeing heroin and being able to

25  say, That's heroin being handed from the Ibarras to one

214

1   of them, no, I have not seen that.

2   BY MR. HEPPERLY:

3   Q.    Other than the description you had of the

4   Ibarras coming to Tiara's Place one time?

5   A.    No, there's more times, sir.

6   Q.    Okay, I'm just talking about your description of

7   them going to Tiara's Place when you're asked by the

8   prosecutor when he backed in his pickup, do you recall

9   that statement?

10  A.    I do.

11  Q.    Okay.  Do you have any specific times and dates

12  when the Ibarras came to Tiara's Place?

13  A.    Yes, I do.

14  Q.    Okay.  And I assume you don't have those with

15  you?

16  A.    Not up on the stand with me but I do have them

17  here.

18  Q.    Okay.  But you would supply that to us later,

19  correct?

20  A.    That -- that's up to the Court and --

21  Q.    Okay.

22  A.    -- all -- all that would have been -- I will say

23  this, sir.  All that evidence, you have.  There is

24  video that you should have a copy of, pole camera video

25  that you should have a copy of, and all of that is the

1  original evidence, all of that is on there.

2  Q.    I have reviewed all that evidence.  I do not

3  recall any transaction that Ibarras had with Mr. Gerald

4  Beasley at Tiara's Place.  Okay?

5            THE COURT:  Is that a question, Mr. Hepperly.

6            MR. HEPPERLY:  It is a question, Your Honor.

7            THE COURT:  I just didn't hear one there, I'm

8  sorry.

9            MR. HEPPERLY:  I'll put one in, sir.

10           THE COURT:  Okay.  Thank you.

11 BY MR. HEPPERLY:

12 Q.    But you're saying there is?

13 A.    There is.

14 Q.    Okay.  But that was not presented here today, is

15 that correct?

16 A.    Not until now.

17 Q.    Okay.  If you would go to Number 6a, Brandon

18 Smith and Gerald Beasley?

19 A.    Yes, sir.

20 Q.    Okay.  And this would be number 304.  Do you see

21 that, sir?

22 A.    Yes, sir, I do.

23 Q.    Is this a conversation on 6a where Brandon is

24 talking to Gerald Beasley about one of Mr. Beasley's

25 sons?

216

```
 1   A.      Yes, it is.

 2   Q.      Does he mention which son?

 3   A.      No, he does not.

 4   Q.      Okay.  Does Mr. Beasley mention which son?

 5   A.      No, he does not.

 6   Q.      Would that also be true of Number 7?  And it's

 7   1556 in which Gerald Beasley is talking to Brandon

 8   Smith.

 9   A.      That session is actually a text message from

10   Brandon Smith to Gerald Beasley.

11   Q.      Okay.  And do you see where the term is, okay,

12   sir, what -- what do you, cuz someone is not talking

13   about marijuana, is it?

14           It's -- you -- you had mentioned earlier in

15   the conversation to the prosecutor that a form of

16   marijuana or a strain of marijuana was cuz?

17   A.      No, cush.

18   Q.      Cush.  Because this term is not cush but cuz

19   similar to c-a-u-s-e?

20   A.      Yeah, I think that is a shortened version for

21   the word because.

22   Q.      Okay.  Do you know what the status of the

23   Ibarras are at this point, sir?  You had mentioned them

24   on several occasions with the prosecutor.

25   A.      Can you clarify what you mean by "status"?
```

1  Q.    Are they in Wichita, Kansas?

2  A.    I don't know for sure, I know -- I have

3  information that leads me to believe that they are.

4  Q.    Have they been arrested for anything?

5  A.    Recently?  Or as part of this investigation?

6  Q.    Have -- have the Ibarras been arrested for any

7  sale of any illegal substances?

8  A.    I don't -- I don't recall.

9  Q.    Okay.  So it would be fair to say that you don't

10 know at this point?

11 A.    I'd have to go back and look.  I know criminal

12 histories were done and as to their -- their arrests or

13 conviction history, but to tell you off the top of my

14 head, I don't know right now.

15     THE COURT:  Are you talking, Mr. Hepperly,

16 about any pending charges or cases?

17     MR. HEPPERLY:  I'm talking about any

18 outstanding charges, I'm talking about any past

19 warrants, I'm talking about any kind of police action

20 to bring them in to custody.

21     THE WITNESS:  Not as part of this

22 investigation.

23 BY MR. HEPPERLY:

24 Q.    A part of any investigation, sir?

25 A.    To my knowledge, there -- there hasn't been.

218

1    Q.    Okay.

2    A.    Other than -- could you -- could you re -- could

3    you ask me that question one more time, sir, just to

4    rephrase?  And what -- I am trying to be one hundred

5    percent accurate with you, sir.

6              MR. HEPPERLY:  If the court reporter could

7    read that back.

8              (Whereupon the last question was read back.)

9    A.    I will say that, obviously, they are people of

10   interest in investigations, not only this one but

11   others because of who we believe them to be and what

12   they're involved in.

13   BY MR. HEPPERLY:

14   Q.    You know who Herbert Jones is, correct?  He's

15   one of the defendants in this case?

16   A.    Yes, sir.

17   Q.    And you indicated that there was some pole

18   cameras at Mr. Herbert Jones's house?

19   A.    No, not on Mr. Jones's house.

20   Q.    Was there -- were there any surveillance done on

21   Mr. Herbert Jones's residence?

22   A.    The surveillance of Gerald Beasley would

23   sometimes lead down there when -- when they were

24   following Gerald Beasley.

25   Q.    So sometimes they'd see Mr. Beasley go in to see

219

1   Mr. Jones?

2   A.    Traveling to his residence or the area where his

3   residence was.

4   Q.    Okay.  Did you at any time see Mr. Beasley sell

5   any kind of drugs to Mr. Jones?

6   A.    I don't recall seeing actual transaction with

7   him, no.

8   Q.    Okay.

9   A.    At his residence, no.  Although -- from the

10  review of the Tiara's Place video, I do believe

11  there -- there is video of what appears to be Gerald

12  Beasley providing a bag to Herbert Jones.

13  Q.    Did you ever stop Mr. Jones when he came out of

14  Tiara's restaurant?

15  A.    Not that I recall.

16  Q.    Did you ever stop Mr. Beasley when he came out

17  of Mr. Jones's house?

18  A.    No.

19  Q.    Look at statement Number 22b, and it would be

20  session number 3075 on April 11th, 2013.

21  A.    Yes, sir.

22  Q.    The conversation between Gerald Beasley and

23  Gerald Wilson.

24  A.    Yes, sir.

25  Q.    Isn't that a comment by Mr. Beasley that

1  Mr. Jones was probably ready for the police?

2  A.    Yes.

3  Q.    That certainly does not make any statement about

4  sale of cocaine, does it, sir?

5  A.    Oh, I think -- I think it relates to the sale of

6  narcotics.

7  Q.    You think that relates to the sale of narcotics?

8  A.    Well, somebody's preparing themselves for a

9  search warrant by the police, if they weren't involved

10 in some type of criminal activity, there would be

11 nothing to prepare for.

12 Q.    All it says is he was probably ready for them?

13 A.    Right.

14 Q.    And so you're extrapolating or taking from that,

15 you're saying that Mr. Jones was ready for a search

16 warrant, that he knew the police were going to be

17 there, and that my client said he was ready for a

18 search warrant?

19 A.    I'm not saying he knew specifically that they

20 were coming that time or that day but I believe it's

21 not uncommon for people that are engaged in narcotic

22 sales to try and evade being arrested for that by

23 preparing certain ways, such as hiding the narcotics or

24 keeping them at some other location than where they're

25 currently at or some other means.

1  Q.    Is there a specific statement in session number

2  3075 that talks about any cocaine?  By Mr. Beasley or

3  Gerald Wilson?

4  A.    No.

5  Q.    Thank you.  You, sir, did not do any of the

6  financial background on Mr. Beasley, did you?  Gerald

7  Beasley.

8  A.    We --

9  Q.    You specifically, sir?

10  A.    I -- I did some preliminary checks when we began

11  the investigation as to what properties were associated

12  with him and some other things but the -- the bulk of

13  the financial investigation was conducted by TFO Ron

14  Goodwyn and AFI Bob Hawkins.

15  Q.    On statements number 23b, 23c, 23d, and 23e,

16  it's Antoine Beasley with Helen Beasley.  Gerald

17  Beasley was never on any of those conversations, is

18  that a fair statement?

19  A.    I believe that's correct.

20  Q.    There were no telephone conversations between

21  Gerald Beasley and any of the Ibarras, is that correct?

22  A.    That were intercepted, not to my knowledge, no.

23  Q.    On Number 24, Steven Gilkey, remember your

24  conversation about that my client was -- Mr. Gilkey

25  said my -- Gerald Beasley was looking for a firearm?

1    A.    Correct.

2    Q.    Did you ever see Mr. Beasley with a firearm

3    after he had been arrested?

4    A.    No, sir.

5    Q.    Did you ever find out from probation whether or

6    not Mr. Gerald Beasley had a firearm either in his

7    vehicle, in his car -- I mean in his restaurant, or at

8    his house?

9    A.    After he was arrested, sir?

10    Q.    Yes, after he was arrested.

11    A.    No.

12        MR. HEPPERLY:  If I may have just a moment,

13    Your Honor.

14        THE COURT:  Certainly.

15    BY MR. HEPPERLY:

16    Q.    When you were at Tiara's you had indicated

17    earlier that you were at Tiara's the day of the

18    arrest --

19    A.    Correct.

20    Q.    -- of Mr. Beasley?

21        Did you find any electronics at Tiara's Place?

22    A.    Uh, yes.

23    Q.    Okay.

24    A.    I didn't personally, the other investigators

25    there --

```
 1   Q.    No, but --

 2   A.    -- did.

 3   Q.    -- I assume you have reviewed the sheet that

 4   indicates what was there at Tiara's Place?

 5   A.    Yes.

 6   Q.    And did it not include some electronics?

 7   A.    Yes.

 8   Q.    Okay.

 9         MR. HEPPERLY:  No further questions.  Thank

10   you.

11         THE COURT:  Thank you.

12         Mr. Pratt.

13                  CROSS EXAMINATION

14   BY MR. PRATT:

15   Q.    I'm going to go over some of your testimony

16   regarding the alleged conspiracies and sort of in

17   order.

18         You mentioned a package that was sent to 655

19   North Estelle that was intercepted.

20   A.    Correct.

21   Q.    And you talked about IP addresses that the post

22   office said had checked on the progress of that

23   package?

24   A.    Correct.

25   Q.    You indicated one of the IP addresses was for
```

1  618 Hedgewood?

2  A.    Yes.

3  Q.    Do you know who actually checked on the package?

4  A.    No.

5  Q.    And where was the second IP address?

6  A.    It came back to a different residence.

7  Q.    A residence -- residence associated with Antoine

8  Beasley?

9  A.    I'm -- I'm not sure.

10  Q.    Okay.  Was it a residence associated with Gerald

11  Beasley?

12  A.    Again, I'm not sure.  I would have to check the

13  report as to what actual residence that was.

14  Q.    Okay.  But as you sit here today, you don't have

15  any knowledge that was associated with either Antoine

16  Beasley or Gerald Beasley?

17  A.    That's correct.

18  Q.    Okay.  Do you think that if it did, it might

19  stick out in your mind?

20  A.    Yes.

21  Q.    Okay.  Now, you also talked about search

22  warrants -- well, strike that.

23        You testified that there were no intercepted

24  phone calls from the Ibarras on either Gerald Beasley

25  or Antoine Beasley's cell phones, correct?

1   A.     That's correct.

2   Q.     Okay.  And, in fact, at one time you thought

3   there were some phone calls belonging to the Ibarras

4   but that actually turned out to be a network switch out

5   of Washington state, correct?

6   A.     I don't know what you're referring to.

7   Q.     There was some numbers on a -- on a, um, pen

8   register that you -- that in the search warrant

9   affidavits indicated a belief that they belonged to

10  Juan Ibarra, do you recall that?

11  A.     I -- I'd have to see the affidavits you're

12  talking about, I don't -- I don't recall that.

13  Q.     Okay.  Do you know the Ibarras' phone numbers?

14  Any of them?

15         I believe there is three brothers?

16  A.     Do I know their phone numbers?

17  Q.     Yes.

18  A.     Currently or in the past?

19  Q.     In the past.

20  A.     I don't -- I don't know for sure.

21  Q.     Okay.  So you indicated that on one of the cell

22  phones found at 618 Hedgewood, in the contacts there

23  was Little Bro?

24  A.     Right.

25  Q.     But you do not know that actually referred to an

1   Ibarra?

2   A.    Not specifically, no.

3   Q.    Okay.  And there was no Big Bro?

4   A.    Um, I'd have to check.

5   Q.    Okay.

6   A.    Again, I don't know if there is or not.

7   Q.    Would it be a fair statement if there was that

8   might be something that stuck in your mind?

9   A.    Potentially, but I'd have to go back and look at

10  those devices again.

11  Q.    And in your review of those phones, those

12  devices, you didn't find any calls that you could

13  associate with the Ibarras?

14  A.    Uh, nothing -- nothing specific that I could say

15  one hundred percent certainty.

16  Q.    Okay.  So it would be a fair statement that

17  other than perhaps some statements by Antoine and

18  intercepted calls, there is really no evidence that

19  there was any contact between Antoine Beasley, Gerald

20  Beasley, and any of the Ibarra brothers?

21  A.    There's physical surveillance and video.

22  Q.    Okay.  I apologize, phone contact.

23  A.    Telephonic contact, no, not at this point.  Not

24  with 100 percent certainty.

25  Q.    Okay.  And you have indicated that at this

1  point, you're not aware of the status of the Ibarra

2  brothers as far as in custody, out of custody?

3  A.    I don't believe they're in custody.

4  Q.    Okay.

5  A.    In fact, I'm sure I would have heard about that

6  if that were the case.

7  Q.    Okay.  It's my understanding that you received

8  information about the Ibarras from a DEA agent in El

9  Paso, Texas, is that correct?

10  A.    Other agents received that information and then

11  passed it along to me.

12  Q.    Okay.  Okay, just so I understand, other agents

13  received information from the DEA in El Paso, Texas

14  regarding the Ibarras?

15  A.    Correct.

16  Q.    And that was information that was received from

17  somebody who had been arrested and became a

18  confidential informant?

19  A.    That's my understanding.

20  Q.    Are you aware of the DEA in El Paso, Texas

21  taking any action against the Ibarras?

22  A.    I'm not aware.

23  Q.    Okay.  Are you aware of the DEA or the ATF in

24  Wichita, Kansas taking any action against the Ibarras?

25  A.    Could you be more specific as to "action"?

1    Q.    Any action whatsoever?  Arrests, anything like

2    that?

3    A.    They have not arrested them, no.

4    Q.    I assume you wouldn't tell me if there was an

5    ongoing investigation against the Ibarras?

6    A.    I don't know if that would be appropriate.

7    Q.    Okay.  Well, let me ask you, is there an ongoing

8    investigation against the Ibarras?

9           MS. JACOBS:  Your Honor, I am going to object

10   at this point.  I don't --

11          THE COURT:  Basis.

12          MS. JACOBS:  I don't believe that Mr. Fuller

13   could answer this question or has any information about

14   this question but even if he did -- but even if he did,

15   I don't believe that Mr. Fuller is in a position to

16   disclose this information.

17          THE COURT:  Sustained.

18          MS. JACOBS:  Additionally --

19   BY MR. PRATT:

20   Q.    Your testimony is that you believe that Gerald

21   Beasley is getting cocaine, and I believe heroin, from

22   the Ibarras through his son Antoine Beasley?

23   A.    Correct.

24   Q.    Okay.  And you have never interviewed the

25   Ibarras?

```
 1   A.     No.

 2   Q.     Are you familiar with the -- strike that.

 3          Gerald Beasley has two sons, correct?

 4   A.     That I know of, yes.

 5   Q.     Okay.  Antoine Beasley, and Gerald Wilson?

 6   A.     Correct.

 7   Q.     And Gerald Wilson also goes by Bebe, is that

 8   correct?

 9   A.     Correct.

10   Q.     Okay.  And one of the people that you

11   interviewed in this case was Terry Ross?

12   A.     Correct.

13   Q.     And Terry Ross told you that Gerald Beasley's

14   son who works at the restaurant deals in kilos of

15   cocaine, correct?

16   A.     I believe that's what he said, yes.

17   Q.     Okay.  So that would be Bebe?

18   A.     I believe that would be Bebe, yes.

19   Q.     To your knowledge, has Antoine Beasley ever

20   worked at the restaurant?

21   A.     No.

22   Q.     Okay.  And I believe you also interviewed

23   Leonard Carter?

24   A.     Correct.

25   Q.     Okay.  And Leonard Carter told you that Gerald
```

1  Beasley's source of heroin was Lin -- Linda's son known

2  as E, correct?

3  A.    I believe that's correct.

4  Q.    And I believe her last name is Beasley.  Linda

5  Beasley has a son named Eric, correct?

6  A.    I don't -- I don't know who her sons are.

7  Q.    Okay.  But two of the people you've interviewed

8  in this case specifically told you that Gerald Wilson's

9  son dealt in kilos of cocaine?

10  A.    Gerald Wilson's son?

11  Q.    I'm sorry, Gerald Beasley's son, Gerald Wilson,

12  dealt in kilos of cocaine and the source of supply of

13  heroin to Gerald Beasley was his nephew E?

14  A.    The -- there were people who provided that

15  information, yes.

16  Q.    Okay.  Would it be fair to say that no one you

17  interviewed told you that the sources of supply to

18  Gerald Beasley for cocaine or heroin were the Ibarra

19  brothers?

20  A.    Nobody that I interviewed, no.

21  Q.    Okay.  To your knowledge, anyone that law

22  enforcement interviewed indicate that the Ibarra

23  brothers were a source for Gerald Beasley for either

24  heroin or cocaine?

25  A.    Not specifically to Gerald Beasley, no.

1    Q.    Okay.

2    A.    There is a source who said that they were a

3    source for cocaine to the Wichita area.

4    Q.    To the Wichita area?

5    A.    Yes.

6    Q.    Okay.  So let me ask the same question in

7    regards to Antoine Beasley.

8          No one you interviewed told you that the

9    Ibarra brothers were a source of heroin or cocaine to

10   Antoine Beasley?

11   A.    Correct.

12   Q.    Okay.  And the person who gave you the

13   information about the Ibarra brothers being a source of

14   cocaine and heroin to Wichita was a person who was

15   arrested in El Paso who was trying to make a deal, is

16   that correct?

17   A.    I believe that's correct.

18   Q.    Okay.  So nobody in Wichita has given you any

19   information that the Ibarra brothers are a source of

20   heroin or cocaine to the Wichita area?

21   A.    I don't know if I can say that.

22   Q.    Okay.  Well, can you think of anyone right now

23   from Wichita who lives in Wichita that told you or law

24   enforcement in this case that the Ibarra brothers are a

25   source of heroin or cocaine to Wichita?

232

1    A.    Nobody has told me that --

2    Q.    Okay.

3    A.    -- specifically.

4    Q.    Has anyone told any law enforcement besides the

5    DEA in El Paso, Texas?

6    A.    It's possible.

7    Q.    But as far as you know, in this investigation,

8    it hasn't happened?

9    A.    Could you ask me the question one more time?

10   Q.    As far as you know, in this investigation, no

11   one in Wichita has given you information that the

12   Ibarras were a source of cocaine or heroin to the

13   Wichita area?

14   A.    Uh, not for this investigation, no.

15   Q.    For another investigation?

16   A.    Not being conducted by me, no.

17   Q.    To your knowledge, part of an investigation

18   conducted by another law enforcement agency or another

19   law enforcement agent?

20   A.    It -- I don't know for sure, but I have

21   information that other law enforcement agencies may be

22   looking at Inocente and Juan Ibarra.

23   Q.    Okay.  Now, you discussed as part of the, I

24   believe the cocaine conspiracy, in call session number

25   1013, that Gerald Beasley stated that he dropped a ba,

1  and you believe that this was a reference to cocaine?

2  A.    I do.

3  Q.    Were there any other instances where Gerald

4  Beasley used the term "ba" to reference cocaine?

5  A.    There's another call between Antoine Beasley and

6  Gerald Beasley where Antoine Beasley asks Gerald

7  Beasley when he's going to be ready to -- to deal with

8  the ba.

9  Q.    Okay.  Could he be referring to his brother,

10 Bebe?

11 A.    I don't believe so from the -- when you listen

12 or actually hear the call, I don't believe that's what

13 they're talking about.

14 Q.    But it's your opinion that Gerald Beasley

15 dropped cocaine and not cash?

16 A.    Yes.

17 Q.    Okay.  You indicated that there was cocaine

18 found at -- on the North Piatt at the search warrant on

19 June 12th, 2013?

20 A.    Correct.

21 Q.    You did not find any cocaine at 655 North

22 Estelle?

23 A.    No.

24 Q.    You did not find any cocaine at 618 Hedgewood?

25 A.    No.

234

1    Q.    At either search warrant at 618 Hedgewood?

2    A.    That's correct.

3    Q.    In fact, you -- strike that.

4          In April, 2013, you indicated you found

5    cocaine -- and by you I mean law enforcement, I don't

6    mean you did specifically -- at Terry Beasley's house.

7    A.    That's -- that's correct.

8    Q.    Okay.  You didn't find cocaine anywhere else

9    that day -- that day?

10   A.    No.

11   Q.    Okay.  Now, you testified that there's an

12   interview with Charles Torrence in which he discussed

13   selling stolen property, I believe to Gerald Beasley,

14   and getting crack and heroin from Gerald Beasley --

15   A.    Correct.

16   Q.    -- is that correct?

17         Are you aware that Charles Torrence indicated

18   in a letter to Special Assistant United States Attorney

19   Michelle Jacobs that he sold stolen property in front

20   of the Mayor of Wichita?

21   A.    Yes.

22   Q.    Okay.  And you're aware that he wanted to be

23   placed in witness protection program for any further

24   information he gave?

25   A.    Yes.

1    Q.    Do you know if he was --

2    A.    No, he was not.

3    Q.    Was there -- after that letter to Special

4    Assistant United States Attorney Michelle Jacobs, was

5    he ever interviewed again?

6    A.    Yes.

7    Q.    Okay.  And when was that interview?

8    A.    I'd have to check for the date.

9    Q.    Okay.  And you also indicated that James

10   Arbertha?

11   A.    Yes, Junior.

12   Q.    Arbertha.  You interviewed him, as well?

13   A.    Yes.

14   Q.    And he wanted to be paid for his information?

15   A.    I don't -- I don't recall that.

16   Q.    Okay.  On June 12th, 2013 during a search

17   warrant of North Piatt, you found heroin, correct?

18   A.    Other investigators did, yes.

19   Q.    Okay.  There was none found at 655 North

20   Estelle?

21   A.    Correct.

22   Q.    There was none found at 618 Hedgewood?

23   A.    Correct.

24   Q.    You also testified about a black travel-type bag

25   that was found at North Piatt and you testified that

1  contained a large amount of currency?

2  A.    Correct.

3  Q.    Then you testified that Antoine Beasley could be

4  seen carrying a bag on video?

5  A.    Correct.

6  Q.    What video are you referring to?  The pole cam

7  video or the Tiara's video?

8  A.    When I made that statement I was specifically

9  referring to the video from Tiara's Place.

10 Q.    Okay.  But there was a pole cam at Tiara's?

11 A.    The DVR from the search warrant.

12 Q.    Okay.  And you had indicated before that that

13 was kind of hard to see it any way what was going on

14 when you were talking about the bag that Stephen

15 Smallwood got?

16 A.    It's -- it's a video system, so it's not like me

17 watching you.

18 Q.    Okay.

19 A.    There's -- it's not as crystal clear as that.

20 Q.    Okay.  So you can't -- as you sit here today,

21 you can't say that that was the same bag?

22 A.    No, I can't say that.

23 Q.    Okay.  And you can't say that that bag contained

24 large amounts of cash or any contraband?

25 A.    I can't say for sure, no.

1   Q.    Okay.  You're just kind of guessing?

2   A.    I'm not guessing.

3   Q.    Wouldn't that be true?

4   A.    I'm looking at the investigation and that's what

5   that indicates to me.

6   Q.    You talked about surveillance for a package that

7   went to Del Rose.  Do you recall that?

8   A.    Yes.

9   Q.    This was part of the marijuana conspiracy.

10         And you testified about arrangements that you

11   felt were being made between Antoine and Gerald

12   Beasley.  Do you know what was in that box?

13   A.    Uh, no, not specifically.

14   Q.    Okay.  Then you also talked about meetings

15   between the Ibarras and, I believe, Antoine Beasley

16   that occurred at 655 North Estelle.

17         There's no sound on these pole cam videos,

18   correct?

19   A.    No, there's not.

20   Q.    So you don't know what they were meeting about?

21   A.    Not from any conversations, no.

22   Q.    Okay.  But you -- you're speculating from

23   as -- from other evidence, as you put it?

24   A.    I wouldn't say I'm speculating, I'm reporting

25   the facts and how they fit in to the rest of the facts.

1  Q.    And as far as -- I believe you categorized these

2  as customers, Eric, Charles, Isaac Wood, and Cameron

3  James, is that correct?  Customers of Antoine?

4  A.    I believe that would be some of them, yes.

5  Q.    Okay.  And you testified about an incident that

6  occurred with Cameron James?

7  A.    Yes.

8  Q.    Now, have you interviewed Cameron James?

9  A.    I have not, I know attempts have been made by

10  other agents.

11  Q.    Okay.  Do you know if those attempts have been

12  successful?

13  A.    No, they have not.

14  Q.    Okay.  What about Isaac Woods?

15  A.    Yes, we -- we did interview him.

16  Q.    And that was a successful interview, in your

17  opinion?

18  A.    No.  Not in my opinion, I don't believe he's

19  being a hundred percent forthright.

20  Q.    Okay.  What about Eric Charles?

21  A.    Um, I know that Shauna Sherwood and some other

22  agents from DEA attempted to interview various people

23  believed to be his customers, I don't know if Eric

24  Charles was one of them or not --

25  Q.    Okay.

1  A.    -- without going back and reviewing reports or

2  speaking with Agent Sherwood.

3  Q.    Okay.  How many would you consider to be

4  successful interviews?

5  A.    Of all the people that we interviewed?

6  Q.    Yes.

7  A.    Would you like me to list them by name or --

8  Q.    I would.

9  A.    Okay.  I believe Leonard Carter's interviews

10 were successful interviews.  Charles Torrence's

11 interviews were successful interviews.  Steven Gilkey's

12 interview was a successful interview.  The time I just

13 spoke with Raymond Jones I believe was a successful

14 interview.  When law enforcement spoke with Terry Ross,

15 I believe that that was a successful interview.

16        There's others, too, probably, but...

17 Q.    But those are the ones that you can think of

18 right now?

19 A.    Those are the ones that stick out in my mind --

20 Q.    Okay.

21 A.    -- currently.

22 Q.    How many specifically do you recall

23 related -- strike that.

24        How many were related specifically to Antoine

25 Beasley?

1    A.    Specifically to him?

2    Q.    Yes.  As opposed to somebody giving general

3    information like Larry Carter did?

4    A.    Leonard Carter.

5    Q.    Leonard Carter, I'm sorry.

6    A.    Yes, primarily those were people that were

7    dealing with Gerald Beasley that I just mentioned --

8    Q.    Okay.

9    A.    -- and so the majority of their information

10   dealt with their -- their association with him --

11   Q.    Okay.

12   A.    -- and not with Antoine Beasley.

13   Q.    Okay.  So were there any successful interviews

14   that related to Antoine Beasley?

15   A.    Um, with customer -- people believed to be

16   customers of his?

17   Q.    Customers, anybody?  Dealers that you consider?

18   A.    Well, the only one I would consider to be a

19   successful interview that would be more specific to

20   Antoine Beasley would be perhaps the interview

21   conducted with Ron Smith --

22   Q.    Okay.

23   A.    -- by Ronald Goodwyn and AFI Hawkins.

24   Q.    And that was primarily related to money

25   laundering, is that correct?

1   A.    That's correct.

2   Q.    And I want to talk a little bit about the

3   searches that you conducted specifically on June 12th,

4   2013.

5         You indicated in the search at 655 North

6   Estelle that you found marijuana, grow equipment,

7   scale, packaging, and bags, correct?

8   A.    Correct.

9   Q.    And you also indicated that you found two

10  firearms?

11  A.    Correct.

12  Q.    Okay.  Now, one was simply a lower receiver that

13  didn't have a trigger house, nothing on it, it was just

14  a hunk of metal with a serial number stamped on it?

15  A.    Which is still considered by the federal law to

16  be a firearm.

17  Q.    I understand that, but it was nothing more than

18  that?

19  A.    That is correct.

20  Q.    Okay.  Now, the other one was broken down in to

21  separate cases?

22  A.    That's my understanding.

23  Q.    Okay.  And the bolt and the bolt receiver were

24  actually removed as well?

25  A.    I don't know about that, I would have to --

242

```
 1   Q.    But your understanding is the upper and lower
 2   were separated in separate cases?
 3   A.    Yes, I know that the upper was commonly referred
 4   to as the -- on an AR-type firearm, as the upper, was
 5   separated from the lower.
 6   Q.    Okay.  Now, on the Hedgewood, June of 2013, you
 7   said that you found three -- three separate weights of
 8   marijuana.  You testified 52 grams, 87 grams, 57 grams.
 9   Is that correct?  Gross weights.
10   A.    You're referencing the April 2014 search
11   warrant?
12   Q.    No, I'm sorry, the June 12th, 2013.
13   A.    Okay.  Based on this, that I have in front of me
14   which is provided to me by DEA Agent Sherwood, yes,
15   there's three items of marijuana that are listed here
16   that were recovered during the search of 615 Hedgewood.
17   Q.    Okay.  And to your knowledge were -- how were
18   they packaged?
19         Were they packaged in Ziploc bags?  Were they
20   packaged in dispensary bags that labeled what they
21   were?
22   A.    I -- I'd have to look at the reports and view
23   the photographs.  I know some of the marijuana, if I
24   recall correctly, from the photos I've seen of the
25   search warrant that was done there, I think were in
```

1  some plastic-type containers.

2  Q.    Some plastic, did you say?

3  A.    I think so.

4  Q.    Okay.  And do you mean plastic, like, pill

5  bottles from a dispensary, or plastic baggies?

6  A.    No, I -- I want to say they were in, um, like

7  small, like, storage --

8  Q.    Okay.

9  A.    -- type plastic containers.

10  Q.    But you -- you -- when you testified about

11  repackaging materials and things like that, you only

12  testified to finding those at 655 North Estelle, not

13  finding them at 618 Hedgewood on June 12th, 2013?

14  A.    Correct.

15  Q.    Okay.  So the fact that there was no scales and

16  no packaging, that could very well indicate that what

17  was found at 618 North -- or 618 Hedgewood was for

18  personal use?

19  A.    You know, I'd have to, again, I'd have to refer

20  to the reports --

21  Q.    Okay.

22  A.    -- to make sure because there was a lot of

23  search warrants that were served that day to -- to be

24  accurate as to exactly what was found in that specific

25  location.

244

```
 1   Q.    Okay.  And -- and, again, on the April, 2014
 2   search, your testimony did not indicate any sort of
 3   scales or repackaging material?
 4   A.    Again, I would have to look at the reports as to
 5   everything that was seized or -- or seen there to make
 6   sure I'm being accurate in response to your question.
 7         If I could look at the reports or -- I could
 8   tell you.
 9   Q.    I want to move on to your testimony regarding
10   the money laundering conspiracy.
11         Again, you did not prepare that multi page, I
12   think it was 86-page affidavit that was presented to
13   the Court.
14   A.    No, I did not.
15   Q.    And you didn't do the majority of -- of the
16   investigation?
17   A.    No.
18   Q.    You did indicate that 618 Hedgewood, I believe
19   your statement was, a lot of that house was paid with
20   cash.
21   A.    Yes, I believe that's correct.
22   Q.    Who paid the cash?
23         (Telephone rings in open court.)
24         THE COURT:  Strange.  Doesn't appear to be
25   coming through our phone but I'm sure.
```

```
 1              MR. WOOD:  There was something on here, Cart
 2   Darrell.
 3              THE COURT:  I just had my speaker on up here
 4   and it is coming through there very low.
 5              MR. PRATT:  Okay, you want me to continue,
 6   Your Honor?  Or you want me to try to find the --
 7              THE COURT:  Well, just find the offending
 8   machine.
 9              MS. SCHMIDT:  The screen just went off on the
10   computers.
11              THE COURT:  Did it?
12              MS. SCHMIDT:  On and off.
13              MR. PRATT:  Well, it sounds like it's over.
14              THE COURT:  Sorry for the interruption, Mr.
15   Pratt.
16              MR. PRATT:  That's fine, Your Honor.
17              I think my question --
18              THE COURT:  Roger, we know it wasn't you.
19   Thank you.
20   BY MR. PRATT:
21   Q.    My question was, who paid that cash?
22   A.    Well, the receipt that we recovered had Helen
23   Beasley's name on it.
24   Q.    So it wasn't Antoine Beasley who paid that cash
25   for that house?
```

246

1  A.    Well, that receipt does not say that he paid

2  that cash, no.

3  Q.    Let me put it this way.  You have no evidence

4  that Antoine Beasley paid that cash for that house?

5  A.    Well, I believe, if I could refer to the

6  affidavit and find the section where it discusses that

7  residence...

8  Q.    Well, let me ask it this way since you didn't

9  prepare that report and we can read the report

10 ourselves.

11        To your knowledge, is there any evidence that

12 Antoine Beasley paid that money for that house?

13 A.    Um, he was living there.

14 Q.    Can you tell me what page you're on, please?

15 A.    Yes, 39.  Okay, if you look at Paragraph 107.

16 Q.    107 -- oh, you're on Page 39?

17 A.    Yeah, Paragraph 107.  And if you look at the

18 sentence that says, In response to a question by Ron

19 Smith asking how much cash had Smith and Company

20 accepted from, quote, Gerald or Antoine, unquote, Ron

21 Smith's mother, who serves as bookkeeper for Smith and

22 Company, advised that $134,000 had been received in

23 cash.

24 Q.    Okay.  Can we agree that's a pretty ambiguous

25 question:  How much did you receive from Gerald or

247

1  Antoine?

2          Wouldn't a more appropriate question have been

3  how much money did you receive from Gerald and how much

4  money did you receive from Antoine?

5  A.     Yes, and there's a separate report I know of

6  prepared by Ron Goodwyn detailing specifically his

7  contacts with Ron Smith and his interviews with him.

8  Q.     Okay, but up at top when it's talking -- and

9  that same paragraph, 107 reference to 618 Hedgewood?

10  A.     Mm-hmm.

11  Q.     It says Ron Smith confirmed that he sold the

12  property to Gerald Beasley and carried the note and

13  mortgage for this transaction.  Smith advised that the

14  property was paid in full in the amount of 191,000.

15  The receipt was made out to Helen Beasley?

16  A.     Mm-hmm.  Yes, sir.

17  Q.     Okay.  So, again, would -- with that sort of

18  question, Gerald or Antoine, you don't have any

19  evidence of how much, if any, Antoine paid for that

20  house?

21  A.     No, not -- not the amounts but I do know that

22  from that report I just referenced of Ron Goodwyn's

23  regarding the interviews with Ron Smith, that while

24  that house was being built Antoine Beasley, according

25  to that report, was very involved in the interior

248

1  layout of that house.

2  Q.    Okay.  So in your -- in your mind that means he

3  paid for it?

4  A.    Well, I -- in my mind knowing what I know about

5  their commingling of assets, and the fact that he was

6  actually living there and that he appeared to be

7  actively involved in the building of it when this house

8  was being paid for, that leads me to believe that

9  he -- that he had a financial interest in that house.

10  Q.    Whose name is the house in?

11  A.    I believe it's in Helen Beasley's name.

12  Q.    You spent a lot of time talking about $54,000,

13  correct?

14  A.    Correct.

15  Q.    It kind of goes back and forth, I'm not sure the

16  earliest date where that number arises but in your mind

17  as part of this investigation, the talks about the

18  54,000, are they the same -- is that the same 54,000

19  that was seized from Terry Beasley on June 3rd?

20  A.    I believe that's related, yes.

21  Q.    Okay.  Well, I didn't ask if it was related.  Is

22  it the same?  Are they talking about this 54,000 and

23  then later on it gets seized?

24  A.    I can't say for sure that that particular 54,000

25  is the same 54,000 they're speaking of in the prior

1  call.

2  Q.    Okay.  I want to go through some of these

3  statements, and a lot of the questions have already

4  been asked.

5        Starting with session number 980 which makes

6  up 1a, b, and c, this really is just a conversation

7  between a son and his mother about his father cheating

8  on his mother and his mother getting divorced, isn't

9  that correct?

10  A.    Yes, that -- that's what the call is about.

11  Q.    Okay.  And are -- and Helen Beasley is hoping to

12  get Gerald Beasley served the next day after paying

13  this attorney?

14  A.    I'm sorry, could you repeat the question?

15  Q.    Helen Beasley is hoping to get Gerald Beasley

16  served the next day after paying the attorney.  That's

17  on the top of Page 07.

18  A.    Yes, that's what --

19  Q.    Okay.

20  A.    -- what she says.

21  Q.    And in reference to this car, it indicates that

22  Gerald cosigned for the car, correct?

23  A.    Yes.

24  Q.    Do you have any evidence that he paid any amount

25  of cash for that car?

```
 1   A.      Uh, I do not.

 2   Q.      Do you have any evidence that he gave -- and I

 3   believe this is dealing with Anita -- was it -- do you

 4   know who they're talking about?

 5           They got the car for?

 6   A.      I believe it's Bianca Holly.

 7   Q.      Okay.  Do you have any evidence -- well, strike

 8   that.

 9           Did you interview Bianca Holly?

10   A.      No, I didn't.

11   Q.      So you don't know if whether or not Gerald gave

12   her any money?

13   A.      No -- from interviewing her, no.

14   Q.      And Helen Beasley is clearly very upset in this?

15   Correct?

16   A.      Yes.

17   Q.      And do you know whether or not Gerald Beasley

18   bought her house full of furniture?

19   A.      No, I don't.

20   Q.      Okay.  Okay.  3a, which is 1672, this -- here

21   they're talking about preparation for a party that's

22   going to be held at the restaurant, correct?

23   A.      That's part of the call, yes.

24   Q.      Okay.  There was also a bar being built at that

25   property, correct?
```

1  A.    Uh, at the -- it's a different address than

2  1339.

3  Q.    But it's connected?

4  A.    Connected, yes.

5  Q.    Okay.  Okay, now you -- statement 5 -- or excuse

6  me, 4, this is between Gerald Beasley and Terry

7  Beasley.  Now, you attribute this to heroin

8  conspiracy --

9  A.    Yes.

10  Q.    -- correct?

11        And I believe your testimony was that the

12  statement that day before it, it was garbage, is

13  reference to heroin, correct?

14  A.    Correct.

15  Q.    Okay.  Then the line after that, Maybe it was

16  probably practically like Eric, what Eric did, do you

17  see that?

18  A.    Yes.

19  Q.    Okay.  That could certainly be a reference to

20  Eric Goodwyn who was Linda Beasley's son that Leonard

21  Carter said was a source of heroin for Gerald Beasley,

22  correct?

23  A.    It's possible.

24  Q.    Okay.  But you still believe that Gerald

25  Beasley's -- strike that.

1   A.    Well --

2   Q.    I'm going to move to 6a, that's 304.

3         This is a statement, I believe the first one

4   is Brandon Smith, Let me get my money together, I

5   really need to have to talk to your son for me cuz I

6   need one of them, let me get my ins together so I can

7   do both at the same time.

8         You don't know which son Brandon Smith is

9   talking about?

10  A.    Do I know for sure from that call?  He does not

11  say Antoine, no.

12  Q.    And he does not say Bebe?

13  A.    No, he does not.

14  Q.    So from this call you cannot tell which son he

15  is talking about?

16  A.    From looking at just that call by itself, no.

17  Q.    Okay.  And you had information that Gerald

18  Wilson dealt in kilo quantities of cocaine, correct?

19  A.    Yes.

20  Q.    Okay.  So when he says, Brandon Smith says,

21  'Cause I need one of them, he could be talking about

22  cocaine from Bebe?

23  A.    Not when you look at the other calls that

24  preceded this or came after it between him and Brandon

25  Smith.  I don't believe that's the case.

1            I believe when he talks about getting

2    something from Gerald's son that's his code for getting

3    marijuana.

4    Q.    Well, on the other calls when Brandon Smith is

5    talking about marijuana, he says "urkle"?

6    A.    On -- on some, yes.

7    Q.    On some.

8            Doesn't "urkle" mean marijuana?

9    A.    It's a type of marijuana, yes.

10   Q.    Okay.  So in some calls it will say urkle and

11   some calls will just say, I need one of them?

12   A.    Sometimes, yes.

13   Q.    Okay.  And what is "one of them"?  How much is

14   that?

15           Is that one ounce, one pound, one --

16   A.    It depends on the caller you're talking about,

17   the specific call.

18   Q.    Okay.  So you have no way of knowing what "one"

19   means?

20   A.    Well, I do when you look at the call and the

21   call that is preceded it, between them it tells you.

22   Q.    Okay.

23   A.    Sometimes those other preceding calls will tell

24   you what the next call is about.

25   Q.    Well, we're just looking at this call, Because I

1  need one of them.  How much is -- is that?  From this

2  call?

3          We don't have all the other calls in front of

4  us.

5  A.    Well, I believe "one of them" is most likely an

6  ounce of marijuana from -- from Antoine Beasley, is

7  what he is asking for.

8  Q.    Most likely?

9  A.    Yes.

10  Q.    Okay.  And the same with statement 10, that is

11  in two -- excuse me, 2400, again, asking about your

12  son.

13          We don't know which son he's talking about

14  there, do we?

15  A.    Again, he does not say Antoine or Gerald Wilson

16  by name.

17  Q.    Okay.  I want to take a look at these real

18  quick.  6a and b occur on March 28th, 2013 and 7, 8, 9,

19  and 10 occurred on April 4th, 2013, so that's about a

20  week between?  Correct?

21  A.    Could you repeat that?  I was trying to keep up

22  with you.

23  Q.    I'm sorry.  6a and 6b occurred on March 28th,

24  2013; statement 7, 8, 9, and 10 occurred on April 4th,

25  2013.

1      I'm just going off the chart that the

2  Government provided.

3  A.     Uh, 9 appears to have occurred on April 6th.

4  Q.     April 6th?

5  A.     Yes.

6  Q.     Okay.  And, well, I'm looking at the transcript

7  now, it looks like Number 10 occurred on April 8th?

8  A.     Correct.

9  Q.     Okay.  So that's even sort of a longer period of

10  time between these phone calls, correct?

11  A.     Compared to what?

12  Q.     Well, I mean, compared to the week I originally

13  thought it was.

14  A.     Yes.

15  Q.     Okay.

16  A.     Well, you're talking about the calls referenced

17  in 7, 8, 9, 10, is that correct?

18  Q.     Well, I was -- I was originally talking about 6a

19  and 6b occurring on March 28th --

20  A.     Oh.

21  Q.     -- 2013.

22  A.     Okay.

23  Q.     And then 7, 8, 9, and 10 all occurring,

24  according to this chart, on the same day, but I believe

25  that this chart may be incorrect, so I want to withdraw

```
 1   my question.
 2           Moving to statement 15.
 3           Now you indicated that this is a phone call
 4   between Antoine Beasley and Isaac Wood.
 5   A.    Yes, I believe that's the case.
 6   Q.    Okay.  Relating to a -- an earlier phone call
 7   with Carlos Beasley?
 8   A.    Yes.
 9   Q.    Okay.  And you believe that this was about
10   cocaine?
11   A.    Not necessarily.
12   Q.    Okay.  Okay.  It -- the original chart I have
13   attributes it to a cocaine conspiracy but you don't
14   necessarily believe it's cocaine?
15   A.    This specific call, I -- it could be marijuana.
16   Q.    Okay.  You just don't know?
17   A.    I don't know from that call, no.
18   Q.    Now, I want to talk about 16a because I am a
19   little confused about it.  This gets attributed to the
20   cocaine conspiracy and it's a discussion about iPads,
21   correct?
22   A.    Uh, yes.
23   Q.    Okay.  And, in fact, Antoine says, I'm just -- I
24   had just rolled through here, was going to grab them,
25   them iPads from you real quick.
```

```
 1            Gerald says:  Okay, it's -- it's one in there,
 2  I gotta get the other one.
 3            Antoine says:  Okay, yeah, he already up
 4  there, I'll just tell him.
 5            And Gerald says:  He's up there?
 6            And further down Gerald says, That one is in
 7  there, go ahead and give them that one but, I mean,
 8  it's two up there but one of them is cellular and I
 9  want to keep it --
10  A.    Mm-hmm.
11  Q.    -- is that correct?
12  A.    That's correct.
13  Q.    Okay.  So they're actually talking about iPads?
14  A.    No, I don't -- I don't -- yes, and no.
15  Q.    Okay.  You think that iPads is code?
16  A.    Yes, I believe in particular with this call
17  he's -- Antoine is talking about a person being up
18  there, that's Juan Ibarra who pulled in the parking
19  lot.
20  Q.    Okay.
21  A.    Antoine then has this conversation with Gerald
22  Beasley about getting those iPads.
23  Q.    Okay.
24  A.    And then on the surveillance, both physical
25  surveillance that day conducted by agents who were out
```

258

```
 1  there, or investigators, and then also from reviewing

 2  the footage obtained from the Tiara's Place video, it

 3  appears that Antoine meets with Juan Ibarra and

 4  provides him with iPad boxes.

 5  Q.    Okay.  Well, my review of it is Mr. Antoine

 6  Beasley gets two iPad boxes, walks back in two and then

 7  comes out with one iPad box, and then later Gerald

 8  Beasley shows up and gives him another one.

 9  A.    That sounds accurate.

10  Q.    Okay?

11  A.    I would have to review my notes.

12  Q.    So that would sort of coincide with what's going

13  on in this conversation?

14  A.    It does coincide with this conversation.

15  Q.    So but you think that iPads, and but one of them

16  is cellular and I want to keep it, is code for drugs?

17  A.    No, not that.  I believe he -- I believe Gerald

18  Beasley actually has iPads --

19  Q.    Okay.

20  A.    -- that he obtained, most likely they were

21  stolen ones.

22  Q.    Okay.

23  A.    And but they were using the boxes that the iPads

24  came in to ferry currency back and forth to the

25  Ibarras.
```

259

1  Q.    And you think this was an instance where they

2  were ferrying currency?

3  A.    Yes, I do.

4  Q.    So why would -- so "cellular" is now code for

5  what?

6  A.    That's not.  That's an actual -- there's an

7  iPad.  I believe Gerald is telling him, I got one of

8  those iPads that I have up here there is a cellular

9  one, don't use that one, don't use that box.

10 Q.    Okay.  Okay.  So -- so -- so this whole thing

11 that's going on here, we're talking about iPad boxes

12 but we're talking about cash, is what you're saying?

13 A.    That's my belief.

14 Q.    Okay.  But you know that from other intercepts

15 and interviews that Gerald Beasley does deal in,

16 sometimes, off-shelf property?

17 A.    That's correct.

18 Q.    Okay.  Okay.  But that's not the case here?

19 A.    No.

20 Q.    Okay.

21 A.    Because there's other information.

22 Q.    Okay.  Okay.  I want to talk now about 23, I

23 guess 23, that -- dealing with these phone calls with

24 Antoine Beasley and Carlos and everyone else.

25       The first call is Carlos Beasley to Antoine

1   Beasley, right?

2   A.      In this notebook?

3   Q.      Yeah, I want to start with 23a and just kind of

4   work my way through.  Okay?

5   A.      Yes, sir.

6   Q.      But that's the first phone call related to this?

7   A.      Yes.

8   Q.      Okay.  And at the time that this was going on,

9   June 3rd, Helen Beasley and Gerald Beasley were pretty

10  well in to separation, perhaps even their divorce, is

11  that correct?

12  A.      I believe they were separated, yes.

13  Q.      Okay.  I believe you testified that for part of

14  the time Gerald Beasley was staying at -- on Piatt?

15  A.      Correct.

16  Q.      Okay.  So, Gerald -- and I'm kind of combining

17  everything and I hope you can follow me, Gerald let

18  Terry keep something in a storage area that belonged to

19  Gerald and Helen, is that correct?

20  A.      Yes.

21  Q.      Okay.  When they separated, Helen switched the

22  lock, is that correct?

23  A.      From these calls, yes, it appears that way.

24  Q.      Okay.  And I'm just going by these calls, so if

25  I'm wrong, correct me.

261

```
 1            So Terry now wants this back?

 2   A.    Correct.

 3   Q.    Gerald won't call Helen because Helen's pissed

 4   at him?  Correct?

 5   A.    That would be a good assumption.

 6   Q.    Okay.  Carlos now intervenes with Antoine and

 7   says, Listen, talk to your -- talk to your father so my

 8   father can get his stuff out, or talk to your mother, I

 9   guess it is, actually.  Talk to your mother, let him

10   get this stuff out, correct?

11   A.    I'm sorry, could you rephrase that?

12   Q.    Carlos is asking Antoine to talk to his mother,

13   Antoine's mother so Carlos's father can get his stuff?

14   A.    Carlos is asking -- is --

15   Q.    Is asking Antoine to help his father get his

16   stuff back?

17   A.    Yes, yes.

18   Q.    Okay.  And Antoine through this whole thing is

19   saying, I got nothing to do with this; I don't know

20   anything about it; it's not my deal.

21   A.    At times he says that.

22   Q.    Okay.

23   A.    There's other times where he indicates he knows

24   exactly what's going on.

25   Q.    Okay.  But knowing what may be in there does not
```

1  mean that he is a part of it, correct?

2  A.    I don't agree with that statement.

3  Q.    Okay.  So, if he says, Look, I know my father

4  let your father put some stuff up there, none of my

5  business, I don't know anything about it, okay, it

6  could be money, it could be whatever, I don't know

7  anything about it, you think that's not a fair

8  statement?  For Antoine -- or a fair position for

9  Antoine to take?

10 A.    Again, could you rephrase the question, I'm

11 having a hard time understanding what the question

12 actually is.

13 Q.    Okay.  An -- Antoine may very well know there's

14 something in there, money or something in that storage

15 area that his father allowed Terry Beasley to put

16 there?

17 A.    Correct.

18 Q.    But you don't believe that Antoine can then say,

19 I have nothing to do with it?

20 A.    Well, he does say that.

21 Q.    Yeah, he does, several times, but you said that

22 that's not true.

23 A.    No, I said at times --

24 Q.    Okay.

25 A.    -- he says that.

263

```
 1   Q.    Okay.

 2   A.    But I said there is times where he makes

 3   statements that he knows exactly what's in there.

 4   Q.    Okay.  But knowing exactly what's in there, does

 5   that make him responsible for it?

 6   A.    If he knows that those are funds that are

 7   proceeds or intended for the use in drug transactions

 8   and he helps other co-conspirators to get that money

 9   out of there, yes, I do believe.

10   Q.    Can you show me the statement where Antoine

11   says, I know that those are drug proceeds and I know my

12   father let your father put them in there?

13   A.    Well, there's circumstantial evidence from the

14   calls that indicate that he knows that and that would

15   be when Helen Beasley says, Well, we're just going to

16   call the police and he's very quick to say --

17   Q.    Okay.

18   A.    -- no, no, no, no, don't do that, we're just

19   going to give them what's theirs.

20   Q.    Actually if you listen to the tape where Helen

21   says, I'm going to call the police, he just says, no,

22   let's get this over with, he doesn't go, no, don't call

23   the police, he says, no, mom, just -- let them get what

24   they need to get so --

25           THE COURT:  Where's the question here,
```

1  Mr. Pratt?

2          You're -- you're -- we can draw whatever

3  inferences we want to, it's a question of what's said.

4  And some inferences people are going to like and some

5  they aren't going to like but we do have the ability to

6  do that --

7          MR. PRATT:  All right.

8          THE COURT:  -- in a James hearing.  So let's

9  not forget we're not trying the case here --

10         MR. PRATT:  All right, Your Honor, I'll move

11 along.

12         THE COURT:  -- it's what's admissible.

13         MR. PRATT:  I'll move along.

14         THE COURT:  Thank you.

15 BY MR. PRATT:

16 Q.    Now, in this first conversation, 1551, Carlos

17 says, You got a lot more pull than you're acting like.

18 A.    Okay.

19 Q.    And he's talking about pull with his father, is

20 that correct?

21 A.    Yes, I believe he is.

22 Q.    All right.  He's not talking about juicing any

23 sort of criminal organization?

24 A.    Well, I don't know if you can separate the two

25 necessarily --

1    Q.    Okay.

2    A.    -- in -- in this circumstance.

3    Q.    Okay.  And at one point, Antoine tells Isaac

4    Wood, I'm done messing with Carlos, I'm done with him?

5    A.    Yes.

6    Q.    Okay.  But several times Antoine tells his

7    mother, Just let him get whatever -- whatever it is.

8    This is even before she mentions calling the police, he

9    says, Just let them get whatever they need?

10   A.    Um --

11   Q.    I'm looking at 1572 which is 3c, about -- about

12   a third of the way down on Page 718 of 788, Antoine

13   says, Let them get whatever it is and let them -- and

14   let's be through with them, is that correct?

15   A.    Yes, he says that.

16   Q.    Okay.  And it's not until -- it's not until 1578

17   that Helen first mentions calling the police, correct?

18   A.    I -- you know, I'd have to -- these aren't all

19   the calls pertaining to that incident.

20   Q.    Okay.

21   A.    I would have to look at the calls.

22   Q.    Of the calls in front of us, 1578 is the first

23   time Helen mentions the police?

24   A.    Yes, of the calls that are included in this

25   notebook, that appears to be the first one.

1  Q.   And she mentioned calling the police because

2  Carlos and Terry, as she puts it, kicking out some

3  threats, so she says, fine, I'll just call the police.

4  They're going to threaten me, I'll have the police come

5  down, they can watch whatever's going on.

6  A.   Yes, that -- that's what she says.

7  Q.   Okay.  Okay.  I want to back up real quick, I

8  think this may be my last question.

9       Statement 23b, this is -- or, excuse me,

10  Antoine Beasley to Isaac Woods, now, the quote that I

11  have on the sheet says, Pops parenthesis, Gerald

12  Beasley, closed paren, done allowed Uncle Terry to put

13  some money up.  Well mama done changed the lock to

14  whatever -- to wherever it's at.

15       Is that an accurate reading of the statement

16  23b on the sheet?

17       Do you have that sheet?

18  A.   Oh, you're talking on this?

19  Q.   Yes.

20  A.   The first part of this?

21  Q.   Yes, yes.

22  A.   On 23b?

23  Q.   Right now my question is, is that an accurate

24  statement of what is on the James hearing statement

25  chart?

1  A.    No, the -- the transcript in the actual

2  linesheet is slightly different.

3  Q.    It's slightly different than the <u>James</u> hearing

4  chart?

5  A.    Yes.

6  Q.    Okay.  The actual linesheet says, and I'm going

7  to quote, Nigga, apparently pops done allow Uncle Terry

8  to -- to -- to -- to put some money up while mama done

9  changed the locks to wherever it's at, mama done

10 changed the locks.  So the chart leaves out the word

11 "apparently."

12 A.    Yes, that appears to be correct.

13 Q.    Okay.

14       MR. PRATT:  I don't have any further

15 questions, Your Honor.

16       THE COURT:  Thank you.

17       Who wants to go next?

18       MR. KERNS:  I will.  My back hurts.

19       THE COURT:  Thank you, Mr. Kerns.

20       MR. KERNS:  I'll be quick, too, Your Honor.

21                  **CROSS EXAMINATION**

22 BY MR. KERNS:

23 Q.    Sir, you began talking early on about my client,

24 Herbert Jones, and I want to focus on questions that

25 deal with whether he was a member of this conspiracy

1  based upon your evidence at the time these statements

2  were made.  Are you with me?

3  A.    Yes.

4  Q.    You talked about how, uh, with my colleague, how

5  you found a pen register and on the pen register it

6  showed that Herbert had talked to Gerald Beasley?

7  A.    Yes, I believe that's the case.

8  Q.    Okay.  When?

9  A.    I'd have to review the pen register.

10  Q.    You talked about how he had an undercover cop go

11  in to his house and buy cocaine on two occasions?

12  Correct?

13  A.    Correct.

14  Q.    When?

15  A.    I believe that was in, I want to say 2011.

16  Q.    August 23rd and August 31st, 2011, correct?

17  A.    That sounds right.

18  Q.    Okay.  And you got this case to begin your

19  investigation in October of 2012?

20  A.    I got what case?

21  Q.    This call from the DA's office, Hey, we're

22  hearing a lot about Gerald Beasley, can you take look

23  at this, pull some of the history, your investigation

24  here, what began --

25  A.    Yes.

269

1   Q.    -- in October, 2012?

2   A.    That's correct.

3   Q.    Okay.  So, when did these pen registers show up

4   that show that my client was talking to either any of

5   these Beasleys?

6   A.    I -- I would have to, again, refer to the

7   reports because I don't have them in front of me to

8   give you the exact dates of when the pen registers were

9   established.

10  Q.    So if my -- if the Court is just trying to

11  figure out whether my client is a member of the

12  conspiracy at this certain time, what I hear you

13  telling me is you don't know when he met these guys,

14  correct?

15  A.    When he initially met them?

16  Q.    Yeah.

17  A.    Uh, you know, we had an interview with Charles

18  Torrence and during that, he told us that he had been

19  buying crack cocaine off of Herbert Jones for many

20  years and at one point he was sitting at Herbert

21  Jones's house and he didn't have any cocaine at the

22  time, they were waiting for what he believed to be the

23  source of supply, and it was Gerald Beasley who then

24  showed up and provided what he believed to be the

25  cocaine or crack cocaine to Herbert Jones.

270

```
 1   Q.    Okay.  And Charles Torrence, one of the
 2   individuals that you said was -- gave you a good
 3   interview, correct?
 4   A.    Yes, two of them.
 5   Q.    And you asked him specifically during that
 6   interview, hey, Do these Beasley guys give cocaine to
 7   Herbert Jones?  Real specific question, right?
 8   A.    I believe so, yes.
 9   Q.    And you recall he said, No, he's independent,
10   that was his word.  In fact, you even on the report
11   quoted it?  Independent.
12   A.    Right, I believe.
13   Q.    So what this informant that you deemed reliable
14   told you back then was, Herbert's independent of these
15   guys, he's got his own show going, correct?
16   A.    Correct, but I didn't believe -- he then went on
17   to elaborate that he may sometimes get and cocaine from
18   them from, specifically, Gerald Beasley, and then he's
19   also told us about that specific incident.
20   Q.    He didn't actually go on to elaborate, then Ron,
21   the guy who you're with, says, Well, wait, like, didn't
22   he get some from the Beasleys sometime?  And then he
23   goes, Probably, correct?
24   A.    I -- you know, without having the -- the
25   transcript or the report in front of me, I would feel
```

1  more comfortable reviewing that and telling you exactly

2  what he said and how he said it.

3  Q.    All right.  I want to focus on these two

4  undercover buys, August, 2011.  As we sit here today,

5  in 2016, my client never got charged with

6  any -- anything as a result of these two supposed

7  undercover buys, correct?

8  A.    Uh, I don't -- I don't believe so.

9  Q.    Right.  And if your investigation didn't begin

10 until October of 2012, I guess I want to ask the

11 question, why?  If you know, why wasn't he ever

12 prosecuted for selling cocaine to an undercover officer

13 on two occasions in 2011?

14 A.    I wasn't part of that original investigation in

15 Herbert Jones.  It's not unusual during a narcotics

16 investigations to wait to charge people.

17 Q.    Okay.  But your investigation didn't even start

18 until October, 2012, correct?

19 A.    That's correct.

20 Q.    Okay.  So, back -- I guess I want to go full

21 circle.  What evidence is there to suggest that any of

22 these Beasley guys had anything to do with the cocaine

23 that was supposedly used in a transaction in my

24 client's home in August, 2011?

25 A.    Again, I go back to the interview with Charles

272

1  Torrence, the fact that Herbert Jones was selling crack

2  cocaine to an undercover officer, and then the calls

3  that we intercepted between Gerald Beasley and Herbert

4  Jones where it's pretty apparent that Herbert Jones is

5  paying Gerald Beasley money and the surveillances where

6  we saw them go over there frequently.

7  Q.    Okay.  So what I think I hear you saying is,

8  Well, Mr. Kerns, because we have an October, 2013

9  interview with a Mr. Torrence, and he says Herbert's

10 been selling for years, and because we have subsequent

11 2013 phone calls intercepted where Mr. Beasley's going

12 over to pick up some money, that that means that back

13 in August of 2011, he must have had something to do

14 with that?  Is that the logic?

15 A.    Well, again, I would have to look at the

16 interviews exactly what Charles Torrence said as to how

17 long ago he had been purchasing cocaine from Herbert

18 Jones and when that relationship that he observed

19 between Herbert Jones and Gerald Beasley actually was.

20 Again, I don't recall off the top of my head an exact

21 date you provided for that.

22 Q.    Okay.  But at least in your report, when asked

23 the specific question by Mr. Torrence that you're

24 relying on about whether or not my client was supplied

25 by any of these Beasley people or anybody here, really,

273

1  his answer was, No, Mr. Jones is, quote, independent,

2  end quote, correct?

3  A.    Would I be able to review the transcript?

4  Q.    Absolutely.

5        MR. KERNS:  May I approach, Your Honor?

6        THE COURT:  Sure.  You don't have to ask

7  permission.

8        THE WITNESS:  Thank you, sir.

9        MR. KERNS:  I think I circled it towards the

10 bottom.

11       THE WITNESS:  Okay.

12 A.    Yes, that's correct, he did say that Jones was,

13 quote, independent.

14 BY MR. KERNS:

15 Q.    All right.

16 A.    But then he goes on to state, after I asked him

17 if Torrence was getting his, quote, stuff, referring to

18 drugs from Gerald Beasley.

19 Q.    So you're asking him a new question and in

20 response to your new question, he goes on to state --

21 A.    Torrence advised that Jones was probably getting

22 drugs from Gerald Beasley on occasion and that all them

23 dealt with each other, quote, here and there.

24 Q.    Okay.  So, to put it in nondrug dealing terms,

25 if K-Mart runs out of steak and runs to Dillons to get

274

1    some steak, what he is basically telling you is he's

2    independent but they all deal together on occasion, is

3    that correct?

4    A.    That -- that's what he's saying there, yes.

5    Q.    All right.  Other than Torrence, do any of your

6    other individuals that you deemed reliable, Carter,

7    Gilkey, Jones, did anyone else ever say anything about

8    Herbert Jones being a part of any kind of agreement

9    with the Beasleys?

10   A.    I don't -- I don't recall any specific

11   statements as to that.

12   Q.    Okay.  And so as it relates to these two buys

13   that you mentioned on direct examination, August 23rd,

14   2011, August 31st, 2011, none of the reports of the

15   officer going in and doing these buys mentions any

16   involvement in any of these other individuals, correct?

17   A.    That's correct.

18   Q.    None of the subsequent search warrant

19   applications -- in fact, a year later they do a search

20   warrant at my client's residence, nothing in that

21   affidavit that mentions anyone else, or anyone else

22   being involved in the basis to go in that house,

23   correct?

24   A.    Can you tell me what -- what affidavit you're

25   talking about?  I never obtained an affidavit for

1  Herbert Jones.

2  Q.    Oh, there was a search warrant August 9th, 2012

3  at his house.  Were you aware of that?

4  A.    I may have been but I'm not recalling it.

5  Q.    Okay.  Do you recall somebody else that was in

6  the house actually getting charged and Herbert Jones

7  not being charged with anything?

8  A.    No, I don't recall that.

9  Q.    Do you recall another search warrant in April of

10 2013 at his house, the one we kind of heard a phone

11 call about a little bit, Hey, the cops are over there,

12 remember?

13 A.    Yes, I remember that one.

14 Q.    And, again, my client wasn't charged with

15 anything as a result of that, correct?

16 A.    Of that search warrant that was done by you?

17 Q.    April -- the April, 2013 one, that we're talking

18 about in the phone call.

19 A.    I think he was arrested for possession of some

20 prescription pills, if I remember correctly.

21 Q.    Was he charged with anything?

22 A.    I -- I don't know.

23 Q.    Okay.  So -- so as it relates to I guess the

24 four instances that we have evidence on, the two buys

25 with the undercover, and two search warrants, one in

1    '12, one in '13, as far as you know, he's never been

2    charged with anything as a result of those four

3    incidents, correct?

4    A.    From the -- the buys?

5    Q.    Right.

6    A.    And then those two search warrants?

7    Q.    Correct.

8    A.    Not to my knowledge.

9    Q.    And other than Mr. Torrence and his initial

10   statement that Herbert's independent, followed up with

11   a question of, Well, would he ever get it from them and

12   he is saying, Well, they all work together now and

13   then, that's the only guy we have to say my client had

14   anything to do with any of these other individuals,

15   correct?

16   A.    As far --

17   Q.    That you're aware of?

18   A.    As far as I can recall.  There was other

19   interviews done with other people.  I would have to go

20   through them to see if they made mention of Mr. Jones

21   or not.

22   Q.    Okay.  But as you sit here having prepared for

23   the James hearing in determining who's a member of a

24   conspiracy, at what time, your best recollection is

25   what you've already testified to and nothing more,

1  correct?

2  A.    Yes.

3         MR. KERNS:  Thank you.

4         THE COURT:  Next?

5         MR. WACHTEL:  I can go fairly quickly, Your

6  Honor.

7         THE COURT:  Thank you, Mr. Wachtel.

8                    **CROSS EXAMINATION**

9  BY MR. WACHTEL:

10  Q.    Detective, my name is Val Wachtel, I represent

11  Gerald Wilson.  And when I said I could go quickly, I

12  was telling the truth.

13         I'm having trouble remembering this late in

14  the day.  How many -- how many phone calls were -- were

15  tapped and reviewed in this case?  Do you remember?

16  A.    How many phones?

17  Q.    How many phone calls.  How many phone calls

18  were -- were reviewed by the Government in this case?

19  A.    I would have to look at the -- the linesheets

20  to -- to tell you the total, but it was thousands.

21  Q.    Thousands.  That works for me.

22  A.    Okay.

23  Q.    The only phone call I have in my Exhibit 1 that

24  is attributed to Gerald Wilson is session 3075 and I

25  notice in that, when I read the synopsis -- and the

1  transcript, right, that the caller is referred to as

2  34, did --

3  A.    Yes.

4  Q.    Do you know why that is?

5  A.    It's the process that's used when monitoring the

6  intercept when we get a call from a person that hasn't

7  been verified as to their identity we refer to them as

8  an unknown male or unknown female.

9  Q.    Or caller 34?  Or 52?

10  A.    Yes, until we obtain more information to where

11  we feel like we can identify them.

12  Q.    And assuming for the sake of argument that you

13  got the identification right, do you know where

14  Mr. Wilson was when he made this call, because he was

15  who the call came from him, right?

16  A.    Yes.

17  Q.    Do you know where he was?

18  A.    I don't.

19  Q.    Do you know how he learned about this?  That

20  which he reported?

21  A.    I don't.

22  Q.    Do you know who Virginia is?

23  A.    I don't.

24  Q.    Do you know when -- I'm assuming this call had

25  to do with a police search.  Do you know when

1  Virginia's residence was searched?

2  A.     I'd have to look at the reports.

3  Q.     Okay.

4  A.     I believe it was the day of that call.

5  Q.     I suspect, yeah.

6         MR. WACHTEL:  Okay.  Thank you very much.  I

7  don't have any further questions.

8         THE COURT:  Thank you.

9         Next?

10        MR. FALK:  Me.

11                    **CROSS EXAMINATION**

12 BY MR. FALK:

13 Q.     Officer -- or, excuse me, Special Agent, I

14 represent Mr. Stephen Smallwood, so I'm going to try

15 and keep my questions limited to Count 17, because

16 that's the only thing he's charged in.  Okay?

17        Now then, according to the Government's

18 listing that they gave us today, the first phone call

19 that appears in the notebook which they gave us is

20 telephone conversation number 1, and it's behind Tab 1,

21 correct?

22 A.     Correct.

23 Q.     Okay.  And that is a verbatim transcript that

24 was prepared of that conversation, correct?

25 A.     In the linesheet, yes, that's -- that's a

1    transcript made by whoever is monitoring that call or

2    transcribed it later.

3    Q.    Okay.  And you've had lots of opportunity to

4    review these phone calls, haven't you?

5    A.    Yes.

6    Q.    You've listened to the recordings, right?

7    A.    Yes.

8    Q.    You've also reviewed the transcripts, correct?

9    A.    Yes.

10   Q.    Okay.  Is there anything about the transcript on

11   this conversation that's inaccurate?

12   A.    Not that I know of.  Now that's not to say that

13   there's not errors occasionally in the transcription on

14   these calls.

15   Q.    When you've read through these transcripts in

16   preparation for your testimony here today, you compared

17   them to the -- you compared the transcripts with the

18   audio recordings, did you not?

19   A.    Not in preparing for this hearing, no.

20   Q.    Okay.  But you have in the past done that?

21   A.    Yes.

22   Q.    And if you had found something that was

23   obviously wrong you would have changed it, wouldn't

24   you?

25   A.    I don't have the ability to change these

```
 1  linesheets.
 2  Q.    Okay.  Well, you would have --
 3        THE COURT:  I'm sorry, Mr. Falk, I'm having
 4  trouble hearing you when you're away.  You can pull the
 5  mike out TO the side if you prefer to be there.
 6        MR. FALK:  I'm sorry.
 7  BY MR. FALK:
 8  Q.    When you listened to the tapes, and compared
 9  them with the transcripts, if there was something that
10  was obviously wrong, you would have brought that to
11  someone's attention, would you not?
12  A.    If -- if it was beyond a simple spelling mistake
13  or -- or something like that.  If it was something of
14  substance, absolutely.
15  Q.    Okay.  Now, again, going back to the front,
16  there are little -- the -- what I'm going to refer to
17  as the cheat sheet, the Government's listing of
18  everything here.
19        They say that the first comment made by any
20  one is 1c, that involves Mr. Stephen Smallwood,
21  correct?
22        His name doesn't appear on 1a, or 1b and it's
23  not talking about any counts other than Count 28 until
24  we get to that conversation.
25  A.    These are not all inclusive of their
```

1    conversations.

2    Q.    I understand.  But that's the first one that

3    names Stephen Smallwood in who this evidence is being

4    offered against, correct?

5    A.    Yes.

6    Q.    Okay.  Now then, Mr. Smallwood's name does not

7    appear anywhere in that document, does it?

8    A.    Well, which document?  The linesheet?

9    Q.    No, I -- let me rephrase.

10          The transcript which is behind Tab 1 makes

11   absolutely no mention of Stephen Smallwood.

12   A.    That -- that is correct.

13   Q.    Okay.  Now then, the next one which is being

14   offered against Stephen Smallwood is part of a

15   telephone conversation that took place between Gerald

16   Beasley and Anita Burkley on 4-5 of 2013, correct?

17   A.    Yes, that's correct.

18   Q.    Okay.  And, it appears after the tab, correct?

19   A.    Yes.

20   Q.    Okay.  And there is nothing -- when you reviewed

21   the transcript and compared it to the tape, did you

22   find that there was anything in that conversation that

23   referenced Mr. Stephen Smallwood?

24   A.    In -- not in this call, no.

25   Q.    Now then, let's turn to the next one, that is 3,

1  that is a telephone conversation between Gerald Beasley

2  and Antoine Beasley, correct?

3  A.    Yes.

4  Q.    And, again, that evidence 3a and 3b, that's all

5  part of the same conversation, right?

6  A.    Yes.

7  Q.    And nowhere in that conversation is

8  Mr. Smallwood mentioned, correct?

9  A.    That's correct.

10 Q.    And there's no references to him, either, are

11 there?  In the third tab?

12 A.    Yes, that's -- that's correct.

13 Q.    Okay.  Now then, turning to Number 4, that's the

14 next item of evidence that's being offered against

15 Stephen Smallwood, correct?

16        Going down through the notebook.

17 A.    Yes, that's correct.

18 Q.    Okay.  And, again, that's a recorded

19 conversation between Gerald Beasley and Terry Beasley,

20 is that right?

21 A.    That is correct.

22 Q.    And nowhere in that conversation is

23 Mr. Smallwood's name mentioned?

24 A.    That's correct.

25 Q.    And nowhere in that conversation is there any

284

1  reference to Mr. Smallwood?

2  A.    That's correct.

3  Q.    Now then, let's turn to Number 5.  Okay?

4         That is a conversation which took place

5  between Stephen Smallwood and Gerald Beasley, according

6  to your transcript, correct?

7  A.    Correct.

8  Q.    How did you know that the party on the other end

9  of the phone was Stephen Smallwood?

10  A.    Well, it's a phone number that was identified as

11  belonging to Stephen Smallwood.

12  Q.    Okay.

13  A.    I believe there was other calls where he might

14  mention or address him as Stephen.  But I did not

15  actually see him making the call, so...

16  Q.    Well, the 316-409-4284 --

17  A.    Mm-hmm.

18  Q.    -- that's Mr. Beasley's number, correct?

19  A.    Correct.

20  Q.    And the associated number, 316-871-1442?

21  A.    Correct.

22  Q.    Whose telephone number is that?

23  A.    It belonged to Stephen Smallwood.

24  Q.    Now then, going through this, there are five

25  different parts of this that are being used, is that

285

1  correct?  5a, b, c, and -- excuse me, up through e,

2  correct?

3  A.    Actually, it goes through 5g.

4  Q.    Well, that's actually a separate conversation,

5  though, is it not?

6         Items 5a --

7  A.    Yes.

8  Q.    -- through 5e pertain to the conversation

9  between Gerald Beasley and Stephen Smallwood?

10  A.    That's correct.

11  Q.    Okay.  We'll get to the other conversation in a

12  moment.

13         Now, again, you've had an opportunity to

14  compare the transcript of that conversation with the

15  audio recording, is that correct?

16  A.    Yes.

17  Q.    Okay.  And, again, you didn't find any

18  discrepancies, correct?

19  A.    Nothing of substance that I remember.

20  Q.    Okay.  Now, you say that based upon how you

21  would interpret this, that they're talking about money

22  owed by my client to Mr. Beasley, correct?

23  A.    Yes.

24  Q.    And your basis for drawing that inference is all

25  these 3,000 plus telephone conversations you've

1  listened to, correct?

2  A.    That's part of it.

3  Q.    Okay.  Let's talk about that for just a minute.

4        This and perhaps one other are the only two

5  conversations that Mr. Smallwood has with anyone

6  associated with the wiretaps in these cases, isn't that

7  correct?

8  A.    No, there's other calls besides this one between

9  Stephen Smallwood and Gerald Beasley.

10 Q.    Does the conversation set forth as part of the 5

11 tab mention heroin?

12 A.    Not by name, no.

13 Q.    Okay.  In other words, you're asking this Court

14 to adopt your interpretation of the plain language that

15 appears in these statements?

16 A.    Yes.

17 Q.    Let's turn to the 5e and f.

18        Excuse me, f and g.

19        Those are part of a conversation between

20 Gerald Beasley and Terry Beasley, correct?

21 A.    Correct.

22 Q.    Okay.  And all -- and that particular

23 conversation asks whether or not Gerald has seen

24 someone that day, correct?

25 A.    Yes.

1  Q.    And Gerald tells Terry, yes, he has seen them,

2  correct?

3  A.    At first he asks him if he talked to someone

4  that morning.

5  Q.    Mm-hmm.

6  A.    And then Gerald states, Yeah.

7  Q.    And then Terry asks, Yeah, already, you have

8  already seen him?

9        The response by Gerald Beasley:  I said yes,

10  Terry?

11  A.    Correct.

12  Q.    Okay.  Now, none of the cameras or pole cameras,

13  whatever the proper name for them is, I know I'll

14  butcher that, they don't show Gerald Beasley and my

15  client getting together that morning anywhere, do they?

16  A.    Not to my knowledge, no.

17  Q.    Thank you.

18        Now, the next item which the Government is

19  offering against my client, I believe is item 11, so we

20  get to fast forward.

21        Item 11 is being offered against Stephen

22  Smallwood again, correct?

23  A.    Correct.

24  Q.    Okay.  Nowhere in that document is there any

25  mention of Mr. Smallwood, correct?

1    A.    Correct.

2    Q.    Okay.  It's talking about Little Brother and Big

3 Brother, right?

4    A.    Uh, correct.

5    Q.    And Mr. Beasley -- Mr. Smallwood is not either

6 Little Brother or Big Brother, is he?

7    A.    I don't believe he is, no.

8    Q.    Okay.  Now, the next item that you offer is

9 still part of that same conversation where Antoine is

10 saying to Terry Beasley -- or excuse me, to Gerald

11 Beasley, That Uncle Terry show me game.  Uncle Terry

12 show his son some action, right?

13    A.    Correct.

14    Q.    That, again, does not mention Mr. Smallwood,

15 does it?

16    A.    That's correct.

17    Q.    And there's no reference in that entire

18 telephone conversation to Mr. Smallwood, correct?

19    A.    Correct.

20    Q.    Okay.  Now, the next item is Number 12 and that

21 is a telephone conversation which occurred on 4-2 of

22 2013 between Anita Burkley and Gerald Beasley, correct?

23    A.    Correct.

24    Q.    And that is the one where you testified on

25 direct examination she slipped and said Steve, and you

1  took that to mean that it was Steve Smallwood, correct?

2  That was your testimony on direct examination.

3  A.    Could -- could I see the, um...

4  Q.    Well, look at item 12 which follows that.  Item

5  12 is the verbatim transcript?

6  A.    Right.

7  Q.    Okay.  That's referenced in the note 12,

8  correct?

9         I mean, I'm assuming that the Number 12 on the

10  cheat sheet applies to Tab 12, would that be a logical

11  assumption?

12  A.    Yes.

13  Q.    Okay.  And that is a verbatim transcript, you've

14  identified that all of these were verbatim transcripts,

15  correct?

16  A.    As the transcript made at the time of the call,

17  correct.

18  Q.    Okay.  Now then --

19  A.    Or shortly thereafter, I should say.

20  Q.    Nowhere in this transcript does the name Steve

21  appear?

22  A.    Not in this transcript, no.

23  Q.    Okay.  And this is a verbatim transcript of the

24  conversation, correct?

25  A.    Um, that was made at that time.

1  Q.    And you compared the transcript to the audio

2  yourself, didn't you?

3  A.    Yes.

4  Q.    Okay.  And you didn't tell anybody this needed

5  to be changed, did you?

6  A.    I can't change this linesheet, that's what I

7  stated earlier.

8  Q.    Okay.  Let me rephrase the question then.

9        Did you make anyone aware that there was some

10 omission, like somebody's name that should be on here

11 that is not?

12 A.    There's a call between Gerald Beasley and Anita

13 Burkley where I believe that the word "he" was

14 mistranscribed and should have said "Steve" and I did

15 point that out to the U.S. Attorney's Office.  I don't

16 know if it is this particular call, that's the issue

17 I'm having.

18 Q.    Okay.  Would you agree with me that the name

19 Steve does not appear in this transcript?

20 A.    It does -- that is correct.

21 Q.    Okay.  And this transcript is verbatim of the

22 audio and you've compared it?

23       THE COURT:  You've already covered that three

24 times now, Mr. Falk, and I've got your point here.

25       MR. FALK:  Okay.

1  BY MR. FALK:

2  Q.    I believe the next item dealing with the cocaine

3  conspiracy -- or excuse me, the heroin conspiracy,

4  Count 17, is item 14 and, again, there's no reference

5  in item Number 14 to Mr. Smallwood?

6  A.    That's correct.

7  Q.    Now, the next item -- the next item is Number 16

8  and, again, that's a telephone conversation between

9  Antoine Beasley and Gerald Beasley, correct?

10  A.    Correct.

11  Q.    Okay.  And that has nothing to do with Stephen

12  Smallwood.  There's no mention of Mr. Smallwood,

13  correct?

14  A.    There's no mention of him.

15  Q.    Number 17 -- excuse me.  Strike that.

16        The next one would be Number 19 that's offered

17  against my client.  Again, no references to Mr.

18  Beasley -- or excuse me, to Mr. Smallwood in that?

19  A.    That -- that's correct, he's not mentioned by

20  name there.

21  Q.    And the same is true of all of these

22  transcripts, save the one that is 5, the one that's

23  behind Tab 5?

24  A.    Yes.

25  Q.    Okay.  Now, you said that you relied upon some

292

1  interviews that you did, specifically Leonard Carter

2  and a Steve Gilkey, correct?

3  A.    Those were two of them, yes.

4  Q.    Okay.  They're the only two out of all the

5  interviews that were conducted that mentioned

6  Mr. Smallwood, correct?

7  A.    No.  Charles Torrence also mentioned

8  Mr. Smallwood.

9  Q.    Charles who?

10  A.    Torrence.

11  Q.    When was he interviewed?

12  A.    He was interviewed two times and, again, I would

13  have to refer to the reports for the exact dates.  But

14  it was following the conclusion of the wiretaps.

15  Q.    Now, isn't it true that one of these

16  individuals, specifically Mr. Carter, told you -- and

17  this is somebody who you found to be a reliable

18  informant, correct?

19  A.    Well, I believe the information he provided to

20  us was corroborated by what we observed or heard from

21  other people we interviewed, yes.

22  Q.    And he told you there was no connection between

23  Gerald Beasley and Stephen Smallwood, didn't he?

24  A.    Well, Leonard Carter was interviewed twice and

25  the first time he did make reference that he obtained

1 heroin through -- or from Stephen Smallwood and that in

2 his opinion he could tell that that was the same heroin

3 that Gerald Beasley was also selling.

4 Q.    He said that in his statement given on October

5 25th, 2013 or in his statement given in January of

6 2014?

7 A.    I believe that was the first time when we

8 interviewed him.

9 Q.    Have you had an opportunity to review the

10 transcript which was prepared by Lissa Whittaker and

11 reviewed by Sara Gardner with regard to that interview?

12 A.    I have.

13 Q.    And you were one of the three detectives who

14 conducted that interview, were you not?

15 A.    The first interview, yes.  There was three of

16 us.

17 Q.    Okay.  Were you not present for the second one?

18 A.    I was, I was present for the second one, as

19 well.

20 Q.    Do you recall him telling you during that first

21 interview that he just thought Gerald was messing

22 around with cocaine, didn't know he was selling heroin?

23 In the first interview?

24 A.    I'm sorry, could you repeat that?

25          MR. FALK:  May I, Your Honor?

```
 1            THE COURT:  Sure.  You don't have to ask
 2  permission, either.
 3            THE WITNESS:  Thank you.
 4  BY MR. FALK:
 5  Q.     Look at Page 21 of that transcript and see if
 6  that doesn't refresh your recollection.
 7  A.     Could -- could you repeat your question?
 8  Q.     My question was, didn't he tell you he wasn't
 9  aware Gerald Beasley was selling heroin?
10  A.     No, that's not what he's saying there.
11  Q.     That's not what he's saying there?
12  A.     No.  And, in fact, are you talking about what
13  you have highlighted here?
14  Q.     Yes.
15  A.     No, he's actually talking about Stephen
16  Smallwood there and Stephen Smallwood's involvement in
17  selling cocaine.
18  Q.     Where he says, I just thought Gerald was messing
19  around with cocaine, that's not referring to Gerald
20  Beasley?
21  A.     That part there?  You have other parts that were
22  highlighted and that's what I was reading.
23            Yeah, I mean, according to this transcript,
24  and I don't even know if this is the corrected one that
25  you have --
```

295

```
 1   Q.     It's what I received from the Government.

 2   A.     Okay.  But according to this one and, again,

 3   I've gone through these and corrected these and there

 4   were some changes that were made to these transcripts

 5   and which of that I have done for the past few weeks,

 6   so unless you received this in the past few weeks, I

 7   can't verify that this is correct or not but according

 8   to this, he is first asked, When I got back to Gerald,

 9   I guess I got lost again on that, I mean you been

10   knowing him so long you're telling me until recently

11   you didn't start getting from him.

12         Leonard Carter states, Well, really, we really

13   what the deal was with Gerald that when I -- when I

14   actually found out that -- that, you know, I just

15   thought Gerald was messing around with cocaine, which

16   means he knew Gerald to be a cocaine distributor and

17   didn't know at one point that he had become involved in

18   heroin.

19         He then goes on to state, I didn't actually

20   know that he was into heroin, you know, and until one

21   day I was up there and I was at the cafe and he had

22   this one guy named JJ on the side of his building, and

23   he goes on to explain how he was doing some work on the

24   restaurant and then got paid in heroin by Gerald

25   Beasley.
```

296

```
 1   Q.    Okay.  Now, in the second interview --
 2         THE COURT:  Mr. Falk, how much longer do you
 3   have to go?
 4         MR. FALK:  I have just this one last
 5   transcript, Your Honor.
 6         THE COURT:  Okay.
 7         MR. FALK:  I'll make it short.
 8         THE COURT:  We'll break for the day after that
 9   then.  Thank you.  Go right ahead.
10   BY MR. FALK:
11   Q.    The second interview of Leonard Carter on
12   1-15-14, when asked specifically if there was a
13   connection between Mr. Smallwood and Mr. Beasley, he
14   said no, there wasn't, didn't he?
15   A.    Again, I'd have to refer to the transcript of
16   the report to be accurate.
17   Q.    I marked it there.
18         I'll withdraw the question.
19         I have nothing further of this witness.
20         THE COURT:  Thank you, Mr. Falk.
21         Well, folks, we're going to call it a day.
22   We'll start up again tomorrow morning at 9 o'clock,
23   where we left off this evening and I hope y'all have a
24   good evening, take care, and we'll see you in the
25   morning.
```

297

1          Thanks so much.

2          MS. JACOBS:  Your Honor, do you mind if I ask,

3   are we able to leave some of our documents and papers

4   in here?  Does the Court mind?

5          THE COURT:  Sure you can.

6          MS. JACOBS:  Okay.

7          THE COURT:  Yeah, we'll lock it up.

8          MS. JACOBS:  Thank you, Your Honor.

9          THE COURT:  You're welcome.

10          (Proceedings recess at 5:10 p.m. and commence

11          the following day, which proceedings are

12          contained in Volume 2.)

13

14

15

16

17

18

19

20

21

22

23

24

25