298

```
 1              IN THE UNITED STATES DISTRICT COURT
                      DISTRICT OF KANSAS
 2

 3  THE UNITED STATES OF AMERICA,

 4              Plaintiff,

 5         vs.                        District Court
                                      Case Number
 6  GERALD BEASLEY,                   13-10112-01
    ANTOINE BEASLEY,                  13-10112-03
 7  CARLOS BEASLEY,                   13-10112-04
    HELEN BEASLEY,                    13-10112-05
 8  TERRY BEASLEY,                    13-10112-06
    HERBERT JONES,                    13-10112-07
 9  WILLIAM PARKER, III,              13-10112-08
    STEPHEN SMALLWOOD,                13-10112-10
10  BRANDON SMITH,                    13-10112-11
    GERALD WILSON,                    13-10112-12
11                                    Volume 2
                Defendants.
12

13              TRANSCRIPT OF PROCEEDINGS

14         On the 12th day of April, 2016 at 9:05 a.m.
    came on to be heard in the JAMES hearing in the
15  above-entitled and numbered cause before the
    HONORABLE J. THOMAS MARTEN, Judge of the United States
16  District Court for the District of Kansas, Sitting in
    Wichita.
17         Proceedings recorded by mechanical
    stenography.
18         Transcript produced by computer.

19

20  APPEARANCES

           The Plaintiff appeared by and through:
21              Ms. Michelle Jacobs
                Mr. Aaron Smith
22              Assistant United States Attorneys
                301 N. Main, Suite 1200
23              Wichita, Kansas 67202

24

25
```

```
1           The Defendant, Gerald Beasley, appeared in
   person, by and through:
2               Mr. Michael D. Hepperly
                Michael D. Hepperly Law Office, Chtd
3               310 W. Central, Suite 119
                Wichita, KS 67202
4
            The Defendant, Antoine Beasley, appeared in
5  person, by and through:
                Mr. James Pratt
6               Pratt Law Office, LLC
                445 N. Waco
7               Wichita, KS 67202

8           The Defendant, Carlos Beasley, appeared in
   person, by and through:
9               Mr. Mark A. Sevart
                PO Box 781602
10              Wichita, KS 67278

11          The Defendant, Helen Beasley, appeared in
   person, by and through:
12              Mr. Kevin Loeffler
                Law Office of Kevin Loeffler
13              111 E. 7th
                Newton, KS 67114
14
            The Defendant, Terry Beasley, appeared in
15 person, by and through:
                Ms. Kari Schmidt
16              Conlee, Schmidt & Emerson, LLP
                200 W. Douglas, Suite 300
17              Wichita, KS 67202

18          The Defendant, Herbert Jones, appeared in
   person, by and through:
19              Mr. Kurt P. Kerns
                Ariagno, Kerns, Mank & White
20              328 N. Main
                Wichita, KS 67202
21
            The Defendant, William Parker, III, appeared
22 by and through:
                Mr. Edward C. Robinson
23              Robinson Law, LLC
                105 S. Broadway, Suite 1170
24              Wichita, KS 67202

25
```

1           The Defendant, Stephen Smallwood, appeared by
2   and through:
            Mr. Roger Falk
            Roger Falk Law Office, PA
3           301 W. Central
            Wichita, KS 67202
4
            The Defendant, Brandon Smith, appeared in
5   person, by and through:
            Ms. Sylvia B. Penner
6           Fleeson, Gooing, Coulson & Kitch, LLC
            1900 Epic Center
7           301 N. Main
            Wichita, KS 67202
8
            The Defendant, Gerald Wilson, appeared in
9   person, by and through:
            Mr. John V. Wachtel
10          Klenda Austerman, LLC
            1600 Epic Center
11          301 N. Main
            Wichita, KS 67202
12

13

14

15

16

17

18

19

20

21

22

23

24

25

301

```
 1                          INDEX

 2   Reporter's Certificate                      401

 3   WITNESS FOR THE PLAINTIFF:
         JASON FULLER
 4           Cross Examination by Ms. Schmidt    302
             Cross Examination by Mr. Loeffler   328
 5           Cross Examination by Mr. Robinson   338
             Cross Examination by Ms.  Penner    345
 6           Cross Examination by Mr. Sevart     367
             Redirect                            385
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Proceedings commenced at 9:05 a.m.)

 2              THE COURT:  Special Agent, if you'd come back

 3     up, take the stand again.

 4              Still under oath.

 5              THE WITNESS:  Yes, sir.

 6              THE COURT:  All right.  Ms. Schmidt.

 7                         JASON FULLER,

 8     recalled as a witness on behalf of the Plaintiff,

 9     having been previously and duly sworn, testified

10     further as follows:

11                       CROSS EXAMINATION

12     BY MS. SCHMIDT:

13     Q.    Good morning.

14     A.    Good morning.

15     Q.    Are you well rested?

16     A.    Somewhat.

17     Q.    I represent Terry Beasley in this case, Agent

18     Fuller, and I think what I'd like to do, do you have

19     the notebook in front of you, Exhibit 1?

20     A.    I do not.

21     Q.    Let me get him a copy.

22              And Exhibit 1 is the notebook that the

23     Government gave to us yesterday that has the index of

24     the original filing with the statements and then the

25     tab statements, is that correct?
```

```
 1   A.    That's correct.
 2   Q.    Okay.  I just wanted to make sure we're working
 3   from the same document.
 4         I'm going to just follow through and go
 5   through tab by tab.  I think that's probably the
 6   easiest organization here.
 7         So I want to start with what is marked Tab 1,
 8   this is session 980 from May 22nd, 2013.  Is that
 9   correct?
10   A.    That's correct.
11   Q.    And Mr. Terry Beasley is not a party to this
12   call, is he?
13   A.    No, he is not.
14   Q.    This is a call between Antoine Beasley and his
15   mother, Helen Beasley, isn't it?
16   A.    That's correct.
17   Q.    And am I correct that this -- this start time,
18   and I'm not real good at military time, I'll be the
19   first to admit, I have to subtract 12 every time, but
20   in this case it appears that the call occurs at 9:30
21   a.m., that would be in the morning, is that correct?
22   A.    9:38 a.m., correct.
23   Q.    But it's in the morning, right?
24   A.    Yes.
25   Q.    Okay.  I would direct your attention to Page 508
```

1  and in my review of this particular document, the only

2  place that Terry Beasley is mentioned is at the bottom

3  of Page 508 where there's a statement by Antoine

4  Beasley that Uncle Terry and them used to stay there,

5  is that correct?

6  A.    Could you tell me again where that's at?

7  Q.    I'm sorry, it's at -- if you look at the page

8  numbers that are on the bottom, right hand corner of

9  each of the documents, it's on Page 508 of 788.

10  A.    Yes, that's correct.

11  Q.    Okay.  And, now, if you would turn back to Page

12  507 of 788, about the middle of the page, there is a

13  statement by Helen Beasley and it says -- it's talking

14  about -- it starts out with, She made that clear last

15  night that she's going down there today, do you see

16  where I am?

17  A.    Yes, I do.

18  Q.    Okay.  And that goes on and several sentences,

19  and then it starts out, this is still Helen Beasley,

20  Like I told him, you need to come and get your stuff

21  out of here.  Do you see that?

22  A.    I do.

23  Q.    So the word "stuff" in that context, it's

24  probably talking about furniture, clothing, those types

25  of things, isn't it?

1  A.     I would believe so.

2  Q.     And then if you go down a little bit, about four

3  or five lines later, Helen Beasley also again talking,

4  and she says, I don't even want to be in that, just be

5  trying to talk to you 'cause it be stuff that I did and

6  learned.

7        And again, the word "stuff" is just

8  referencing vague information, isn't it?

9  A.     That's correct.

10 Q.     And I believe as you testified earlier, I don't

11 remember whose cross examination it was, you agreed

12 that this phone call between Antoine Beasley and Helen

13 Beasley, it's primarily, if not exclusively, about the

14 fact that Helen Beasley is extraordinarily upset at her

15 husband, Gerald Beasley, for sleeping around with other

16 women, is that correct?

17 A.     That's fair to say.

18 Q.     And, in fact, there is even one place where the

19 transcriptionist notes that she is crying, and then

20 there is another place where the transcriptionist notes

21 that Antoine Beasley sniffs.  Isn't that correct?

22 A.     Uh, yes, I believe so.

23 Q.     And as it relates to phone call 980, even if, as

24 there's been testimony, Gerald Beasley signed for a car

25 or bought furniture or those other things, at least as

1  it relates to this telephone call, there's absolutely

2  nothing that indicates Terry Beasley had anything to do

3  with that, is there?

4  A.    With cosigning for the car?

5  Q.    Or buying furniture for Gerald Beasley's

6  girlfriends or any of those things.

7  A.    That's correct.

8  Q.    And it's also correct that there's absolutely

9  nothing indicating that Terry Beasley even, in this

10  phone call, even knew anything about those things, is

11  there?

12  A.    That's correct.

13  Q.    Now, I would direct your attention to Tab 2,

14  which is phone call 1799 between Anita Burkley and

15  Gerald Beasley on April 5th, 2013.  It appears to be

16  about 10 o'clock at night, is that correct?

17  A.    At 10:51 p.m.

18  Q.    Closer to 11:00, actually, I guess?

19  A.    Correct.

20  Q.    In this particular telephone call there's

21  absolutely no reference to Terry Beasley, is there?

22  A.    That's correct.  Not by name.

23  Q.    Not by name.

24       If I ask that question, let me just say for

25  purposes of the remainder of the cross examination, I

307

1  am referring to by name.

2  A.    All right.

3  Q.    So I will try and qualify that for the record

4  but if I forget, please remind me.

5        Tab Number 3, that is call number 1622 dated

6  April 5th, 2013 between Antoine Beasley and Gerald

7  Beasley at 3:56 in the afternoon, is that correct?

8  A.    Correct.

9  Q.    This telephone call represent -- or, excuse me,

10  references someone named Big John.  Do you know who Big

11  John is?

12  A.    Uh, not for certain, no.

13  Q.    And Terry Beasley is not a party to this call,

14  correct?

15  A.    That's correct.

16  Q.    And there's no reference to Terry Beasley by

17  name, is there?

18  A.    No, there's not.

19  Q.    Moving on to Exhibit 4, Tab 4.  This is session

20  525 dated March 29th, 2013.  This is also at 9:31 p.m.,

21  is that correct?

22  A.    That's correct.

23  Q.    And this is a telephone call between Terry

24  Beasley and Gerald Beasley?

25  A.    Correct.

1    Q.    If you look at the bottom, kind of big paragraph

2  there at the bottom of the page, it's Gerald Beasley

3  speaking, and this is the paragraph that you previously

4  discussed use of the word "garbage" and then it goes on

5  to say, You know and I told them to keep of that shit.

6  I wouldn't, you know, if I could tell it first, I

7  wouldn't.

8            Oh, excuse me, I skipped a line.

9            Tomorrow might is they, they made some

10  promises.

11            Then it goes on, says, You know and I told

12  them to keep that.  You know so, you know.  Maybe it

13  was probably practically like Eric, what Eric did.

14            Do you know who Eric is?

15  A.    I do not.

16  Q.    Is there anybody in this case named Eric who was

17  indicted?

18  A.    No.

19  Q.    Tab 5, this is document 587 dated March 30th,

20  2013 at 10:11:56, which would be in the morning,

21  correct?

22  A.    Correct.

23  Q.    And that is a call between Stephen Smallwood and

24  Gerald Beasley, is that correct?

25  A.    Correct.

1    Q.    So Terry Beasley is not a party to that call?

2    A.    Correct.

3    Q.    Nor is he referenced in that call, isn't that

4    correct?

5    A.    That's correct.

6    Q.    And just for purposes of tying that back to the

7    index, I believe that particular phone call under that

8    tab is related to a 5a, 5b, 5c, 5d, and 5e, is that

9    correct?

10   A.    Correct.

11   Q.    Now if we go to the page that's numbered at the

12   bottom, it's still part of that tab, 232 of 1709.  And

13   it is call 604.

14         Are you with me?

15   A.    Yes, ma'am.

16   Q.    Okay.  And that call is from March 30th of 2013

17   at 11:26 in the morning, is that correct?

18   A.    Correct.

19   Q.    And that is a call between Terry Beasley and

20   Gerald Beasley, is that correct?

21   A.    Correct.

22   Q.    And I'd like you to turn back, if you will, I

23   just need to make sure I understand something.

24         Go back to the first part of Tab 5, which is

25   that telephone call between Stephen Smallwood and

1  Gerald Beasley.  Keep your finger there on 604 and go

2  back to the front to 587.

3          Are you with me?

4  A.    Yes, ma'am, mm-hmm.

5  Q.    Sometimes hard to make these things happen in

6  words.

7          That -- and I need to make sure I understand.

8  When they say session 587, and then if you look at the

9  next one, 604 --

10 A.    Correct.

11 Q.    -- am I to understand that that means -- or I

12 could fairly interpret that there were 17 calls

13 involving Gerald Beasley's telephone between 10:11 that

14 morning and between 11:26?  Is that a fair assessment?

15 A.    Telephone calls or text messages.

16 Q.    But some -- some type of interaction that was

17 tracked but not necessarily -- it may have been

18 minimized or it might not be here, but --

19 A.    That's correct.

20 Q.    -- am I -- am I assuming fairly that there were

21 17 other transactions?

22 A.    Yes, approximately.

23 Q.    And when, if you go back then to session 604,

24 which ties to 5f and 5g on the Index, the statement by

25 Terry Beasley, did you talk to -- because there were 17

1  transactions, there is absolutely no way to know from

2  this particular session which of those 17 other calls

3  Terry Beasley may be referencing, is there?

4  A.    Um, it -- that -- those other calls would have

5  taken place at other times between when 587 occurred at

6  10:11 in the morning, and when 604 occurred at 11:26 in

7  the morning on the same date.  The other calls, I'd

8  have to look at them to see when all those other

9  contacts occurred at but around that time, when he is

10  talking to Stephen Smallwood about talking to somebody

11  and he says that it was around -- that it was at 10

12  o'clock, that's when he had his conversation with Terry

13  Beasley.

14  Q.    Okay.  But my question is, there are at least 17

15  transactions -- and when I say "transactions" I mean

16  something involving Gerald Beasley's telephone, between

17  the time that Gerald Beasley and Stephen Smallwood

18  speak, and the time that Terry Beasley and Jerry

19  Beasley speak and my question is, as to those 17, Terry

20  Beasley could be referencing any of those, couldn't he?

21  A.    I'd have to look at the linesheets to see when

22  the other calls are heard, because I don't know how

23  many of those calls occurred around 10 o'clock.  Some

24  of them may have been around 11:00, for example.

25  Q.    But from this document --

312

```
 1   A.     Right.

 2   Q.     -- we can't tell, can we?

 3   A.     No.

 4   Q.     And, in fact, it's possible that that could be

 5   referencing a call that was actually minimized, isn't

 6   it?

 7   A.     It -- it's -- it's possible but, again, I would

 8   have to confirm that by looking at the linesheets.

 9   Q.     Okay.  And in this particular call, there is no

10   overt language, meaning coded language or stated

11   language, linking this call to any illegal activity, is

12   there?

13   A.     Not from the plain language of the call, no.

14   Q.     Now, with regard to Tab 6, which includes calls

15   6a and 6b, I believe, these are calls involving Brandon

16   Smith and Gerald Beasley, and Terry Beasley is not a

17   party and there's no reference to him in those

18   particular calls, is there?

19   A.     Correct.

20   Q.     Now, with regard to tabs -- and I'm just going

21   to skip through these fairly quickly, Tab 7, Tab 8, Tab

22   9, and Tab 10, those are all calls that the Government

23   alleges relate to a marijuana conspiracy, correct?

24   A.     That's correct.

25   Q.     And Terry Beasley is not a party to any of those
```

313

1  calls, correct?

2  A.     I don't believe so.

3  Q.     Nor is he mentioned in any of those calls, is

4  he?

5  A.     Not to my knowledge.

6  Q.     Okay.  Now we go to Tab 11, which is session 760

7  on March 30th of 2013.  I believe this is occurring at

8  11:07 at night, is that correct?

9  A.     Correct.

10  Q.     And this is a telephone call between Antoine

11  Beasley and Gerald Beasley, isn't it?

12  A.     Yes, it is.

13  Q.     And Terry Beasley, therefore, is not a party to

14  this conversation, is he?

15  A.     No, he is not.

16  Q.     I have a question, I just need you to help me

17  understand.

18         If you turn the page where it says 260 of

19  1709?

20  A.     Yes, ma'am.

21  Q.     About a third of the way down there is a

22  notation, and I just need to understand what this

23  means.  It says, "Transcribed too 23.08.27 SQS."

24         Do you see that?

25  A.     I do.

1  Q.    Can you explain to me what that is?

2  A.    Yes, that -- that's a notation by Shauna

3  Sherwood that she had transcribed the first part of

4  that call and then had left off there so that if

5  somebody else was coming or if she was going to resume

6  transcribing that call, she would know where she left

7  off at.

8  Q.    So and this, again, is -- just to help educate

9  me, that then means that as -- as it relates to the

10 information that this is still from that same telephone

11 call that occurred at that same time, it's not

12 an -- indicating a break in the telephone call, is it?

13 A.    No, it's not.

14 Q.    Okay.  And isn't it true that in that particular

15 session 760, the only narcotic or narcotic derivative

16 that is mentioned by name is on Page 262, where they're

17 talking about Lortabs, isn't that correct?

18 A.    That's correct.

19 Q.    Now, if we go to Tab 12, which is session 1196

20 on April 2nd of 2013, this is occurring at 2210, which

21 is 10:10 p.m. in the evening, is that correct?

22 A.    Correct.

23 Q.    And Terry Beasley is not a party to this call,

24 is that correct?

25 A.    That's correct.

1  Q.    And this is a call between Anita Burkley and

2  Gerald Beasley, correct?

3  A.    Correct.

4  Q.    And there's no reference to Terry Beasley,

5  correct?

6  A.    Correct.

7  Q.    And turning to Tab 13, I believe there are two

8  sessions there, 1013 and 1189, both of those calls are

9  between Gerald -- the first one, excuse me, 1013, is

10 between -- from Gerald to Antoine; 1189 is from Antoine

11 to Gerald, is that correct?

12 A.    1013 is from Gerald Beasley to Antoine Beasley,

13 and session 1189 is from Antoine Beasley to Gerald

14 Beasley.

15 Q.    And those purport to be about a cocaine

16 conspiracy, correct?

17 A.    Correct.

18 Q.    And they don't reference Terry Beasley at all,

19 do they?

20 A.    Correct.

21 Q.    Now, turning to Tab 14 which on the Index, I

22 believe ties to statements labeled 14a and 14b, is that

23 correct?

24 A.    Correct.

25 Q.    But it's just one telephone call, I believe,

1  session 802, March 31st of 2013 at 1:56 in the

2  afternoon, is that correct?

3  A.    Correct.

4  Q.    And this is a call between Gerald Beasley and

5  Terry Beasley with Gerald initiating the call, correct?

6  A.    Correct.

7  Q.    And I'm going to direct your attention to the

8  conversation that begins, and I believe in the

9  materials it's labeled as 14a, starts on the bottom of

10  268 of 1709, correct?

11         Starts, Soon, as soon as I get down.  How

12  much, 2100 in the morning and then it goes on over to

13  Page 269.

14         Are you with me?

15  A.    Yes, ma'am.

16  Q.    And then on 14b, which is on Page 269 of 1709, I

17  direct your attention to the statement, one, two,

18  three, four, the fifth line down, Terry Beasley, it's

19  very clear there that he says $2100, isn't it?  It's

20  unambiguous that he use the word $2100?

21  A.    It is.

22  Q.    Tab 15, call 172, this is a call between Carlos

23  Beasley and Antoine Beasley, I believe.

24         No, I'm sorry, excuse me.  This is a call

25  between Antoine Beasley and Isaac Woods, correct?

317

1   A.     Correct.

2   Q.     And there is no mention of Terry in this

3   particular call, is there?

4   A.     Correct.

5   Q.     Now, turning to 16, Tab 16, and I -- the first

6   one, 16a is session 633 from May 16th at 1:39 in the

7   afternoon, correct?

8   A.     Correct.

9   Q.     And this is a call between Antoine Beasley and

10  Gerald Beasley, correct?

11  A.     Correct.

12  Q.     And there's no mention of Terry Beasley in that

13  call, is there?

14  A.     Correct.

15  Q.     Now then if we turn to the second call, which is

16  session 637 on 516, that call happens at approximately

17  2:47 in the afternoon, correct?

18  A.     Correct.

19  Q.     And my understanding from the index as to 16b is

20  that the Government's position is that that's

21  supporting two different conspiracies, is that correct?

22  The cocaine conspiracy and the heroin conspiracy --

23  A.     Correct.

24  Q.     -- is that --

25         And those conspiracies, other than Antoine

318

1  Beasley and Gerald Beasley, involve different players,

2  don't they?

3  A.    Some the same and some different.

4  Q.    Terry Beasley is only involved in the allegation

5  regarding heroin, correct?

6  A.    Correct.

7  Q.    Can you tell me with any specificity what part

8  of that phone call deals with cocaine and what part

9  deals with heroin?

10  A.    Well, this call pertains to a call between

11  Antoine Beasley and Gerald Beasley following a meeting

12  at Tiara's Place where they met with Juan Ibarra on

13  April 16th, 2013.  After that, Antoine Beasley called

14  Gerald Beasley and, in summary, tells Gerald Beasley

15  that it must be true that law enforcement are following

16  them.

17        That's a warning that's used to update Gerald

18  Beasley as to the status of that conspiracy, including

19  both the conspiracy related to cocaine distribution,

20  and heroin distribution.

21  Q.    Is there anything involving this that indicates

22  with any specificity that it may just be one rather

23  than the other?

24  A.    No.  Not from this call.

25  Q.    And, again, Terry Beasley is not at all

1  mentioned in that particular session, is he?

2  A.    No, he is not.

3  Q.    Moving to Tab 17, which is -- excuse me, session

4  1032, on May 22nd, 2013, this call is occurring at 9:03

5  p.m. in the evening, is that correct?

6  A.    That's correct.

7  Q.    And isn't this the same day, if we turn back to

8  Tab 1, that Antoine Beasley has the fairly emotional

9  telephone call with his mother in the morning regarding

10  Helen's issues and divorce from Gerald Beasley?

11  A.    Correct.

12  Q.    And this call, going back to Tab 17, is a

13  telephone call between Gerald and Antoine, correct?

14  A.    Correct.

15  Q.    And, again, it's plausible that this discussion

16  about women and cars and furniture is related to the

17  fact that Helen Beasley has had a very emotional

18  conversation with her son Antoine, earlier that same

19  day, isn't it?

20  A.    Yes.

21  Q.    And, again, no overt references to any coded

22  language for drugs, is there?

23  A.    Not to specific drugs but there are statements

24  that I believe are attributable to the overall

25  conspiracy.

1  Q.    Okay.  Moving on to Tab 18, again, this is

2  15 -- excuse me, session 1570 on April 4th of 2013

3  between Antoine and Gerald.

4            There's no reference to Terry Beasley in that

5  call at all, is there?

6  A.    No, there is not.

7  Q.    Moving on to Tab 19, this is session 1801 on

8  April 5th of 2013 at 11:06 in the evening, correct?

9  A.    Correct.

10  Q.    This is a call between Gerald and Antoine, so

11  Terry is not a party, correct?

12  A.    Correct.

13  Q.    I should say Terry Beasley is not a party,

14  correct?

15  A.    Correct.

16  Q.    And then if you go to Page 633 of 1709, there's

17  a reference, no, just gonna see your Terry.

18            There's no -- we know that there's a Terry

19  Ross also involved in this case, don't we?

20  A.    Yes, there is.

21  Q.    Tab 20, again, this is a call between Gerald

22  Beasley and I believe you said William Jones, is that

23  correct?

24  A.    It's an unknown male tentatively identified as

25  William Jones, yes.

1    Q.    Okay.  This is just for the record.  This call

2    has nothing to do with Terry Beasley, as far as we can

3    tell, correct?

4    A.    Correct.

5    Q.    And as to call 20 -- Tab 21, call 1707 on April

6    5th, 2013, this is a call between Gerald Beasley and

7    Terry Beasley, correct?

8    A.    Correct.

9    Q.    And other than the Government's theory that

10   there's coded language, there are no direct references

11   to any particular drug, correct?

12   A.    There's no drug mentioned by name, no.

13   Q.    Tab 22 is call number 3075 on April 11th

14   purportedly between -- well, I'm not sure.  Who -- who

15   did we believe that call is between?  It's Gerald

16   Beasley and unknown -- unidentified male 34?

17   A.    I believe that is Gerald Wilson.

18   Q.    Gerald Wilson.  Okay.  I had that written but I

19   couldn't tell what I meant by my note.

20         Again, this particular call there is no

21   reference to Terry Beasley, correct?

22   A.    Correct.

23   Q.    And then, finally, there's a series of calls

24   behind Tab 23 and none of those calls is Terry Beasley

25   a party, is that correct?

1    A.    That's correct.

2    Q.    And I'm sorry, I forgot to label the record.

3  These are sessions 1551, these are all on June 3rd,

4  2013.  1551 is at 5:10 p.m.?

5    A.    Correct.

6    Q.    Turning two pages, session 1564 is at 5:31 p.m.,

7  is that correct?

8    A.    Correct.

9    Q.    Session 1572 is at 5:46 p.m., is that correct?

10   A.    Correct.

11   Q.    Session 1578 is at 5:55 p.m., is that correct?

12   A.    Correct.

13   Q.    Session 1623 is at 7:28 p.m., is that correct?

14   A.    No, that's --

15   Q.    I'm sorry.  8:28 p.m., is that correct?

16   A.    It -- yes, 8:28 p.m.

17   Q.    Sorry.

18         Okay.  Now that we've got those labeled.

19         And I'm just going to ask some questions

20  generally because this is a series of questions that

21  happened during the time that the agents -- and we know

22  this from -- let me back up.

23         You sat through the testimony from the

24  suppression hearing on this the other day, didn't you?

25   A.    Yes, I did.

1  Q.    Okay.  So I'm going to reference some of that.

2  If you don't remember, just tell me, but this series of

3  telephone calls was the same evidence that was used at

4  that suppression hearing, wasn't it?

5  A.    Yes.

6  Q.    And with regard -- let me actually start with

7  the last one, 1623, that's at 8:28, that is a telephone

8  call between Antoine Beasley and Gerald Beasley,

9  correct?

10        I'm sorry, it's the last one in that.

11  A.    623, ma'am?

12  Q.    1623, yes.

13  A.    Yes, 1623, yes.

14  Q.    Excuse me.

15  A.    Oh, I'm sorry, yes, it is a call between Antoine

16  Beasley and Gerald Beasley.

17  Q.    And isn't it true we know from the suppression

18  hearing and watching the videotape that Terry Beasley

19  was actually stopped on that traffic stop by about 7:01

20  that evening, wasn't he?

21  A.    That time sounds approximately accurate.

22  Q.    Okay.  And there's also a place in that video

23  where he is told very specifically by the patrol

24  officer that he is detained, isn't there?

25  A.    Yes.

```
 1   Q.    And that stop -- let me go back.
 2         The dog sniff on that was at approximately
 3   7:50 that evening, wasn't it?
 4   A.    I'd have to -- I don't recall exactly
 5   when -- when that occurred, the time.
 6   Q.    Do you recall the testimony that there was about
 7   38 minutes that elapsed between the time that the stop
 8   originated and before the canine officer even arrived
 9   on the scene?
10   A.    I recall testimony about that, yes.
11   Q.    Well, can we agree that by 8:28 Terry had been
12   detained by law enforcement, correct?
13   A.    Prior -- prior to 8:28.
14   Q.    No, well, by the time this call happens, Terry
15   was already detained, correct?
16   A.    I believe he was not currently detained at the
17   time of this call.
18   Q.    But he -- that event had already happened?
19   A.    Yes.
20   Q.    Okay, I'm sorry, I'm not asking the question
21   very artfully.
22         And Terry Beasley is not a party to any of
23   these telephone calls, is he?
24   A.    No, he's not.
25   Q.    And it's pretty clear from the context of these
```

1  calls that Terry Beasley wants his stuff back from the

2  storage unit, isn't it?

3  A.    Yes.

4  Q.    And do you recall from the suppression hearing

5  that Detective Sherwood testified that the word "stuff"

6  could mean anything?

7  A.    I don't specifically recall that, but...

8  Q.    But that it was not typical coded language, like

9  the word girls or --

10  A.    Yes.

11  Q.    -- those type of things?

12  A.    That would be true.

13  Q.    And so when Terry Beasley is saying he wants his

14  stuff -- and of course this is before the search

15  happened -- there's really no way to know what stuff

16  might be in a storage unit, is there?

17  A.    Well, there is a way to know from the other

18  calls that were intercepted.

19  Q.    But from the language in this call, the word

20  "stuff" is just stuff, isn't it?

21  A.    With the plain meaning of stuff, yes.

22  Q.    Right?

23  A.    It's impossible to know.

24  Q.    And Helen Beasley used the word "stuff" when she

25  was referring to furniture and things inside of a

1  house, didn't she?

2  A.     Yes.

3  Q.     And that's not an uncommon word for people to

4  use?

5  A.     Not at all.

6  Q.     And in this particular series of phone calls

7  there isn't any indication that anybody is arguing that

8  whatever this stuff is that Terry Beasley wants from

9  the storage unit is his stuff, is there?

10  A.     No.

11  Q.     Helen Beasley doesn't say, It's not Terry's,

12  does she?

13  A.     Correct.

14  Q.     Antoine Beasley doesn't say, It's not Terry's,

15  does he?

16  A.     Correct.

17  Q.     Carlos Beasley, who's one of the participants in

18  this call doesn't say, It's not Terry's?

19  A.     Correct.

20  Q.     And there is no indication that through any of

21  these people Gerald Beasley says, This isn't Terry's,

22  correct?

23  A.     Correct.

24  Q.     And, again, when we had the suppression hearing,

25  Detective Sherwood testified that in and of itself

327

```
 1  there's nothing unlawful about keeping money, is there?

 2          Do you recall that testimony from the

 3  suppression hearing?

 4  A.    I don't specifically recall that testimony.

 5  Q.    Would you agree with that statement, that

 6  keeping money in and of itself, unlike unlawful drugs,

 7  there's a difference?

 8  A.    Right.

 9  Q.    And in and of itself, keeping a safe, there's

10  nothing unlawful about that, is there?

11  A.    In and of itself, in the absence of any other

12  information, yes, that would be correct.

13  Q.    And in and of itself there is nothing unlawful

14  about keeping money in a safe, correct?

15  A.    Correct.

16  Q.    And in and of itself there is nothing unlawful

17  about keeping a safe with money in it in a storage

18  unit, is there?

19  A.    Correct.

20  Q.    And this series of calls happened on June 3rd,

21  2013, correct?

22  A.    Correct.

23          MS. SCHMIDT:  I have nothing else, Your Honor.

24          THE COURT:  Thank you very much.

25          Any other?
```

328

```
 1          Mr. Loeffler?

 2          MR. LOEFFLER:  Thank you, Your Honor.

 3                    CROSS EXAMINATION

 4  BY MR. LOEFFLER:

 5  Q.     Good morning.

 6  A.     Good morning, sir.

 7  Q.     My name's Kevin Loeffler and I represent Helen

 8  Beasley.

 9  A.     Yes, sir.

10  Q.     Let's see, I just have a couple things I want to

11  go through with you.

12          Let's go back to Tab 1, and that's the phone

13  call, it's in session 980 on 5-22.  You would agree,

14  and I guess several other attorneys have gone over that

15  a little bit on that, that's clearly a case where -- or

16  a phone call where she's calling and talking to her son

17  about her divorce, correct?

18  A.     That's part of it, yes.

19  Q.     Okay.  And she starts out by saying -- in fact,

20  the first statement you guys have referenced is $300 to

21  an attorney, correct?

22  A.     Correct.

23  Q.     But the rest of that statement talks about it

24  being a retainer fee and having to go back at 5 o'clock

25  so they can get paperwork done and so that they can get
```

329

1  him served, is that correct?

2  A.    Correct.

3  Q.    So it's pretty clear that's not anything but

4  talking about getting the divorce done?

5  A.    Yes, that's what it pertains to.

6  Q.    And then through the rest of that statement, I

7  think yesterday you testified that part of the reason

8  you believe that has something to do with the

9  conspiracy is that they are talking about distributing

10 property, is that correct?

11 A.    Correct.

12 Q.    But the only property they really talk about is

13 at one point she mentions that -- that he doesn't have

14 her name -- or her name's not on anything, and that she

15 believes that she's going to be left high and dry, and

16 that she's not going to get anything through the

17 divorce, correct?

18 A.    Correct.

19 Q.    And that Antoine, her son mentions, well, there

20 is laws.  The Court's not going to let him take

21 everything.  You should get half of the marital

22 property, correct?

23 A.    Correct.

24 Q.    And that's the only property they talk about

25 distributing, is that correct?

330

1  A.    I think that's fair to say.

2  Q.    Okay.

3  A.    In this particular call.

4  Q.    So it's pretty clear, this call doesn't have

5  anything to do with conspiracy at all.  This call has

6  to do with a lady who's very upset that her husband's

7  cheating; she's talking to her son, who she's also

8  upset with because she thinks he might have known that

9  her husband's been cheating on her all this time.

10  That's a fair representation of that call, isn't it?

11  A.    Um, for the most part, yes.  The -- it is a step

12  in distributing the properties that were obtained

13  during the money laundering conspiracy and her getting

14  the attorney and them talking about the properties and

15  her obtaining some assets that were obtained through

16  that conspiracy make that call pertinent.

17  Q.    That's if she is a party to the conspiracy?

18  A.    Correct.

19  Q.    And then the next call, or the other call that

20  she's, I guess she's mentioned in, and this would be

21  call 18, and that call, let's see, that's -- or Tab 18,

22  it would be session 1570 and that happened on April

23  4th, is that correct?

24  A.    Correct.

25  Q.    And that's a call between Gerald and Antoine and

331

1    it's basically one where, well, I guess your

2    interpretation of the call is they're talking about

3    marijuana, is that correct?

4    A.    That's correct.

5    Q.    They don't actually mention marijuana but that's

6    what you believe they're talking about?

7    A.    That's correct.

8    Q.    And it appears that -- that Antoine and Gerald

9    seem to think that Helen, there, may be smoking too

10   much pot, is that correct?

11          She's going through more than they thought she

12   should?

13   A.    Well, they don't say smoking, they say selling.

14   Q.    Well, yes, they talk about how she's going

15   through a lot, I believe she's selling it, correct?

16   A.    Yes.

17   Q.    Okay.  And in a conspiracy, people usually know

18   what the other party's doing, is that correct?

19          People have roles in a conspiracy?

20   A.    Um, people know about certain members of the

21   conspiracy, may not know about the roles of all the

22   members of a conspiracy.

23   Q.    And it's pretty clear that her role in this

24   conspiracy, from this phone call, is not to be selling

25   any weed, because they seem to be a little perplexed

332

1  about the idea that she's selling weed, is that

2  correct?

3  A.    Well, they don't seem to really have much of a

4  problem with it, I wouldn't say.  I mean, they seem to

5  be discussing that fact.

6  Q.    I think at one time Antoine says, If I wanted it

7  sold, I could sell it myself, I know how to do that?

8  A.    Right.

9  Q.    So it's clear, they don't think she should be

10 selling anything, right?

11 A.    Well, I don't know if I would interpret it quite

12 that way.  I think he is just making a general

13 statement to his father about how he can sell a lot of

14 marijuana himself, but they don't really seem to say

15 that they have to cut her off.

16 Q.    And they don't reference any amounts, do they?

17 A.    No, they do not.

18 Q.    So we don't know if they think she is going

19 through a lot of weed and they're talking about a

20 quarter ounce of weed, or ten pounds of weed, do we?

21 A.    Not from this particular call, no.

22 Q.    And I believe that yesterday you testified at

23 one point in the video from Tiara's Place that Gerald

24 is seen giving Helen a package, is that correct?

25 A.    Correct.

1    Q.    And how big is that package?

2    A.    (Indicating.)  I'm estimating it is about that

3  big, it appears to be like a gallon-type container or a

4  plastic bag, about that size.

5    Q.    Okay.  A gallon baggie size?

6    A.    Uh, yeah, about -- (indicating) a bag about that

7  big.

8    Q.    Was it a clear bag or was it a bag you couldn't

9  see through?

10   A.    It appeared to be a bag that had a dark colored

11 material inside of it.

12   Q.    Okay.  So you couldn't see what was in the bag?

13   A.    Well, I could see that there was a dark colored

14 material in it, yes.

15   Q.    Okay.  I guess the bag itself, was it clear?

16   A.    It -- it appeared to be, yes.  To me.

17   Q.    And then inside the bag you could see a dark

18 material?

19   A.    Yes.

20   Q.    But you couldn't identify what the material

21 would be?

22   A.    From just looking at that particular video?

23   Q.    Exactly.

24   A.    No, but there were other calls that would

25 indicate to me that that was marijuana.

334

1    Q.    Okay.  And by -- if it was about a gallon baggie

2  or I guess a baggie, you are saying about this big,

3  would that be correct?  (Indicating.)

4    A.    That's correct.

5    Q.    I guess I'm holding my hands about six inches

6  apart, maybe four inches tall?

7    A.    That would be about correct.

8    Q.    So approximately how much marijuana do you think

9  that would be?

10   A.    It would be at least probably a quarter pound,

11 in my estimation.

12   Q.    Now, in the search -- well, in any of the

13 searches, did you find this baggie?

14   A.    Well, I don't know if I would be able to ever

15 say that particular baggie was recovered.

16   Q.    So I guess your testimony is that you don't know

17 exactly what's in the bag and no bag was ever found

18 that you could match up with the bag you saw there?

19   A.    Well, there was evidence of marijuana use at the

20 search warrant that was conducted at Colt in June,

21 2013, where Helen Beasley was living.

22   Q.    There's evidence of marijuana usage, right?

23   A.    Well, I would say also a distribution, there was

24 a scale that was also recovered there.

25   Q.    And in your experience you would say that not

1  everybody that has a scale is selling, is that true?

2   A.    Not necessarily, but if she was simply obtaining

3  marijuana for personal use from her husband or her son,

4  I don't know why there would be a need for her to weigh

5  it.  And this was a rather large scale, as well.  This

6  wasn't a scale that you would need to -- to weigh just

7  small amounts of drugs.

8   Q.    And then the last is Tab 23.  And we would go

9  to, it would be session 1578, and that's the call

10  between Helen and Antoine, and this is at about not

11  quite 6 o'clock -- 5:55, would that be correct?

12  A.    That's correct.

13  Q.    And this is right before the car stop where

14  Terry is stopped in the vehicle, earlier that evening

15  about an hour before, would that be correct?

16  A.    Correct.

17  Q.    Okay.  And in this call it's pretty clear that,

18  well, I guess -- and this would be about two weeks -- a

19  little less than two weeks after the -- in Tab 1 where

20  Helen and Antoine are talking about the divorce.

21        I believe Tab 1 call happened on --

22  A.    Yes, approximately two weeks.

23  Q.    -- May 22nd and then the 23rd -- Tab 23 call is

24  on 6-3, is that correct?

25  A.    Correct.

336

1    Q.    Okay.  So this is during the middle of -- I

2    guess during the start of a divorce?

3    A.    Correct.

4    Q.    And it's pretty clear that Helen's upset that

5    she -- they are wanting her to go and open up the

6    locker and she doesn't really want to do that, does

7    she?

8    A.    No.

9    Q.    And, in fact, she doesn't want -- well, I guess

10   it would be fair to say at that point in time based on

11   the conversation in -- in the call on Tab 1 of the

12   con -- of the divorce conversation, that she is worried

13   about being left high and dry and that Gerald's not

14   going to leave her anything, that's correct, isn't it?

15   A.    Correct.

16   Q.    And that would be a good reason why she might

17   decide to go and change the locks on a storage locker

18   they both have?

19   A.    Possibly.

20   Q.    That wouldn't be any indication that she knew

21   that Gerald or Antoine or anybody else had let Uncle

22   Terry put anything in that locker, is that correct?

23   A.    That's correct.  Up to -- up to the point of

24   this -- of these phone calls that were intercepted.

25   Q.    And in this phone call, the very first part of

337

1  the phone call she talks about how she's going to bring

2  the police to the locker with her?  That's correct,

3  isn't it?

4  A.    It's the -- when you say first call, the first

5  one that's in this book, yes.

6  Q.    I guess the first part of her call to Antoine --

7  A.    Yes.

8  Q.    -- she talks about bringing the police and

9  making it real ugly?

10  A.    Correct.

11  Q.    So if she was ever involved in a money

12  laundering scheme, it's clear at this point when this

13  call is made that she's no longer involved in that

14  scheme, would that be correct?

15  A.    I don't agree with that.

16  Q.    Well, in your experience, is it common for a

17  co-conspirator to bring the police to a meeting with

18  other co-conspirators to further a conspiracy?

19  A.    Not generally, but I can see it happening if

20  somebody was so motivated and was really angry at

21  somebody, and if they don't really realize the

22  ramifications of their own actions.

23  Q.    You mean if they're not involved in what might

24  be found?

25  A.    I mean, if they don't think what they're doing

338

```
 1  is that bad or that they could get in trouble, they

 2  might do something like that.

 3  Q.    So if they don't believe they're involved?

 4  A.    If they don't -- if they don't believe that

 5  their specific actions are necessarily criminal, even

 6  though they may be, not realizing their criminal

 7  culpability they might do something like that.

 8  Q.    Okay.

 9  A.    Speaking hypothetically.

10  Q.    Okay.  Thank you.

11        MR. LOEFFLER:  I have no more questions.

12        THE COURT:  Thank you.

13        Mr. Robinson.

14        MR. ROBINSON:  Thank you, Your Honor.

15                  CROSS EXAMINATION

16  BY MR. ROBINSON:

17  Q.    Good morning, sir.

18  A.    Good morning.

19  Q.    I represent William Parker in this case.  I

20  don't think I'm going to have too many questions.  A

21  lot of what I am going to be doing is kind of whittling

22  down.  Okay?

23        In the Exhibit 1, there are -- this is the

24  Exhibit 1 is the book that has all the tabs, Mr. Parker

25  is not listed as a declarant in any of those
```

1  statements, is he?

2  A.    That's correct.

3  Q.    And none of those statements are being offered

4  against Mr. Parker, is that true?

5  A.    That's correct.

6  Q.    And -- and none of the statements are being

7  offered for any of the counts in which Mr. Parker is

8  named, true?

9  A.    Correct.

10  Q.    Exhibit 2, which is the affidavit prepared by

11  Mr. Goodwyn?

12  A.    Yes, sir.

13  Q.    It is -- it does not reference Mr. Parker at

14  all, does it?

15  A.    Uh, may I refer to the affidavit?

16  Q.    Sure.

17  A.    I believe in Paragraph 57 it states:  On

18  September 13th, 2012 Gerald Beasley used EBT card

19  number -- and then is ending in 5239, at Sam's Club

20  located at 6200 West Kellogg, Wichita, Kansas.  The

21  purchase total was $199.16.  The EBT card paid for

22  $140.30 of the purchase and Gerald Beasley paid the

23  difference of 58.86 in cash.  Card number, again,

24  ending in 5239 is registered to W. Parker.

25            I would have to confirm that with -- at the

340

1  time TFO Goodwyn whether that was actually William

2  Parker or not but I believe that's quite possible.

3  Q.    Thank you for that.

4       Are you aware of any other references to

5  Mr. Parker in this document?

6  A.    That's the only one.

7  Q.    In your testimony yesterday, there was some

8  other references made to Mr. Parker and I just had a

9  couple of follow up questions for you on those things.

10  Okay?

11       You said that with respect to conspiracy

12  number 5, bank fraud, that there were interviews that

13  occurred regarding the bank fraud claims?

14  A.    Yes.

15  Q.    Was Mr. Parker implicated through any of those

16  interviews?

17  A.    Yes, he was.

18  Q.    Which interviews were those?

19  A.    Well, there's the interview that was done with

20  Cleo Walker on the incident that occurred where he was

21  also arrested.

22  Q.    Okay.  Any others?

23  A.    If I may have a moment to --

24  Q.    Sure.

25  A.    -- review some of the reports.

1    Q.    Go ahead.

2    A.    I'm not seeing any reference in the reports that

3 I have in front of me right now.

4    Q.    Okay.

5    A.    Terry Ross may have mentioned him but, again, I

6 would have to confirm that by reviewing the interview

7 that was conducted with him.

8    Q.    Okay.  Thank you.  And the interview with Cleo

9 Walker was after they had both been arrested, she and

10 Mr. Parker had both been arrested, and she was pointing

11 the finger at him?

12    A.    It was actually before he was even arrested --

13    Q.    Oh, okay.

14    A.    -- she had indicated --

15    Q.    That's right.

16    A.    -- he was in her car out in the parking lot.

17    Q.    Right.  Now, with respect to Count 5, there was

18 a October 20th, 2012 phone call from Mr. Parker to

19 Mr. Gerald Beasley, that was after Cleo Walker had been

20 arrested, is that right?

21    A.    Yes.

22    Q.    Now you said that the Government had intercepted

23 thousands of phone calls in this investigation, is that

24 right?

25    A.    That's right, but the call you're talking about

342

1  wasn't a part of the wire interception --

2  Q.    Okay.

3  A.    -- that was a jail call.

4  Q.    But if we -- if we look at the -- at the sum

5  total of all the wire taps and all the jail calls and

6  everything, we are talking about thousands of phone

7  calls, right?

8  A.    Correct.

9  Q.    And other than the one phone call on October

10 20th, 2012, are there any other phone calls that

11 Mr. Parker is claimed to have made in furtherance of

12 this alleged conspiracy?

13 A.    Of the bank fraud?

14 Q.    The check fraud.

15 A.    I believe there is one call that may pertain to

16 that that was intercepted.

17 Q.    So there's possibly a total of two calls?

18 A.    Specific to the bank fraud?

19 Q.    Yes.

20 A.    Again, I'd have to look at all the linesheets

21 pertaining to William Parker but there were other calls

22 besides just that one with -- between them and

23 Mr. Beasley.

24 Q.    Thank you.  I just have a couple of questions

25 for you on the program fraud issue and then I'll be

343

1  done.

2  A.    Yes, sir.

3  Q.    You said that, when you were talking with Ms.

4  Jacobs yesterday, that the Government intercepted a

5  number of phone calls about purchasing Vision cards?

6  A.    Correct.

7  Q.    How many of those involved Mr. Parker?

8  A.    Only a few.

9  Q.    Just a few.  Okay.  You said that one agent

10 stood behind Mr. Gerald Beasley when he was buying

11 groceries at Sam's using a Vision card?

12 A.    Correct.

13 Q.    Was that using Mr. Parker's card?

14 A.    I don't know whose card that was off the top of

15 my head.

16 Q.    You said that there was security footage of

17 Gerald having conversations with others about buying

18 the Vision cards and exchanging cards for cash, do you

19 remember saying that?

20 A.    There's not video footage of --

21 Q.    There is not --

22 A.    Well, there's not audio, so there is not video

23 footage of conversations, there is video footage of him

24 meeting with individuals.

25 Q.    Right, and these are at Tiara's Place?

```
1    A.    If they -- if they came from the video from
2    Tiara's Place, yes.
3    Q.    Do you know where these -- where this footage
4    was taken?  Off the top of your head?
5            Because Mr. Parker was -- worked at Tiara's
6    Place, right?
7    A.    No.
8    Q.    Your understanding is he never worked at Tiara's
9    Place?
10   A.    To my knowledge, he never did.
11   Q.    Okay.
12   A.    There -- during the time of the wiretaps and
13   from the review of the video footage, the individuals
14   who were working at Tiara's Place included Isaac Woods,
15   Gerald Wilson, Charles Goldston, Gerald Beasley
16   himself, and then on occasion we have a couple of other
17   people come and help clean up afterwards but none of
18   those, including James Arbertha, but none of those
19   people that I observed appeared to be William Parker.
20   Q.    Okay.
21           MR. ROBINSON:  That's all I have, sir, thank
22   you.
23           THE COURT:  Thank you, Mr. Robinson.
24           Mr. Sevart, you have any questions?
25           Ms. Penner?
```

345

```
 1              MR. SEVART:  I do, but I can go last.
 2                    CROSS EXAMINATION
 3  BY MS. PENNER:
 4  Q.    Good morning, Special Agent Fuller.
 5  A.    Good morning, ma'am.
 6  Q.    Good morning.  My name is Sylvia Penner and I
 7  represent Brandon Smith.
 8          Is it your understanding, Special Agent
 9  Fuller, that Mr. Smith is indicted in this case for the
10  conspiracies involving marijuana and cocaine?
11  A.    Correct.
12  Q.    Am I correct that he is not being charged with
13  any other crime in association with this -- with the
14  subject investigation in the indictment?
15  A.    Correct.
16  Q.    A number of the people indicted are members of
17  the Beasley family, is that correct?
18  A.    That's correct.
19  Q.    Brandon Smith is in no way related to the
20  family, either by blood relation or even marriage?
21  A.    Not to my knowledge.
22  Q.    He does not live in a house provided to him by a
23  member of the Beasley family?
24  A.    Not to my knowledge.
25  Q.    He does not drive a vehicle or own a vehicle
```

346

1 that had been provided to him by the Beasley family?

2 A.    Not to my knowledge.

3 Q.    He has no connection that you can show directly

4 tying Brandon Smith to either of the Ybarra brothers

5 that have been discussed during this hearing?

6 A.    He did not have direct contact with them to my

7 knowledge.

8 Q.    There has been quite a bit of discussion

9 regarding a storage unit, both in the suppression

10 hearing and then as well as this James hearing, and the

11 storage unit is the subject of statements largely 23a

12 through 23f.  Do you -- you're familiar with this

13 storage unit?

14 A.    Yes, ma'am.

15 Q.    There is nothing that directly ties Brandon

16 Smith to that storage unit or its contents, correct?

17 A.    Correct.

18 Q.    There's also been discussion about Tiara's

19 Place.  Tiara's Place is a restaurant, is that right?

20 A.    That is correct.

21 Q.    People go to this restaurant to eat meals, true?

22 A.    Yes.

23 Q.    There are a number of patrons that go in and out

24 of Tiara's Place during its business hours, true?

25 A.    Yes.

347

1    Q.    Just because a person enters a restaurant does

2    not mean that they are engaging in criminal activity,

3    correct?

4    A.    Correct.

5    Q.    So simply because a person might appear on a DVR

6    video showing the actions taking place within a

7    restaurant does not in and of itself prove criminal

8    activity, correct?

9    A.    Depending on what the video shows but if in the

10   absence of any observed criminal activity, that's a

11   fair statement, yes.

12   Q.    Special Agent Fuller, you provided some

13   testimony regarding the evidence or the mechanism by

14   which you obtained evidence in this case.  I'd like to

15   talk to you about some of that.

16         You mentioned interviews that were performed

17   by yourself as well as other members of law

18   enforcement.  And I might not have a complete list but

19   you identified names such as Terry Ross, James

20   Arbertha, Leonard Carter, Charles Torrence, William

21   Jones, Alfonso Fisher, Steven Gilkey, Cameron James.

22   In any of the interviews performed with those

23   individuals was Brandon Smith identified as someone who

24   sold them marijuana?

25   A.    No, he was not.  And I would like to point out

348

1  Cameron James was not actually interviewed.

2  Q.    I'm sorry?

3  A.    You mentioned Cameron James as being a person

4  who was interviewed.  He was not one of them.

5  Q.    Okay.  Of the persons that were interviewed,

6  again, either by you or other members of the law

7  enforcement, did any of them identify Brandon Smith as

8  a person who sold them cocaine?

9  A.    No.

10  Q.    During any of those interviews that were

11  performed, did any of those persons identify Brandon

12  Smith as an individual who was engaged in the

13  distribution of drugs on behalf of the Beasley family?

14  A.    No.

15  Q.    Special Agent Fuller, you also mentioned jail

16  calls that were listened to.  In any of the jail calls

17  that you or other members of law enforcement listened

18  to, was Brandon Smith ever referenced?

19  A.    Not that I recall.

20  Q.    There was a tracker device placed on Antoine

21  Beasley's vehicle, is that correct?

22  A.    That is correct.

23  Q.    And reviewing the places in which that vehicle

24  traveled, there is no instance that you can point to

25  where that vehicle traveled to a meeting involving

1  Brandon Smith, correct?

2  A.    Uh, are you asking if it traveled to Brandon

3  Smith's residence or...

4  Q.    The tracker did not reveal an instance in which

5  that vehicle traveled to a meeting with Brandon Smith?

6  A.    Between Antoine Beasley and Brandon Smith, no,

7  there was no such meeting that -- that I know of.

8  Q.    Search warrants were also utilized in this case

9  to gather evidence, is that right?

10 A.    Correct.

11 Q.    And, in fact, there was a search warrant

12 executed on Brandon Smith's residence on April 9th,

13 2014?

14 A.    Correct.

15 Q.    In connection with the execution of that search

16 warrant, a drug dog was taken to his residence and

17 deployed on both the inside and outside of his

18 residence, correct?

19 A.    I don't recall.

20 Q.    Would it help to refresh your recollection if I

21 showed you the report generated from that search

22 warrant?

23 A.    Yes, it would.

24       MS. PENNER:  Your Honor, if I may approach.

25       THE COURT:  Of course.  And you don't have to

1  ask.

2  A.    Thank you, ma'am.

3       That's correct, a canine was called to the

4  location.

5  BY MS. PENNER:

6  Q.    Special Agent Fuller, is it your understanding

7  from your role in this investigation that the purpose

8  of that search warrant was to look for evidence of

9  involvement in drugs or drug related crimes?

10  A.    I believe so.

11  Q.    When law enforcement is looking for evidence of

12  engaging in drugs or drug related offenses, what types

13  of things do they look for?

14  A.    The drugs themselves, items used to cut drugs,

15  items used to weigh up or to package drugs, documents

16  evidencing suppliers and purchasers and amounts and

17  debts owed related to drug trafficking, firearms,

18  things of that nature.

19  Q.    Special Agent Fuller, when that search warrant

20  was executed on April 9th, 2014 at Brandon Smith's

21  residence, were any scales found, whether they be

22  digital scales or finger scales?

23  A.    From this report there's not a scale listed in

24  this report.

25  Q.    Would you agree with me that if a search warrant

351

1  is being executed for the purpose of investigating drug

2  activity, that anything that might actually be evidence

3  of drug activity would have been seized?

4  A.    I would hope so, yes.  If it was pursuant to the

5  warrant.

6  Q.    Special Agent Fuller, if I could direct you to

7  Page 3 of what you have been provided to refresh your

8  recollection, I believe that contains the items that

9  were seized.

10  A.    Well, it's a receipt for property and other

11  items on ATF Form 3400.23 filled out by Special Agent

12  Wayland on April 9th, 2014.  So, yes, this appears to

13  be the receipt for property form that's referenced as

14  an attachment in RY150.

15  Q.    Special Agent Fuller, there were no packaging

16  materials consistent with the distribution of marijuana

17  or cocaine found in his residence, correct?

18  A.    There was none taken.

19  Q.    There was no evidence of a ledger, which would

20  be I believe what you meant when you were talking about

21  a list of suppliers, debts owed?

22  A.    Correct.

23  Q.    There were no glass pipes located in the home,

24  correct?

25  A.    Not to my knowledge.

352

Q.    There were no cooking utensils located in his home that would be consistent with converting powder cocaine in to crack cocaine?

A.    Again, I wasn't at this search warrant, I'm just going by what the report reflects and there is no mention in the report of that.

Q.    Are you aware if Mr. Smith was charged with any other offenses following the execution of that search warrant?

A.    I don't believe so.

Q.    Moving on, Special Agent Fuller, you also mentioned that there were undercover officers and agents utilized in this case, is that correct?

A.    Only on a very limited basis.

Q.    At no time did any undercover agent communicate directly with Brandon Smith, correct?

A.    Not to my knowledge.

Q.    And you do not have any confidential informant who has come to you to disclose that they purchased marijuana or cocaine from Brandon Smith, correct?

A.    No.

THE COURT:  I'm sorry, just to clarify that last answer, she asked if that was correct and you said no, that was the tag on the end.  And I assume that what you were testifying to is that nobody said they

353

1    purchased --

2              THE WITNESS:  Directly from Brandon Smith?

3              THE COURT:  Yes.

4              THE WITNESS:  I don't recall anybody -- us

5    interviewing or anybody coming forward telling us that

6    they purchased narcotics directly from Brandon Smith.

7              THE COURT:  Thank you.

8              MS. PENNER:  Thank you, Your Honor.

9              THE COURT:  Certainly.

10   BY MS. PENNER:

11   Q.    Special Agent Fuller, if we could now turn to

12   the phone calls and those are contained in -- it's been

13   referred to as Exhibit A, as well as Exhibit 1, but

14   it's the notebook that was prepared by the Government

15   for this case.

16              The first call that we see that is being

17   offered by the Government against Brandon Smith is call

18   1c.  This is a phone call that occurred between Helen

19   Beasley and her son, Antoine Beasley, is that correct?

20   A.    Correct.

21   Q.    Brandon Smith was not a participant nor was he

22   referenced in the conversation?

23   A.    No, he was not.

24   Q.    There's nothing from this phone call that would

25   indicate that if furniture was purchased, that it was

354

1  purchased by Brandon Smith?

2  A.     That's correct.

3  Q.     There's nothing from this phone call that would

4  indicate that if furniture, a home, or cars were

5  purchased that it was done so with any knowledge of

6  Brandon Smith?

7  A.     Correct.

8  Q.     There's nothing from your investigation that

9  shows that Brandon Smith even knows Bianca Holly, true?

10  A.     True.

11  Q.     There's nothing from your investigation that

12  shows that Brandon Smith ever met with Helen Beasley,

13  correct?

14  A.     Nothing that I can say positively.

15  Q.     And from the thousand plus phone calls that were

16  obtained from the wire related to Antoine Beasley's

17  telephone, there is absolutely no call, not one call

18  between Antoine Beasley and Brandon Smith?

19  A.     Not that I recall.

20  Q.     And just to be clear, that is not only phone

21  calls but also text messages, true?  Nothing between

22  Antoine and Brandon Smith?

23  A.     Again, I don't recall any contact between the

24  two.

25  Q.     The next call referring to Brandon Smith or at

1    least being offered against him is call number 2, this

2    is -- and, again, I'm referring to statement number two

3    as noted in the Government's exhibit, this was a call

4    on April 5th, 2015 between Gerald Beasley and Anita

5    Burkley.

6              Special Agent Fuller, do you have any evidence

7    to show that Brandon Smith ever met Anita Burkley?

8    A.    No, I do not.

9    Q.    Brandon Smith was not a participant nor was he

10   referenced in this call, was he?

11   A.    No, he was not.

12   Q.    The next one is call number 4, this is a little

13   further down on page -- on the page.

14             This is session 525 on March 29th, 2013 and

15   this is a call between Gerald Beasley and Terry

16   Beasley, is that right?

17   A.    That's correct.

18   Q.    And this call, here again Brandon Smith is not a

19   participant to the call nor is he referenced?

20   A.    That's correct.

21   Q.    And there is no evidence that you are aware of

22   that would ever show Brandon Smith meeting with Terry

23   Beasley?

24   A.    Not that I know.

25   Q.    Call Number 4 in part is being offered in

1  furtherance of a heroin conspiracy, is that correct?  I

2  believe that's Count 17?

3  A.    Yes, yes, that's correct.

4  Q.    And, again, but just to be clear, I think we

5  addressed this earlier but, again, to be clear, Brandon

6  Smith is not charged with heroin conspiracy?

7  A.    That's correct.

8  Q.    If you could turn the page now and go down to

9  statement numbers 6a and 6b, these would be the next

10 ones that are being offered against Mr. Smith.

11       This is a phone -- this is the first time

12 where we see Brandon Smith being identified as the

13 declarant and it's a conversation that he had with

14 Gerald Beasley, is that right?

15 A.    Yes, that's correct.

16 Q.    If you can, please help me understand, what's

17 interesting about this call is that it is one

18 conversation but it's being offered in one instance

19 because of a marijuana conspiracy, but then in a second

20 instance, 6b, as being part of a cocaine conspiracy.

21       Can you help me understand at what point in

22 the conversation they transition from talking about

23 marijuana to cocaine?  Specifically, what language

24 indicates to you that they are now talking about

25 cocaine as opposed to marijuana?

357

1  A.    At the beginning of the conversation I believe

2  they're talking about cocaine where Gerald Beasley

3  informs Brandon Smith and states, Man, I couldn't get

4  them up under that so I just thought I would call and

5  let you know.  And I believe -- and then Brandon Smith

6  replies, up under what, 11?  And Gerald Beasley states,

7  11.

8         I believe there they're talking about cocaine

9  and ounce prices for cocaine.

10  Q.    What do you base that belief on?

11  A.    On the -- the price that I believe they're

12  listing there, 1100.  I believe that's consistent with

13  an ounce price of powder cocaine.

14  Q.    But what they list, what they state is 11,

15  correct?  You're inferring that that means 1100.

16  A.    From that specific call, yes.  They do say 11.

17  Q.    And in this portion of the call, where the word

18  "11" is used, we do not see any direct reference to a

19  particular drug?

20  A.    No, not by name.

21  Q.    We don't see a reference to a drug at all,

22  correct?

23  A.    Not by name.

24  Q.    Or even in code?

25  A.    Well, it's -- when they're talking about 11,

1 that's in reference to, in my opinion, a price for an

2 ounce quantity of cocaine.  So an 11 is a shortened

3 version of 1100, so in a way, that's a code.

4 Q.    But there's nothing in here about girl or any of

5 the other terms that you had previously identified as

6 being what you believed to be code for powder cocaine

7 or crack cocaine?

8 A.    Not in this specific call, no.

9 Q.    So then at what point in this conversation do

10 you think there's something that triggers a transition

11 to marijuana?

12 A.    I believe it's later on in the call, Brandon

13 Smith states, Yeah, um, okay, well, I really look, well

14 let me get my money together cuz I need -- I might need

15 to get another two but uh, uh, but I, I really need to,

16 have you go talk to your son for me.  Cuz I need one of

17 them.  But, but let me -- but let me -- let me -- uh,

18 get my little ins together first and then, uh, cuz then

19 that way I can do both of them at the same time.

20        And I believe it's at that point the

21 conversation shifts from them talking about prices for

22 cocaine, to Brandon Smith telling Gerald Beasley that

23 he would also like to purchase marijuana.

24 Q.    In what you just read to us, what is it that is

25 code for marijuana?

```
 1   A.    I believe when he is asking Gerald Beasley to go

 2   talk to his son for him.

 3   Q.    To go talk to his son is code for marijuana?

 4   A.    Yes.

 5   Q.    Which son?

 6   A.    I believe that is Antoine Beasley.

 7   Q.    How do you know that it's Antoine?  From the

 8   context -- from this phone call, how do we know that

 9   it's Antoine?

10   A.    If I was looking solely at this call, I would

11   not know that but based on the other information that I

12   have, that's who I believe it to be.

13   Q.    Who are Gerald Beasley's sons?

14   A.    The two that I know of are Gerald Wilson and

15   Antoine Beasley.

16   Q.    You already testified that Brandon Smith never

17   met with Antoine Beasley.  Did Brandon Smith ever meet

18   with Gerald Wilson?  That you know -- that you can

19   show?

20   A.    Um, I'd have to go back and review my notes.  I

21   know that Brandon Smith went to the restaurant on

22   several occasions and whether or not Gerald Wilson was

23   also present there, I would have to check.

24   Q.    At no point in session 304 is there ever any

25   direct language identifying marijuana or cocaine,
```

360

1  correct?

2  A.    Correct.

3  Q.    Your code for cocaine is the word "11," is that

4  correct?

5  A.    In that call.

6  Q.    And your code for marijuana is the word "son" or

7  the phrase, go talk to your son?

8  A.    Correct.

9  Q.    Special Agent Fuller, now turning to statements

10  7 through 10, please.

11        There's been conversation throughout this

12  hearing about the term "urkle" and it -- and it is your

13  belief that the term "urkle" is in reference to

14  marijuana, is that correct?

15  A.    That's correct.

16  Q.    On what do you base that?

17  A.    I know that a strain of marijuana, specifically

18  called urkle, or purple urkle, is a common strain of

19  marijuana.

20  Q.    When you say purple and urkle, are those two

21  separate things?

22  A.    They -- sometimes people refer to it as just

23  urkle; there's a type of marijuana sold sometimes

24  people call purple urkle; there is all kinds of

25  different names that people place on different strains

1  or types of marijuana that are sold, but that -- but

2  that, in my experience, urkle, is one of them.

3  Q.    Did you investigate whether there are any

4  alternative uses for the term "urkle"?

5  A.    I don't know of any.

6  Q.    Did you investigate whether there are any

7  alternative uses for the term "urkle"?

8  A.    No.  I would like to, if I may, point out that

9  there were documents recovered during the search

10  warrants where the -- the -- off the phones that list

11  various types of marijuana, purple urkle being one of

12  them.

13  Q.    You mentioned documents that were seized, is

14  that right?

15  A.    Yes.

16  Q.    None of those documents were seized from Brandon

17  Smith's home, true?

18  A.    No, they were not.

19  Q.    Special Agent, turning to statement 11a, please,

20  and actually, 11a, 11b, and 13a, those are all on the

21  same page as statements 7 through 10, please?

22  A.    Yes.

23  Q.    These are not being offered, again, 11a, 11b and

24  13a, in furtherance of a marijuana conspiracy, correct?

25  A.    That's correct.

362

1  Q.    Brandon Smith is not a participant to statements

2  11a, 11b, and 13a, is that correct?

3  A.    That's correct.

4  Q.    He is not mentioned in the sessions where those

5  three statements are pulled from, correct?

6  A.    Not to my knowledge, no.

7  Q.    In statement 11a, is there direct reference to

8  cocaine or crack cocaine?

9  A.    Not by name, no.

10  Q.    In 11b, is there direct reference to cocaine or

11  crack cocaine?

12  A.    Again, not by name, no.

13  Q.    And in 13a, if I understood your testimony, the

14  reference that we see, at least the reference that you

15  infer meaning cocaine would be the term "Bebe", is that

16  right?

17  A.    That's correct.

18  Q.    But Bebe, I believe has already been established

19  to also be known as a nickname for Gerald Wilson, is

20  that correct?

21  A.    That's correct.

22  Q.    Special Agent, if you could turn the page now,

23  and let's talk about statements 15, 16a, and 16b.

24  These three statements are not offered in furtherance

25  of a marijuana conspiracy, correct?

1  A.    I'm sorry, did you -- did you ask me if 15 was

2  offered in furtherance of the marijuana conspiracy?

3  Q.    Furtherance of marijuana, yes, sir.

4  A.    I -- I believe that that -- that is in

5  furtherance of the marijuana conspiracy.

6         Wait.  Hold on, let me -- if I may have a

7  moment to review.

8  Q.    Certainly.

9  A.    To me, that's a call more consistent with the

10 marijuana conversation.

11 Q.    According to the exhibit, it's being offered for

12 Count 15 which would be the cocaine count, is that

13 right?

14 A.    It appears so from this -- from this chart.

15 Q.    But your testimony today is that you do not

16 believe it to be in furtherance of a cocaine conspiracy

17 but, instead, marijuana?

18 A.    From me reading that call, that's what I

19 interpret it as.

20 Q.    And you assisted in the preparation of this

21 exhibit, correct?

22 A.    I did to a certain extent.

23 Q.    You reviewed the phone calls and their context

24 in preparation for this hearing, correct?

25 A.    Some of them, yeah.

1    Q.    What is it about statement number 15 that causes

2  you to believe today that that is about marijuana

3  rather than cocaine?

4    A.    I mean, I base that on the fact that he's

5  talking to Isaac Woods and talks about 800 bucks and

6  the amount there would have me believe that that's more

7  likely they're talking about marijuana than anything

8  else.

9    Q.    So the amount of money that's identified is what

10 leads you to believe that this is referring to

11 marijuana?

12   A.    Look -- just looking at that particular call,

13 yes.

14   Q.    Marijuana is not identified in the call, though,

15 correct?

16   A.    No, it is not.

17   Q.    And your testimony yesterday was that the price

18 for narcotics will vary depending on demand and supply,

19 correct?

20   A.    It can, yes.

21   Q.    And I may have asked you this already,

22 calls -- statements 15, 16a, 16b -- and, again, if I

23 asked you this already, I apologize, Brandon Smith is

24 not a declarant or a participant in the call, correct?

25   A.    No, he is not.

365

Q.    He is not referenced in the context of the
calls, correct?

A.    No, he is not.

Q.    And just to be clear, not simply the synopsis or
the specific part of the call that is being offered,
but the call themselves, the entire call, Brandon Smith
is not mentioned?

A.    No, he is not.

Q.    Turning, please, to call -- or statement,
rather, statement number 18a, session 1570.

       Here again we see a conversation that does not
either involve or refer to Brandon Smith, is that
right?

A.    That's correct.

Q.    This is a conversation occurring between Antoine
Beasley and his father regarding his mother, Helen
Beasley, is that right?

A.    That's correct.

Q.    And we've already established that Brandon
Smith, that you are aware of, has never met with Helen
Beasley?  True?

A.    Uh, not -- not that I know of for sure.

Q.    And in this phone call we see no mention of
marijuana, urkle, cush, or any other type of code, do
we?

366

1  A.    No, we don't.

2  Q.    Special Agent, statement number 20, please, and

3  I'll just 20, 22a, 22b, Brandon Smith is not a

4  participant to any of these statements, correct?

5  A.    No, he is not.

6  Q.    And at no point in the calls is reference to

7  Brandon Smith made?

8  A.    No, he is not.

9  Q.    Statement numbers 22a and 22b are believed by

10  law enforcement to be referring to a search warrant

11  that was going to be executed at Herbert Jones's home,

12  is that right?

13  A.    I believe the search warrant was in the process

14  of being executed at the time.

15  Q.    There's no evidence that you are aware of that

16  can show that Brandon Smith was ever at Herbert Jones's

17  residence, correct?

18  A.    Correct.

19  Q.    There's no evidence that would show that Brandon

20  Smith ever met with Herbert Jones?

21  A.    Correct.

22  Q.    Anything that might have been obtained in the

23  execution of the search warrant at Herbert Jones's

24  residence has absolutely no connection that you can

25  point to to Brandon Smith?

1  A.    Correct.

2  Q.    Yesterday, Special Agent Fuller, your testimony

3  when asked by Ms. Jacobs to identify your basis for

4  believing that Brandon Smith was involved in the

5  distribution of more than just marijuana, your answer

6  was the calls?

7  A.    Correct.

8  Q.    So as we sit here today, there is absolutely no

9  physical evidence of any kind, zero, that you can point

10  to that connects Brandon Smith to the distribution of

11  cocaine?

12  A.    Other than the narcotics that were recovered

13  from other people or residences.

14  Q.    From other people?

15  A.    Correct.

16  Q.    Nothing from his residence?

17  A.    Correct.

18  Q.    Thank you, special agent, those were my

19  questions.

20       MS. PENNER:  Thank you, Your Honor.

21       THE COURT:  Mr. Sevart.

22       MR. SEVART:  Thank you, Your Honor.

23                  **CROSS EXAMINATION**

24  BY MR. SEVART:

25  Q.    Special Agent Fuller, I'm Mark Sevart and I

368

1  represent Carlos Beasley.

2          As I understand your testimony from yesterday

3  and today, you started your investigation sometime in

4  October of 2012, is that correct?

5  A.    Correct.

6  Q.    And that then you investigated a case for six or

7  seven months and then in March 27th, I believe of 2013,

8  you obtained your first wiretap, is that correct?

9  A.    Correct.

10  Q.    And that was for 30 days?

11  A.    Correct.

12  Q.    And was that then extended another 30 days?

13  A.    No, it was not.

14  Q.    Okay.  So there was really a 30-day period of

15  March and April?

16  A.    Correct.

17  Q.    And then there was some search warrants that

18  were executed a little bit later, or were they all done

19  before then, as well?

20  A.    There's a -- there's another wiretap on a

21  different phone after that.

22  Q.    Okay.  And was it done for 30 days as well?

23  A.    Yes.

24  Q.    Okay.  So the first wiretap was Gerald Beasley.

25  Second was Antoine Beasley?

369

```
 1   A.      Correct.

 2   Q.      Any other wiretaps affiliated with this?

 3   A.      No.

 4   Q.      Any other extensions affiliated?

 5   A.      No.

 6   Q.      Okay.  With respect to my client, Carlos

 7   Beasley, you would agree, would you not, that during

 8   the vast majority of your investigation, he was

 9   incarcerated in the state of Kansas, correct?

10   A.      I'm sorry, could you repeat the question?

11   Q.      During the vast majority of your investigation

12   my client, Carlos Beasley, was incarcerated in the

13   state of Kansas, correct?

14   A.      For part of the time, yes.

15   Q.      Okay.  Sir, I'm going to approach and hand you a

16   document purports to be a KASPER report.  You're

17   familiar with KASPER, are you not?

18   A.      Yes, I am.

19   Q.      And what is KASPER, for the record?

20   A.      KASPER stands for the Kansas Adult Supervised

21   Population Electronic Repository and it provides

22   information from the Kansas Department of Corrections.

23   Q.      Certainly.  And part of that includes when

24   somebody is incarcerated, correct?

25   A.      Correct.
```

1  Q.    And if you would, take a look at that report and

2  tell us on what dates the report indicates that

3  Mr. Beasley was incarcerated.

4  A.    It lists new court commitment on November 28th,

5  2011; and then inner facility movement on January 4th,

6  2012; and then in-state post-release on March 21st,

7  2013.

8  Q.    Okay.  So he was -- you would agree then, would

9  you not, that he was incarcerated during the vast

10  majority of your investigation in this case?

11  A.    Well, he was incarcerated up until March 21st,

12  2013.

13  Q.    Just a few days before your first wiretap?

14  A.    Correct.

15  Q.    And certainly you had done the vast majority of

16  your investigation in order to get the wiretap,

17  correct?

18  A.    Yes.

19  Q.    Okay.  Now, before I take that report from you,

20  you would agree, would you not, that there is no

21  indication on the report that my client had any

22  disciplinary problems while he was incarcerated,

23  correct?

24  A.    From this document, it doesn't appear anything.

25        MS. JACOBS:  Your Honor, I am going to object

371

```
 1   at this point to relevance to this hearing.

 2            THE COURT:  Mr. Sevart.

 3            MR. SEVART:  Your Honor, just had a couple

 4   questions just trying to point out that doesn't appear

 5   to be any conspiracy activity going on with my client

 6   while he's incarcerated.

 7            THE COURT:  Well, let's push on with this.

 8   It's overruled.

 9   BY MR. SEVART:

10   Q.    You would agree that there's no indication that

11   he's in possession of any unlawful substances while

12   he's incarcerated, correct?

13   A.    Not -- not from that document, there's no

14   evidence of that.

15   Q.    Doesn't appear that he has been having contact

16   with inappropriate people or doing inappropriate

17   things, correct?

18   A.    From that document?

19   Q.    Yes.

20   A.    I -- I don't know if they would even report that

21   on there.

22   Q.    Okay.  You've seen reports, though, where people

23   have had disciplinary issues, though?

24   A.    Yes.

25   Q.    With respect to the electronic recordings that
```

372

1  you made, particularly pole cameras, you would agree

2  that there is no video on any pole camera showing my

3  client possessing any illegal substances, correct?

4  A.    Not that I can say where you can actually see

5  him holding any controlled substances.

6  Q.    Okay.  No video from the restaurant showing my

7  client in possession of any illegal substances,

8  correct?

9  A.    Correct.

10  Q.    No video presentation that shows my client is

11  cashing worthless checks or forged checks, correct?

12  A.    Correct.

13  Q.    No videos showing him passing any welfare cards

14  or cash cards or any cards, correct?

15  A.    Correct.

16  Q.    The KASPER report indicates that my client is 6

17  foot 4, 425 pounds.  Would you agree that

18  that's -- that my client is a big man?

19  A.    Yes.

20  Q.    And certainly bigger than anyone else who's

21  charged in this case, correct?

22  A.    I believe so.

23  Q.    He would certainly stand out, correct?

24  A.    Yes.

25  Q.    You mentioned that there were some -- some

1  interviews of a number of people, and I don't want to

2  spend too much time on this but I did have just a

3  couple of questions about those.

4         I -- I take it from your testimony earlier

5  that the Ybarras are certainly not available for any

6  sort of cross examination or presentation, correct?

7  A.    Correct.

8  Q.    With respect to Leonard Carter, has he been

9  charged in anything through this investigation?

10  A.    Not through this investigation, no.

11  Q.    Has he been given any grant of immunity that you

12  know of?

13  A.    Um, we told him that we would pass on to the

14  prosecutor whether or not he cooperated.

15  Q.    So he was given by the law enforcement community

16  a free pass in exchange for testimony or...

17  A.    I -- I never made him a promise of any sort as

18  to that.  What I always tell all these individuals when

19  I interview them is all I can do is tell and inform the

20  U.S. Attorney's Office and the Court as to their

21  cooperation and it's up to them as to take that into

22  account, unless there is some type of deal that's been

23  worked out with the U.S. Attorney's Office.

24  Q.    Okay.  Well, with respect to Leonard Carter, do

25  you know of any deal that he has received from either

374

 1  the District Attorney for Sedgwick County, or for the

 2  United States Attorney for the State or District of

 3  Kansas?

 4  A.    No.

 5  Q.    And he has not been prosecuted yet on anything,

 6  either, correct?

 7  A.    Not by the U.S. Attorney's Office, no.

 8  Q.    Okay.  And so as far as whether he's available

 9  for cross examination, we don't know, correct?

10  A.    Uh, I believe he's -- he's still around, so he

11  may be available.

12  Q.    But he could exercise his constitutional right

13  to remain silent, correct?

14  A.    I suppose he could.

15  Q.    Okay.  And would the same hold true for Terry

16  Ross?

17  A.    Would what hold true?

18  Q.    That he, likewise, could exercise his Fifth

19  Amendment right to remain silent in this case?

20  A.    I suppose he could.

21  Q.    Okay.  How about Denise Davis?

22  A.    Yes, I suppose she could.

23  Q.    And how about Charles Torrence?

24  A.    Yes, I suppose he could.

25  Q.    What about Steven Gilkey?

1   A.    Yes, I suppose he could.

2   Q.    There was a Brandon and a -- the last name I

3   wasn't sure about but Rookin?

4   A.    Richey.

5   Q.    Brandon Richey.

6   A.    Richey.

7   Q.    Okay.  How about him, could he

8   remain -- exercise his constitutional right to remain

9   silent?

10  A.    Um, I suppose he could.

11  Q.    Okay.  How about James Harborough?

12  A.    I'm sorry, who?

13  Q.    James Arbor or Arborough?

14  A.    Oh, Arbertha?  Yes, I suppose he could exercise

15  his rights.

16  Q.    And then there was a -- a Mr. Jones?

17  A.    Yes.

18  Q.    And what was his first name?

19  A.    Raymond.

20  Q.    And what about him?  Could he remain silent, as

21  well?

22  A.    Yes, he could.

23  Q.    How about Jacob Watie?

24  A.    I suppose anybody can exercise their -- their

25  right.

1    Q.    Okay.  How about Anita Burkley?

2    A.    Yes.

3    Q.    And you understand what I'm asking here is

4    whether these folks, any of these folks have been given

5    a grant of immunity and I take if from your answer that

6    none of them have been given a grant of immunity,

7    correct?

8    A.    I don't know if I can say that.  There -- there

9    may have been some individuals that got some

10   consideration either from the District Attorney's

11   Office or the U.S. Attorney's Office.

12   Q.    Well, have any of these folks been -- been, to

13   your knowledge, have any of these folks that we're

14   talking about here been given a -- a deal for

15   testifying in this case?

16          MS. JACOBS:  Your Honor, I -- have allowed

17   some time to explore this issue but at this point I

18   guess I would object to relevance.  Again, for the

19   purpose the James hearing.

20          THE COURT:  I'll sustain that.  Let's move on,

21   Mr. Sevart.

22          MR. SEVART:  Yes, Your Honor, thank you.

23   BY MR. SEVART:

24   Q.    Well, let me ask you just a couple questions

25   here real quick about the structure here of the family

1   dynamics.

2            You have Gerald and Terry, correct?  That are

3   brothers?

4   A.    That's correct.

5   Q.    And so they are -- they are of one generation,

6   correct?

7   A.    I'm sorry, could you repeat that?

8   Q.    They are of one generation --

9   A.    Yes.

10  Q.    -- of Beasleys?

11           Then you have a next generation of Beasleys

12  and that would be Antoine, who is Gerald's son,

13  correct?

14  A.    Correct.

15  Q.    And you have Carlos, who is Terry's son?

16  A.    Correct.

17  Q.    Correct?

18           And approximately how old are Gerald and

19  Terry?

20  A.    Uh, at the time of this investigation I believe

21  they were in their 50s.

22  Q.    Okay.  And how about Antoine and Carlos?

23  A.    I believe they're in their 30s.

24  Q.    Okay.  So about 20 years difference in age?

25  A.    Correct.

378

1    Q.    How about Terry Ross?

2    A.    I don't know his exact age but I suppose he's in

3    his 50s, as well.

4    Q.    Okay.  So he would be more of Gerald and Terry's

5    generation?

6    A.    Correct.

7    Q.    Okay.  How about Leonard Carter?

8    A.    Yeah, he would be older, as well.

9    Q.    So he would be more in Gerald and Terry's

10   generation?

11   A.    Yes.

12   Q.    The majority of these people that you talked

13   with, are they more of Gerald and Terry's generation?

14   A.    Yes.

15   Q.    You're shaking your head yes.  Is that yes?

16   A.    The majority of them are, yes.

17   Q.    Okay.  And you don't have any information then

18   that would suggest that Carlos Beasley had

19   any -- had -- had introduced these individuals to their

20   parents or anything of that sort, correct?

21   A.    No, I don't have any information like that.

22   Q.    Okay.  Now, as I understand it, with respect to

23   Carlos Beasley, and please correct me if I'm wrong on

24   this, that the complaint that the Government has with

25   respect to Carlos has to do with him making,

379

1  apparently, a phone call to Antoine trying to get

2  Antoine to talk to Gerald about some property, is that

3  accurate?

4  A.    It was about getting a safe with money in it out

5  of a storage unit, yes.

6  Q.    Okay.  And but for that phone call, which I

7  believe is phone call 23a, there really isn't anything

8  else from your investigation regarding Carlos Beasley,

9  correct?

10  A.    Well, there's phone calls of him paying monies

11  to Antoine Beasley.

12  Q.    Okay.  The -- and what phone call number is

13  that?

14  A.    I'd have to have the linesheets in front of me

15  to tell you the exact phone call numbers.

16  Q.    Okay.  And you say these are Carlos Beasley?

17  A.    Yes.

18  Q.    Okay.  You don't know those numbers?

19  A.    I don't -- I can't tell you from memory what

20  exact number that session was.

21  Q.    Okay.  Certainly, none of those calls are part

22  of this James hearing, correct?

23  A.    That's correct.

24  Q.    And so none of those communications are being

25  sought to be admitted in this case, correct?

1    A.    That's correct.

2    Q.    Okay.  Now, with respect to the call that is

3  being used or that is being complained about, you would

4  agree, would you not, that that is a call of the

5  younger generation talking about the older generation,

6  correct?

7    A.    I'm not sure if I understand what your question

8  is.

9    Q.    Well, it's Carlos calling his cousin about a

10  dispute between their mutual fathers, correct?

11    A.    Yes.

12    Q.    Okay.  And so it's the boys talking about the

13  dads?

14    A.    Yes.

15    Q.    And it's clear from the conversation, 23a, that

16  the boys have no independent control over what it is

17  that the two dads are fighting over, right?

18    A.    Well, I -- I don't actually think that Terry

19  Beasley and Gerald Beasley are fighting.

20    Q.    Okay.  But it's -- it's Carlos talking to

21  Antoine about something involving their dads?

22    A.    Yes.

23    Q.    Okay.  It's -- it's not Carlos saying, I want my

24  stuff back, right?

25    A.    Correct.

381

```
 1   Q.    And Antoine -- and he's not saying, Antoine, you
 2   need to get my dad's stuff back, it's not that, either,
 3   is it?
 4         It's, Your dad needs to give my dad his stuff
 5   back, right?
 6   A.    Well, to a certain extent, but the conversation
 7   goes a little further than that even.
 8   Q.    Well, it's clear from the -- from the
 9   conversation that Antoine doesn't have control over
10   this property, correct?
11   A.    Not at that time, no.
12   Q.    And Carlos doesn't have control over the
13   property, correct?
14   A.    No, they don't have access to that storage unit.
15   Q.    Okay.  And it's not that Carlos is trying to get
16   any benefit for him, correct?  It's a benefit for his
17   dad?
18   A.    Well, I believe it's a benefit for the
19   conspiracies.
20   Q.    Well, I understand that's part of what you're
21   trying to say but what I am trying to say is that
22   there's no shared mutual benefit between Carlos and
23   anybody else, and particularly his father, Terry?
24         He's not trying to get something back for
25   himself, right?
```

1    A.    It -- yes, the money was clearly for Terry

2  Beasley.

3    Q.    Right.  No -- no benefit for Carlos?

4    A.    Well, again, I believe those funds were intended

5  to be used in the conspiracies and to further the

6  criminal enterprise that existed, which I believe all

7  those parties were a part of.

8    Q.    Well, I understand what your -- your intent or

9  your belief may be but as far as from the conversations

10  themselves, what's going on is you've got a family

11  that's getting ready to go through a divorce, right?

12    A.    Correct.

13    Q.    And people are thinking, man, everything is

14  going to be tied up in court so we probably better get

15  our property back now before we have some district

16  court judge in divorce court saying who gets what,

17  correct?

18    A.    I think that's part of it.

19    Q.    You've got the mother thinking she's going to

20  get left high and dry with nothing, so she's nervous,

21  right?

22    A.    That's part of it.

23    Q.    You've got, apparently, a brother-in-law who has

24  lent them something who's afraid that he's not going to

25  get it back if he doesn't get it back now, is that

1  correct?

2  A.    Again, that -- that's part of it.

3         I think another part of it is the belief by

4  some of these individuals that law enforcement may be

5  surveilling them.  So that, coupled with this family

6  situation...

7  Q.    Well, certainly, the only talk about law

8  enforcement is Helen talking about bringing law

9  enforcement in, is that correct?

10  A.    Correct.

11  Q.    Not -- there's no talk about keeping law

12  enforcement out, is there?

13  A.    Well, Antoine says, No, don't bring the police

14  there.

15  Q.    Okay.  But as far as the conversation and the

16  concern about getting the property has to do with the

17  divorce, that's what's in the -- I mean, that's what's

18  in the conversations, correct?

19  A.    Well, I don't know if that has -- she changed

20  the locks probably because of the divorce.  As to the

21  purpose for those funds that clearly belong to Terry

22  Beasley that were stored there, I -- I don't believe

23  that had to do with the divorce necessarily.

24  Q.    Okay.  But you would agree, would you not, that

25  there was certainly no benefit for Carlos, he -- that

1  was benefit for Terry, is that correct?

2  A.    I would say Terry benefited the most, yes.

3  Q.    Okay.  And, likewise, if -- if, you know, just

4  on a hypothetical, if you have a business, and you're

5  putting money into the business, that could be trying

6  to help the business along, is that correct?

7  A.    Well, yes.

8  Q.    Trying to further the business activity,

9  correct?

10  A.    Yes.

11  Q.    But what we've got here is taking something out

12  of, correct?

13  A.    Taking out of the storage unit, yes.

14  Q.    Yes?

15  A.    Moving it.

16  Q.    The phone call 23a is about taking back,

17  correct?

18  A.    Yes.

19  Q.    Not putting in.  Correct?

20  A.    Yes.

21  Q.    Okay.

22        MR. SEVART:  I don't believe I have anything

23  else.

24        Thank you, Your Honor.

25        THE COURT:  Thank you.

385

```
 1            Well, I think everybody's had the opportunity.
 2            Ms. Jacobs, you have any redirect?
 3            MS. JACOBS:  Sadly, Your Honor, just a few
 4   follow up questions, but could we take a short recess
 5   so that I could use the restroom --
 6            THE COURT:  Of course.  Start back up at
 7   11:10.
 8            (Recess taken from 11:00 a.m. until
 9            11:15 a.m.)
10            THE COURT:  Any time you're ready.
11            MS. JACOBS:  Thank you, Your Honor.
12            THE COURT:  Certainly.
13                    REDIRECT EXAMINATION
14   BY MS. JACOBS:
15   Q.   Special Agent Fuller, I just have a few
16   questions to follow up and just to clarify a few points
17   for the Court.
18            Let's talk just a little bit about Herbert
19   Jones.  Throughout the investigation -- and let's go
20   ahead and be a little bit more specific.  Throughout
21   the 30 days that you were up on a wire on Gerald
22   Beasley, can you tell the Court how many phone
23   conversations, approximately, Herbert Jones had with
24   Gerald Beasley?
25   A.   I believe it was approximately 20.
```

386

1    Q.    And can you tell the Court approximately how

2    many times you observed Gerald Beasley -- not you

3    personally but surveillance, law enforcement, observed

4    Gerald Beasley either meet with Herbert Jones either at

5    his house or at the restaurant?

6    A.    It was multiple times.

7    Q.    So we talked about one or two instances

8    involving Herbert Jones but would it be your testimony

9    that, in fact, there was more than just those one or

10   two instances, there was numerous instances

11   between -- of contact between Gerald Beasley and

12   Herbert Jones?

13   A.    There -- there was multiple contact between

14   them, either at the restaurant or what I believed to be

15   Herbert Jones's residence.

16   Q.    One of the questions that Mr. Kerns asked you

17   was whether or not you believed that Herbert Jones was

18   ever charged with the distribution of controlled

19   substance for the undercover buys on August 23rd of

20   2011 and August -- I believe it was 30th or 31st of

21   2011.  After reviewing your notes last night, do you

22   have a better answer for that question?

23   A.    I do.  He was actually charged in the Second

24   Superseding Indictment with those substantive counts.

25   Q.    All right.  And that would be Count 33 and Count

1  34, is that correct?

2  A.    That's correct.

3  Q.    There was also questioning from Mr. Pratt about

4  Antoine Beasley's involvement in the heroin and the

5  cocaine distribution.  We discussed that there was only

6  marijuana located at his residence and I believe mainly

7  marijuana located at his stash house, would that be

8  correct?

9  A.    Correct.

10  Q.    Do you have direct evidence, as well, that

11  Antoine Beasley was involved in the heroin and the

12  cocaine distribution?  Beyond all the phone calls that

13  we've talked about?

14  A.    I interviewed Tradessa Donnell who told me that

15  she had purchased approximately a half ounce of crack

16  cocaine from Antoine Beasley in the past.

17  Q.    Was there also an instance during the case that

18  Antoine Beasley was followed and observed disposing of

19  trash in to a local or business dumpster in an

20  alleyway?

21  A.    Yes.

22  Q.    And what occurred after that, after law

23  enforcement observed this?

24  A.    They recovered the bag that Antoine Beasley is

25  believed to have thrown away and inside that bag was

388

1  packaging for narcotics that tested positive for

2  marijuana, cocaine, and heroin residue.

3  Q.    And to your knowledge was the bag sent off for

4  fingerprint testing as well?

5  A.    I believe it was.

6  Q.    And to your knowledge do you know whether it

7  came back with Antoine Beasley's fingerprints on those

8  bags?

9  A.    I don't believe it did.

10 Q.    Oh, you don't?  I thought it was on that case.

11       All right.  We're going to move on to Stephen

12 Smallwood.  Again, we're just going to address quickly

13 the number of contacts that you observed between

14 Mr. Smallwood and Mr. Beasley.  And I say you observed.

15 Can we explain where you observed most of these

16 contacts between Smallwood and Gerald Beasley?

17 A.    The vast majority of them occurred at the

18 restaurant, Tiara's Place.

19 Q.    So a lot of these actually -- a lot of these

20 contacts that you've observed actually were observed

21 after the search warrants in June, when you had an

22 opportunity to review the tape, is that correct?

23 A.    Um, that would be correct but he was also

24 observed while we were conducting the wiretaps by

25 physical surveillance.

1   Q.    Can you give the Court an estimate about how

2   many times in an estimation over maybe just the time

3   that we were up on Gerald Beasley's phone, Stephen

4   Smallwood and Gerald Beasley were in contact with each

5   other?

6         And I guess I would say at this point physical

7   contact?

8   A.    I could only estimate at this point but it was

9   numerous contacts, usually several times a week.

10  Q.    All right.  And that was in addition to the

11  number of phone calls that were intercepted between

12  Mr. Smallwood and Mr. Beasley, is that correct?

13  A.    Yes.

14  Q.    And, again, do you have an estimation for the

15  Court about how many times Mr. Smallwood was

16  intercepted on Gerald Beasley's phone?

17  A.    I don't.

18  Q.    All right.  But, again, it was numerous times,

19  it wasn't just one or two phone calls that we've talked

20  about here -- here yesterday in court?

21  A.    It was multiple times.

22  Q.    This time when you went up to have a seat you

23  took a notebook with you.  Would you go ahead and

24  describe to the Court, because I'm going to have you

25  turn to a few pages, would you go ahead and describe

1  for the Court what this document is in front of you?

2  A.    It's a spreadsheet printout that contains

3  information from the reports that were done as part of

4  the surveillance during the wiretaps, as well as notes

5  taken by myself from reviewing the pole cameras at

6  Piatt, and 655 North Estelle, as well as from reviewing

7  the video footage from the DVR inside Tiara's Place

8  restaurant.

9  Q.    So an accurate statement that this is actually

10  kind of your ongoing working product of putting the

11  case together, would that be an accurate --

12  A.    That's correct.

13  Q.    -- attempt?

14        Or have you used this document to try to give

15  you an overall picture or to try to see or establish

16  any kind of patterns throughout this case?

17  A.    Yes.

18  Q.    And I would like you to -- to turn to the first

19  tab that I've actually marked as a yellow tab while you

20  were testifying earlier today.

21        When you were speaking with Ms. Schmidt

22  regarding Terry Beasley, again, she had a couple

23  questions for you regarding the collection of money and

24  the collection of how much money it was.

25        Through your investigation, did you observe

1  patterns between -- well, did you observe patterns with

2  Gerald Beasley as to how things worked with him,

3  especially when he was collecting money?

4  A.    Yes.

5  Q.    And can you explain that, before we start

6  talking specifically about some of the things that

7  you've placed in this spreadsheet.

8  A.    Generally speaking, from the patterns that I

9  observed would be the collection of money, there would

10  be conversations by Gerald Beasley with other

11  individuals, such as Terry Beasley or Stephen

12  Smallwood, or Antoine Beasley, that I believe pertain

13  to amassing money together -- together and then

14  oftentimes there would be a meeting with one of the

15  Ibarras, either Juan or Inocente, usually by Antoine,

16  and then Antoine meeting back up with Gerald Beasley.

17  Q.    All right.  And you were able to put a lot of

18  that together, again, from collecting all the

19  information that you have in front of you and, again,

20  all this information that has been provided to defense

21  and able to establish the pattern of how -- of the

22  activity in this organization, is that correct?

23  A.    That's correct.

24  Q.    Ms. Schmidt spoke with you about what you refer

25  to in there as event 341, which is the events that

1  starts on, I believe it's March 30th.

2          Would you go ahead and talk to --

3          MR. FALK:  Your Honor, if he is going to be

4  using an exhibit --

5          THE COURT:  I can't hear you, Mr. Falk.

6          MR. FALK:  I'm sorry.  Your Honor, if he is

7  going to be using that document to refresh his

8  recollection, I would like it marked as an exhibit

9  so --

10          THE COURT:  We don't need to mark anything as

11  an exhibit that is used to refresh recollection, you

12  can do that with anything and it doesn't even need to

13  be identified, so I am going to overrule the objection.

14  BY MS. JACOBS:

15  Q.   Would you explain to the Court what occurs in

16  event -- and, again, we've identified it or you've

17  identified it as 341, I believe, that starts this

18  event, and I think it continues on for about the next

19  two or three pages.

20          THE COURT:  Now, if he's going to be

21  testifying from this document as opposed to simply an

22  aid to his recollection, that's something else

23  entirely.

24          MS. JACOBS:  Then let me ask that a little bit

25  differently.

1  BY MS. JACOBS:

2   Q.    In event, what we identify as 341 in that

3  document, what encompasses everything in that event?

4        MR. HEPPERLY:  I would make the objection,

5  Your Honor, that he is referring to that document to

6  testify from that document, not only refreshing his

7  memory but he's -- he is, in my opinion, he is going to

8  answer based upon what he learns from that particular

9  document.

10        THE COURT:  Ms. Schmidt?

11        MS. SCHMIDT:  Your Honor, I agree, and the

12  problem I have is that there's apparent -- I mean that

13  is a -- I'm looking at it, looks like it is about a two

14  inch thick document that there are going to be

15  extracts -- I'm anticipating what's going to happen,

16  I'm not trying to read Ms. Jacobs' mind, but there are

17  going to be extracts taken from that and there is

18  absolutely no way for any of us to be able to review

19  that to see the context in which that is being handled

20  and I believe he is going to testify from that

21  document.

22        THE COURT:  Ms. Jacobs.

23        MS. JACOBS:  And, Your Honor, and let me go

24  ahead and explain this better.

25        This is a document that Mr. Fuller has put

394

1 together.  The reason he's -- I've given it to him to

2 refresh his recollection is because --

3          THE COURT:  Wait a minute.  Now, refreshing

4 recollection he has to, first, say he doesn't know that

5 he doesn't remember, or he doesn't know, and he really

6 hasn't done this.

7          You've asked him a question and he's flipping

8 to a place and looking in his notes and there's no

9 indication that that has refreshed his recollection.

10 And of course the process for that is you ask him to

11 look at it, does it refresh your recollection.  If it

12 does, he can testify.  If it doesn't and he's using

13 that as the substance of his testimony, that's an

14 entirely different process.

15          So I think you need to lay an appropriate

16 foundation for the use of the document, and if it's not

17 refreshing his recollection but it's a substitute for

18 it, then we can't use this process here.

19          MS. JACOBS:  And I agree, Your Honor, I need

20 to take a few steps backwards and start -- start a

21 little bit better with this, so let me start over with

22 this.

23          THE COURT:  Thank you.

24          Mr. Pratt, what's on your mind?

25          MR. PRATT:  Your Honor, I would make this

1  objection:  The agent referred to testified from that

2  document yesterday, as I recall.  He has already made

3  some testimony from that document today, so --

4           THE COURT:  There was no objection yesterday,

5  so...

6           MR. PRATT:  And I -- and I understand that,

7  Your Honor, that's not the objection I'm making.

8           I'm just saying that if he is referring to

9  something on the stand to refresh his recollection or

10 testify, then we're entitled to copies of that

11 document.

12          THE COURT:  No, you're not.  You absolutely

13 are not, Mr. Pratt.  And I'll let you brief it if you

14 want to, but if it's a substitute for his recollection,

15 then you absolutely are entitled to it and that's what

16 I'm trying to get to here.

17          So, all right.  Go ahead.

18 BY MS. JACOBS:

19 Q.   All right.  So I'm going to take a few steps

20 backwards.

21          When you were speaking with me --

22          THE COURT:  By the way, why are we going

23 through this process?  I have heard everything, and

24 Government's 1 has been admitted, I've heard all the

25 cross examination, I've got Government's 2, which is,

396

1  of course, the property, so what -- what are we adding

2  to the record here in terms of the James hearing?

3       MS. JACOBS:  Your Honor, I am attempting to

4  firm up the conspiracy on my follow up questions.

5       Quite frankly, my questions deal with Herbert

6  Jones, Mr. Smallwood, Mr. Beasley, and Mr. Smith.  I

7  have about four questions on each one, just to provide

8  information to the Court in response to cross

9  examination that there were more than just the one or

10  two contacts that defense counsel attempted to show the

11  Court that there was limited contact.

12       THE COURT:  He's already established that what

13  we have in this book and that he testified about are

14  just examples and that it's not the whole picture, and

15  I think that's already been established.

16       I am going to let you all brief this, so you

17  can assert your positions here.  I am going to have

18  simultaneous briefs due April the 22nd.  I am going to

19  give everybody a week to file any responses that they

20  think are necessary.

21       So I am not sure that there is any added

22  value, Ms. Jacobs, at this.  And I'm not going to cut

23  you off from making your record but, you know, when

24  people go over with me things that are already in the

25  record, that's more of a jury ploy than anything else

397

1  and when they say, well, that's all there is here,

2  yeah, that's all there is there, but those are examples

3  of what has happened.  And I am not thinking for a

4  moment -- you know, if -- if this was all there was,

5  there would be no need to have a trial --

6          MS. JACOBS:  Sure, and I understand that, Your

7  Honor.  Again --

8          THE COURT:  -- so --

9          MS. JACOBS:  -- if the Court believes it's

10  heard enough, I would love to sit down and conclude

11  today's hearing.

12          THE COURT:  And I'm not going to have any more

13  recross from anybody, either, I mean this is the end of

14  the road right here, Ms. Jacobs, on this hearing.

15          So you do what you will, but I'm just telling

16  you that I haven't heard anything new on -- on redirect

17  yet, other than, well, this isn't all there is, but I

18  knew that already.

19          MS. JACOBS:  All right.  Then I will have a

20  seat, because if the Court's heard everything it needs

21  to hear, I mean, I believe we have covered our

22  conspiracies initially anyways, I just wanted to fill

23  in a few holes that I believe could have been made by

24  defense counsel on cross examination.

25          THE COURT:  Well, thank you very much.  I

398

1  appreciate it.

2           All right.  Sir, you may step down.

3           And, counsel, again, you had asked for time to

4  brief this yesterday.  A week from Friday, get your

5  briefs in.

6           We had realtime here and so I don't know how

7  much difficulty there is going to be for those of you

8  who want a transcript of the hearing to get it but I

9  would imagine, Jana, you can crank that out pretty

10  quickly, can't you?

11           So April the 22nd is simultaneous briefs.  If

12  any of you want to get together on your briefs, that

13  would be fine, too, and April 29th for responses.

14           All right.  Ms. Jacobs, anything else from the

15  Government?

16           MS. JACOBS:  Just a moment, Your Honor.

17           Your Honor, the only concern that Mr. Smith

18  and I were discussing is, again, just like the initial

19  motion deadline, the Government may be in a position

20  that it has ten different motions to respond to or

21  briefings to respond to.  I would -- I would perceive

22  that a lot of them would not be kind of the same or

23  familiar but, quite frankly, I guess the Government at

24  this point would ask for two weeks to -- to submit that

25  response, just because there would be a possibility of

399

```
 1  ten different briefs to respond to.
 2            THE COURT:  Well, let's leave it at one for
 3  the moment and you can see what you get.  And, you
 4  know, in some instances responses may not even be
 5  necessary.
 6            So, I mean, you can argue what things mean but
 7  the testimony is the testimony, and it's a James
 8  hearing.
 9            So, let's leave it at the 29th.  If you need
10  more time, let us know and we'll take a look at it
11  then.
12            Do any of the defendants' counsel wish to call
13  any witnesses?
14            MR. HEPPERLY:  Mr. Mike Hepperly for
15  Mr. Beasley.  We do not intend to call any witnesses,
16  Your Honor.
17            THE COURT:  Thank you.
18            There anyone who intends to call a witness in
19  this hearing?
20            If so, stand up and just let me know.
21            If not, we'll just note that everybody is
22  planning not to call witnesses here.
23            All right.  I don't see anybody standing up.
24            Well, thank you all so much and we'll look
25  forward to getting your briefs.
```

400

1          Let Jana know if you're looking for a

2    transcript.

3          Thank you all so much.

4          (Proceedings conclude at 11:35 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

401

```
 1              C E R T I F I C A T E

 2          I, Jana L. McKinney, United States Court

 3  Reporter in and for the District of Kansas, do hereby

 4  certify:

 5          That the above and foregoing proceedings were

 6  taken by me at said time and place in stenotype;

 7          That thereafter said proceedings were

 8  transcribed under my discretion and supervision by

 9  means of transcription, and that the above and

10  foregoing constitutes a full, true and correct

11  transcript of requested proceedings;

12          That I am a disinterested person to the said

13  action.

14          IN WITNESS WHEREOF, I hereto set my hand on

15  this, the 15th day of April, 2016.

16

17                    s/ Jana L. McKinney
                      Jana L. McKinney, RPR, CRR, RMR
18                    United States Court Reporter111

19

20

21

22

23

24

25
```

Jana L. McKinney, CSR, RPR, CRR, RMR
United States Court Reporter